**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 4681 |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, PIMCO FUNDS, and JOHN DOES 1-100, | ) ) ) ) | Hon. Ronald A. Guzman |
| Defendants. | ) ) ) | |

## DEFENDANT PIMCO'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Plaintiffs are disappointed investors who sold short securities they did not own in the risky financial futures market. They now seek to shift their purported trading losses to defendant Pacific Investment Management Company LLC ("PIMCO"), which manages funds for institutions and individuals that invest in mutual funds and other investment programs. Plaintiffs' claim, reduced to its essence, is that even though the contracts they willingly entered into expressly required them to deliver any one of numerous different issues of Treasury notes, PIMCO had a legal duty to take affirmative steps to make sure that plaintiffs and others who did not own the securities (*i.e.*, "naked" short sellers) could obtain the cheapest of these numerous deliverable issues of securities to make delivery. The effect of the duty which plaintiffs seek to impose on PIMCO would be that those with long positions, *i.e.*, the clients for whom it managed funds, could profit the least on the futures contract, and those with naked short positions, *i.e.*, plaintiffs, could profit the most. There is no such legal duty to the plaintiffs.

A ruling for plaintiffs on a claim such as this would undermine both the discipline of the market, and the ability of PIMCO to fulfill its fiduciary duties to its clients.  In the market, each participant is entitled and expected to act to advance its own economic interests.  In the case of PIMCO, which manages funds for others, the economic interests are those of its clients such as private and governmental pension plans, other employee benefit plans and individual investors seeking returns on their savings.  PIMCO has fiduciary duties to those clients to seek investment gains for them.  However, the "duties to the market" which plaintiffs seek to impose on PIMCO would require it to place its clients' interests in a secondary position and give priority to taking care of naked short sellers such as plaintiffs, by taking affirmative steps to make sure the short sellers have the cheapest to deliver security.

This Court should not permit plaintiffs to go forward with this action.  Based on the allegations of the First Amended Consolidated Class Action Complaint ("Complaint"), it is clear that at all times, the price which plaintiffs claim was "manipulated" reflected the prices of Treasury notes that were deliverable under the express terms of the futures contracts that plaintiffs willingly entered into.  Therefore the price of the futures contract at all times reflected the prices of underlying securities which the longs had agreed to buy and the shorts had agreed to sell.  It is also clear that the only way plaintiffs can succeed is to obtain a legal ruling that PIMCO must place its fiduciary duties to its clients in a secondary position and give priority to the alleged "duties to the market" which plaintiffs seek to impose on PIMCO – but which in reality are alleged duties to the plaintiffs and other naked short sellers.

The allegations by themselves show that the Complaint has no merit.  As shown below, the law requires dismissal for failure to state a claim.

**Background**

Plaintiffs' Complaint alleges that Defendants PIMCO and PIMCO Funds manipulated the prices of the June 2005 Treasury note futures contract and the underlying Treasury note in violation of Section 9(a) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 13(a). The claimed manipulation is that the price of the futures contract, which permitted delivery of many different issues of notes, was artificially high because it reflected the possibility that a holder of that contract could receive delivery of an issue of notes that was more expensive than the "cheapest" issue deliverable on the contract.

**The Futures Market**

A "future," or futures contract, is an agreement in which the parties agree to the price, quantity, and date of delivery of a particular commodity in advance of the actual delivery. *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1032 (N.D. Ill. 1995). Thus, for example, in the futures contracts at issue here, plaintiffs and defendants allegedly[1] entered into contracts to purchase or sell Treasury notes (which are the underlying commodity) at a particular price for delivery at the end of June 2005. Complaint ¶¶ 3 & 103. The terms of futures contracts (other than price) are standardized according to terms specified by the commodity exchange that creates the contract. *In re Soybean Futures*, 892 F. Supp. at 1032; Complaint ¶ 28. This standardization makes such contracts "fungible," according to plaintiffs, Complaint ¶ 28, and allows them to be bought and sold over the exchange.

