**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, and PIMCO FUNDS, | ) ) ) |
| Defendants. | ) ) ) |

No. 05 C 4681
Judge Ronald A. Guzman

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO PIMCO'S MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. iv

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Through An Unprecedented Long Position And A Refusal To Liquidate Same, Defendants Possessed The Ability To Cause And Did Cause Artificial Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Separately, Through Their CTD Note Positions Alone, Defendants Had The Ability To Cause Artificial Prices . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    Making False Statements In Connection With The Conduct Described In A Or B Above, Increased Defendants' Ability To Cause Artificial Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

POINT I.      GOVERNING STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

POINT II.    DEFENDANTS HAD THE ABILITY TO MANIPULATE PRICES . . . 8

    A.    The Treasury Market Has Repeatedly Been Manipulated By Positions That Were Far Smaller Than Defendants' . . . . . . . . . . . . . . . . .8

    B.    Defendants' Argument That They Lacked The Ability To Cause Artificial Prices Must Be Rejected At This Stage Because It Improperly Contradicts The Express Allegations Of The Complaint . . . . . . . . . . . . 9

    C.    Defendants' Arguments Are Contrary To Congress' Overarching Purpose In The CEA To Prevent Manipulation And To The Judicial Principles That Have Developed To Implement That Purpose . . . . . . . . 10

        1.    Congress' Overarching Purpose In The CEA Is To Prevent And Redress Manipulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Consistent With This Overarching Congressional Purpose, Congress And The CFTC Have Refrained From Defining Manipulation In Any Exclusive Fashion . . . . . . . . . . . . . . . . . . . 13

3.      Pursuant To This Flexible Approach, The Judicial Test For
        Manipulation Must Be A "Practical One" And The Seventh
        Circuit Says That The "Know It When You See It" Test May
        Be "The Most Useful" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

D.      Commodity Exchanges Are Not A Substitute Physical Market, And
        The Case Law Recognizes That Legally Permitted Deliveries Are
        Different From Commercially Practicable Deliveries . . . . . . . . . . . . . . 14

E.      Courts Have Repeatedly Rejected Prior Manipulators' Arguments That
        They Lacked The Ability To Manipulate Because The Terms Of The
        Contract Permitted A Wide Variety Of Items To Be Delivered . . . . . . . .15

        1.      Fenchurch Rejects This Argument . . . . . . . . . . . . . . . . . . . . . . 15

        2.      Great Western Rejects Defendants' "Infinite Legally Permissible
                Supply" Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.      Cargill Rejects Defendants' "Infinite Legally Permissible
                Supply" Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        4.      Soybeans Rejects Defendants' "Infinite Legally Permissible
                Supply" Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        5.      Under Frey, Deliverable Supply Is A "Fact-Intensive" Issue, And
                The Non-Binding Cox Decision Was Decided Only After A Full
                Trial About What Was Commercially Practicable . . . . . . . . . . . .19

F.      Between 2000 And September 2004, The Contracts Became Susceptible
        To Manipulation By An Extraordinarily Large Long Position That
        Did Not Liquidate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

G.      Separately, Defendants Also Had The Ability To Cause
        Artificial Prices Through Their Squeeze And/Or Through Their
        False Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

POINT III.      PLAINTIFFS HAVE ADEQUATELY ALLEGED DEFENDANTS'
                MANIPULATIVE INTENT AND A DUTY NOT TO EXACERBATE.21

A.      From The Time Defendants Acquired Their Positions, They Allegedly
        Intended To Manipulate Prices And Knowingly Exploit The Contracts'
        Susceptibility To Manipulation By An Extraordinarily Large Long
        Position That Was Not Liquidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.    There Is No License To Manipulate Simply Because The Intent To
Manipulate Arises After Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

POINT IV.    IT IS PREMATURE TO RESOLVE PIMCO FUNDS'
MANIPULATIVE INTENT AT THIS STAGE  . . . . . . . . . . . . . . . . . . .23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .... 25

## TABLE OF AUTHORITIES

**PAGE**

### FEDERAL CASES

In re Abrams, [Current Transfer Binder], Comm. Fut. L. Rep. (CCH) p. 26
(C.F.T.C. July 31, 1995) ...........................................................................21

Apex Oil Co. v. DiMauro, 713 F. Supp. 587 (S.D.N.Y. 1989) ........................................20

Bivens v. Six Unknown Named  Agents of Federal Bur. Of Narcotics,
403 U.S.388 (1971)................................................................................22

Board of Trade v. Milligan, 90 F.2d 855 (8th Cir.), cert. denied,
302 U.S. 710 (1937)................................................................................11

Board of Trade of City of Chicago  v. Olsen, 262 U.S. 1 (N.D. Ill. 1923).......................11

Bontkowski v. Smith, 305 F.3d 757 (7th Cir. 2002)............................................................8

Cange v. Stotler and Co., Inc.,
826 F.2d 581 (7th Cir. 1987) ..................................................................24

Cargill, Inc. v. Hardin, 452 F.2d 1154 (8th Cir. 1971), cert. denied sub nom.,
Cargill, Inc. v. Butz, 406 U.S. 932 (1972).......................................................3, 13, 21

Doe v. Kankakee, 2004 WL 1557970 (N.D. Ill. July 8, 2004) ........................................22

Frey v. Commodity Futures Trading Commission, 931 F.2d 1171 (7th Cir. 1991) .. passim

General Foods Corp. v. Brannan, 170 F.2d 220 (7th Cir. 1948) .......................................13

Great Western Food Distributors, Inc. v. Brannan,
201 F.2d 476 (7th Cir.), cert. denied, 345 U.S. 997 (1953)....................3, 16, 17, 24

Hastings v. Fidelity Mortgage Decisions Corp., 984 F. Supp. 600 (N.D. Ill. 1997) ...22, 23

In re Henner, 30 Agric. Dec. 1151 (1971) .......................................................................21

Hishon v. King & Spalding, 467 U.S. 69 (1984)..................................................................8

Leist v. Simplot, 638 F.2d 283 (2d Cir. 1980), aff'd sub nom., Merill Lynch
Pierce Fenner & Smith v. Curran, 456 U.S. 353 (1982).........................................11

Minpeco v. ContiCommodity Serv., 673 F. Supp. 684 (S.D.N.Y. 1987)..........................19

In re Natural Gas Commodities Litig., 337 F. Supp. 2d 498 (S.D.N.Y. 2004)............14, 20

Premium Plus Partners, L.P. v. Davis, 2005 WL. 711591
    (N.D. Ill. Mar. 28, 2005)............................................................14

Rosenthal & Co. v. Commodity Futures Trading Commission,
    802 F.2d 963 (7th Cir. 1986) ..................................................24

In re Salomon, Inc. Sec. Litig., 1994 WL 265917 (S.D.N.Y. June 16, 1994) ....................1

Shah v. Intercontinental Hotel Operating Group, 314 F.3d 278 (7th Cir. 2002) ................8

In re Soybean Fut. Litig., 892 F. Supp. 1025 (N.D. Ill. 1995)................................... passim

In re Steinhardt Partners, L.P., 9 F.3d 230 (2d Cir. 1993)....................................................1

Strobl v. New York Mercantile Exchange, 582 F. Supp. 770 (S.D.N.Y. 1984),
    aff'd, 768 F.2d 22 (2d Cir. 1985), cert. denied sub nom., Simplot v. Strobl,
    474 U.S. 1006 (1985)...............................................................13

In re Sumitomo Copper Litig., 182 F.R.D. 85 (S.D.N.Y. 1998).......................................14

Thomas v. Butzen, 2005 WL. 2387676 (N.D. Ill. Sept. 26, 2005).....................................8

