**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|   |   |   |
|---|---|---|
| JOSEPH A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 4681 |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, PIMCO FUNDS, and JOHN DOES 1-100, | ) ) ) ) ) | Hon. Ronald A. Guzman |
| Defendants. | ) ) | |

**DEFENDANT PIMCO'S REPLY IN SUPPORT OF MOTION TO DISMISS**

The Court should not permit this action to proceed further. It is evident from the plaintiffs' response that they seek to retroactively impose non-existent legal duties on PIMCO, in an attempt to escape the effects of their own decisions to sell short in a risky market.

Plaintiffs sold short futures contracts whose express terms required plaintiffs to deliver any one of a number of issues of Ten Year Treasury notes. They therefore knowingly took the risk that they might be required to deliver one of the more expensive issues, depending on what was available in the market, and they took the risk that the futures contracts' prices could reflect the potential delivery of a more expensive issue. Their case, however, is based on the theory that, contrary to the express terms of the futures contracts, they could only be required to deliver the "cheapest to deliver" of these multiple issues, such that any price of the futures contract which reflected a potential of delivery of one of the more expensive issues would be artificial. But they have failed to show that the law supports their attempt to change their duties in this way. In fact, the law is directly contrary to the existence of any such duty here.

Plaintiffs also sold short in a market where they were engaged in a zero-sum game with persons who took long positions, such that any gain by them would cause an equal loss to the longs, and vice versa. The only way such a market can and does work is that the longs are entitled to seek to maximize their gains at the expense of the shorts, just as the shorts seek to maximize their gains at the expense of the longs. Plaintiffs' legal theory, however, is exactly the opposite: They contend that PIMCO, as a long, had "duties to the market" to take affirmative action to assist shorts such as plaintiffs in profiting at the expense of PIMCO's clients, who are fixed-income investors such as pension funds and employee benefit plans. Not surprisingly, plaintiffs have failed to show that the law supports this theory.

While failing to show that their theories are supported by the law, plaintiffs have attempted to create an appearance of legal support with an oversize brief and extensive legal citations. Most of their response, however, is devoted to irrelevant generalities about the law of manipulation, and responses to arguments not made by PIMCO. On the issues actually presented by PIMCO's motion to dismiss, plaintiffs' response fails to show that the Complaint states a cause of action, and it should therefore be dismissed.

**I.    The Allegations in The Complaint Establish That Prices Were Not "Artificial," and That PIMCO Did Not Have the "Ability" To Manipulate Prices.**

Plaintiffs have failed to rebut PIMCO's showing that the prices of the futures contracts they sold short were not artificial; indeed, plaintiffs do not dispute that the futures they held at all times reflected prices of a mix of Treasury notes expressly deliverable under those contracts.

In arguing that they have stated a claim, plaintiffs rely heavily on a Chicago Board of Trade ("CBOT") rule that was adopted at the end of June 2005, which placed a 50,000 contract limit on the number of Treasury note futures contracts any one trader may hold during the last

2

ten days of trading. They argue that the adoption of this rule shows that PIMCO's position, which was in excess of this limit prior to the limit being imposed, was manipulative. In making this argument, however, plaintiffs ignore the CBOT's Notice accompanying the rule, as well as their own theory of manipulation in this case. Plaintiffs' theory of manipulation is that only the cheapest to deliver note is appropriate for delivery in a non-manipulated market. But the CBOT rule directly contradicts plaintiffs' theory by stating, as follows, that the new position limits will not prevent the contract from requiring delivery of a more expensive issue than the cheapest to deliver, and will not prevent the contract from being priced in accordance with issues of the note that are more expensive than the cheapest to deliver:

> The establishment of position limits during the last ten trading days does *not* ensure that the cheapest to deliver (ctd) security will be the only security necessary to satisfy delivery obligations, nor does it ensure that a contract's fair value will be priced exclusively with reference to its ctd. If the level of contract open interest at expiration exceeds the available supply of the ctd, then at least some short position holders in the contract will necessarily have to fulfill their delivery obligations with a security other than the ctd, selected from the relevant basket of deliverable-grade securities. Market factors will thus dictate whether the futures contract prices a single-issue or a multi-issue delivery.

(Notice, Position Limits in Treasury Futures During Last Ten Trading Days, June 29, 2005 at 1, attached as Ex. A.)[1] CBOT's statements regarding position limits therefore undercut, rather than support, plaintiffs' theory regarding the cheapest to deliver notes.

