

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOSEF A. KOHEN, BREAKWATER    )
TRADING LLC, and RICHARD HERSHEY,    )
    )
    Plaintiffs,    )
    )
    v.    )    05 C 4681
    )
PACIFIC INVESTMENT MANAGEMENT    )    Judge Ronald A. Guzmán
COMPANY LLC, PIMCO FUNDS, and    )
John Does 1-100,    )
    )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Breakwater Trading LLC ("Breakwater") and Richard Hershey have filed this class action against Pacific Investment Management LLC ("PIMCO") and PIMCO Funds alleging violations of §§ 9(a), 22(a) and 22(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 13(a), 25(a), 25(a)(1). Plaintiffs now move for class certification pursuant to Federal Rule of Civil Procedure ("Rule") 23. Additionally, defendants have moved to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6). For the reasons set forth in this opinion, the Court grants plaintiffs' motion for class certification, denies PIMCO Funds' motion to dismiss, and grants in part and denies in part PIMCO's motion to dismiss.

### Facts

This is a class action brought by plaintiffs on behalf of purchasers of the June 2005 Ten-Year Treasury note futures contract ("June Contract"). (Pls.' Mem. Supp. First Am. Mot. Class Cert. ("Pls.' Mem. Supp. Mot. Class Cert.") 1.) Plaintiffs allege defendants manipulated

and aided and abetted the manipulation of prices of the June Contract and the cheapest-to-deliver ("CTD") Treasury note underlying the June Contract in violation of §§ 9(a), 22(a) and 22(a)(1) of the CEA. (*Id.*)

Futures contracts are standardized according to terms specified by the commodities exchange that creates the contract, which makes such contracts fungible and allows them to be bought and sold over the exchange. (Compl. ¶ 29; PIMCO's Mem. Supp. Mot. Dismiss 3.) The party contracting to sell the underlying commodity pursuant to a futures contract is called the "short," and is said to have a "short position." (PIMCO's Mem. Supp. Mot. Dismiss 3-4.) The party contracting to buy the underlying commodity pursuant to a futures contract is called the "long," and is said to have a "long position." (*Id.*) The long position has the right to take delivery of the underlying commodity, while the short position is obligated to make delivery to the long position. (*Id.*) A party to a futures contract can "liquidate" its position by entering into an equal and opposite transaction (*i.e.*, "offset") in the futures market prior to the expiration of trading on the futures contract. (*Id.* at 4.)

Plaintiffs Hershey and Breakwater purchased June Contracts during the class period to liquidate a short position and incurred a loss on the transaction. (Compl. ¶¶ 18-19.) PIMCO is an institutional money manager, and PIMCO Funds is a Massachusetts trust and registered open-end management investment company consisting of separate portfolios. (*Id.* ¶¶ 22-23.) PIMCO Funds does not make any investment decisions or execute trades; rather, PIMCO Funds contracts with its investment advisor, PIMCO. (PIMCO Funds' Mem. Supp. Mot. Dismiss 2.) Plaintiffs refer to PIMCO and PIMCO Funds collectively in their complaint. (Compl. ¶ 23.) Plaintiffs allege that between the years 2000 to 2004 the volume and open interest of the

2

Chicago Board of Trade ("CBT") Ten-Year Treasury note futures contract steadily increased while the available supply of Treasury notes deliverable in satisfaction of the futures contracts remained constant or declined, which made the futures contract susceptible to manipulation by a person in control of a large long position. (Pls.' Mem. Supp. Mot. Class Cert. 3.)  In late 2004 and 2005, and with knowledge of the foregoing facts, defendants began to accumulate a large long position in the June Contract. (Compl. ¶¶ 2, 45.)  By March 31, 2005, defendants held in excess of $16.3 billion in the June Contract, which plaintiffs claim is of unprecedented size and was many times larger than defendants' position prior to October 2004.  (*Id.* ¶ 53; Pls.' Mem. Supp. Mot. Class Cert. 3.)  This long position exceeded the available supply of the CTD Treasury note.  (Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 6.)

Additionally, from March 20, 2005 until the end of June 2005, defendants increased their holdings of the February 2012 Treasury note (the "CTD Treasury note") to $13.3 billion, which was the CTD Treasury note for the June Contract and was in excess of 75% of the deliverable supply of such notes. (Compl. ¶¶ 5, 34, 37, 56, 58; Pls.' Mem. Supp. Mot. Class Cert. 4.) However, defendants argue that the $13.3 billion amounted to merely 3.16% of the notes deliverable under the terms of the June Contract.  (PIMCO's Mem. Supp. Mot. Dismiss 6.)

The CBT rules specify a number of different Treasury note issues with maturity dates ranging from six-and-one-half to ten years that are acceptable for delivery against a Ten-Year Treasury note futures contract. (Compl. ¶ 33.) Although multiple Treasury note issues are typically deliverable against a particular futures contract, usually a single Treasury note is most economical for shorts to deliver, which is referred to as the CTD.  (*Id.* ¶ 34.)

As the June Contract neared its expiration, and coinciding with a decline in the open

3

interest of the June Contract in May and June 2005, defendants held their long position in the June Contract, which plaintiffs claim is "highly unusual." (*Id.* ¶ 4; Pls.' Mem. Supp. Mot. Class Cert. 4; Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 6.) After trading in the June Contract closed, defendants represented that they took deliveries on the June Contract (which, according to plaintiffs, occurs less than 1% of the time because traders usually offset their future contract positions before their contracts mature) and acquired a large position in the CTD Treasury note for investment purposes. (Compl. ¶ 30; Pls.' Mem. Supp. Mot. Class Cert. 4.) However, by September 30, 2005, defendants had sold all of their CTD Treasury note holdings. (Pls.' Mem. Supp. Mot. Class Cert. 4.) On June 29, 2005, the CBT amended CBT Regulation 425.01 to limit the amount of contracts that could be held during the last ten trading days to 50,000 contracts, which was less than one-third of defendants alleged long position in the June Contract. (Compl. ¶¶ 81-82.)

