**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.  05 C 4681 |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, and PIMCO FUNDS | ) ) ) | Hon. Ronald A. Guzman |
| Defendants. | ) ) ) | |

**DEFENDANT PIMCO'S AMENDED MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

The plaintiffs are attempting to manufacture a case against Defendant Pacific Investment Management Company LLC ("PIMCO") where government regulators found none.  They claim that PIMCO engaged in market manipulation in violation of the Commodity Exchange Act ("CEA"), and caused artificially high prices in a treasury note futures contract, but their claims are contrary to the well-established law and undisputed facts.  Their claims are also contrary to the findings of the federal agency that regulates futures markets.

*First*, the entirety of plaintiffs' claim is based on a theory that PIMCO had a duty to liquidate its positions, even though plaintiffs *admit* that PIMCO did not enter into those positions with manipulative intent.  The law, however, is clear, and rejects such a claim.  Moreover, the undisputed facts show that, far from exacerbating market conditions, which is required for plaintiffs' claim here, PIMCO took significant steps to *alleviate* any alleged price artificiality by liquidating and lending its positions.

*Second*, plaintiffs and their experts admitted that the allegedly artificial prices were

attributable to factors other than PIMCO, but they nevertheless seek damages for all of the alleged artificiality from PIMCO, which also requires dismissal under established precedent. Indeed, government regulators recognized that it was systemic market factors – and not PIMCO – that caused the distorted pricing relied on by plaintiffs.  Moreover, plaintiffs admit that PIMCO's trades caused a *decrease* in artificiality during the class period, and that they have not even looked at the activities of other traders, who could have caused the alleged artificiality.

*Third*, a claim for market manipulation requires that there be an insufficient amount of the deliverable supply to satisfy delivery on futures contracts.  Here, however, it is undisputed that there was enough of the deliverable supply.  Plaintiffs instead base their claims on the novel and unprecedented claim that PIMCO caused a "panic" among market participants who *incorrectly* believed that they would not be able to obtain the "cheapest" treasury note for delivery on their futures positions, but the law is clear and does not recognize such a claim.

For each of these reasons, and as set forth more fully below, plaintiffs' claims fail as a matter of law, and summary judgment should be granted in favor of PIMCO.

## Background

### The Parties

Plaintiffs Kohen and Hershey are individuals, and plaintiff Breakwater Trading, LLC is a trading company, which bought and sold June 2005 ten year treasury note futures contracts during the May and June 2005 period.  (PIMCO's Statement of Undisputed Facts, filed concurrently herewith ("*SOF*") ¶¶ 1 & 2).  Defendant PIMCO is a professional money management firm that manages investments on behalf of its clients, which include mutual funds, pension plans and employee benefit plans.  *Id.* ¶ 3.  Defendant PIMCO Funds is one of many clients of PIMCO.  *Id.* ¶ 4.

### The Ten Year Treasury Note Futures Market

A "future," or futures contract, is an agreement in which the parties agree to the price, quantity, and date of delivery of a particular commodity in advance of the actual delivery. *Id.* ¶ 8. Thus, for example, in the futures contracts at issue here, plaintiffs sold futures contracts on ten year treasury notes (which are the underlying commodity) at a particular price for delivery in June 2005. *Id.* ¶ 2.

The party contracting to buy a futures contract, and thereby to take delivery of the treasury notes, is called the "long," and is said to have a "long position," and the person contracting to sell the futures contract is called the "short," and is said to have a "short" position. *Id.* ¶ 9. PIMCO bought, *i.e.*, established, "long" positions in a 10-year treasury note futures contract set to expire at the end of June 2005. SOF ¶ 18. In other words, PIMCO had the right under its futures contracts to buy, or take delivery of, treasury notes at the end of June 2005, assuming that it did not liquidate its positions in advance.[1] *Id.* ¶ 10. Plaintiffs, in turn, are alleged to have sold, or taken short positions in, the same futures contract, SOF ¶ 2, which means that, unless they liquidated their positions, they were obliged to make delivery of treasury notes to persons with long positions. *Id.* ¶ 11.