The party contracting to buy the underlying commodity pursuant to a futures contract is called the "long," and is said to have a "long position," and the person contracting to sell the

---

[1] The allegations in the Complaint are assumed to be true solely for purposes of this motion. PIMCO denies any wrongdoing, and further denies that it is liable to plaintiffs and the putative class.

underlying commodity is called the "short," and is said to have a "short" position. *In re Soybean Futures*, 892 F. Supp. at 1032. PIMCO in this case is alleged to have bought, *i.e.*, established "long" positions in, a 10-year Treasury Note futures contract set to expire at the end of June 2005. Complaint ¶ 3. In other words, PIMCO had the right under its futures contracts to take delivery of Treasury notes at the end of June 2005, assuming that it did not liquidate its long positions in advance.[2] *E.g., In re Soybean Futures*, 892 F. Supp. at 1032. Plaintiffs, in turn, are alleged to have sold short positions in the same futures contract, Complaint ¶¶ 18-20, which means that, unless they liquidated their positions, they were obliged to make delivery of Treasury notes to persons with long positions. Complaint ¶ 27[3]; *e.g., In re Soybean Futures*, 892 F. Supp. at 1032. Plaintiffs allege that less than one percent of futures contracts are settled by delivery, and the majority are settled by liquidation in advance of delivery. Complaint ¶ 30.

One term of Treasury note futures contracts that is specified by the Exchange is the type of note that may be delivered by a short, and that must be accepted by a long, in satisfaction of any obligation to make or take delivery. *Id.* ¶ 33. With respect to the Treasury note futures at issue in this case, plaintiffs admit that there were several notes that Exchange rules and the parties' contracts allowed to be delivered in satisfaction of a short's delivery obligation. *Id.* Ten Year Treasury notes are issued periodically by the U.S. Treasury at interest rates prevailing at the time of issuance. Under the terms of the futures contract, any Ten Year Treasury note with a period of 6 ½ to 10 years remaining to maturity can be delivered to satisfy the delivery obligation

---

[2] A party to a futures contract can liquidate its position by entering into an equal and opposite transaction – *i.e.*, an "offset" – in the futures market prior to the expiration of trading on the contract. *In re Soybeans Futures*, 892 F.2d at 1032.

[3] In Paragraph 27 of the Complaint, plaintiffs allege that "[t]he futures contract is a *firm commitment* to make or accept delivery of a specified quantity and quality of a commodity during a specific month in the future at a price agreed upon at the time the commitment is made." (emphasis added).

on the contract. *Id.* ¶ 33. As is typical, one of these notes was the "most economical" for shorts to deliver. *Id.* ¶ 34. This note is typically referred to as the "cheapest to deliver" note, or the "CTD." *Id.*

### The Alleged Manipulation

Plaintiffs allege that between 2000 and 2004, the volume of Ten Year Treasury note futures contracts traded on the Exchange steadily increased. Complaint ¶ 1. At the same time, they allege, the Treasury notes available for delivery by shorts on such contracts remained constant or declined. *Id.* According to plaintiffs, this left the Ten Year Treasury note futures contracts "more susceptible to manipulation by a person who controlled large long positions, refused to liquidate such long positions, and otherwise exacerbated an imbalance between the volume of futures contracts and the readily available supply of notes to [*sic*] delivery thereunder." *Id.*

Plaintiffs also allege that PIMCO purchased, by March 31, 2005, "an extraordinarily large long position" – constituting in excess of $16 billion worth – of the June 2005 futures contracts. *Id.* ¶ 3. And, according to plaintiffs, sometime between April 1 and the end of June 2005 PIMCO also purchased $13.3 billion worth of the U.S. Treasury note that was the "cheapest to deliver" on the June contract, which they deem "highly unusual." *Id.* ¶ 5. Significantly, plaintiffs do not allege that when PIMCO acquired these positions in futures contracts and Treasury notes it intended to create an artificial price.

As a basis for their claim, Plaintiffs rely on PIMCO's allegedly large position in the Treasury note that will mature in February 2012, which they claim was the "cheapest to deliver" note for the June futures contract. As noted above, however, they admit that the June futures

contract allowed delivery of not just the "cheapest" notes, but also a variety of other notes as well. *Id.* ¶ 33. In fact, PIMCO's alleged $13.3 billion share of the "cheapest" notes amounted to a mere *3.16% of the more than $421 billion* in notes deliverable under plaintiffs' contracts.[4] Plaintiffs do not allege that PIMCO had a large position in any of the other issues of deliverable notes.