United States v. Philadelphia National Bank, 374 U.S. 321 (1963) .................................18

Utesch v. Dittmer, 947 F.2d 321 (8th Cir. 1991), cert. denied,
    604 U.S. 1006 (1992)...............................................................13

Vicom v. Harbridge Merchant Services, Inc., 20 F.3d 771 (7th Cir. 1994) .....................23

Volkart Brothers, Inc. v. Freeman, 311 F.2d 52 (5th Cir. 1962) ......................................21

Wilk v. American Medical Assoc., 895 F.2d 352 (7th Cir.), cert. denied,
    496 U.S. 927 (1990)................................................................18

**CFTC CASES**

In the Matter of Cox., 1987 WL 106879 (CFTC July 15, 1987) ..................................18, 19

In re Fenchurch Capital Management, Ltd., 1996 WL 382313
    (CFTC July 10, 1996) ...........................................................1, 16

In re Indiana Farm Bureau Cooperative Assoc., 1982 WL 30249
    (C.F.T.C. Dec. 17, 1982) ..........................................................22

## FEDERAL STATUTES AND RULES

7 U.S.C. § 1, et seq.................................................................21

7 U.S.C. § 1a(4) ...................................................................11

7 U.S.C. § 4 .........................................................................25

7 U.S.C. § 7(b)(2) .................................................................12

7 U.S.C. § 7a(a)(10) ..............................................................12

7 U.S.C. § 12a(9) ..................................................................12

7 U.S.C. § 13(a)(2)................................................................11

7 U.S.C. § 25 .......................................................................12

Fed. R. Civ. Proc. 8(a) ..........................................................23

June 15, 1936, c. 545, § 1, 49 Stat. 1491 ..............................10

Publ. L. 93-463, § 1, Oct. 23, 1974, 88 Stat. 1389 .................10

Sept. 21, 1922, c. 369, § 1, 42 Stat. 998 ...............................10

## MISCELLANEOUS

Markham, Manipulation of Commodity Futures Prices -- The Unprosecutable
        Crime, 8 Yale J. on Reg. 281 at 461, note 526 (1991)...........................13

Russo, Regulation of Commodities Futures and Options Markets,
        § 12.11 at 12-18 (1983)......................................................14

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1215
        (2d ed. 1990) ................................................................23

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

Plaintiffs respectfully submit this memorandum in opposition to the Fed. R. Civ. Pro. Rule 12(b)(6) dismissal motions by Pacific Investment Management Company LLC ("PIMCO") and PIMCO Funds (collectively "Defendants").

Defendants' first argument for dismissal is (1) that the size of the Treasury securities market is so great that it supposedly cannot be manipulated (PIMCO Mem. pp 8-11. and fn 6), and (2) the deliverable supply of U.S. Ten Year Treasury Notes was so great that Defendants did not possess the ability to manipulate the prices of U.S. Ten Year Treasury Note Futures Contracts ("Contracts") traded on the Chicago Board of Trade ("CBOT"). Id.

However, the Treasury market has repeatedly been manipulated by positions that were far smaller than Defendants'. See Argument ("Arg.") Pt. IIA infra; In re Salomon, Inc. Sec. Litig., 1994 WL 265917 (S.D.N.Y. June 16, 1994); In re Steinhardt Partners, L.P., 9 F.3d 230 (2d Cir. 1993) (manipulation of Treasuries); In re Fenchurch Capital Management, Ltd., 1996 WL 382313 at *6 (CFTC July 10, 1996) ("Fenchurch").

Defendants' assertion that they lacked the ability to cause artificial prices contradicts both the express allegations of the Complaint and controlling legal authority. Plaintiffs expressly allege that Defendants possessed such ability and make particularized allegations of the size of Defendants' positions and the specific indicia of artificiality that such positions and Defendants' conduct caused. See Arg. Pt. IIB infra; First Amended Consolidated Class Action Complaint ("Compl.") ¶¶ 8, 13, 61-73, and 102.

Further, in twenty-plus pages of briefing, Defendants fail to mention Plaintiffs' pleading of the CBOT's anti-manipulation rule that was promulgated in response to Defendants' conduct. Compl. ¶¶ 81-82. The CBOT created a new limit of 50,000 contracts during the last month **of**

1

**trading**.  Id.  The purpose of this limitation on positions **was to prevent manipulation** by a single trader.  But 50,000 Contracts was less than one-third as large as Defendants' **alleged** long position in June Contracts.  Id  (discovery shows that Pimco actually held more than twice the **alleged** amount, see fn.5).   If, according to the CBOT and CFTC[1], a long position that is less than one-third as large as Defendants', had the ability to manipulate prices **during trading,** then Plaintiffs have adequately alleged that Defendants' long position had the ability to cause artificial prices **during trading**.  See Arg. Pt. IB infra.  And Pimco's argument that only manipulative conduct occurring after trading ended is punishable (see Pt. IE1 infra Fenchurch discussion infra), makes no sense.

 Accordingly, this branch of Defendants' motion must be denied because its assertions flatly contradict the Complaint.  See Arg. Pts. I and IIB infra.

Separately, Defendants' "no ability to manipulate" argument also contradicts the practical, case-by-case analysis of commercial reality that courts have employed in order to accomplish the overarching purpose of the Commodity Exchange Act, i.e., to prevent and redress manipulation.  Arg. Pt. IIC infra.

Thus, the convicted manipulators in Fenchurch and many other cases have **unsuccessfully** made the same argument that Defendants emphasize here: they supposedly lacked the ability to manipulate because the commodity futures exchange is supposedly a substitute physical delivery market, and the terms of the allegedly manipulated futures contract legally **permitted** an extremely large supply of the commodity to be delivered.

---

[1] See Commodity Futures Trading Commission Information Memorandum, November 30, 2005, pp. 2, 3, and 19 (approving the CBOT limits because they were necessary to "reduce the probability that a single party could cause price distortion in the expiring subject futures contracts," "insulate Treasury futures from potential manipulative conduct," "restrict a trader's ability to exercise market power" and "address bona fide concerns about manipulation.").

However, this argument is seriously flawed. Arg. Pts. IIB-C <u>infra</u>. For one example, "commercially reasonable supply," not "infinite legally permitted supply," is the traditional test of determining what supplies are available in a manipulation case. <u>See</u>, <u>e.g.</u>, <u>Fenchurch</u>, <u>supra</u> (limiting deliverable supply on Contracts to the portions of cheapest to deliver ("CTD") notes that were readily available); <u>Great Western Food Distributors, Inc. v. Brannan</u> ("<u>Great Western</u>"), 201 F.2d 476 (7th Cir. 1953), <u>cert. denied</u>, 345 U.S. 997 (1953) (eliminating from deliverable supply various legally permitted items that were more expensive and, therefore not commercially practicable); <u>Cargill, Inc. v. Hardin</u>, 452 F.2d 1154, 1163 (8th Cir. 1971), <u>cert. denied sub nom.</u>, <u>Cargill, Inc. v. Butz</u>, 406 U.S. 932 (1972) (same); <u>see</u> Arg. Pt. IIC1-3 <u>infra</u>.

Just as Defendants' legal argument has been rejected in these prior cases,[2] so it should be rejected here. <u>Id.</u> Indeed, Defendants' reprise of these failed arguments is further fatally flawed at this procedural stage because those cases were decided after full trials, and Defendants' argument contradicts multiple allegations of the Complaint. <u>See</u> cases cited in preceding paragraph <u>supra</u>. For these and many other reasons, Defendants' first ground for dismissal must be rejected.