In arguing that they were entitled to a futures contract based only on the cheapest to deliver note, plaintiffs also rely on inapplicable agricultural cases. These cases suggest that factors such as the feasibility and cost of delivering a physical agricultural commodity from one

---

[1] This Court may consider the CBOT's Notice regarding position limits on a motion to dismiss because the Complaint refers to the CBOT's decision and plaintiffs assert that it is central to their claim. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

3

location to another must be taken into account when determining the scope of the deliverable supply of the commodity. Pls.' Mem. at 17-19 (citing *Great Western Food Distrib. Inc. v. Brannan*, 201 F.2d 476, 481 (7th Cir. 1953); *Cargill, Inc. v. Hardin*, 452 F.2 1154, 1165-66 (8th Cir. 1971); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1049-51 (N.D. Ill. 1995).) The circumstances here, however, are quite different from the facts in those cases, because Treasury notes, unlike physical commodities, are not subject to time delays and storage and transportation costs associated with physical delivery of agricultural commodities. Instead, here, Treasury notes are financial instruments which are bought and sold electronically, such that the time and expense involved in delivering them across great distances – the primary issues considered in the cases cited by plaintiffs – are not relevant here. Moreover, here, plaintiffs' futures contracts and CBOT rules *expressly provided for* delivery of any number of Treasury notes other than the "cheapest" note, as plaintiffs themselves admit. First Amended Consolidated Class Action Complaint ("Complaint" or "Compl.") ¶¶ 33-34. As the CFTC explained in *In the Matter of Cox*, 1987 CFTC Lexis 325, at *20 (CFTC July 15, 1987),[2] "[m]arket participants who are dissatisfied with the terms of a futures contract (including delivery terms) are free either to petition the exchange to alter those terms or to refrain from trading an instrument they deem to be unsatisfactory." *Id.* Plaintiffs should not be permitted to state a claim by re-writing the terms of their futures contracts after-the-fact.

As a matter of law, prices cannot be characterized as "artificial" and PIMCO did not have the "ability"[3] to manipulate prices, simply because of a purported shortage of the "cheapest"

---

[2] Although, as plaintiffs note, *Cox* was decided after a trial, the *legal principles* it recognizes require rejection of plaintiffs' allegations as a matter of law, which can be decided on a motion to dismiss.

[3] Despite plaintiffs' suggestion that some courts "drop" the "ability" element, this Court clearly

4

notes. *Cox*, 1987 CFTC Lexis 325, at *20-21 ("[i]f the terms of the contract permit delivery of premium grades of the commodity, then premium grades must be counted as part of the relevant supply, if otherwise available.")[4] Although plaintiffs criticize *Cox* as a non-binding decision of the CFTC, they fail to recognize that, as the agency charged with enforcement of the Commodity Exchange Act, its decisions are typically respected by the courts, including this Court. *E.g.*, *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044-45 (N.D. Ill. 1995) (stating that "the task of defining manipulation and its elements has fallen to the CFTC and the courts" and citing CFTC decisions as persuasive authority). And the only case cited by plaintiffs regarding manipulation in Treasury notes under the Commodity Exchange Act is *In the Matter of Fenchurch*, 1996 CFTC Lexis 128 (July 10, 1996) – which itself was merely a *non-litigated settlement* of the *same agency* – the CFTC.

---

requires it. *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995). And, in any event, all courts certainly require a showing that prices were artificial, which plaintiffs cannot do here under *Cox*.

[4] When all deliverable notes are considered, PIMCO allegedly had only 3% of $421 billion available supply of notes, which plaintiffs do not deny. Although Plaintiffs claim that manipulation has been found in Treasury securities and futures in other cases when the defendant had similar positions (Plaintiffs' Br. at 1 & 8-9, 19-20), the decisions they cite do not help them here. Far from supporting plaintiffs' position, *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989), actually *rejected* a manipulation claim where the long defendants jointly held 29% of the open interest, finding that "[a]s a matter of law," the defendants "lacked the requisite market dominance . . . ." *Id.* at 602. Although the court allowed an *attempt* to manipulate claim to proceed, plaintiffs here do not allege such a claim, and any effort to do so would be futile, because they could not possibly be injured by any attempted manipulation that was not actually successful in manipulating prices. And *In re Salomon, Inc. Sec. Litig.*, 1994 WL 265917 (S.D.N.Y. June 16, 1994) and *In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993), were each brought under the Securities Exchange Act – not the Commodity Exchange Act. Moreover, *In re Salomon* involved improper bidding, which is different from the manipulation alleged here – and was not based on the size of the defendants' positions; the Second Circuit decision also involved only a discovery dispute, and did not address the merits of the case. Moreover, the *In re Steinhardt* decision plaintiffs cite involved a *settlement*, which was not a litigated outcome. Finally, *Fenchurch*, 1996 CFTC Lexis 128 (CFTC July 10, 1996), which plaintiffs also cite, is easily distinguished, as discussed in the text. Most significantly, none of these cases relied on by plaintiffs involved alleged manipulation based on a position constituting only 3% of the deliverable supply.