Plaintiffs allege the motive and intent underlying defendants' conduct was to increase financial returns and profit from artificially high prices. (*Id.* ¶ 92; Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 7.) Throughout the class period, May 9, 2005 to June 30, 2005, the pricing relationships and trading behavior of the June Contract and/or the CTD Note exhibited anomalies, which plaintiffs alleged evinced an artificial market. (Compl. ¶¶ 62-73; Pls.' Mem. Supp. Mot. Class Cert. 4.)

## Discussion

Plaintiffs have moved for class certification pursuant to Rule 23. Additionally, defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a

4

claim upon which relief can be granted.

## I. Motion for Class Certification

Before discussing the merits of plaintiffs' motion for class certification, two preliminary

arguments that have been raised by defendants will be considered. Defendants argue that

plaintiffs lack standing to bring their individual actions, and that the class definition is fatally

flawed because it includes persons that have not been injured by defendants alleged manipulation

of the June Contract.

First, defendants argue that neither Hershey nor Breakwater can serve as a representative

of the putative class because both plaintiffs lack standing. If the named plaintiffs cannot

establish standing, then they may not seek relief on their own behalf or on the behalf of any other

members of the class. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Defendants assert that § 22

of the CEA imposes the standing requirement that plaintiffs must have purchased or sold a

futures contract and suffered actual damages as a result of the price manipulation of the futures

contract. 7 U.S.C. § 25(a)(1)(D).

Defendants argue that plaintiffs were not the actual purchasers of the June Contract.

According to defendants, plaintiffs entered into a partnership or joint account arrangement,

which was the actual purchaser of the contracts. Defendants assert that Breakwater was not even

the legal owner of the accounts in which its employees traded, and Hershey held only a minority

interest in his joint account. According to defendants, that plaintiffs lack standing is consistent

with general principles of jointly held claims. In support of their argument, defendants rely

solely on *Shelley v. Noffsinger*, a case in which the court ordered joinder of a party with an

5

interest in the disputed joint account because it was necessary to avoid needless risk of multiple lawsuits. 91 F.R.D. 263, 266-67 (N.D. Ill. 1981).

The Court is not persuaded by defendants' argument. In *Hochschuler v. G.D. Searle & Co.*, the defendants argued that the absence of a joint owner rendered the class' named representative's claim atypical. 82 F.R.D. 339, 346 (N.D. Ill. 1978). In concluding the claim was not atypical, the court stated that both an individual purchaser and a purchaser that decided to purchase as a co-owner "would be influenced by the same material nondisclosures." *Id.* Similarly, in this case, the same alleged course of conduct by defendants that resulted in manipulation of the price of the June Contract would influence and harm both the individual purchaser and the co-owner of a joint account. Hershey's decision to purchase as a co-owner of a joint account should not affect his ability to seek remedies under the CEA because Hershey has alleged that he suffered actual damages from purchasing the June Contract at a manipulated price. (Compl. ¶ 103.) Therefore, the Court finds that Hershey has standing and may seek to represent other members of the putative class.

Additionally, the Court finds that Breakwater has standing to sue under the § 22 of the CEA. Breakwater has alleged that it purchased one or more June Contracts during the class period and was injured as a result of defendants' manipulative conduct. (*Id.*) Because Breakwater has alleged that it suffered injury, Breakwater has standing and may seek to represent other members of the putative class. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) ("Appellee has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others."); *see also Indemnified Capital Invs., SA v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1408-10 (7th Cir. 1993) (finding plaintiff did not have standing to sue based

6

on "customer accounts," as opposed to plaintiff's "house accounts," because customers alone suffered the loss; further noting that plaintiff did not allege that it was injured by losses sustained in customer accounts).

Second, defendants argue that despite plaintiffs' amendment, the amended class definition still includes class members who were not injured by the alleged manipulation of the June Contract. If class members cannot allege some threatened or actual injury resulting from defendants' illegal actions, then a federal court may not assume jurisdiction because there is no actual case or controversy. *O'Shea*, 414 U.S. at 493-94 (quotations omitted); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (stating it was not reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting relief in order to support the requirement of an actual case or controversy). Defendants contend that the amendment to the class definition still does not eliminate those members of class who both bought and sold, which in some cases resulted in a net benefit to those who sold at higher prices than they bought.