Rules of the Chicago Board of Trade ("CBOT"), which is the exchange on which the futures at issue here were traded, specify which treasury notes may be delivered by a short, and that must be accepted by a long, in satisfaction of the obligation to make or take delivery on a futures contract. *Id.* ¶¶ 12 & 35. With respect to the June 2005 treasury note futures at issue in this case, any ten year treasury note with 6 ½ to 10 years duration could be delivered in

---

[1] A party to a futures contract can liquidate its position by entering into an equal and opposite transaction – *i.e.*, an "offset" – in the futures market prior to the expiration of trading on the contract. *Id.* ¶¶ 10 & 11.

satisfaction of a short's delivery obligation.  *Id.* ¶ 13.  There were 13 different issues of ten year

notes that qualified for delivery.  *Id.* ¶ 14.  Of the 13 notes, one was the "most economical" for

shorts to deliver.  *Id.* ¶ 15.  This note is referred to as the "cheapest to deliver" note, or the

"CTD."  *Id.*

### The Alleged Manipulation

As of May 8, 2005, the day before the beginning of the class period, PIMCO held

360,700 June futures contracts, worth approximately $36.7 billion, by plaintiffs' calculations.  *Id.*

¶ 18.  In fact, PIMCO had a larger position before then, and had a position of at least 350,000

contracts since mid-March 2005.  *Id.* ¶¶ 19 & 20.  Significantly, however, plaintiffs do *not* claim

that PIMCO had intent to manipulate prices before May 9, *id.* ¶ 21, so they do *not* assert that

PIMCO acquired these positions with manipulative intent.

Instead, the basis for plaintiffs' claim for damages is that beginning May 9 – *i.e.*, *after* it

lawfully acquired this position – PIMCO did not liquidate enough of its position before the

contract expired.  *Id.* ¶ 22.  According to plaintiffs, this led traders with short futures positions to

"panic," because they allegedly believed that the size of PIMCO's positions would require them

to deliver more expensive notes than the CTD note.  *Id.* ¶ 25.

Despite plaintiffs' claim of "panic," however, it is undisputed that all traders with short

positions were able to obtain the CTD, and none were required to deliver a more expensive note.

*Id.* ¶ 26.  Moreover, any panic could not have been due to PIMCO, which plaintiffs admit

liquidated its futures position *faster* than the rest of the market participants from May 9 to May

26 – which included the period of greatest alleged artificiality, according to plaintiffs.  *Id.* ¶¶ 27

& 28.

In fact, from May 8 to June 21, which is the end of the class period certified by the Court,[2] PIMCO substantially reduced its June futures position, from *360,700* contracts to *132,493* contracts, by plaintiffs' calculations. *Id.* ¶ 30. PIMCO bought a relatively small number of CTD during the class period, but only at times when it simultaneously liquidated an equal or larger amount of June 2005 futures. *Id.* ¶ 32. And, contrary to the baseless allegations in the Complaint, plaintiffs now admit that PIMCO lent almost all of its CTD notes to other market participants, and that this made the CTD available for shorts to deliver on the June 2005 contract. *Id.* ¶¶ 57, 58.

In light of the foregoing, plaintiffs' damages claim is based entirely on the theory that prices would have been lower if PIMCO had liquidated more. *Id.* ¶ 22 & 24.

### Regulators' Involvement

The treasury note futures market is highly regulated. *Id.* ¶¶ 35-38. There is continuous market surveillance by the Commodity Futures Trading Commission ("CFTC") and the surveillance staff of the CBOT. *Id.* During the class period, PIMCO was in regular contact with these regulatory authorities regarding its positions and intentions, and provided information and answered their questions on virtually a daily basis. *Id.* ¶¶ 37-38. Moreover, the CFTC and CBOT had information as to the positions of all market participants, which plaintiffs here do not have. *Id.* ¶¶ 36, 39.

The CFTC, which has statutory authority and responsibility to prosecute violations of the anti-manipulation and other provisions of the CEA, has never taken enforcement action against PIMCO or otherwise alleged that PIMCO violated the law. *Id.* ¶ 40. To the contrary, it has

---

[2] Although the certified class includes certain persons who bought futures contracts between May 9 and June 30, the contract stopped trading on June 21. *SOF* ¶ 17. Of course, this means that no class members (or anyone else for that matter) bought (or sold) the June contract between June 21 and June 30.

stated that several systemic market factors – and not the actions of any particular market

participant – "caused" the "distorted" prices that plaintiffs claim to be evidence of manipulation

by PIMCO.  *Id.* ¶¶ 41, 43 & 46.  The factors identified by the CFTC include:

> First, the current low yield and flat yield curve environment
> encourages delivery of bonds and notes with short durations and
> short remaining times to maturity.  Second, the proportion of open
> interest in the Treasury futures contracts relative to the underlying
> cash market has nearly doubled in the last two years, increasing
> demand for the CTD securities.  Finally, the [Chicago Board of
> Trade] stated that the increased incidence of fails in the cash
> market and in the repo market has "eroded trade certainty in the
> Treasury market in ways that impair the ability of market
> participants to perform cash-futures arbitrage."  Together, these
> factors have ***caused*** pricing of the futures contracts to become
> distorted because of the market perception that the CTD bond or
> note would not be available for shorts to deliver.