Plaintiffs also allege that as the "open interest"[5] in the June contract declined in May and June 2005, PIMCO purportedly "engaged in the highly unusual conduct of not commensurately (or at all) liquidating its extraordinary June contract long positions," *id.* ¶ 4, and instead "took unusually large deliveries" of notes on the June contract. *Id.* ¶ 76. It also purportedly "engaged in the highly unusual conduct of largely failing to make the [cheapest to deliver] note available to other market participants . . . ." *Id.* ¶ 77. Indeed, plaintiffs' theory that PIMCO manipulated the market is premised on their assertion that PIMCO intentionally neglected a purported "duty" to liquidate its positions. *See, e.g.*, Complaint ¶ 41 ( "one of many forms of manipulation is to acquire a large long position and fail to liquidate or trade out of the position as the open interest declines"). For example, plaintiffs allege that:

> As a holder of an extraordinarily large long position in the June contract as well as significant portions of a deliverable supply, PIMCO had important responsibilities and duties to the market *including duties to make its holdings of cheapest to deliver notes available to and to liquidate its futures contracts. PIMCO*

---

[4] *See* data available at http://wwws.publicdebt.treas.gov/AI/OFAuctions regarding Treasury notes with maturity dates between February 2012 and June 2015. The court may take judicial notice of such matters in the public record without converting this motion to dismiss into a motion for summary judgment. *See General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997).

[5] The "open interest" in a futures contract is the number of futures contracts still outstanding. The open interest may decline as the time for delivery approaches because, as plaintiffs allege, certain parties choose to liquidate their positions rather than making or taking delivery of the underlying commodity. Complaint ¶ 30.

> *intentionally failed to observe these duties and responsibilities.* On
> the contrary, PIMCO intentionally exacerbated the conditions to
> inflate prices.

Complaint ¶ 11 (emphasis added).

## Argument

The Complaint should be dismissed, because it is premised on fatally-flawed legal theories.

First, plaintiffs' assertion that futures prices were "manipulated" because they reflected a basket of Treasury notes, rather than only the "cheapest to deliver" note, is contrary to the express terms of the contracts, as established by rules of the Chicago Board of Trade ("Exchange"), which plaintiffs admit expressly allowed delivery of any number of Treasury notes other than the cheapest to deliver note. Moreover, this Court should follow established precedent in finding that an interest in only the "cheapest" commodity deliverable under a futures contract, which also permits delivery of more expensive grades, does not give a defendant the ability to "manipulate" prices.

Second, the purported basis for plaintiffs' claim – *i.e.*, the allegation that a defendant may "manipulate" prices merely by "failing to liquidate" its futures and note positions, even if it did not acquire those positions with the specific intent to manipulate prices – is contrary to precedent under the CEA. That authority demonstrates that to be liable a defendant must have specifically intended to create artificial prices when it entered into its positions. Plaintiffs' "failure to liquidate" theory therefore fails as a matter of law.

In addition to alleging claims against PIMCO and PIMCO Funds, plaintiffs purport to allege claims against "John Does 1-100," who they contend are "market participants" to whom

PIMCO spoke, and PIMCO "associates." The claims against these unidentified "John Doe defendants" should also be dismissed, because plaintiffs have not stated a claim against such defendants.

In ruling on a motion to dismiss, the Court should assume the truth of the facts alleged in the Complaint and construe the allegations in the light most favorable to plaintiffs. *See, e.g.*, *McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir. 1992). The Court, however, is not bound by plaintiffs' legal characterization of the facts or required to ignore facts set forth in the complaint that undermine plaintiffs' claims. *Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992). A motion to dismiss should be granted where it is clear that plaintiffs cannot prove any set of facts consistent with the Complaint that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The CEA prohibits, but does not define, price manipulation. *See* 7 U.S.C. § 13(a). Courts have generally characterized manipulation as the "intentional exaction of a price determined by forces other than supply and demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991). In order to prove manipulation, plaintiffs must demonstrate four elements: (1) PIMCO possessed the ability to influence market prices; (2) an artificial price existed at the time of the alleged offense; (3) PIMCO caused the artificial price; and (4) PIMCO specifically intended to cause the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995). Far from supporting such a claim, however, the allegations in the Complaint are affirmatively contrary to any suggestion that PIMCO engaged in any sort of manipulation.

I.     **Prices Were Not "Artificial," and PIMCO Did Not Have the "Ability" To Manipulate Prices, Based on Its Holdings of Cheapest to Deliver Notes.**

As noted above, plaintiffs' claim is premised on the assumption that PIMCO had the ability to cause artificial prices, and that prices were in fact artificial, due to its allegedly large position in the "cheapest to deliver" notes. This claim fails as a matter of law, because plaintiffs concede that the terms of the 10 year Treasury note futures contracts allowed delivery of not just the "cheapest to deliver" notes, but also any one of a number of issues of Treasury notes. As a matter of law, prices cannot be characterized as "artificial" if they are based on a mix of notes that are expressly allowed to be delivered under plaintiffs' futures contracts.