Defendants' second argument for dismissal is that (1) because Defendants supposedly did not intend to manipulate prices at the moment they "acquired" their positions, (2) Defendants supposedly have a license later to develop intentions to manipulate, to use their "innocently" acquired positions to manipulate prices, and to wreak as much havoc and go as berserk as they please without any duties to the market place. PIMCO Mem. pp. 5, 11-14.

---

[2]  The last resort of convicted or accused "long" manipulators (<u>i.e.</u>, persons who held long positions and artificially inflated prices) has traditionally been to try to escape legal liability for their conduct by making the argument that Defendants make here. <u>See</u> cases cited in text. PIMCO has now associated itself with these arguments and their previous proponents.

First, no case holds that an intent to manipulate must exist be held when the position is acquired. Second, Plaintiffs do allege that, from the time Defendants acquired their positions, they intended to manipulate prices and knowingly exploit the Contracts' susceptibility to manipulation by an extraordinarily large long position that was not liquidated; Pimco always knew that it had the option and ability to squeeze and manipulate if it so chose. <u>See</u> Arg. Pt. IIIA <u>infra</u> and Statement of Facts ("<u>Facts</u>") ¶¶ 2-6 <u>infra</u>.

Third, contrary to Defendants' "license to later manipulate" theory, manipulative intent is inferred from all the circumstances and may not be determined on a motion to dismiss. <u>See</u> Arg. Pts. IIIB and V <u>infra</u>. Defendants' "license to later manipulate" argument is contrary to Congress' efforts for eighty years to prevent manipulation. <u>Id</u>. These efforts have caused Courts to impose on longs the very duties that Defendants say do not exist. <u>Id</u>. Here, Pimco's traders expressly stated on May 9, 2005 (the first day of the Class Period) that they wanted to "stand for delivery" or delay Pimco's liquidation precisely in order (a) to "cause" price relationships to change in Pimco's favor, and (b) to "exploit" (cause) a highly unusual situation in which the CTD notes on the June contract started to trade "special". ¶ 61. Pimco's conduct allegedly did cause artificial prices including by making the CTD trade "special". Compl. ¶¶ 61, 63-67.

Relatedly, PIMCO argues that it had a fiduciary duty to its customers, who include pensions, to maximize the profits on their position. PIMCO Mem. pp. 1-2, 13-14. However, PIMCO has neither a fiduciary duty to break the law nor, through sheer size, to bully the market out of its normal pricing pattern in order to create a self-fulfilling prophecy of artificial prices (and profits for Defendants). This is what PIMCO allegedly did by buying so many of the Contracts. What has caused the CBOT and other commodity exchanges to flourish is that traders

who are not in a position to make or take delivery, can trade at non-manipulated prices without having to go through "power games" of uncommercial deliveries.  See Arg. Pt. IIC infra.

Moreover, both the long and the short side of the market in commodity futures consists of hedgers (who hold mortgage-backed and other securities hedgeable in Contracts) and funds and others who trade on behalf of pensions and other persons.  Recognizing as much, PIMCO shifts its attack and says it has no duty to "naked short sellers."  PIMCO Mem. pp. 1, 13, 14.  But there are "naked longs," i.e., traders who do not need to buy as much of the commodity as they are long.  And there are "naked shorts," i.e., traders who do not own as much of the commodity as they are short.

PIMCO was, in reality, a naked long, i.e., after forcing an unprecedented volume of deliveries on its unprecedented long position, PIMCO turned around and quickly sold out its position.  Compl. ¶¶ 84-87.  PIMCO falsely represented that it wanted to hold the delivered notes for long term investment.  Id.  But it sold them.  This branch of Defendants' motion should be denied in all respects.

### STATEMENT OF FACTS

1.  There are two sides to a futures contract.  The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity.  The "short" side is the seller of the contract and is obligated to make delivery of the commodity.  Compl. ¶ 27.  However, futures markets, the standardized and fungible futures contracts, and the mechanism of the clearing house to hold the other  side of every futures contract, are specifically designed to facilitate and ease trading in one central market place by traders who are located throughout the world.  Thus, the commodity exchange is not to be an alternative physical delivery market, and deliveries on

futures contracts are very rare, representing less than 1% of all futures contracts traded.  Id. ¶¶ 29, 30.

A.     **Through An Unprecedented Long Position And A Refusal To Liquidate Same, Defendants Possessed The Ability To Cause And Did Cause Artificial Prices**

2.  Between 2000 and September 2004, the market for Contracts became susceptible to manipulation by an extraordinarily large long who refused to liquidate.  Compl.  ¶¶ 1, 2, 41, 44.

3.  "With knowledge" and "well aware" of the Contracts' susceptibility to manipulation through the foregoing steps, id. ¶¶ 2, 45, PIMCO took precisely these manipulative steps in late 2004 and 2005.

4.  (a) First, PIMCO began to accumulate an enormous long position in Contracts that, by March 31, 2005, exceeded $16.3 billion in the June 2005 Contract (the "June Contract").  Compl. ¶¶ 3, 52.  This highly unusual June Contract position was, Plaintiffs believe, unprecedented.  At a minimum, it was many times larger than PIMCO's positions in Contracts prior to October 2004.[3] Id. ¶ 53; see fn. 5 infra.

(b) Indeed, this $16.3 billion long position was so large that it exceeded the available supply of February 2012 notes, i.e., the "cheapest to deliver" ("CTD") notes for the June Contract.  Compare Compl. ¶ 56 (the "float" or deliverable supply was at most $15.5 billion) with ¶ 52 (long position was $16.6 billion).

5.  Second, as the June Contract neared its expiration date and the open interest in the June Contract plunged in May and June 2005, PIMCO took the highly unusual step of not liquidating its extraordinary long position.  Comp. ¶¶ 4, 60, 75.

---

[3]  This conspicuous change in Defendants' trading behavior began just after an extra source of allegedly unlawful income for PIMCO had been ended by government legal actions.  Compl. ¶¶ 48-50.

6. In other words, PIMCO undertook precisely the manipulative acts which it "knew" (Compl. ¶ 2) and was "well aware" (id. ¶ 45) would manipulate June Contract prices. Why did PIMCO do this? Defendants' motive and intent, when they took the foregoing manipulative acts, was to profit from the artificially high prices that they would cause. Id. ¶ 92.

7. This failure to liquidate and Defendants' other conduct caused an extremely high, unprecedented number of deliveries to occur on the June Contract, prompted anti-manipulative action by the CBOT (see Facts ¶¶ 8-9 infra), and artificially distorted numerous pricing relationships. Compl. ¶¶ 52, 53, 62-73.

8. In response to Defendants' extraordinarily large long position, the CBOT changed its rules. On June 29, 2005 (i.e., one day before the end of the Class Period), the CBOT created a limit of 50,000 contracts, during the final month of trading that became effective with the December 2005 Contract. Compl. ¶¶ 81-82.

9. 50,000 contracts was less than one-third as large as Defendants' alleged long position.

**B.      Separately, Through Their CTD Note Positions Alone, Defendants Had The Ability To Cause Artificial Prices**

10. Separate and independent of the ability to manipulate described in A above, Defendants possessed another ability to manipulate prices.

11. From March 20, 2005 until the end of June 2005, Defendants greatly increased to $13.3 billion[4], their holdings of February 2012 Notes, i.e., the CTD notes. Compl. ¶¶ 5, 34, 37, 58.

---

[4] Although plaintiffs were uncertain as to exactly when (between March 30, 2005 and the end of June) PIMCO acquired this position (Complaint ¶ 59), preliminary discovery has since shown that PIMCO had acquired in excess of $6 billion of the CTD by May 2005. This was in excess of 33 1/3% of the alleged CTD deliverable supply.