With respect to *Fenchurch*, Plaintiffs quote from that settlement to suggest that its analysis was intended to apply to the Ten Year Note futures contracts at issue here. Plaintiffs' selective quotation does not address in any manner the significant distinction between that and this case, which was expressly noted in that settlement – *i.e.*, that the alleged manipulation in the "cheapest" securities in *Fenchurch* occurred only *after* trading in the futures had closed, so that the market had *already priced the future based on only the cheapest to deliver security*. 1996 CFTC Lexis 128, at *15-16 (July 10, 1996). According to the settlement, after the contracts had been priced on the basis of the cheapest to deliver issue of the Treasury security, the respondents actively bought up a sufficient supply of the cheapest to deliver security with the specific intent to prevent parties with delivery obligations from using them for delivery. These circumstances were far different from those here, where the allegations relate to a time period where the market was trading and the market price of the futures contract could therefore readily adjust to any perceived shortage of the cheapest to deliver security. As noted in PIMCO's opening brief, that case expressly noted that its facts "differ[ed] from prior decisions discussing manipulation," including the fact that, unlike here, the alleged manipulative conduct "did not commence until several days after trading had expired" on the futures contract. *Id.* In contrast, in this case, as in *Cox,* because the futures contract was still trading at the time of the conduct at issue, the price of the futures could reflect the availability of numerous grades of the underlying commodity defined by the futures contracts. This is precisely what the CBOT Notice relied upon by Plaintiffs says should happen.

Plaintiffs' new assertion that they do, in fact, allege that PIMCO manipulated the Treasury Notes both before *and after* trading in the futures ended is unsupported by any citation

6

to the Complaint. In fact, the Complaint nowhere asserts that PIMCO engaged in manipulative purchases *after* trading closed in the futures at issue.

Plaintiffs also contend that PIMCO's argument is contrary to the allegations of the Complaint, where they make the conclusory assertion that PIMCO had the "ability" to manipulate prices. *See* Pls.' Mem. at 9-10. Yet this conclusory allegation is far from adequate to sustain a claim – particularly where, as here, the other allegations in the Complaint demonstrate that the assertion could not possibly be true. *Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992) (the court is not bound by plaintiffs' legal characterization of the facts or required to ignore facts set forth in the complaint that undermine plaintiffs' claims). Because plaintiffs' own allegations make clear that their futures contracts always reflected the prices of notes that the contracts and CBOT rules allowed to be delivered, PIMCO cannot be deemed to have manipulated prices. *Cox*, 1987 CFTC Lexis 325, at *20-21.

Finally, plaintiffs attempt to resuscitate their claim by arguing that the Complaint supports the theory that PIMCO manipulated the market by making false statements.[5] They allege that after trading in the allegedly manipulated contract was finished, PIMCO made an untrue statement about the trades it had made when the contract had been trading. PIMCO denies that the statement was untrue, but even if it were assumed to be untrue for purposes of this motion, it would not matter. Plaintiffs' own allegations establish that the allegedly untrue

---

[5] Plaintiffs also argue that Congress's "overarching purpose" was to prevent manipulation, and that the futures market is not a "substitute" physical market, but these arguments are not in any manner responsive to PIMCO's arguments regarding the flaws in plaintiffs' Complaint. PIMCO does not dispute that Congress intended to prohibit manipulation, or (for purposes of this motion) that deliveries are typically obtained by means other than the futures market. What it does dispute, however, is whether the circumstances described in the Complaint amount to manipulation.

statement was made only *after* the putative class period closed, and *after* trading in the futures contract closed. *See* Pls.' Mem. at 8; Complaint ¶¶ 12, 83-85. It therefore could not affect the prices paid by plaintiffs, who all closed out their positions *before* the statement was made.