The amended class definition includes "[a]ll persons who purchased, between May 9, 2005 and June 30, 2005 ("Class Period"), inclusive, a June 10-year Treasury note futures contract in order to liquidate a short position (the "Class"). Excluded from the Class are defendants and any affiliated or associated party or defendants." (Pls.' Reply Mem. Supp. Class Cert. 4.) Defendants rely on *Dura Pharmaceuticals, Inc. v. Broudo* in support of the proposition that both sides of transactions by class members who bought and sold within the class period would need to be analyzed and netted to determine whether there was actual injury. 544 U.S. 336 (2005). In *Dura*, the Supreme Court reversed the Ninth Circuit's standard for pleading the element of loss

7

causation for a securities fraud claim. *Id.* at 346. The Court stated that merely alleging an inflated purchase price is inconsistent with the law's requirement that a plaintiff prove a defendant's fraudulent conduct caused the plaintiff's economic loss. *Id.* However, this is not a securities fraud case and, thus, the elements of proof are different. *Compare id.* at 341-42 (listing the essential elements of a securities fraud claim: a material misrepresentation, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation), *with In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995) (listing the elements of a price manipulation claim: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price."). Therefore, the Court does not find *Dura* controlling on the issue of whether the class definition includes uninjured members. Plaintiffs respond by arguing that all class members allegedly suffered the injury of paying an artificially inflated price for the June Contract. Even with regard to class members that purchased and sold before and during the class period, plaintiffs contend that market manipulation cases have repeatedly certified classes despite issues of net damages for in-and-out traders. *See, e.g., In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) (stating, in regard to in-and-out traders, that "factual differences in the amount of damages, date, . . . the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class.").

The Court finds that the amended class definition does not suffer from a fatal flaw. At this stage of the litigation, it would be premature to deny plaintiffs the opportunity to unify in

8

their task to prove that defendants engaged in a common course of conduct that negatively

affected all members of the proposed class.  Plaintiffs allege that defendants' conduct

manipulated the price of the June Contract upward to an artificial level, and, thus, each purchaser

of a June Contract within the class period would have paid a higher price than would otherwise

be the case absent the alleged manipulation.  Therefore, the Court is satisfied that all members of

the class have suffered injury, and defendants' concerns over the final determination of net

damages for some individual members of the class should be resolved in the damages stage of

the litigation.[1]  *See Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D. Ill. 1987) ("Traditionally .

. . the courts have not allowed individual questions of damages to prevent class certification.");

*In re LTV Sec. Litig.*, 88 F.R.D. 134, 148 (N.D. Tex. 1980) ("[O]ne who has both bought and

sold in the 'tainted market' may nonetheless have suffered an injury.  Inquiry into matters of the

measure of damage is not ordinarily made at the class certification stage.").  Because defendants

two preliminary arguments are not dispositive, the Court will move on to consider the merits of

plaintiffs' motion for class certification.

"[A] district court has broad discretion to determine whether certification of a class is

appropriate." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993).  The

putative class representative has the burden of establishing four prerequisites to class

certification:  (1) the class is too numerous to join all members, (2) there are common questions

of law or fact common to the case, (3) the claims or defenses of the representative parties are

---

[1]Defendants' concerns about the inclusion of class members that did not suffer actual
damages will further be considered and analyzed infra in connection with the requirements of
Rule 23.

typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Id.*; Fed. R. Civ. P. 23(a). Failure to satisfy any of the prerequisites will preclude certification of the class. *Retired Chi. Police Ass'n*, 7 F.3d at 596. "Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries . . . necessary under Rule 23." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

## A. Rule 23(a) Requirements

### 1. Numerosity

To satisfy the numerosity requirement, "the class must be so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs are not required to specify the number of members with exactness, *Marcial v. Coronet Insurance Co.*, 880 F.2d 954, 957 (7th Cir. 1989), and, to support a finding of numerosity, the court is entitled to make common-sense assumptions, *Peterson v. H & R Block Tax Servs.*, 174 F.R.D. 78, 81 (N.D. Ill. 1997).

Plaintiffs allege that there are over one thousand class members around the United States whose identities can be ascertained through CBT records. (Compl. ¶ 95; Pls.' First Am. Mot. Class Cert. ¶ 4.) Defendants fail to dispute the numerosity requirement, and the Court is satisfied that the number members in the proposed class is large enough to render joinder impracticable.

### 2. Commonality

To satisfy the commonality requirement, there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). "A common nucleus of operative fact is usually enough to

satisfy the commonality requirement," and "[t]he fact that there is some factual variation among the class . . . will not defeat a class action." *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992). The commonality requirement has been referred to as a low hurdle that is easily surmounted. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996); *In re Prudential Sec. Inc., Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 (S.D.N.Y. 1995); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). Commonality is satisfied as long as one question of law or fact is common to the class. *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 196 (N.D. Ill. 1998); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 663 (N.D. Ill. 1996).

Plaintiffs assert that questions of law are common to all members of the class. Under the CEA, they argue, the same elements for claims of manipulation and for claims of aiding and abetting manipulation are applicable to all class members. Defendants fail to dispute plaintiffs' assertion that common questions of law exist. Furthermore, plaintiffs argue that common questions of fact will arise as they seek to prove historical facts such as ordinary Treasury note futures prices, volumes, open interests, as well as industry practices. Plaintiffs argue that all class members will want to develop this historical information database, which will require extensive discovery and expert testimony, in order to establish whether and to what extent defendants' conduct caused the Treasury note futures prices to become artificial. Plaintiffs have established that there are questions of law and fact common to all members of the putative class.

11

## 3. Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983); *see Rosario*, 963 F.2d at 1018 ("[W]e look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)."). Even if there are factual distinctions between the representative parties and other class members, the typicality requirement can be satisfied. *De La Fuente*, 713 F.2d at 232. "Thus, similarity of legal theory may control even in the face of difference of fact." *Id.*

Defendants assert that plaintiffs are not typical of the putative class. Defendants note that "[i]f proof of [plaintiffs'] claims would not necessarily prove all of the proposed class members' claims," then the typicality prong is not satisfied. *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 586 (N.D. Ill. 2000) (quotation omitted). Because Hershey only purchased a June Contract on May 11, 2005, defendants contend that Hershey will only have to prove manipulation on that specific day, and he has no incentive to prove claims of the class members that purchased on other dates during the class period. Moreover, defendants contend Hershey's trading during the class period was profitable overall, and thus he is not typical of members that may have lost money overall.