*Id.* ¶ 43 (emphasis added).

In fact, these factors led to "distorted" prices in numerous other contracts that PIMCO is

not alleged to have manipulated, as noted by the CFTC.  *Id.* ¶¶ 41-46.  Plaintiffs claim, for

example, that a "negative net basis" (which generally calculates the difference in price between

the futures contract and CTD) is evidence of manipulation here, but at least *ten* other contracts

that PIMCO is not alleged to have manipulated had a sustained "negative net basis" during the

class period.  *Id.* ¶¶ 44 & 45.  The same factors that caused unusual pricing in all of these other

contracts also caused the allegedly distorted pricing here.

Plaintiffs note that the CBOT established position limits for all Treasury note contracts

on June 29, 2005, and claim that this is evidence that the exchange believed that PIMCO

manipulated contracts, but that is contrary to the CBOT's own statements.  In particular, in

response to criticism that it should not impose position limits "in the absence of any empirical

evidence of market manipulation," the CBOT did not assert that anyone had, in fact, manipulated

prices. *Id.* ¶ 46. Instead, it expressly stated that it adopted the position limits "in light of" the systemic market factors, as outlined above. *Id.*

Despite these facts, plaintiffs, with less information available to them than the regulators, accuse PIMCO of manipulation.

## Argument

Summary judgment should be granted if there is "no genuine issue as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Plaintiffs' sole claim is that PIMCO violated the CEA, which prohibits price manipulation. *See* 7 U.S.C. § 13(a). Although the CEA does not define manipulation, Courts have generally characterized it is as the "intentional exaction of a price determined by forces other than supply and demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991).

To prove their claim, plaintiffs must satisfy four elements: (1) ability of defendant to cause an artificial price; (2) existence of artificial price; (3) causation of the artificial price by the defendant; and (4) specific intent of defendant to cause the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995). A private plaintiff must also show that the violation caused its damages. 7 U.S.C. § 25(a). While some courts have noted that the scope of conduct that should be deemed "manipulative" is limited only by the "ingenuity of man," *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir. 1971), there are nevertheless certain, clear legal requirements for such claims, as outlined below. Because plaintiffs' claims are directly contrary to those requirements, they should be rejected.

## I. As a Matter of Law, Plaintiffs' "Failure to Liquidate" Theory Is Not Cognizable, and Plaintiffs Cannot State a Claim Based on Exacerbation of Market Conditions.

Plaintiffs' experts *admit* that there is no basis for arguing that PIMCO intended to manipulate prices when it acquired its positions before May 9, the beginning of the class period.

*SOF* ¶ 21. Instead, their entire claim for damages is based on their theory that PIMCO, once it had acquired its positions lawfully, had a duty to liquidate until prices declined to a value plaintiffs deem fair. *Id.* ¶¶ 22-24. This is contrary to the law.

In particular, it is well established that (1) a defendant cannot be held liable if it initially acquires its position with no improper intent, and (2) it is not manipulative to simply seek the best price for that position. *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 59 (5th Cir. 1962) ("it must appear not only that they profited from a squeeze, but that they intentionally brought about the squeeze by planned action"); *In re Soybeans Futures*, 892 F. Supp. at 1058 (seeking the best price for existing positions is not sufficient to prove manipulation); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 602 (S.D.N.Y. 1989) ("the long . . . is not prevented from acting in its own self-interest to obtain the highest price"); *In the Matter of Indiana Farm Bureau Coop. Ass'n, Inc.*, CFTC No. 75-14, 1982 WL 30249, at *8 n. 13 (CFTC Dec. 17, 1982) (there must be evidence that the defendant both exercised its ability to cause artificial prices and *"intentionally acquired the ability to conduct"* the purported manipulation); *id.* at *7 (it is not enough to show the accused intended to influence price, since self interest of traders play a legitimate, critical role in futures markets); *see also Gen. Foods Corp. v. Brannan*, 170 F.2d 220, 231 (7th Cir. 1948).[3] This authority is directly contrary to plaintiffs' claims, and requires their rejection as a matter of law.