Indeed, the Commodity Futures Trading Commission ("CFTC"), which is the federal agency that administers the CEA, has categorically rejected a manipulation claim – and any inference that a defendant had the ability to manipulate prices – where the plaintiff alleged that the deliverable supply of the underlying commodity was "'really' narrower than the terms of the contract permit." *In the Matter of Cox*, 1987 CFTC Lexis 325, at *20-21 (CFTC July 15, 1987) (citations omitted). In *Cox*, there were several grades of wheat deliverable under the futures contract, some of which were more expensive than others. The CFTC Enforcement Division alleged that the respondents had manipulated the market by acquiring large positions in futures and the grade of commodity that was most economical to deliver under those futures, so that traders with short positions could have difficulty acquiring the cheapest grade to fulfill their obligations. The CFTC rejected this theory of liability as a matter of law, and explained that "[i]t is our firm belief that the terms of the underlying futures contract should not be lightly ignored when calculating deliverable supply," and "if the terms of the contract permit delivery of premium grades of the commodity, then premium grades must be counted as part of the relevant

supply, if otherwise available." *Id.* at *20. The same reasoning requires rejection of plaintiffs' attempt to disregard the terms of their futures contracts here.

*In the Matter of Fenchurch*, 1996 CFTC Lexis 128 (July 10, 1996), is not to the contrary. In *Fenchurch*, the CFTC entered into a consent order with a defendant that considered only the cheapest to deliver Treasury securities as the deliverable supply, rather than all notes deliverable pursuant to the terms of the futures contracts at issue. That consent order, however, expressly noted that its facts "differ[ed] from prior decisions discussing manipulation," in part because, unlike here, the alleged manipulative conduct "did not commence until several days *after* trading had expired" on the futures contract. *Id.* at 15-16 (emphasis added). Thus, the market had already finally priced the futures contract based on the availability of cheapest to deliver security, and the defendant had then intentionally bought large quantities of the cheapest to deliver securities to prevent those with short positions from obtaining them. In contrast, in this case, as in *Cox,* the futures contract was still trading at the time of the conduct at issue, so that the price of the futures could reflect the availability of the various grades of the underlying commodity defined by the futures contracts. Moreover, the order in *Fenchurch* was merely a consent order that was not litigated. As such, it bears no precedential value.

As in *Cox*, plaintiffs should not be allowed to ignore their obligations under the futures contracts in question, which, as they admit, allowed delivery of a number of Treasury notes other than the cheapest to deliver note. Accordingly, plaintiffs' argument that the deliverable supply of notes was "really" narrower than that allowed by contract is flawed as a matter of law. If the futures prices reflected notes that the terms of the contracts, as established by exchange rules, allowed to be delivered, they cannot be considered "artificial" for purposes of a manipulation claim. Moreover, PIMCO could not possibly have had the ability to manipulate prices by

allegedly holding only 3.16% of the more than $421 billion in notes deliverable under plaintiffs' contracts.[6]

Permitting a claim such as this to proceed would do harm to the market. The law cannot and does not permit a short seller who willingly assumes an express obligation to deliver any one of a series of issues of notes to complain because the futures contract price reflects the possibility that there could be delivery of an issue that is not the cheapest to deliver. Each party to a futures contract enters into the contract with the hope of profiting at the expense of the other, as that is the only way that profits are made in this market. This market is a zero-sum game where either the long profits at the expense of the short, or the short profits at the expense of the long. There is no other possibility. The contract specifically calls for delivery of any one of numerous issues of the notes, so that any short seller is on notice that delivery of a note that is not the cheapest to deliver may be required. A short seller who does not wish to undertake this risk can either buy the underlying security before selling it on the futures market, or stay out of the market. What the short cannot be permitted to do is what plaintiffs seek to do here – *i.e.*, complain when the contract price reflects the terms of the contract.

## II. Plaintiffs' Theory That PIMCO Had "Duties to the Market" to Liquidate Its Positions is Legally Insufficient, and Cannot Give Rise to a Cause of Action for Manipulation.