12.   Plaintiffs allege that this was in excess of 75% of the deliverable supply of such notes. Compl.  ¶ 56.

13.   Through this "squeeze" of the CTD, Defendants possessed yet another ability to cause artificial prices.

### C.   Making False Statements, In Combination With The Conduct Described In A Or B Above, Increased Defendants' Ability To Cause Artificial Prices

14.   Defendants took one other type of manipulative step that enhanced their ability to cause artificial prices.

15.   This was to make false statements about the supposed attractiveness of Ten Year Treasury Notes and Defendants' supposed intention to "invest" in same.  Compl. ¶¶ 12, 83-86.

## ARGUMENT

## POINT I.     GOVERNING STANDARDS

The nature of Defendants' arguments prevents Defendants from sustaining their Movants' Rule 12(b)(6) burden.  Rule 12(b)(6) does not require a plaintiff to plead facts or legal theories but "merely to describe his claim briefly and simply."  <u>Shah v. Intercontinental Hotel Operating Group</u>, 314 F.3d 278, 282 (7th Cir. 2002).

Defendants' arguments all fail the controlling standards: the Court must accept as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor; no claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  <u>Thomas v. Butzen</u>, 2005 WL 2387676 at *1 (N.D.Ill. Sept. 26, 2005) (Guzman, J.), <u>citing</u> <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984).

The heavy movants' burden under Rule 12(b)(6) in this Circuit is reflected in the following: "This is a suit that is going nowhere; but the district court, by granting a motion to dismiss under Fed.R.Civ.P. 12(b)(6), buried it prematurely because a few faint signs of life remained." Bontkowski v. Smith, 305 F.3d 757, 759 (7th Cir. 2002).

## POINT II.    DEFENDANTS HAD THE ABILITY TO MANIPULATE PRICES

### A.    The Treasury Market Has Repeatedly Been Manipulated By Positions That Were Far Smaller Than Defendants'

Contrary to Defendants' assertion that the United States Treasury Note markets are too large to be manipulated (PIMCO Mem. p. 8 and n. 4 and 6), the CBOT imposed a 50,000 contract limit to prevent manipulation (¶¶ 81-84) and the Treasury markets were subject to repeated manipulations that were detected and successfully prosecuted during the 1990s. See cases cited at p. 1 supra.

During 2000 to 2004, the Contracts became susceptible to manipulation by a person who controlled a large long position and refused to liquidate such long positions. Statement of Facts, ¶ 2. Defendants' conduct here followed precisely this manipulative profile. However, Defendants' long futures position here was much bigger than those in previous cases. See, e.g., Fenchurch, 1996 WL 382313 at *3 (defendants held long position of 1,270,000,000, which is approximately one-thirteenth of Defendants' long position of $16.3 billion[5] in this case (Compl. ¶¶ 3, 52)).

### B.    Defendants' Argument That They Lacked The Ability To Cause Artificial Prices Must Be Rejected At This Stage Because It Improperly Contradicts The Express Allegations Of The Complaint

Contrary to Defendants' argument that they lacked the ability to cause artificial prices because the legally permissible supply was virtually infinite, Defendants had many different

---

[5] Discovery shows that defendants' long position far exceeded $16.3 billion and, indeed, $36 billion during May 2005.

abilities to cause artificial prices under the allegations of the Complaint.  <u>See</u> <u>Facts</u> A-C <u>supra</u>; Compl. ¶¶ 61 (Defendants "had the ability to increase and manipulate prices of June Contracts"); 102 ("Defendants' activities created . . . artificial prices"); 13.  These allegations must be accepted as true on this motion.  <u>See</u> Arg. Pt. I <u>supra</u>.

Further, these allegations are supported by detailed allegations of the indicia of artificiality (Compl. ¶¶ 62-73) and the unprecedented size of the positions and conduct ( <u>id.</u> ¶¶ 52-58) that caused same.  <u>Id.</u> ¶ 8.

Finally, a very good mirror reflecting what the market participants and regulators viewed as the practical deliverable supply and threshold level of the ability to manipulate Contracts is the conduct of the CBOT.  Compl. ¶¶ 81-82; <u>Facts</u>, ¶¶ 6-7.  In over twenty pages of briefing, the Defendants fail to mention the CBOT anti-manipulation rule change creating a limit of 50,000 contracts.  <u>Id.</u>  One obvious kind of manipulation prevented by this rule is the taking of an extraordinarily large long position and refusal to liquidate same.  <u>See</u> p. 2, n. 1 <u>supra</u>.  If a position one-third as large as Defendants' can manipulate prices, then plaintiffs have adequately pleaded that Defendants' position could cause artificial prices.  Compl. ¶¶ 81-82.  Thus, the CFTC did not refuse to approve the CBOT's anti-manipulation rule on the grounds that the market for U.S. Treasuries is large, unmanipulatable, or of infinite supply.  Rather, the CFTC approved such rule in order to prevent manipulation by a single large trader.  <u>See</u> p.2, n. 1 <u>supra</u>.

Therefore, this branch of Defendants' motion must be denied because it contradicts the Complaint.  Although this is a complete response to this part of Defendants' motion, the legal positions advocated by Defendants are seriously flawed and this branch of the motion must be denied for that separate reason as well, as explained below.

**C.    Defendants' Arguments Are Contrary To Congress' Overarching Purpose In The CEA To Prevent Manipulation And To The Judicial Principles**

**That Have Developed To Implement That Purpose**

**1.     Congress' Overarching Purpose In The CEA Is To Prevent
And Redress Manipulation**

Congress in 1922 enacted the Grain Futures Act which it re-enacted in 1936 as the

Commodity Exchange Act ("CEA") and substantially amended in 1974 through legislation that

created the Commodity Futures Trading Commission ("CFTC").  See Sept. 21, 1922, c. 369, § 1,

42 Stat. 998; June 15, 1936, c. 545, § 1, 49 Stat. 1491; Publ. L. 93-463, § 1, Oct. 23, 1974, 88

Stat. 1389.

Congress' primary purpose in enacting and repeatedly expanding the CEA is to prevent,

deter, and redress manipulation of prices of commodities and commodity futures contracts.  See

Leist v. Simplot, 638 F.2d 283, 304 (2d Cir. 1980), aff'd sub nom.,  Merill Lynch Pierce Fenner

& Smith v. Curran, 456 U.S. 353 (1982) (raison d'etre of CEA is preventing manipulation;

through 75 years of expanding regulation, Congress has sought to stamp out manipulation).[6]

In Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), Congress provides that it shall be a

felony for any:

---

[6]  Vindicating the anti-manipulation provisions of the CEA is an important public policy because
preventing manipulation has been judicially described as the sole or the most important purpose
of the CEA.  Board of Trade v. Milligan, 90 F.2d 855, 857 (8th Cir.), cert. denied, 302 U.S. 710
(1937); Board of Trade v. Olsen, 262 U.S. 1 (1923); Section 3 of the CEA ("prices of
commodities . . . are susceptible to excessive speculation and can be manipulated . . . to the
detriment of the producer or the consumer . . . rendering regulation imperative for the protection
of such commerce and the national public interest").

> "Manipulations of grain futures for speculative profit, though not carried to the
> extent of a corner or complete monopoly, exert a vicious influence and produce
> abnormal and disturbing temporary fluctuations of prices that are not responsive
> to actual supply and demand and discourage, not only this justifiable hedging, but
> disturb the normal flow of actual consignments."  [emphasis supplied].

Board of Trade v. Olsen, 262 U.S. 1, 39 (1923).

> person [1] to manipulate or attempt to manipulate the price of any commodity in
> interstate commerce, or for the future delivery on or subject to the rules of any
> [contract market], or [2] to corner or attempt to corner any such commodity or [3]
> knowingly to deliver or cause to be delivered for transmission through . . .
> interstate commerce . . . false or misleading or knowingly inaccurate reports . . .
> that affect or tend to affect the price of any commodity in interstate commerce . . .
> [material in brackets supplied].