Plaintiffs' theory that futures prices were artificial and manipulated if they reflected prices other than the cheapest to deliver is fatally flawed as a matter of law. Their complaint must therefore be dismissed.

## II. Plaintiffs Do Not Allege, As They Must, That PIMCO Intended to Manipulate Prices When It Acquired Its Positions.

In responding to PIMCO's argument that they do not allege that PIMCO intended to manipulate prices when it initially acquired its futures and note positions, plaintiffs mischaracterize both the Complaint and the law. To be liable for manipulation, a defendant must have intended to manipulate prices at the time it acquired its positions. *In the Matter of Indiana Farm Bureau Coop.*, 1982 WL 30249, at *8 n. 13 (CFTC Dec. 17, 1982) (there must be evidence that the defendant both exercised its ability to cause artificial prices and *"*intentionally acquired the ability to conduct*"* the purported manipulation); *Volkart Bros. Inc. v. Freeman*, 311 F.2d 52, 59 (5th Cir. 1962) ("it must appear not only that they profited from a squeeze, but that they intentionally brought about the squeeze by planned action")[6]; *Great Western Food Distribs. v. Brannan*, 201 F.2d 476, 479 (7th Cir. 1953). Thus, plaintiffs' suggestion that "no case holds that an intent must exist when the positions are initially established" (Pls.' Mem. at 22) is clearly wrong.

---

[6] Although Plaintiffs suggest that the *Volkart* decision has been criticized, that criticism has not applied to the portion of *Volkart* on which PIMCO relies, and the holding in *Volkart* on which PIMCO relies is supported by *Indiana Farm Bureau*. *See* 1982 WL 30249, *8 n. 13 (CFTC Dec. 17, 1982).

In attempting to respond to PIMCO's argument, plaintiffs erroneously contend that the Complaint does, in fact, allege that PIMCO intended to manipulate prices when it acquired its positions. This assertion is not supported by the portions of the Complaint to which they cite. In particular,

- Paragraphs 2 and 45, cited by plaintiffs, merely allege that, PIMCO had "knowledge" and was "aware" that the markets were allegedly susceptible to manipulation, and that PIMCO then "changed its prior behavior." As plaintiffs themselves admit, however, *specific intent* is required for manipulation claims, and mere knowledge is not sufficient. Pls.' Mem. at 14; *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995). Moreover, this allegation does not state that PIMCO intended *to manipulate* the market when it acquired its positions; instead, it states only that PIMCO was aware that the markets *were susceptible to* manipulation – which is a far cry from specific intent to manipulate prices.

- Paragraph 92, another paragraph cited by Plaintiffs, merely alleges that the "motive and intent" for PIMCO's alleged acts was to "increase financial return . . . ." Again, contrary to plaintiffs' unsupported assertions, this provision does not allege that PIMCO had improper intent *at the time it entered into its positions*.

- Paragraph 61 of the Complaint, relied on by Plaintiffs, alleges only that on May 9, 2005, PIMCO's traders made various statements that allegedly support plaintiffs' intent allegations. Putting aside the fact that plaintiffs grossly misinterpret those statements, this allegation does not cure the Complaint's deficiencies because it does not indicate that the positions PIMCO acquired before May 9 were acquired with manipulative intent.

9

Plaintiffs have simply not alleged that PIMCO had the intent to manipulate when it engaged in the allegedly improper trades.

Thus, although (as plaintiffs note) factual issues regarding intent often cannot be decided on a motion to dismiss, there are no such disputed issues here; plaintiffs have failed even to plead that PIMCO had the requisite intent.

Perhaps recognizing the weakness of the Complaint's allegations in this regard, plaintiffs' fallback position is that even if PIMCO did not acquire its positions with manipulative intent, it later intentionally "exacerbated" market conditions when the market became congested. In support of this theory, plaintiffs rely on PIMCO's purported "false statements" as affirmative actions to manipulate. But as explained above, the "false statements" argument obviously fails to support plaintiffs' claim, because the alleged false statements occurred *after* plaintiffs claim to have been damaged by the manipulation, and *after* the putative class period.