Additionally, defendants assert that Breakwater is not typical of the class members. Defendants claim that Breakwater did not trade through the entire class period and Breakwater's claims focus only on certain days within the class period. Specifically, defendants state that

12

market volatility on the dates Breakwater traded resulted from an announcement on May 24,

2005 made by the Federal Reserve Board's Federal Open Market Committee. Thus, defendants

contend Breakwater will have to litigate this issue individually, which renders Breakwater's

claim atypical of other members of the class who do not have to address the Federal Reserve

Board issue.

Plaintiffs argue that they are typical of members of the class because their claims are

predicated on defendants' common course of conduct or scheme to create artificial prices for the

June Contract. Plaintiffs contend that in order to prove a price manipulation claim, no class

member could merely submit evidence of what occurred on the specific days they traded; rather,

to have validity, the class members would need to present historical data.

The Court determines that plaintiffs' claims are typical of members of the class.

Defendants are alleged to have engaged in a course of conduct that manipulated prices for the

June Contract. All class members purchased the same futures contract within the class period,

and, thus, all members were affected by defendants' same course of conduct and alleged price

manipulation. Furthermore, all class members seek relief under the CEA based on the same legal

theory. Therefore, plaintiffs' claims are typical because they arise from the same events or

course of conduct that gives rise to the claims of other class members and are based on the same

legal theory. *See De La Fuente*, 713 F.2d at 232.

The fact that plaintiffs did not trade through the entire class period does not preclude

class certification. *See In re Sumitomo Copper Litig.*, 182 F.R.D. at 94 ("[T]he simple fact that

Class members may have purchased and sold copper futures at different times, for different

purposes, does not detract from the fact that every class member purchased or sold the same

13

fungible . . . contract in the same centralized . . . market."). Moreover, the Court agrees with

plaintiffs that all class members would desire to compile historical evidence, as opposed to

merely relying on evidence based on a single date, to support an allegation of price manipulation

in order to lend reliability to their claims. Therefore, the fact that plaintiffs traded only on certain

dates while members of the class traded on different dates is not dispositive of the typicality

issue. *See In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) ("[T]he

possibility that proof of injury might require separate evaluations of the artificiality of a

commodities price at the moments affecting each of the class members need not defeat class

certification.").

Even if defendants prove Hershey offset a loss during the class period, Hershey's claim

would not be atypical of a class member who sustained a loss. *See Blackie v. Barrack*, 524 F.2d

891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does

not defeat class action treatment."); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179

(S.D.N.Y. 2005) (recognizing the possibility that, although the nature of the manipulation was

not yet ascertained by plaintiff, a class member who earned substantial profits through trading in

natural gas futures could nonetheless have been damaged by the alleged scheme to manipulate

prices higher than they otherwise would have been);[2] *In re Sumitomo Copper Litig.*, 182 F.R.D.

---

[2]The standard relied upon by the *In re Natural Gas Commodities* court to determine whether plaintiffs had adequately alleged Rule 23's requirements has since been overruled. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24,35 n.5 (2d Cir. 2006) (holding that the "some showing" standard is overruled, to be replaced with the standard that a judge should resolve any factual disputes relevant to establishing Rule 23 requirements prior to certifying a class). Other class actions certified in the Second Circuit prior to the ruling in *In re Initial Public Offering Securities Litigation* may have also relied on the more lenient standard. *See, e.g., In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998). However, district courts have broad discretion in determining whether to

at 93 (rejecting the argument that conflicts of interest in establishing the fact and extent of any

manipulation will arise between spread and hedge traders and the proposed class). Finally, the

Court determines that the market volatility purportedly caused by the Federal Reserve Board's

announcement on May 24, 2005 is not a defense that renders Breakwater's claim atypical of the

putative class. A named plaintiff is not a proper class representative only "where it is predictable

that a major focus of the litigation will be on an arguable defense that is unique to the named

plaintiff." *In re VMS Securities Litig.*, 136 F.R.D. 466, 475 (N.D. Ill. 1991). Even if defendants

prove that the Federal Reserve Board's announcement affected market prices of the June

Contract during the class period and that issue becomes a major focus of the litigation, many

members of the class may have an interest in opposing this issue since it occurred in the middle

of the class period. For these reasons, the Court determines that plaintiffs have satisfied the

typicality requirement.

## 4. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation includes both

adequacy of named plaintiff's counsel, as well as adequacy of representation in protecting the

different, separate, and distinct interests of the class members. *Retired Chi. Police Ass'n*, 7 F.3d

at 598. "A class representative must be part of the class and possess the same interest and suffer

---

certify a class, and each determination is fact specific. Because class certifications are fact
specific, comparisons to other class certification cases is of limited value. In any event, the Court
is satisfied that plaintiffs have carried their burden in their motion for class certification.

the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

Plaintiffs claim they have no interest antagonistic to the class. However, defendants argue that plaintiffs claims are in direct conflict with putative members of the class because, in order to prove their damages, plaintiffs must demonstrate that the price was artificial on the dates they purchased the June Contract, while other class members who sold on those same dates would have an interest in demonstrating the price was not artificially high in order to maximize their damages.[3]

The Court is satisfied that the representative parties will fairly and adequately protect the interests of the class. Despite defendants' arguments that there exists a potential conflict of interest in proving various levels of artificiality on different dates throughout the class period, courts have rejected similar arguments when certifying classes. *See Fry v. UAL, Corp.*, 136 F.R.D. 626, 633-34 (N.D. Ill. 1991) ("[A]ny alleged conflict in the fact [that plaintiffs] were primarily sellers of put contract [that must prove a decrease in price] as opposed to sellers of common stock [that must prove a increase in price] will arise at the damages stage of the litigation."); *Blackie*, 524 F.2d at 908 (agreeing that at some point in the litigation the class members will have differing interests, i.e., maximizing the inflation existing on one day while minimizing it on other days, but "altogether disagree[ing], for a spate of reasons, that such potential conflicts afford a valid reason at this time for refusing to certify the class."); *In re*

---

[3]Defendants also claim that the allegations of plaintiffs' complaint are partly attributable to one of the putative class members plaintiffs seek to represent. This argument will not preclude certification of the class, though it may be probative during the liability or damages stage of the trial.