---

[3] *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971), is not to the contrary. As the CFTC explained in *Indiana Farm Bureau Coop.*, 1982 WL 30249, at *8 n. 13:

> While *Volkart* and *Cargill* disagree with respect to the obligation of shorts to exercise due diligence in making reasonable delivery preparations, they do agree that there must be evidence from which to conclude that the accused both intentionally acquired the ability to conduct a squeeze and thereafter exercised that ability to cause "artificial" prices.

Rather than arguing that PIMCO had manipulative intent before May 9, plaintiffs rely on purported evidence of PIMCO's intent *on and after* May 9, but under the clear standards cited above this is simply not relevant as a matter of law. They cite, for example, a statement by a PIMCO manager in an email on May 9 that he wished to "exploit the potential for the front month to go on special." Setting aside for now plaintiffs' mischaracterizations of this and other documents, these statements simply do not bear on the test outlined above: They are all *during* the putative class period, and do not reflect PIMCO's intent *at the time* it entered into the positions, which is dispositive. At most, these statements indicate that PIMCO was considering ways to maximize its profit *on its existing position that it acquired lawfully*, which the case law clearly allows.

To be sure, some Courts have held that traders may not "exacerbate" market conditions after they lawfully acquire positions, by, for example, piling on new positions. The indisputable evidence here, however, demonstrates that, far from exacerbating conditions, PIMCO liquidated most of its contracts, and lent almost all of its CTD to other market participants. *SOF* ¶ 27-30, 57-58. Indeed, plaintiffs have admitted that PIMCO's trades during the class period *decreased* the alleged artificiality. *Id.* ¶ 33.[4]

Even more significantly, plaintiffs have admittedly submitted no evidence calculating any purported damages from any alleged exacerbating conduct – instead, their damages claim is based entirely on the theory that PIMCO should have liquidated its positions. *Id.* ¶¶ 22-24. There is, then, no legal basis for plaintiffs' claims.

---

*Id.* at *8 n. 13 (citations omitted).
[4] Although, in considering the motion to dismiss, the Court noted that PIMCO's sales of its CTD position in September 2005 could potentially be construed as exacerbating conduct (July 31, 2007 Mem. Op. and Order at 30), discovery has indisputably shown that those sales occurred *after* the class period, and therefore could not possibly have exacerbated alleged artificiality during the class period. SOF ¶ 34.

**II.    Plaintiffs' Causation Theory is Flawed As a Matter of Law.**

Plaintiffs' theory for proving that PIMCO uniquely caused the alleged price artificiality is their assertion that if PIMCO had liquidated more of its positions, the alleged price artificiality would have been zero.[5]  *Id.* ¶ 23.  This theory is also fatally flawed, however, because they admit that other factors contributed to the artificiality, but have nevertheless attributed artificiality entirely to PIMCO.  In particular, they claim, incredibly, that other traders should also have liquidated, but nevertheless only PIMCO is responsible.  Moreover, plaintiffs admit that although these other traders would have affected prices, they have not even looked at the activity of such traders.

Furthermore, as noted above, plaintiffs' experts admit that PIMCO's liquidation of its position during the class period *caused a decrease* in the alleged artificiality, which alone requires rejection of their claims.

Even if some alleged artificiality were attributable to PIMCO, however (which is not the case), Plaintiffs' claims would still fail, because the law is clear:  If a claimant does not "sort[] out" multiple causes, then "the charge of manipulation cannot be sustained."  *In re Cox*, 1987 CFTC LEXIS 325, at *35-36, Comm. Fut. L. Rep. (CCH) ¶ 23,786 (CFTC July 15, 1987).  For example, in *Cox*, the CFTC dismissed the claim, even where both longs and shorts were each found to be at least partially responsible for the artificiality, because the government had not "sorted out" the various causes.  *Id.* at *43-44.  And *Cox* was a regulatory action brought by the CFTC, which did not even need to quantify damages.  In cases brought by civil plaintiffs, this requirement is even stricter, because the plaintiff, by statute, must tie the amount of its damages to specific conduct by the defendant.  7 U.S.C. § 25 (civil claimants may only collect "actual

---

[5] PIMCO also denies that prices were artificial.  As noted above, the CFTC found that market forces led to the unusual prices.

damages . . . caused by" the alleged manipulation); *see also Gen. Foods Corp.*, 170 F.2d at 230-31.