Plaintiffs' Complaint fails for an additional, independent reason: It is based on the faulty theory that PIMCO can be held liable for "failure to liquidate" its positions, even where it did not initially acquire its positions with manipulative intent. This claim is contrary to authority

---

[6] *See* note 4, *supra*. Because the market for Treasury securities is so large, commentators have suggested that manipulation of futures in such commodities "is likely to be impossible." Daniel Fischel and David Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harvard L. Rev. 503, 547 (1991).

interpreting the CEA, which has held that there must be evidence that the defendant *both* exercised its ability to cause artificial prices and *"intentionally* acquired the ability to conduct*"* the purported manipulation. *In the Matter of Indiana Farm Bureau Coop.*, 1982 WL 30249, at *8 n. 13 (CFTC Dec. 17, 1982) (emphasis added). The Fifth Circuit in *Volkart Bros. Inc. v. Freeman*, 311 F.2d 52, 59 (5th Cir. 1962), similarly explained that a defendant cannot be held liable for manipulations such as "squeezes" or "corners"[7] that it did not bring about intentionally:

> There may be a squeeze not planned or intentionally brought about by the petitioners. Such a squeeze should not result in their being punished. . . . Even in the case of an unplanned corner, the longs would not be guilty of manipulation. . . . "The intent of the parties *during their trading* is a determinative element of a punishable corner. Unintentional corners can develop and should not carry the pain of forfeiture of trading privileges." In brief, before the order punishing the petitioners can be sustained, it must appear not only that they profited from a squeeze, but that they *intentionally brought about the squeeze by planned action.*

*Volkart Brothers, Inc. v. Freeman*, 311 F.2d 52, 58-59 (5th Cir. 1962) (emphasis added) (citations omitted) (quoting *Great Western Food Distribs. v. Brannan*, 201 F.2d 476, 479 (7th Cir. 1953)).[8]

---

[7] Although the Complaint is far from clear on this point, and it has not defined the term "squeeze," it apparently bases its manipulation claims on the theory that PIMCO manipulated the market by taking advantage of a "squeeze." *See, e.g.*, Complaint ¶¶ 10 & 11.

[8] *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th 1971), is not to the contrary. As the CFTC explained in *Indiana Farm Bureau Cooperative*, 1982 WL 30249, at *8 n.13 (CFTC Dec. 17, 1982),

> While *Volkart* and *Cargill* disagree with respect to the obligation of shorts to exercise due diligence in making reasonable delivery preparations, they do agree that there must be evidence from which to conclude that the accused both intentionally acquired the ability to conduct a squeeze and thereafter exercised that ability to cause "artificial" prices.

*Id.* at *8 n.13 (citations omitted).

In direct contravention of these principles, the Complaint makes clear that its manipulation claim is based not on an allegation that PIMCO *acquired* its positions with improper intent, but rather on the assertion that PIMCO allegedly intentionally breached a supposed "duty" by later *failing to liquidate* its positions and standing for delivery:

> As a holder of an extraordinarily large long position in the June contract as well as significant portions of a deliverable supply, PIMCO had important responsibilities and duties to the market *including duties to make its holdings of cheapest to deliver notes available and to liquidate its futures contracts.  PIMCO intentionally failed to observe these duties and responsibilities.*

Complaint ¶ 11 (emphasis added).[9]  Similar allegations regarding PIMCO's alleged "duty" to liquidate are spread throughout the Complaint, and are the basis for plaintiffs' manipulation claim.[10]  In contrast, plaintiffs do not allege that PIMCO acquired its initial position with the specific intent to create artificial prices.  The foundation of plaintiffs' Complaint, therefore, does not state a claim cognizable under the CEA, and it therefore should be dismissed.

---

[9] Although plaintiffs also make the conclusory allegation that PIMCO intentionally "exacerbated" market conditions to inflate prices, Complaint ¶ 11, such allegations fail to put PIMCO on notice of what it allegedly did to "exacerbate" the situation, and are therefore inadequate, even under Rule 8 of the Federal Rules of Civil Procedure.  *See Sterling v. Kazmierczak,* 983 F. Supp. 1186, 1189 (N.D. Ill. 1997) (dismissing complaint where plaintiff asserted "bare legal conclusions" and insufficient facts to support claim).

[10] *See* Complaint ¶ 4 ("PIMCO engaged in the highly unusual conduct of not commensurately (or at all) liquidating its extraordinary June contract long positions"); *id.* ¶ 41 ("In financial futures contracts (such as Treasury Note futures contracts) one of many forms of manipulation is to acquire a large long position and fail to liquidate or trade out of the position as the open interest declines"); *id.* ¶ 60 ("During May and early June 2005, the open interest in the June contract plummeted rapidly but PIMCO held and did not liquidate its June contract position at the same rate (or at all)"); *id.* ¶ 75 ("As [of] June 1, 2005, notwithstanding the high prices of the June contract relative to other contracts, PIMCO had failed to liquidate and still held an enormous June contract long position") *id.* ¶ 76 ("During June 2005, PIMCO took unusually large deliveries on its June contract rather than liquidating most of its June contracts"); *id.* ¶ 77 ("during June 2005, PIMCO engaged in the highly unusual conduct of largely failing to make the CTD note available to other market participants notwithstanding the premium prices and attractive revenues PIMCO could have gained form such sales or loans").