As indicated above, the "corner" and the "false report" are the only kinds of manipulation that are listed by name in the CEA. Both are allegedly present here. See Facts B and C supra. United States Ten Year Treasury Notes are a "commodity" within the meaning of the Section 1a(4) of the CEA, 7 U.S.C. § 1a(4).

In addition to making manipulation a felony, Congress also tries to regulate manipulation out of existence by requiring the CFTC and the commodity exchanges to take numerous steps to prevent manipulation and corners.[7] (One example of these steps is the 50,000 Contract limit promulgated by the CBOT, see Facts ¶¶ 6-7 supra.).

Contrary to Defendants' criticism of plaintiffs as "naked shorts" (PIMCO Mem. pp. 1-2), Plaintiffs and class members are the persons for whose especial benefit the CEA was passed. Merill Lynch, 456 U.S. at 384-385; see pp. 4-5 supra regarding the fact that Defendants are "naked longs." Plaintiffs' suit under the CEA is "a valuable supplement" in enforcing the CEA. Merill Lynch, 456 U.S. at 384-85. Insofar as Section 9(a) prohibits manipulation, plaintiffs have an express right of action under Section 22 of the CEA, 7 U.S.C. § 25, which provides:

> (a)(1) Any person . . . who violates this chapter or who willfully aids, abets,
> counsels, induces, or procures the commission of a violation of this chapter shall
> be liable for actual damages resulting from one or more of the transactions

---

[7]  E.g., Section 5(b)(2) of the CEA, 7 U.S.C. § 7(b)(2), requires exchanges to prevent manipulation and corners; Section 8a(9) of the CEA, 7 U.S.C. § 12a(9), allows the CFTC to intervene in order to prevent manipulation and corners; and former Section 5a(a)(10) of the CEA, 7 U.S.C. § 7a(a)(10), required exchanges to establish delivery systems and delivery differentials in order to reduce the likelihood of a corner.

referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person –

\* \* \*

(D) . . . if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

> **2.** **Consistent With This Overarching Congressional Purpose, Congress And The CFTC Have Refrained From Defining Manipulation In Any Exclusive Fashion**

Because the methods of "manipulation are limited only by the ingenuity of man"[8] and woman, Congress and the CFTC have purposely refrained from defining in an exclusive way what constitutes manipulation. [9]

> **3.** **Pursuant To This Flexible Approach, The Judicial Test For Manipulation Must Be A "Practical One" And The Seventh Circuit Says That The "Know It When You See It" Test May Be "The Most Useful"**

Thus, Circuit Courts that have considered manipulation have chosen to articulate a flexible test that avoids crabbed parameters.[10]

---

[8] Cargill, Inc. v. Hardin, 452 F.2d 1154, 1163 (8th Cir. 1971), cert. denied sub nom., Cargill, Inc. v. Butz, 406 U.S. 932 (1972).

[9] Markham, Manipulation of Commodity Futures Prices - - The Unprosecutable Crime, 8 Yale J. on Reg. 281 at 461, note 526 (1991) (quoting CFTC Memorandum dated November 16, 1976 rejecting efforts to catalog manipulative practices because "crafty" traders could evade the prohibitions).

[10] Eighth Circuit. Cargill, Inc. v. Hardin, 452 F.2d at 1163 ("test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished . . . The aim [is] to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand"'); Utesch v. Dittmer, 947 F.2d 321, 327 (8th Cir. 1991), cert. denied, 604 U.S. 1006 (1992) ("no fixed standards or tests to apply in determining whether there has been 'manipulation'").

Seventh Circuit. General Foods Corp. v. Brannan, 170 F.2d 220, 231 (7th Cir. 1948) ("the creation of an artificial price by planned action, whether by one man or a group of men"); accord Frey v. Commodity Futures Trading Comm'n, 931 F.2d 1171, 1175 (7th Cir. 1991)(manipulation "is an intentional exaction of a price determined by forces other than supply and demand"; the

The Seventh Circuit has specifically cautioned that the "know it when you see it" test may be the most useful test. <u>Frey</u>, at 931 F.2d at 1175, <u>Id</u>. The <u>Frey</u> court holds that the "limitations" of any other test must be carefully kept in mind when such test is applied to the particular fact context of a given case. <u>Id.</u>

A "four elements" test for a manipulation claim is usually articulated as follows: (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. <u>See In re Soybean Futures Litig.</u>, 892 F. Supp. 1025, 1030, 1045 (N.D. Ill. 1995), <u>citing</u> <u>Frey</u>, 931 F.2d at 1177-78; <u>see also</u> <u>Premium Plus Partners, L.P. v. Davis</u>, 2005 WL 711591, *14 (N.D. Ill. Mar. 28, 2005).

Courts sometimes drop the "ability to manipulate" element as a separate element of the test because it may be redundant to the others. <u>In re Sumitomo Copper Litig.</u>, 182 F.R.D. 85, 89-90 (S.D.N.Y. 1998); Russo, <u>Regulation of Commodities Futures and Options Markets</u>, § 12.11 at 12-18 (1983); <u>In re Natural Gas Commodities Litig.</u>, 337 F. Supp.2d 498, 502 (S.D.N.Y. 2004).

In all events, "deliverable supply" is not an element of a claim for manipulation.

> **D.** **Commodity Exchanges Are Not A Substitute Physical Market, And The Case Law Recognizes That Legally Permitted Deliveries Are Different From Commercially Practicable Deliveries**

Consistent with the practical case-by-case approach to assessing manipulation, Courts have carefully considered the nature of futures markets. The Courts have been clear that such markets are not substitute physical delivery markets:

---

"know it when you see it" test may be "most useful" test, but in specific types of manipulation, traditional criteria may be employed, recognizing their "limitations").

Second Circuit. <u>Strobl v. New York Mercantile Exchange</u>, 582 F. Supp. 770 (S.D.N.Y. 1984), <u>aff'd</u>, 768 F.2d 22 (2d Cir. 1985), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u>, <u>Simplot v. Strobl</u>, 474 U.S. 1006 (1985).

> While the obligation to make or take delivery is a bona fide feature of the futures contract, in reality the futures market is not an alternative spot market for the commodity itself, and indeed the functions performed by the futures market would probably be severely hampered if it were turned into an alternative spot market. Most parties who engage in futures transactions are in no position to either make or take delivery, and if they were required to always make preparations to fulfill their obligations to make or take delivery, the number of persons who could effectively participate in the futures market would be substantially restricted, thus reducing the liquidity and volume of that market.

Cargill, 452 F.2d at 1172-73; accord, e.g., In re Soybeans, 892 F. Supp. at 1051.

Similarly, Plaintiffs allege that deliveries occur on less than 1% of all positions and that the CBOT is designed to facilitate trading, not to be a substitute physical market. Compl. ¶¶ 26-29; Facts ¶ 1 supra. Indeed, the reason that the CBOT and other commodity exchanges have flourished is that both longs and shorts may trade at non-manipulated prices without having to play power games to make and take uncommercial deliveries. As the Cargill court reasoned:

> The main economic functions performed by the futures market are the stabilization of commodity prices, the provision of reliable pricing information, and the insurance against loss from price fluctuation. The functions can be fulfilled only if both longs and shorts can be assured that they can offset their contracts at non-manipulated prices. If in a squeeze situation, the shorts must be forced either to pay manipulated prices to offset their contracts or in the alternative to bring in higher priced outside supplies which are neither wanted nor needed in the local market, then both the cash and the futures markets will be dislocated.