Plaintiffs also rely on PIMCO's alleged "refusal to liquidate" its futures contracts. But a mere "refusal to liquidate" is not the sort of affirmative "exacerbation" that other courts have allowed to state a claim for manipulation. Indeed, plaintiffs rely on *Fenchurch*, where, as described above, the CFTC analyzed the defendant's decision to *increase* its positions as "exacerbating" conduct after futures trading closed; that decision did not involve a mere failure to liquidate. *Fenchurch*, 1996 CFTC Lexis 128, at *15-16 (July 10, 1996). Indeed, *Fenchurch* is actually based on a line of cases beginning with *Indiana Farm Bureau* – a case upon which PIMCO relies – which distinguished between exacerbating conduct that intentionally *increased* a defendant's position, and a mere failure to liquidate, which is what plaintiffs rely on here, and which cannot be a basis for liability. *Indiana Farm Bureau Coop.*, 1982 WL 30249, *8 nn. 12 &

13; *see also Volkart Bros.*, 311 F.2d at 59. Thus, this "exacerbation" theory does not support plaintiffs' claims, and the Complaint should be dismissed.

**III.     Claims Against the John Doe Defendants Should Be Dismissed**.

Plaintiffs do not oppose PIMCO's motion to dismiss the claims against the so-called "John Doe" defendants. *See* Pls.' Mem. at 25 n.17.

**IV.     Leave To Amend Should Be Denied.**

Plaintiffs' request for leave to amend in the event the Court grants defendants' motion to dismiss should be rejected for several reasons. As an initial matter, it is inappropriate to make such a request at the end of plaintiffs' opposition to a motion to dismiss, without providing the Court and defendants the actual proposed amendments. *In re Bally Mfg. Sec. Litig.*, 144 F.R.D. 78, 80 (N.D. Ill. 1992).

Even if plaintiffs had properly filed a motion for leave to amend, it should still be denied. First, PIMCO's leading argument – *i.e.,* that PIMCO did not have the ability to manipulate prices – is based on indisputable facts (*e.g.*, that it held only an insignificant amount of the supply of all notes deliverable under the relevant futures contract). Amendment, therefore, would be futile.

Second, Plaintiffs are requesting leave several months beyond the May 30, 2006 deadline set by this Court for amendment of pleadings (2/24/06 Minute Order). By missing this Court's deadline, plaintiffs must show "good cause" for their delay in seeking to amend, and the more liberal Rule 15 standard no longer applies. *Hawthorne Land Co. v. Occidental Chemical Corp.,* 431 F.3d 221, 227 (5th Cir. 2005); *Parker v. Columbia Pictures Industries,* 204 F.3d 326, 340 (2d Cir. 2000); *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir. 1998); *Johnson v. Mammoth Recreations Inc.,* 975 F.2d 604, 610 (9th Cir. 1992). They have made no attempt to

11

meet their burden of demonstrating good cause, and they could not do so. Plaintiffs and their counsel have had the documents on which their motion relies for several months, and they have already filed *five* complaints between them: One by Raymond Chiu (who withdrew as a plaintiff), one by plaintiff Richard Hershey, a consolidated amended complaint, a corrected consolidated amended complaint, and a first amended consolidated complaint. It would be highly prejudicial to defendants, after extensive document discovery, to allow plaintiffs to continue amending their complaint to expand the scope of the litigation.

## Conclusion

For the reasons stated above, defendant PIMCO respectfully requests that the Court dismiss the First Amended Consolidated Class Action Complaint with prejudice.

Dated: August 28, 2006 Respectfully submitted,

By: /s/ Eric H. Grush
William J. Nissen
Eric H. Grush
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
**Counsel for Defendant Pacific Investment Management Company LLC**

## **CERTIFICATE OF SERVICE**

        I, Eric H. Grush, an attorney, hereby certify that I have served copies of the forgoing Defendant PIMCO's Reply In Support of Motion to Dismiss upon the following individuals by the Court's ECF system and/or other electronic means on the 28th day of August, 2006.

Marvin Alan Miller
MILLER FAUCHER and CAFFERTY, LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602

Christopher Lovell
LOVELL, STEWART HALEBIAN, LLC
500 Fifth Avenue
New York, NY 10110

Louis F. Burke
LOUIS F. BURKE, P.C.
460 Park Avenue
21st Floor
New York, NY 10022

Vincent Briganti
LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
One North Lexington Avenue
11th Floor
White Plains, NY 10601

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218

Blake T. Hannafan
MICHAEL T. HANNAFAN & ASSOCIATES, LTD.
One East Wacker Drive, Suite 1208
Chicago, IL 60601

                                                        /s/ Eric H. Grush
                                                          Eric H. Grush