16

*Natural Gas Commodities Litig.*, 231 F.R.D. at 183 (rejecting argument that class certification is precluded when class members, including purchasers, sellers, and speculators, have potentially conflicting interests in showing defendant's alleged misconduct caused the price to be lower or higher on particular dates). The Court determines that plaintiffs will be adequate representatives and protect the interests of the class. Defendants have failed to dispute adequacy of counsel, and the Court is satisfied that plaintiffs' counsel will vigorously prosecute this case. Accordingly, plaintiffs have fulfilled the adequacy of representation requirement.

The supplemental authority submitted by defendants, *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007), does not persuade the Court otherwise. *Langbecker* is factually distinguishable from this case because in that case, appellants sought injunctive relief that would have dissolved the stock fund at issue. *Id.* at 315. That stock fund could not be partially dissolved and yet remain open as an investment option for absent class members, and the appellants were contesting conduct that involved "a multitude of considerations over a period of years." *Id.* In contrast, here, plaintiffs and all class members purchased the exact same standardized futures contract in the same market, seek the same type of relief, and there is a proposed fifty-two-day class period. Therefore, the nature and extent of potential conflicting interests in this case are much less.

## B. Rule 23(b) Requirement

In addition to the requirements of Rule 23(a), one of the three subsections of Rule 23(b) must be satisfied before a class may be certified. Fed. R. Civ. P. 23(b). Here, plaintiffs seek certification under Rule 23(b)(3), which requires the court to find that common questions of law

17

or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.*

## 1. Predominance

The predominance requirement is far more demanding than the commonality requirement of Rule 23(a)(2). *Amchem Prods., Inc.*, 521 U.S. at 623-24. "At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." *Hyderi v. Wash. Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006). The court should consider whether the class seeks remedy to a common legal grievance. *Hochschuler*, 82 F.R.D. at 348-49.

Defendants assert that in order to be liable, both the fact of injury and causation must be proven on a class-wide basis. Thus, defendants argue, individual issues regarding whether individual class members suffered economic losses may predominate over issues common to the class. Additionally, defendants argue that there will be predominant individual issues related to plaintiffs' expert's statistical model and predominant issues raised by class members who satisfied their futures contract obligation with securities rather than cash.

The Court determines that common questions of law will predominate over individual questions. Plaintiffs argue, and the Court agrees, that the predominant issue in this case will be whether defendants unlawfully manipulated prices of the June Contract in violation of the CEA. Accordingly, if plaintiffs can prove price manipulation, then fact of injury will have been established for all members of the class that purchased the June Contract at higher prices than

18

otherwise would have existed absent manipulation. The determination of this legal question involves the same fungible futures contract purchased by all members of the class on the CBT, and the defendants' same alleged manipulative conduct that plaintiffs will attempt to prove through a common economic formula that has been developed through extensive discovery and expert testimony. In sum, the common legal grievance, violation of the CEA, depends upon proof and findings pertaining to defendants' course of conduct and favorable findings would prove the claims of all class members who purchased the June Contract.

Other courts considering class certification for price manipulation claims under the CEA have also found common questions to predominate. *See In re Sumitomo Copper Litig.*, 182 F.R.D. at 90-91 ("'The common factual questions of the who, what, when, where, and how of the conspiracy, and the common legal questions of the application of the law, particularly the Commodity Exchange Act, to the facts proven predominate over the individual questions of whether the conspiracy caused each class member some injury.'") (quoting *Gordon v. Hunt*, 98 F.R.D. 573, 578 (S.D.N.Y. 1983)); *see In re Natural Gas Commodities Litig.*, 231 F.R.D. at 183 (stating presence of class members with arguably conflicting interests did not undermine the predominance requirement because all class members have the same shared interest in proving price artificiality). Courts generally focus on the showing of predominance of common questions at the liability stage of litigation rather than at the damages stage. *In re Natural Gas Commodities Litig.*, 231 F.R.D. at 180-81; *Dura-Bilt Corp., v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981). Thus, the Court rejects defendants' argument that individual questions will predominate because, at some point, damage calculations may be required on an

19

individual basis.[4]  For the same reasons, the Court rejects defendants' arguments related to the

plaintiffs' expert's statistical model and class members that satisfied their futures obligations

with securities rather than cash as these issues go to the individual determinations of damages

after liability has been established.  Therefore, the Court determines that plaintiffs have

demonstrated that common questions will predominate.

## 2. Superiority

Rule 23(b)(3) requires "that a class action [be] superior to other available methods for the

fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  Defendants argue

that many of the putative class members' claims are sufficiently large to provide them with

incentive to prosecute their individual claims.  Plaintiffs argue that the cost of bringing a

commodity futures manipulation action is, even for Breakwater's multi-million dollar claim, a

negative value claim—a claim that would cost more to prosecute than may be recovered in

damages.