The logic of these cases is inescapable. Markets are made up of many players, and the collective actions of all determine price levels. Plaintiffs here have looked only at PIMCO, and have disregarded all other traders. There is therefore absolutely no evidence of the relative contributions of the various traders, and no evidence in the record that plaintiffs could introduce at trial to sort out the various causes.

Despite these principles and lack of evidence, plaintiffs' damages calculations inexplicably attribute *all* alleged artificiality to PIMCO. SOF ¶ 47. Plaintiffs' own expert testified that this is improper: He admitted that "ascribing the whole" of any discrepancy in prices to Defendants "would . . . not be correct." *Id.* ¶ 48.

Other causes of the alleged artificiality are manifest. To begin with, as noted above, the CFTC itself found that systemic market factors "caused" the price distortions present in not only the June futures contract at issue here, but other Treasury futures contracts as well. *Id.* at ¶¶ 41-46.

Moreover, on its face, plaintiffs' liquidation theory attributes causation to other market participants. In particular, plaintiffs' expert acknowledged that if *other* market participants had liquidated even a small number of contracts, this could also have decreased the alleged artificiality. *Id.* ¶ 64. In other words, the artificiality cannot in any manner be attributed uniquely to PIMCO. Indeed, plaintiffs have not even studied the trading of other market participants, some of which could easily have had *larger* positions than PIMCO for much of the class period, and which plaintiffs' experts admit could have affected the level of alleged artificiality. *Id.* ¶¶ 60-64.

11

Moreover, plaintiffs and their experts have offered additional, concrete evidence of causes of the alleged price artificiality other than PIMCO:

- Plaintiffs' own Rule 30(b)(6) witness claimed that "there must be, just by the raw numbers, other participants" in the alleged effects on prices. *Id*. ¶ 65. He also acknowledged that he does not claim that PIMCO was the sole cause of any market "panic" that allegedly led to artificial prices. *Id.* ¶ 66.

- Plaintiffs' expert admitted that the trades of one other market participant "could be proximately related to what was happening to the price" during the class period, and that there were other traders with positions like that participant. *Id.* ¶¶ 50 - 51. In fact, it is well established that this market participant withdrew $7.9 billion worth of CTD notes from the market between May 10 and 23, which coincided with the allegedly large increase in price artificiality. *Id.* ¶¶ 49 & 53. Plaintiffs' expert also admitted that this market participant's trades could have the same economic effect as a price "squeeze." *Id.* ¶ 54.

- Plaintiffs themselves admit that the "failing" of the CTD note in the lending market, which they claim led to artificial prices, was attributable at least in part to "one or more holders of the securities," who "had stopped lending the note . . . ." *Id.* ¶ 56. And Plaintiffs' Rule 30(b)(6) witness even admitted that it was "common knowledge" that the notes "were being either withheld from the market or boxed and were causing failure." *Id*. ¶ 55. PIMCO, however, was indisputably lending the notes, unlike other market participants. *Id.* ¶¶ 57-58.

Thus, plaintiffs' claim for manipulation cannot be sustained because they simply attribute all of the alleged artificiality to PIMCO, and none of it to these other market participants or other factors which they have admitted caused the alleged artificiality. Under the case law cited above, their failure to "sort out" these factors, and their failure to develop any evidence to do so, require dismissal.

## III.  Plaintiffs' "Panic" Theory Fails As a Matter of Law.

As noted above, plaintiffs' case is also based on the theory that PIMCO caused a "panic," because short traders allegedly believed that the available supply of the cheapest to deliver notes would not be sufficient to satisfy PIMCO's long futures position at the close of trading. *Id*. ¶ 25. It is undisputed, however, that whatever fears the marketplace had were incorrect: Long traders,

including PIMCO, took delivery of *only* the CTD note – in other words, all shorts were able to obtain the CTD. *Id.* ¶ 26.

This alone should be dispositive. The law requires plaintiffs to show that there were inadequate supplies of the deliverable notes available to satisfy the shorts' delivery obligations on the futures.[6] *Volkart Bros., Inc.,* 311 F.2d at 59 (to be liable, defendants must have more futures positions than the available supply); *Apex Oil Co.*, 713 F. Supp. at 601 ("where a long squeeze is alleged, it must be pleaded and proved 'that the respondent accumulated a position in the futures market that exceeded the available deliverable supply'"); *Cox*, 1987 CFTC LEXIS 325, at *43-44 (rejecting manipulation claim where deliverable supply exceeded defendants' futures position, because defendant could not foreclose shorts' delivery option); *In re Indiana Farm Bureau*, 1982 WL 30249, at *10 (rejecting claim of squeeze where there was enough deliverable supply).