This theory of liability, if permitted to proceed, would be a direct attack on the fiduciary duties which money managers such as PIMCO owe to their clients. Fiduciaries such as PIMCO cannot be placed in the untenable position of being required to look out for the welfare of short sellers such as plaintiffs who are attempting to profit at the expense of PIMCO's clients. The "duties to the market" which plaintiffs allege exist are in reality purported duties of persons with long positions to naked short sellers such as plaintiffs. The integrity of the market and the integrity of PIMCO's fiduciary duties to its clients cannot be preserved if the Court were to impose on PIMCO the alleged duties that plaintiffs seek to impose, because performing duties to plaintiffs would compromise PIMCO's duties to its own clients.

## III.    All Claims Against "John Doe Defendants" Should Be Dismissed.

All claims against unidentified "John Doe defendants" should also be dismissed, because the Complaint does not state causes of action against such defendants. This Court should join the court in *Doe v. County of Kankakee*, 2004 WL 1557970 (N.D. Ill. July 8, 2004), and "proscribe" plaintiffs from attempting to state a claim against unnamed defendants by relying on vague, undefined allegations. *Id.* at *3. Although the naming of John Doe defendants may be acceptable where a complaint alleges "specific actions by specific individuals" whose names the plaintiff simply does not know, a complaint should be dismissed where, as here, it makes "no specific allegations concerning the actions" of the unnamed defendants, because such allegations do not put anyone on notice regarding the nature of such claims. *Id.*

Similar to the plaintiffs in *Doe*, plaintiffs here vaguely identify the John Doe Defendants as "market participants" that PIMCO "spoke to," and as PIMCO "associate[s]" "through" whom it "acted." Complaint ¶ 24. It also alleges in conclusory fashion that the Doe defendants "knew" of and "willfully intended to assist" the purported manipulation, although it does not identify

what they did to provide such assistance. *Id.* ¶ 106. These allegations do not state a claim against the unknown parties, or put any of the defendants on notice regarding the nature of such claims. And they certainly do not allege "specific . . . actions" by specific (albeit unnamed) individuals, as required under *Doe*, 2004 WL 1557970, at *3.

Plaintiffs apparently wish to use this case to conduct a roving investigation of the Treasury Note futures and cash markets in an attempt to develop causes of action against parties other than PIMCO and PIMCO Funds. Allowing plaintiffs to include the John Doe defendants in the case will give them a basis for claiming that the scope of discovery should be enlarged beyond that which would apply if only the PIMCO parties were defendants. PIMCO could thus be forced to bear the burden of participating in costly and ill-defined discovery that does not pertain to the claims against it. Because plaintiffs' allegations do not meet the standards required for naming John Doe defendants, all claims against these defendants should be dismissed.

## Conclusion

For the reasons stated above, Defendant Pacific Investment Management Company LLC respectfully requests that the Court dismiss the Corrected Consolidated Amended Class Action Complaint with prejudice.

Dated: June 30, 2006                   Respectfully submitted,

By:    /s/ Jennifer Tan
William J. Nissen
Eric H. Grush
Jennifer Tan
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
**Counsel for Defendant Pacific
Investment Management Company
LLC**

## CERTIFICATE OF SERVICE

I, Jennifer Tan, an attorney, hereby certify that I have served copies of the forgoing Defendant PIMCO's Memorandum In Support of Motion to Dismiss upon the following individuals by Electronic Means on the 30th day of June, 2006.

Marvin Alan Miller
MILLER FAUCHER and CAFFERTY, LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602

Christopher Lovell
LOVELL, STEWART HALEBIAN, LLC
500 Fifth Avenue
New York, NY 10110

Louis F. Burke
LOUIS F. BURKE, P.C.
460 Park Avenue
21st Floor
New York, NY 10022

Vincent Briganti
LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
One North Lexington Avenue
11th Floor
White Plains, NY 10601

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218

Blake T. Hannafan
MICHAEL T. HANNAFAN & ASSOCIATES, LTD.
One East Wacker Drive, Suite 1208
Chicago, IL 60601

/s/ Jennifer Tan
Jennifer Tan