Id. at 1173. Because Defendants, as a "naked long," sold out and did not want to hold the CTD of which they took delivery, the manipulative conduct quoted above is precisely what (allegedly) occurred here.

### E. Courts Have Repeatedly Rejected Prior Manipulators' Arguments That They Lacked The Ability To Manipulate Because The Terms Of The Contract Permitted A Wide Variety Of Items To Be Delivered

In the foregoing legal context, it is unsurprising that Defendants' "infinite legally permitted supply" arguments have been repeatedly rejected.

## 1.    <u>Fenchurch</u> Rejects This Argument

In <u>Fenchurch</u>, the settling respondents argued to the CFTC that they supposedly lacked the ability to manipulate Contract prices because the Contract terms allowed many different notes in addition to the cheapest to deliver ("CTD") note to be delivered. <u>Fenchurch</u>, 1996 WL 382313 at \*6. However, the CFTC recognized that trading in Contracts is based on a portion, the "float," of the CTD for each maturity. <u>Id</u>. Thus, the CFTC determined that "the available deliverable supply of the Ten Year Treasury Note contracts" <u>was</u> a **portion** of "the cheapest-to-deliver notes.

Defendants creatively seek to distinguish <u>Fenchurch</u> on the basis of the timing of the manipulative conduct there (after trading had ended). PIMCO Memo. pp. 8-11. However, the CFTC carefully phrased its limitation on the precedental value of <u>Fenchurch</u> **not** to fact patterns in which the manipulative conduct occurred **exclusively** after trading ended, but to fact patterns in which instruments other than Ten Year Treasury Notes are at issue:

> In finding that Fenchurch controlled a dominant portion of the available supply of the 8 ½% note, the Commission is mindful that the terms of the Ten Year Note Contract allow for delivery of any security in a basket of qualified issues, and that Fenchurch's conduct affected only one part of the total deliverable supply on the June contract, the 8 ½% note . . . . **the Commission does not intend that this determination that Fenchurch controlled the available deliverable supply of the Ten Year Treasury Note contracts by dominating a portion of that supply (i.e., control of the cheapest-to-deliver notes) necessarily should apply in determining available deliverable supply in markets other than those for futures on treasury securities.**

<u>Id</u>. [Emphasis supplied] Thus, contrary to Pimco's arguments, the CFTC clearly **did** intend that its CTD deliverable supply analysis would govern treasury "futures or treasury securities", **particularly** the Ten Year Treasury Note futures contracts at issue here.

Second, plaintiffs here do allege that Pimco manipulated prices and acquired

portions of the CTD both **during** and **after** trading ended; indeed, plaintiffs allege that Pimco's long futures positions and CTD positions are far larger than the manipulator possessed in <u>Fenchurch.</u>[11]

Third, the CBOT found that positions larger than 50,000 contracts could manipulate prices **during trading**. Comp. ¶¶ 81-84. The CFTC approved. These findings would make no sense if Defendants' argument about $400 billion in deliverable supply, were correct.

Fourth, <u>Fenchurch</u> and all manipulation cases turn on what is commercially normal and practicable. See <u>infra.</u> For example, <u>Fenchurch</u>'s exclusion from deliverable supply of large portions of the CTD note itself, respects what is normal and practicable and disregards what is legally permissible under the contract definition. (Moreover, exclusion it has nothing to do with whether the manipulative conduct occurs after trading.) The determination of what is commercially normal and practicable cannot be made on the basis of self-serving assertions by a defendant on a motion to dismiss.

Thus, <u>Fenchurch's</u> language and reasoning --- read along with the CBOT 50,000 contract limit and the CFTC approval thereof --- refute Defendants' proposed "after trading ended" distinction.

> **2.** **<u>Great Western</u> Rejects Defendants' "Infinite Legally Permissible Supply" Argument**

---

[11] Though there were hundreds of billions of dollars of U.S. Treasury notes in 1993, <u>Fenchurch</u>'s control of approximately $2,000,000,000 in Notes and $1,300,000,000 in long positions (which was less than the deliverable supply) gave <u>Fenchurch</u> the ability to manipulate.

Here, Defendants' **alleged** 16 plus billion dollar long position allegedly exceeded the deliverable supply and was approximately thirteen times as large as the reported long position held by the convicted manipulator in <u>Fenchurch</u>. <u>Id.;</u> fn [5] (and preliminary discovery confirms) <u>supra.</u>

In these circumstances, it is a reasonable inference in plaintiffs' favor that Pimco held far larger June contract long positions and CTD positions during trading than Fenchurch held after trading. Compl. ¶¶ 52-59.

In <u>Great Western Food Distributors, Inc. v. Brannan</u> ("Great Western"), 201 F.2d 476 (7th Cir. 1953), <u>cert</u>. <u>denied</u>, 345 U.S. 997 (1953), the convicted manipulator argued on appeal that it had no ability to manipulate because, under the terms of the futures contract, the deliverable supply on the December 1947 contract included **any** of the following three types of eggs: (1) "refrigerator eggs, graded U.S. No. 2 Extras, stored in approved houses in Chicago"; (2) fresh eggs; and (3) refrigerated eggs, graded U.S. No. 2 extras, but stored in approved out of town warehouses. <u>Id</u>., 201 F.2d at 481.

However, based on a full evidentiary record that was developed by the Secretary of Agriculture, the Seventh Circuit held that categories (2) and (3) above, though within the legal terms of the contract, were not part of the deliverable supply.[12] <u>Id</u>.

### 3. <u>Cargill</u> Rejects Defendants' "Infinite Legally Permissible Supply" Argument

In <u>Cargill</u>, the convicted manipulator argued on appeal that it had no ability to manipulate because out of town hard wheat should have been included in deliverable supply. 452 F.2d at 1165-1166. The Eighth Circuit rejected this argument:

> Hard wheat was of a higher grade than No. 2 soft winter wheat, it price was higher, no premium was allowed for its delivery, and the cost of shipment into Chicago for delivery on the future was an additional economic impediment to its delivery. It would be more economic to pay the long a premium than to pay the additional charges for premium wheat plus shipping and handling charges.

<u>Id</u>. To hold otherwise, in the Eighth Circuit's view, would not be "economically realistic." 452 F.2d at 1166.

### 4. <u>Soybeans</u> Rejects Defendants' "Infinite Legally Permissible Supply" Argument

---

[12] This evidence established (a) that fresh eggs customarily range higher in price than refrigerators and "were generally not contemplated as part of the supply for these futures transactions," (<u>id</u>. at 480), and (b) due to pricing disparities, "out of town eggs are economically excluded from the contemplated available supply[.]" <u>Id</u>. at 480.

In <u>In re Soybean Fut. Litig.</u>, the Defendants argued on summary judgment that they had no ability to manipulate because deliverable supply should include out-of-town soybeans. 892 F. Supp. at 1049. This Court rejected such argument because "requiring the shorts to make extraordinary efforts to satisfy their obligations may itself be proof of a squeeze or corner on the market." <u>Id.</u> at 1051 (<u>citing</u> <u>In re Henner</u>, 30 Agric. Dec. 1151, 1264-80 (Sept. 15, 1971)).

> **5.     Under <u>Frey</u>, Deliverable Supply Is A "Fact-Intensive" Issue,
> And The Non-Binding <u>Cox</u> Decision Was Decided Only After A Full
> Trial About What Was Commercially Practicable**

The sole or primary authority cited by Defendants in favor of their deliverable supply argument is <u>In re Cox</u>, 1987 WL (CFTC July 15, 1987). However, <u>Cox</u> was decided after a full trial and detailed factual findings were made about whether each aspect of legally permitted supply was, in fact, commercially practicable supply. <u>See</u>, <u>e.g.</u>, <u>id.</u> at **5-6. Because there has been no trial or evidentiary record, and no such findings here, <u>Cox</u> does not support Defendants at the motion to dismiss stage.