---

[4]Defendants cite the Third Circuit's analysis in *Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 259 F.3d 154 (3rd Cir. 2001), as instructive, which involved a § 10(b) claim under the Securities Exchange Act of 1934. The *Newton* court considered the plaintiff's duty to prove that each member of the class was injured by defendant's conduct, as distinguished from calculation of damages. *Id.* at 188. The court stated that class actions based on a fraud-on-the-market theory, excessive securities pricing policies, or antitrust violations were examples of conduct itself causing economic injury. However, the court noted: "[b]ut only those class members whose trades could have been executed at better prices sustained economic injury here," and thus individual questions in determining which class members were harmed was deemed overpowering. *Id.* at 189. In this case, the Court has concluded that injury in fact is satisfied by the fact that class members purchased the June Contract at an artificially manipulated high price. This, in essence, is "economic injury" and, thus, the Court does not find *Newton* to be inconsistent with the Court's determination. Moreover, this is not a securities fraud case and, thus, the elements of proof are different.

Considering that the size of the potential class is estimated at over one thousand, the class action is a superior method for adjudicating this case. Class actions permit pooled claims that otherwise would be uneconomical to litigate individually to have their day in court. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). This case involves a large number of investors who are geographically dispersed and seek to resolve a common legal grievance based on defendants' same course of conduct affecting the same fungible contract purchased on the CBT. The Court determines that judicial resources would be used most efficiently by certifying this class to resolve these common questions.

Additionally, defendants argue that difficulties will be encountered in the management of this class action. Specifically, defendants point to the number of traders within the class and the need for individual determinations of injury. However, previous commodities futures litigation classes have been certified, which were much larger than the class proposed here and included both purchasers and sellers of futures contracts, and were deemed to be manageable. *See, e.g., In re Natural Gas Commodities Litig.*, 231 F.R.D. at 179 (certifying a class numbering in the thousands, including both purchasers and sellers, with a three-year-class period). Therefore, the Court is satisfied that a class action will be a superior method for the fair and efficient adjudication of this controversy.

For the foregoing reasons, the Court finds that all of the requirements for class certification have been satisfied. Accordingly, the Court grants plaintiffs' Amended Motion for Class Certification.

## II. Motion to Dismiss

Defendants PIMCO and PIMCO Funds have moved to dismiss the complaint pursuant to

Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Under Rule 12(b)(6),

a court must "determine whether the complaint contains 'enough factual matter (taken as true)' to

provide the minimum notice of the plaintiffs' claim that the Court believes a defendant [is]

entitled to." *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, __ F.3d __, 2007 WL

1791004, *8 (7th Cir. June 22, 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955,

1967-69 (2007)). All factual allegations and the inferences reasonably arising therefrom are

accepted as true. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520-21 (7th Cir. 1990). However, the

Court is not required to ignore facts in the complaint which undermine a plaintiff's claim. *R.J.R.*

*Servs., Inc. v. Aetna Cas. Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1988).

Price manipulation of a commodity is prohibited by the CEA. 7 U.S.C. §§ 13(a)(2),

25(a). Although not defined in the statute, "broadly stated, [manipulation] is an intentional

exaction of a price determined by forces other than supply and demand." *Frey v. Commodity*

*Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991).[5]  The four elements of a price

manipulation claim are: "(1) the defendant possessed the ability to influence prices; (2) an

artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant

specifically intended to cause the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. at

1045.

---

[5]The *Frey* court noted: "Sophisticated economic justification for the distinctions made in
[the price manipulation area] may at times seems questionable. Sometimes the 'know it when
you see it' test may appear most useful." *Id.*

**A. PIMCO Funds' Motion to Dismiss**

The Court first considers PIMCO Funds' arguments in support of its motion to dismiss. First, PIMCO Funds argues it lacked the necessary intent to violate the CEA. PIMCO Funds contends that the complaint alleges PIMCO Funds was "controlled" and "managed" by PIMCO, and PIMCO "caused PIMCO Funds'" conduct in purchasing futures contract positions. (Compl. ¶ 23.) Therefore, PIMCO Funds concludes that the complaint itself concedes PIMCO Funds did not have the requisite ability or intent to manipulate the market. Second, PIMCO Funds argues plaintiffs fail to state a claim for aiding and abetting a violation of the CEA. Under § 22 of the CEA, to state a claim for aiding and abetting, plaintiffs must allege PIMCO Funds "(1) had knowledge of the principal's . . . intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *See Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998).

Plaintiffs assert that they have alleged that PIMCO Funds[6] knowingly aided and abetted the violations of the CEA, willfully intended to assist the manipulation, and had the motive and intent to profit from artificial prices. (Compl. ¶¶ 92, 104, 105.) Moreover, plaintiffs argue that it is premature to resolve PIMCO Funds' manipulative intent at this stage of the litigation.