Apparently recognizing this fatal flaw in their claim, plaintiffs attempt to rely on an alternative theory that even if PIMCO did not, in the end, hold more futures than the deliverable supply of CTD, it nevertheless should be held liable because it previously held such a position, which allegedly caused plaintiffs and other shorts to cover their positions in a "panic." *SOF* ¶

---

[6] Another form of manipulation recognized by some courts is manipulation by "false reports." The only purportedly false statement alleged in their Complaint, however, does not support a claim for that type of manipulation. In particular, plaintiffs claim that PIMCO's chief investment officer, Bill Gross, falsely stated during an interview that "PIMCO would continue to hold for investment its extraordinary concentrated position in the illiquid [February 2012] note which was no longer deliverable." First Amended Class Action Complaint, Doc. 80, ¶ 12. Plaintiffs, however, are the ones making the misrepresentation, because Mr. Gross said no such thing, as demonstrated by the transcript of the interview, which was publicly available when plaintiffs falsely characterized what he said. In reality, he said that PIMCO would continue to hold only "some" of the notes, and gradually sell even those notes because PIMCO preferred to invest in futures rather than the notes. *SOF* ¶ 67. More importantly, *Mr. Gross made the statement in August 2005 – months after the putative class period, as plaintiffs admit.* SOF ¶ 67. This statement, therefore, could not possibly have manipulated prices during plaintiffs' proposed class period, which runs from May 9 to June 21, 2005.

25.  Such a claim of short covering in a "panic" prior to expiration of the contract, however, has previously been rejected as a basis for a manipulation claim, and should be rejected here as well. *Grossman v. Citrus Assoc. of the N.Y. Cotton Exch., Inc.*, 742 F. Supp. 843, 854 (S.D.N.Y. 1990) (reasoning that fact that a short "panicked and bought . . . at very high prices" "is the risk one takes in playing the market").  Under plaintiffs' analysis, it was plaintiffs' own incorrect fear of *something that PIMCO did not actually do – i.e.*, require delivery of non-CTD notes – that led to their losses, which cannot be blamed on PIMCO.

PIMCO cannot be held responsible for fears of other people which never occur in reality. There was no shortage at the time of delivery of "cheapest" notes, and an unfounded fear of such a shortage by someone else cannot be used as a basis for imposing liability on PIMCO.

## Conclusion

For the reasons stated above, defendant PIMCO respectfully requests that the Court grant its motion for summary judgment and enter judgment dismissing the complaint with prejudice.

Dated: November 28, 2007

Respectfully submitted,

By:  /s/ Eric H. Grush
     William J. Nissen
     Eric H. Grush
     Jennifer Tan
     Sidley Austin LLP
     One South Dearborn Street
     Chicago, IL  60603
     (312) 853-7000
     **Counsel for Defendant Pacific**
     **Investment Management Company**
     **LLC**

## <u>CERTIFICATE OF SERVICE</u>

I, Eric H. Grush, an attorney, hereby certify that I have served copies of Defendant PIMCO's Amended Memorandum in Support of Motion for Summary Judgment upon the following individuals by Electronic Means and CM/ECF Notification on November 28, 2007.

Marvin Alan Miller
Miller Law LLC
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
mmiller@millerlawllc.com

Anthony Fata
Cafferty Faucher LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602
afata@caffertyfaucher.com

Christopher Lovell
Christopher McGrath
Lovell Stewart Halebian, LLP
500 Fifth Ave.
New York, NY 10110
clovell@lshllp.com
cmcgrath@lshllp.com

Louis F. Burke
Louis F. Burke, P.C.
460 Park Avenue
21st Floor
New York, NY 10022
lburke@lfblaw.com

Vincent Briganti
Lowey Dannenberg Bemporad, Selinger & Cohen, P.C.
One North Lexington Avenue
11th Floor
White Plains, NY 10601
vbriganti@ldbs.com

David A. Kotler
Dechert LLP
Princeton Pike Corporate Center
PO Box 5218
Princeton, NJ 08543-5218
david.kotler@dechert.com

Blake T. Hannafan
Hannafan & Hannafan, Ltd.
One East Wacker Drive, Suite 1208
Chicago, IL 60601
bth@hannafanlaw.com

/s/ Eric H. Grush    _
Eric H. Grush