Moreover, the precise holding in <u>Cox</u> which the Seventh Circuit of Court of Appeals reviewed in <u>Frey</u>, <u>supra</u>, was that four members of the Commodity Futures Trading Commission, over one dissent, reversed the Administrative Law Judge ("ALJ") and held that:

> Based on our review of the record [adduced at a full trial on the merits], we think
> the weight of the evidence does not warrant the exclusion of Kansas City as a
> "normal" supply area for Chicago.

<u>In re Cox</u>, 1987 WL 106879 at *6.

In reviewing this finding, the Seventh Circuit reasoned or held that the deliverable supply issue is a "market definition" issue.

> Market determination is a ***fact-intensive question***, a task that has given a number
> of courts difficulty in a variety of contexts. <u>See</u> <u>United States v. Philadelphia
> Nat'l Bank</u>, 374 U.S. 321, 360 n. 37, 83 S.Ct. 1715, 1739 n. 37, 10 L.Ed.2d 915
> (1963) ("fuzziness" inherent in any attempt to delineate relevant geographical

market); Wilk v. American Medical Assn., 895 F.2d 352, 360 (7th Cir. 1990) (market power a "***fact bound*** question"), cert. denied, 496 U.S. 927, 100 S.Ct. 2621, 110 L.Ed.2d 642 (1990).

Frey, 931 F.2d at 1177-78. This Court would seem to be bound by Frey's holding that deliverable supply is a "fact bound" and "fact-intensive" issue. But this Court is **not** bound by any principle in Cox. See e.g., Minpeco v. ContiCommodity Serv., 673 F. Supp. 684, 693 n. 9 (S.D.N.Y. 1987) (declining to be bound by any holding in Cox); In re Soybeans, 892 F. Supp. at 1046 (also noting that Cox is not binding).

In Cox, only after a full trial were the "fact-intensive" issues of the "normal" supply area determined with respect to the wheat market in 1971. To the extent that Cox is even persuasive here, it persuades that a full trial is required.

Similarly, in Cox, Great Western, and Cargill, there had been discovery and a full trial about, among other things, what was and what was not commercially practicable for delivery. In Soybeans, there had been extensive discovery on the same point.[13] This Court may never need to determine deliverable supply. If it does, it may reject Cox altogether and will not be bound by Cox.

### F.  Between 2000 And September 2004, The Contracts Became Susceptible

---

[13] Cox purports to distinguish Great Western and Cargill on the basis that, under the terms of the futures contracts at issue there, there was no contract differential price provided for different types of deliveries. Cox, 1987 WL 106879 at *7. Cox is capable of being read to hold that, even if there is a millionth of a penny price differential for a different type of delivery and this differential is far less than the amounts indicated by the commercial or financial realities of the market, this differential changes the Great Western and Cargill analyses. If so, then the non-binding Cox decision is at odds with sixty years of manipulation law since the Seventh Circuit's decision in Great Western.

A reading of Cox that is more consistent with the "practical" test of manipulation is as follows: only where the price differential in the contract approximates financial and commercial reality is the supply deliverable. A trial and discovery will be needed to determine the commercial and financial setting here. After same, Plaintiffs believe that the logic of Fenchurch, Cargill, Great Western and Soybeans will apply here: the portion of the CTD (as in Fenchurch) that is reasonably available will be the deliverable supply.

**To Manipulation By An Extraordinarily Large Long Position That
Did Not Liquidate**

Defendants misconstrue Plaintiffs' claim as centered exclusively or primarily on a corner.

PIMCO Mem. pp. 5, 9. However, Plaintiffs' primary claim is that Defendants acquired an

extraordinarily long position and refused to liquidate same.[14] Even where the long positions

have been far smaller, this is all that is needed to manipulate.

> As for Apex's claim that the long Defendants attempted to manipulate the price of
> oil in the wet market, Belcher's motion for summary judgment is denied. While
> the long Defendants did not have the market dominance necessary to actually
> corner the oil market and to effect a long manipulative squeeze, the Court cannot
> conclusively determine at this state of the litigation that they might not have
> attempted to do so or otherwise taken steps resulting in an artificial price increase.

Apex Oil Co. v. DiMauro, 713 F. Supp. 587, 603 (S.D.N.Y. 1989).

**G.      Separately, Defendants Also Had The Ability To Cause Artificial
Prices Through Their Squeeze And/Or Through Their False Reports**

In addition to their foregoing manipulative conduct, Defendants also allegedly squeezed

the CTD and made false statements. See Facts ¶¶ 14-15. The squeeze provided a separate

ability to cause artificial prices and the false statements enhanced Defendants' ability to cause

such prices. See Soybeans, 892 F. Supp. at 1031; compare In re Natural Gas Commodity Litig.,

337 F. Supp. 2d at 500 (manipulation claim based solely on false statements).

**POINT III.      PLAINTIFFS HAVE ADEQUATELY ALLEGED DEFENDANTS'
MANIPULATIVE INTENT AND A DUTY NOT TO EXACERBATE**

---

[14] PIMCO itself acknowledged its ability to manipulate prices as a result of their extraordinarily
large long position that they did not liquidated, as demonstrated by a statement made by PIMCO,
per Chang Hong Zhu, on May 9, 2005: "Even if we just pulled off rolling we may be able to
cause calendar to trade closer to 'historical norm' cheap level." Complaint, ¶ 61.

Relying on the repeatedly-criticized holding in <u>Volkart Brothers, Inc. v. Freeman</u>, 311 F.2d 52 (5th Cir. 1962) ("<u>Volkart</u>"),[15] Defendants argue that, because they supposedly did not intend to manipulate when they acquired their positions, they have no duties to the market and may later develop "manipulative intent" without consequence.

First,  no case holds that an intent must exist when the positions are initially established.

**A.     From The Time Defendants Acquired Their Positions, They Allegedly Intended To Manipulate Prices And Knowingly Exploit The Contracts' Susceptibility To Manipulation By An Extraordinarily Large Long Position That Was Not Liquidated**

Second, Plaintiffs' Complaint alleges, taking reasonable inferences in plaintiffs' favor, that Defendants intended to cause artificial prices when they entered their positions.  <u>See</u> <u>Facts</u> ¶¶ 2-6 <u>supra</u>.  Defendants assert to the contrary.  PIMCO Mem. pp. 5, 13.  ("Plaintiffs do not allege that PIMCO acquired its initial position with the specific intent to create artificial prices.").  Defendants' assertion contradicts the allegations of the Complaint and takes reasonable inferences against plaintiffs.  Therefore, under the standards governing a motion to dismiss pursuant to Rule 12(b)(6) this part of Defendants' dismissal motion must be denied.  <u>See</u> Arg. Pt. I <u>supra</u>.  Defendants' intent arguments, for this reason alone, must be rejected.

From the time that PIMCO completed its acquisition of its extraordinarily large long position, it had the option and the ability to squeeze and manipulate June contract prices, if

---

[15]  The ALJ in <u>In re Henner</u>, included a 28 page appendix excoriating the reasoning in <u>Volkart</u>. <u>In re Henner</u>, 30 Agric. Dec. at 1264-91.  The United States Court of Appeals for the Eighth Circuit also pointedly criticized <u>Volkart</u>.  <u>See</u> <u>Cargill</u>, 452 F.2d 1154:

> if the <u>Volkart</u> decision is to be interpreted as prohibiting regulation of manipulative squeezes, it is not in line with the Commodity Exchange Act, 7 U.S.C. § 1 et seq., providing for competitive trading markets and proscribing excessive speculation, and should not be followed.