Taking all factual allegations and the inferences reasonably arising therefrom as true, the Court concludes that plaintiffs have adequately pleaded that PIMCO Funds had the requisite intent to manipulate prices. Intent is a subjective inquiry and "must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the

---

[6]PIMCO and PIMCO Funds are referred to collectively in plaintiffs' complaint. (Compl. ¶ 23.)

circumstances." *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, No. 75-14, 1982 WL 30249, at *5 (C.F.T.C. Dec. 17, 1982). *Cf. Makor Issues Rights, Ltd., v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006) (stating, with regard to pleading a securities fraud claim, "[i]f a reasonable person could not draw . . . an inference [of scienter] from the alleged facts, the defendants are entitled to dismissal"). Here, considering the totality of the circumstances, it can be reasonably inferred from the facts alleged that PIMCO Funds intended to cause artificial prices or otherwise manipulate the futures market. PIMCO Funds is alleged to have accumulated a very large long position in the June Contract, which it did not liquidate, and PIMCO Funds is alleged to have accumulated a large position in the CTD Note. This coincided with an above average number of deliveries on the June Contract, which could not be satisfied with the CTD Treasury note. The reasonable inference that PIMCO Funds' had the requisite intent is not negated by plaintiffs' reference in the complaint to PIMCO causing PIMCO Funds' conduct because, taking the allegations as true and all reasonable inferences arising therefrom, PIMCO Funds was well aware of its ability to influence prices while it was accumulating these large contract positions.

In addition, plaintiffs have sufficiently alleged that PIMCO Funds had the requisite intent with regard to aiding and abetting a violation of the CEA. For the reasons discussed above, it can be reasonably inferred form the alleged facts that PIMCO Funds knew that PIMCO intended to manipulate the futures market by accumulating large positions in the June Contract and the CTD Treasury note, and by acting as the purchaser of such notes, PIMCO Funds intended and actually furthered PIMCO's objective. Therefore, for the foregoing reasons, the Court denies PIMCO Funds' motion to dismiss.

## B. PIMCO and PIMCO Funds' Joint Motion to Dismiss

The Court next considers PIMCO's arguments in support of its motion to dismiss. PIMCO Funds has joined the motion and adopts it in its entirety. (PIMCO Funds' Mem. Supp. Mot. Dismiss 1.)

The first element of a price manipulation claim requires that defendants possess the ability to influence prices. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Defendants argue they did not have the ability to manipulate prices because the June Contract allows for delivery of a number of other Treasury notes besides the CTD Treasury note. (Compl. ¶¶ 33-34.) In fact, defendants assert that they only held 3.16% of the notes deliverable under the terms of the June Contract. (PIMCO's Mem. Supp. Mot. Dismiss 6.) In support of this argument, defendants cite the Commodity Futures Trading Commission ("CFTC") in *In re Cox*: "the terms of the underlying futures contract should not be lightly ignored when calculating deliverable supply. If the terms of the contract permit delivery of premium grades of the commodity, then premium grades must be counted as part of the relevant supply, if otherwise available." No. 75-16, 1987 CFTC Lexis 325, at *20 (C.F.T.C. July 15, 1987). Therefore, defendants contend, June Contract prices could not have been artificial because the price was based on a mix of notes that are expressly deliverable under the terms of the June Contract.

Plaintiffs contend that defendants' argument has been refuted by the CFTC in *In re Fenchurch Capital Management, Ltd.* The CFTC found that Fenchurch controlled a dominant portion of the available supply of the CTD Treasury note but acknowledged that the terms of the futures contract allowed for delivery of securities other than the CTD Treasury note. No. 96-7, 1996 WL 382313, at *6 (C.F.T.C. July 10, 1996). However, the CFTC stated that the pricing and

delivery system at issue (*i.e.*, Treasury note futures) was different from that in *In re Cox* (*i.e.*, wheat futures), which led the CFTC to conclude Fenchurch's exacerbating conduct of increasing its position in the CTD Treasury note constituted manipulation in violation of the CEA, which resulted in certain shorts delivering a more valuable security. *Id.*

However, defendants contend *In re Fenchurch* is distinguishable from this case. The alleged manipulative conduct in *In re Fenchurch* commenced after trading on the futures contract had expired. *Id.* In contrast, here, the alleged misconduct occurred while the June Contract was still trading, and defendants argue the price of the June Contract reflected the current supply of the various contracts available for delivery, which absolves defendants from having the requisite ability to manipulate prices. Plaintiffs reply by arguing that the CFTC in *In re Fenchurch* intended its analysis to apply to futures contracts on treasury securities.[7]

Notwithstanding the intricacies of these arguments, plaintiffs have alleged defendants accumulated an unprecedented long position in the June Contract, which it did not liquidate, and a large position in the CTD Treasury note. Even if the Court were to accept the reasoning in *In re Cox* and defendants' argument that the price of the June Contract reflected the availability of all the notes available for delivery under the express terms of the June Contract, the price of the June Contract could still have been manipulated by defendants' alleged conduct because the

---

[7]The CFTC stated in *In re Fenchurch*:

> Further, the Commission does not intend that its determination that Fenchurch controlled the available deliverable supply of the Ten-Year Treasury note contracts by dominating a portion of that supply (i.e., control of the cheapest-to-deliver notes) necessarily should apply in determining available deliverable supply in markets other than those for futures on treasury securities.

1996 WL 382313, at *6.

June Contract, as defendants argue, incorporated the short supply of the CTD Treasury note available in the market. Therefore, defendants' large accumulation of the CTD Treasury note could have provided them with the ability to influence the price of the June Contract.

Moreover, regardless of the timing of purchases in *In re Fenchurch*, implicit in the CFTC's analysis was that Fenchurch's activity of increasing its position in the CTD Note gave Fenchurch the ability to influence prices of the futures contract. 1996 WL 382313, at *5 ("Fenchurch . . . controlled a dominant portion of the cheapest-to-deliver notes . . . and thus restricted the available supply of the cheapest-to-deliver issue. Fenchurch's conduct resulted in the value of the futures contract being artificially altered."). It is notable that the CBT announced on June 29, 2005 that it was amending CBT Regulation 425.01 to limit the permissible Ten-Year Treasury note contract position to 50,000 contracts during the last ten trading days. (Compl. ¶ 81.) Plaintiffs allege that 50,000 contracts is one-third of the amount defendants held, a fact the Court assumes is true for the purposes of this motion, and that the CBT's amended rule implies that a 50,000 contract position could create an ability to cause artificial prices. Therefore, the Court is satisfied that plaintiffs have adequately pleaded that defendants possessed the ability to influence prices of the June Contract.