<u>Id.</u> at 1173.

PIMCO so chose, when the open interest liquidated during May and June 2005.  Compare, CBOT position limit of 50,000 contracts, intended to prevent manipulation during the delivery month, with PIMCO's **alleged** position in excess of 160,000 contracts, i.e., $16 billion of treasuries.  See fn 5 supra.

By May 9, 2005, the first day of the amended class period, PIMCO's traders were stating, in internal e-mails, that they wanted to take delivery on their June contracts in order "exploit potential for front month to go on special"; and that "even if" they merely delayed rolling out of their contracts, "we may be able to cause calendar [i.e. calendar spread]"  prices to change. Complaint ¶ 61.

### B.  There Is No License To Manipulate Simply Because The Intent To Manipulate Arises After Acquisition

Even if Defendants did not intend to manipulate prices when they acquired their unprecedented positions, if they later developed that intent, then they may be liable from the time such intent arose even under the language of the cases cited by defendants. Thus, the CFTC has repeatedly held that:

> 'even if a dominant long played no role in the creation of a congested market, [the long] has a duty to avoid conduct that exacerbates the situation.'  In re Abrams, [Current Transfer Binder] Comm. Fut. L.Rep. (CCH) p. 26, 479 at 43,136 (C.F.T.C. July 31, 1995) [citing In the Matter of Indiana Farm Bureau Cooperative Ass'n, 1982 WL 30249 at *8 (C.F.T.C. December 17, 1982)].

Fenchurch, 1996 WL 382313 at *6.  Accordingly, this branch of Defendants' motion contradicts the Complaint and persuasive authority.  And, the large long futures position and large CTD position of Pimco did play "a substantial role in the creation of a congested contract".

Finally, Defendants also argue that they have no notice of the exacerbating conduct. However, Defendants' exacerbating conduct consists, among other things, of their refusal to

liquidate, their purchases of CTD notes, and their false statements. Compl. ¶¶ 4, 52-59, 83-87. This branch of Defendants' motion should be denied in all respects.

**POINT IV.    IT IS PREMATURE TO RESOLVE PIMCO FUNDS'
MANIPULATIVE INTENT AT THIS STAGE**

In addition to the foregoing, PIMCO Funds also argues that Plaintiffs fail to allege that it had manipulative intent. PIMCO Funds Mem. pp. 4-6. However, Plaintiffs allege that the motive of Defendants (referred to collectively as "PIMCO," see Compl. ¶ 23) for engaging in the conduct at issue was to profit from the artificial prices. Id.  ¶ 92. Because PIMCO Funds held the positions, it was exactly this Defendant that directly profited from such artificial prices. Id. ¶ 92.

Further, plaintiffs expressly allege that Defendants intended to assist the manipulation and knowingly aided, abetted, counseled, induced and/or procured the manipulation. Compl. ¶¶ 104-106. Under the controlling standards on a Rule 12(b)(6) motion (see Arg. Pt. I supra) these allegations must be accepted at this time. Therefore, plaintiffs have adequately alleged the manipulative intent of PIMCO Funds.

Moreover, questions of intent are generally inappropriate to be determined on a motion to dismiss, or even a motion for summary judgment. See In re Soybean Futures Litig., 892 F.Supp. at 1058); see also Great Western, 201 F.2d at 484 ("inference of manipulative intent could be readily drawn" from hearing testimony). In this context, PIMCO Funds' assertion that PIMCO, rather than PIMCO Funds, directed the trading (PIMCO Funds Mem. pp. 2-4) does not negate Plaintiffs' allegations of manipulative intent. Compl. ¶¶ 92, 104-106[16].

---

[16]  Separately, even if PIMCO Funds ultimately is not proved, itself, to have an intent to manipulate, PIMCO Funds may still be liable for manipulation. Why was it that PIMCO directed and managed the trading of PIMCO Funds because PIMCO Funds appointed PIMCO as its trade manager agent to make its trading decisions.

## LEAVE TO AMEND

To any extent that this Court might consider granting any portion of the motions, leave to amend should be granted. Plaintiffs have learned from discovery of additional manipulative practices by Pimco (including manipulative orders, "basis trade liquidations" by which Pimco forced deliveries to be made to it during May 2005, additional statements by Pimco, and other manipulative acts). Plaintiffs have also learned of additional e-mails indicating manipulative intent and extensive factual information reflecting that Pimco's long positions were 2 ½ times as large as alleged in the complaint and that Pimco intentionally acquired a substantial portion of the cheapest to deliver notes in order to manipulate the June contract prices.[17]

## CONCLUSION

Defendants' motions should be denied in all respects.

Dated: July 31, 2006                    Respectfully submitted,

                                        **JOSEF A. KOHEN, BREAKWATER**
                                        **TRADING LLC, and RICHARD HERSHEY,**

                                        By: s/  Christopher Lovell
                                        Christopher Lovell

---

If its manager had manipulative intent, then PIMCO Funds did as well. See Cange v. Stotler and Co., Inc., 826 F.2d 581, 589 (7th Cir. 1987) (under Section 2(a)(1) of CEA, 7 U.S.C. § 4, principal was liable without regard to the fact that it "had no prior knowledge of the illegal acts and did not take commissions from the defrauded customer or otherwise benefit financially from the illegal acts" of its agent); Rosenthal & Co. v. Commodity Futures Trading Comm'n, 802 F.2d 963, 966 (7th Cir. 1986) (Posner, J.) (Section 2(a)(1) "impose[s] strict liability, under a theory of respondeat superior, for acts within" the scope of the agency "by agents who are not necessarily employees").

[17]   Plaintiffs could make a substantial argument that dismissal of the John Doe defendants is improper, see Hastings v. Fidelity Mortgage Decisions Corp., 984 F. Supp. 600, 605 (N.D. Ill. 1997), and plaintiffs continue to contend that other persons worked with Pimco to manipulate prices.

However, plaintiffs need not put the Court to the work of deciding whether the allegations are sufficiently particular at this stage to uphold claims against the "John Does". Accordingly, plaintiffs do not oppose defendants' motion to dismiss the John Doe allegations.

Gary S. Jacobson
Craig Essenmacher
Ryan Long
**LOVELL, STEWART HALEBIAN, LLP**
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677
*Lead Counsel for Plaintiffs*

By: s/ Marvin A. Miller
Marvin A. Miller
Jennifer W. Sprengel
Anthony F. Fata
**MILLER FAUCHER AND CAFFERTY LLP**
30 North La Salle Street, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Facsimile: (312) 782–4485
*Designated Local Counsel for Plaintiffs*

Geoffrey M. Horn
Vincent Briganti
**LOWEY DANNENBERG BEMPORAD
 & SELINGER, P.C.**
The Gateway
One North Lexington Avenue
White Plains, New York 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

Louis F. Burke
**LOUIS F. BURKE, P.C.**
460 Park Avenue
New York, New York 10022
Telephone: (212) 682-1700
Facsimile: (212) 808-4280
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE BY ELECTRONIC MEANS</u>

I, Marvin A. Miller, one of the attorneys for Plaintiffs, hereby certify that on July 31, 2006, service of the foregoing ***Plaintiffs' Memorandum in Opposition to PIMCO's Motions to Dismiss*** was accomplished pursuant to ECF as to Filing Users and further that I shall comply with LR5.5 as to any party who is not a filing user or represented by a filing user.

Dated: July 31, 2006

By: s/  Marvin A. Miller
Marvin A. Miller
Jennifer W. Sprengel
Anthony F. Fata
**MILLER FAUCHER AND CAFFERTY LLP**
30 North La Salle Street, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Facsimile: (312) 782–4485
***Designated Local Counsel for Plaintiffs***

27