The second and third elements of a price manipulation claim require plaintiffs to prove that an artificial price existed and that defendants caused the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Plaintiffs allegations are sufficient to satisfy their burden of pleading the existence of an artificial price caused by defendants' conduct for the same reasons the Court found plaintiffs adequately pleaded that defendants had the ability to manipulate prices. Also, for these same reasons, the Court rejects defendants' argument that the price was not

artificial because the price reflected the availability of all the contracts available for delivery under the express terms of the June Contract.

The fourth element of a price manipulation claim requires the allegation that defendants specifically intended to cause the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Plaintiffs must allege that defendants both intentionally acquired the ability to manipulate prices and thereafter exercised that ability to cause artificial prices. *See In re Ind. Farm Bureau Coop. Ass'n, Inc.*, 1982 WL 30249, at *8 n.13 (citing *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58-59 (5th Cir. 1962); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971)). Defendants argue that plaintiffs' claim fails because the complaint does not allege defendants acquired its contract position with the intent to create artificial prices. Rather, plaintiffs merely allege an intentional breach of a duty by failing to liquidate its long positions.

Plaintiffs contend that the complaint alleges defendants intended to cause artificial prices. Specifically, plaintiffs allege that defendants: (1) "knowingly" changed their behavior as the futures contracts became susceptible to manipulation by persons controlling a large long position by their acts of acquiring an "extraordinary large long position" and refusing to liquidate (Compl. ¶¶ 1-4, 52-53, 60, 75); (2) were well aware of this form of manipulation (*id.* ¶¶ 41-45); (3) the motive and intent for the manipulative acts described in the complaint was to increase financial return (*id.* ¶ 92); and (4) intended to and did manipulate prices of the June Contract during the class period (*id.* ¶ 13.).

As discussed above, intent is a subjective inquiry and thus may be inferred from the facts alleged and the totality of the circumstances. *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, 1982 WL 30249, at *5. Accepting plaintiffs' factual allegations as true, and drawing all reasonable

28

inferences in their favor, the Court is persuaded that plaintiffs have adequately pleaded that defendants intended, at the time of acquisition, to cause an artificial price and subsequently exercised the ability to influence prices. Considering the totality of the circumstances, it may be reasonably inferred that defendants intended to acquire a very large long position in the June Contract and a large position in the CTD Treasury note because defendants would be benefited by refraining from liquidating these positions and instead taking delivery of more valuable notes other than the CTD Treasury note. Moreover, in a market that was susceptible to manipulation by a dominant long position, it is reasonable to infer that defendants were well aware of their potential ability to influence prices and that they intended to manipulate the futures market at the time of acquisition of the large contract positions.

Plaintiffs argue in the alternative that even if defendants did not intend to manipulate prices when they acquired their contract positions, they are liable once the requisite intent developed. Plaintiffs cite *Fenchurch*, in which the CFTC stated: "the Commission has held that even if a dominant long played no role in the creation of a congested market, the long has a duty to avoid conduct that exacerbates the situation." 1996 WL 382313, at *6. Plaintiffs have alleged defendants intentionally exacerbated the market, which was susceptible to price manipulation. (Compl. ¶ 11.)

Defendants assert that a mere refusal to liquidate is not the type of affirmative exacerbation that other courts have relied upon. Defendants argue that the type of manipulative intent that would suffice is conduct summarized in *In re Indiana Farm Bureau Cooperative Association, Inc.*: "Manipulative intent may be inferred . . . where, once the congested situation becomes known to him, the long exacerbates the situation by, for example, intentionally

29

decreasing the cash supply or increasing his long position in the futures market." 1982 WL 30249, at *8 n.12.

Although *In re Indiana Farm Bureau Cooperative Association, Inc.* set forth two situations in which manipulative intent may be inferred, the list is by no means exclusive. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971) ("The methods and techniques of manipulation are limited only by the ingenuity of man."). Considering the totality of the circumstances, intentional exacerbating conduct may be reasonably inferred from the alleged fact that defendants sold their entire position in the CTD Treasury note by September 30, 2005, mere months after purportedly accumulating these notes for investment purposes. Therefore, for the foregoing reasons, the Court is satisfied that plaintiffs have adequately alleged that defendants intended to cause an artificial price of the June Contract. Accordingly, the Court finds that plaintiffs have sufficiently pleaded their claims that defendants violated the CEA.

Finally, defendants argue that all claims against John Doe defendants should be dismissed for failure to state causes of action against such defendants. Plaintiffs do not oppose the dismissal, (Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 25 n.17), and thus the Court grants defendants motion to dismiss as to the John Doe allegations.

## Conclusion

For the foregoing reasons, the Court grants Plaintiffs First Amended Motion for Class Certification, [doc. no. 87], denies PIMCO Funds' motion to dismiss, [doc. no. 82], grants PIMCO's Motion to Dismiss (which PIMCO Funds has joined) as to the John Doe allegations and denies the remainder of PIMCO's motion to dismiss [doc. no. 85].

**SO ORDERED**                    **ENTERED:**    7/31/07

**HON. RONALD A. GUZMAN**
**United States Judge**