IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEF A. KOHEN, BREAKWATER
TRADING LLC, and RICHARD HERSHEY,

    Plaintiffs,

   v.

PACIFIC INVESTMENT MANAGEMENT
COMPANY LLC, and PIMCO FUNDS,

    Defendants.

No. 05 C 4681
Judge Ronald A. Guzmán
Magistrate Michael T. Mason

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**CORRECTED COPY**

**REDACTED**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

STATEMENT OF FACTS ........................................................................................10

ARGUMENT............................................................................................................14

    A.    Defendants Have Failed To Negate Material Issues Of Fact
        Regarding Their Intent To Manipulate, A Question Generally
        Inappropriate For Summary Judgment ......................................................14

        1.    Defendants' Manipulative Intent Is Properly Inferred From
            Their Conduct, Including Their Nine Manipulative Acts
            And Lies..............................................................................................15

            a.    Contrary To Defendants' Assertion, They
                    Committed Nine Manipulative Acts, Not One .................15

            b.    This Court Has Recognized That The Subjective
                    Inquiry Of Intent Must Be Inferred From Conduct
                    And The Totality Of The Circumstances...........................15

            c.    The Conduct Is Also Uneconomic.....................................16

            d.    Misleading Statements Also Justify The Inference
                    Of Intent.............................................................................16

            2.    Contrary To Defendants' Argument, Their Failure To
            Liquidate Is Manipulative Under The Circumstances
            Present Here......................................................................................16

            3.    Defendants Cite To No Authority Condoning Their Failure
            To Liquidate Under The Circumstances Present Here .................17

            4.    PIMCO's Manipulative Intent Is Imputed To PIMCO
            Funds, And The Facts Demonstrate PIMCO Funds'
            Knowledge Of The Manipulative Acts..........................................19

    B.    Defendants Have Failed To Negate Material Issues Of Fact
        Regarding Their Causation of Artificial Prices, A Question
        Generally Inappropriate For Summary Judgment....................................20

        1.    Defendants Rely Not On Law But Dicta, Which They Also
            Misread, As Their Sole Authority Against Causation..................22

i

2.  Defendants' Causation Arguments Are Wrong As A Matter of Law And Run Counter To Established Authority ...................24

3.  Plaintiffs Have Submitted Extensive Evidence Disputing Defendants' Factual Assertion That There Were Multiple Causes Of Artificial Prices ...............................................................26

4.  Plaintiffs Have Submitted Evidence Of Numerous Acts By Defendants, In Addition To Their Failure To Liquidate, Which Caused Artificial Prices .......................................................28

C.  Defendants' Final, Throwaway Argument, Not Addressing Any Element Of A Manipulation Claim, Seeks An Exemption Whenever A Long Manipulator Takes Delivery Only Of CTD Notes ..........................................................................................31

D.  Defendants Have Failed To Negate Material Issues Of Fact Regarding Their Ability To Manipulate And The Existence Of Artificial Prices .................................................................................33

1.  Admission Of The Existence Of Artificial Prices .........................33

a.  Admissions Of Record Richness in June 2005 Contract Prices ...........................................................33

b.  Admissions Of Severe Squeeze Of June 2005 Contract And That Defendants Caused The Artificial Prices ...................................................................34

CONCLUSION .................................................................................................35

## TABLE OF AUTHORITIES

### Federal Cases

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)...................................................................33, 35

*Apex Oil Co. v. DiMauro*, 713 F.Supp. 587 (S.D.N.Y. 1989) ..........................................................22

*Board of Trade v. Olsen*, 262 U.S. 1 (1923) ......................................................................................4

*Cange v. Stotler and Co., Inc.*, 826 F.2d 581 (7th Cir. 1987).........................................................20

*Cargill, Inc. v. Hardin*, 452 F2d 1154 (8th Cir. 1971) ......................................................... *passim*

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................1, 2

*CFTC v. Enron*, 2004 WL 594752 (S.D.Tex. Mar. 10, 2004)......................................................24, 28

*Frey v. CFTC*, 931 F.2d 1171 (7th Cir. 1991) ...................................................................... *passim*

*G.H. Miller & Co. v. United States*, 260 F.2d 286 (7th Cir. 1958)....................................... *passim*

*Great Western Food Distributors v. Brannan*, 201 F.2d 476 (7th Cir. 1953) ...................... *passim*

*Grossman v. Citrus Assoc. of the New York Cotton Exchange, Inc.*,
    42 F.Supp. 843 (S.D.N.Y. 1990) .............................................................................................32

*Issen v. GSC Enterprises Inc.*, 522 F.Supp. 390 (N.D.Ill. 1981) .......................................................1

*Kohen v. Pacific Investment Management Co. LLC*, 244 F.R.D. 469 (N.D. Ill. 2007) ......... *passim*

*Leaf v. United States*, 588 F.2d 733 (9th Cir. 1978) .........................................................................1

*McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789 (7th Cir. 1997) ...................................................1

*Minpeco v. ContiCommodity Serv.*, 673 F. Supp. 684 (S.D.N.Y. 1987) .........................................18

*Minpeco, S.A. v. Hunt*, 718 F. Supp. 168 (S.D.N.Y. 1989) .............................................................24

*Powers v. Dole*, 782 F.2d 689 (7th Cir. 1986).................................................................................1

*R. J. Koeppe & Co v. SEC*, 95 F.2d 550 (7th Cir. 1938) .................................................................16

*Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963 (7th Cir. 1986)............20

*SEC v. Blackwell*, 477 F.Supp.2d 891 (S.D.Ohio 2007)................................................................20

*SEC v. Credit First Fund, LP*, 2006 WL 4729240 (C.D.Cal. Feb. 13, 2006)................................20

*SEC v. Haligiannis*, 470 F.Supp.2d 373 (S.D.N.Y. 2007)............................................................20

*SEC v. Moscowitz*, 1998 WL 524903 (S.D.N.Y. Aug. 20, 1998)..................................................20

*In re Soybean Futures Litig.*, 892 F.Supp. 1025 (N.D.Ill. 1995)........................................... *passim*

*Strobl v. New York Mercantile Exchange*, 582 F. Supp. 770 (S.D.N.Y. 1984)...................9, 25, 34

*Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93 (7th Cir. 1985).......................................................1

*In re Sumitomo Copper Litig.*, 182 F.Supp. 85 (S.D.N.Y. 1998) ...................................................33

*Transnor (Bermuda) Ltd. v. BP North America Petroleum*,
    738 F.Supp. 1472 (S.D.N.Y. 1990) ................................................................................1, 21, 22

*United Egg Producers v. Bauer International Corp.*, 311 F.Supp. 1375 (S.D.N.Y. 1970)...........32

*Volkart Bros., Inc. v. Freeman*, 311 F.2d 52 (5th Cir. 1962)............................................17, 18, 19

*Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ....................................................25

## Administrative Decisions

*In re Cox* 1987 WL 106879 (C.F.T.C. July 15, 1987)........................................................ *passim*

*In the Matter of Fenchurch Capital Management*, 1996 WL 382313 (C.F.T.C. July 10, 1996)...17

*In re David G. Henner*, 30 A.D. 1151 (CEA No. 14,159, Sept. 15, 1971)............................ *passim*

*In re Indiana Farm Bureau Cooperative Assn'*,
1982 WL 30249 (C.F.T.C. Dec. 17, 1982)..................................................................... *passim*

*In re Kosuga*, 19 A.D. 603 (CEA 1960) .................................................................................15, 20

## State Cases

*Derosier v. New England Tel. & Tel. Co.*, 130 A. 145 (N.H. 1925)...............................................25

## Federal Statutes

7 U.S.C. § 1 et seq...............................................................................................................................1

7 U.S.C. § 4.................................................................................................................................19

**<u>Other Authorities</u>**

Keeton, W. Page, PROSSER & KEETON ON THE LAW OF TORTS, (5th ed. 1984)............................25

Markham, *Manipulation of Commodity Futures Prices - - The Unprosecutable Crime*,
    8 YALE J. ON REG. 281, 360 n. 526 (1991).........................................................................5, 33

Note, *The Delivery Requirement: An Illusory Bar To Regulation Of Manipulation In Commodity
    Exchanges*, 73 YALE L.J. 71 (1963).................................................................................18

## INTRODUCTION AND SUMMARY OF ARGUMENT

The overlapping Federal Rules of Civil Procedure Rule ("FRCP") 56 summary judgment motions of Pacific Investment Management Company LLC ("PIMCO") and PIMCO Funds (collectively "Defendants") should be denied because Plaintiffs have submitted extensive evidence demonstrating that Defendants (1) intentionally (2) caused (3) prices to be artificial in the June 2005 U.S. Treasury Note Futures Contract (the "June 2005 Contract") between May 9 and June 30, 2005 ("Class Period"). [1]

Defendants "inform[] the district court [that] the basis for [their] motions" is portions of two elements of Plaintiffs' claim: intent and causation. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (movant "always bears [this] initial responsibility" and burden to notify the Court of the extent of the summary judgment challenge); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 795-96 (7th Cir. 1997) (same).

Summary judgment is generally inappropriate on questions of intent[2] and causation.[3] It has repeatedly been denied in commodity futures manipulation cases. *E.g.*, *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995); *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 738 F.Supp. 1472 (S.D.N.Y. 1990). Nor is a motion for summary judgment an appropriate occasion to weigh the evidence. Instead, the court must review the record and draw all possible inferences from it in the light most favorable to the non-movant. *Lohorn v.*

---

[1] This Court has held that there are four elements of a claim for manipulation in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendants caused the artificial price; and (4) the defendants specifically intended to cause the artificial price." *Kohen v. Pacific Investment Management Co. LLC*, 244 F.R.D. 469, 481 (N.D. Ill. 2007) (Guzmán, J.) *citing In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995).

[2] *Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986); *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985); *In re Soybean Futures*, 892 F.Supp. at 1058-59.

[3] *Leaf v. United States*, 588 F.2d 733, 736 (9th Cir. 1978); *Issen v. GSC Enterprises Inc.*, 522 F.Supp. 390, 399 (N.D.Ill. 1981).

*Michal*, 913 F.2d 327, 331 (7th Cir. 1990); *Schwartz v. System Software Assoc.*, 813 F.Supp. 1364, 1366 (N.D.Ill. 1993).

Defendants further "inform the Court," *Celotex, supra*, that Plaintiffs supposedly contend that Defendants engaged in only one manipulative act, a failure to liquidate their long positions in the June 2005 Contract.[4] Based on this premise, Defendants argue that, because they supposedly did not intend to manipulate prior to May 9th when they acquired most of their large long positions and supposedly did not "exacerbate" artificiality through their failure to liquidate after May 9, 2005, there is supposedly no evidence which can justify an inference that Defendants intended to manipulate. *Id.*

However, contrary to Defendants' premise of only one manipulative act, Plaintiffs contend that Defendants committed **nine (9) separate manipulative acts** on and after May 9, 2005. *See* pp. 6-10 *infra* (demonstrating that each act is manipulative). Defendants established seven manipulative positions and committed the other manipulative acts during the Class Period. Even Defendants concede or fail to contest that there is evidence of their manipulative intent during the Class Period. Therefore, summary judgment on intent grounds must be denied. *See* Arg. Pt. A. *infra*.

Defendants' summary judgment argument on intent is also flawed as a matter of law. Even a mere failure to liquidate, standing alone, would justify an inference of manipulative intent. *See* Arg. Pt. A *infra*; *e.g.*, *In re Soybean Futures*, 892 F.Supp. at 1036; *In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249 at \*32 (CFTC Dec. 17, 1982). However, especially in the context of Defendants' eight other manipulative acts, the evidence shows as follows. Defendants clearly coordinated their failure to liquidate with their other manipulative

---

[4] PIMCO's Memorandum In Support of Motion For Summary Judgment, on which PIMCO Funds also relies ("D. Mem.") pp. 1-2, 7-10.

conduct in one combined scheme to manipulate June 2005 Contract prices. See Plaintiffs'

Statement of Additional Facts Pursuant to Local Rule 56.1 ("Facts") ¶¶ 4-17.

PIMCO Funds' separate motion for summary judgment on manipulative intent must also

be denied. Where the law has encountered claims of intentional conduct against funds or passive

entities, under the CEA and in other contexts, it has found scienter by imputing the state of mind

of the agent, here PIMCO, to the principal, here PIMCO Funds. See Arg. Pt. A infra. Also,

PIMCO controlled PIMCO Funds. Id.

**Causation.** Defendants' summary judgment argument on causation grounds is premised

on a series of factual assertions that, at best, only create issues of fact: (a) Plaintiffs supposedly

contend that Defendants caused price artificiality **solely** through a failure to liquidate (D. Mem.

p. 10); (b) Plaintiffs have supposedly "admitted" that price artificiality was caused by "factors

other than Defendants," D. Mem. pp. 1-2, and (c) the "government" supposedly made findings

that systemic factors did, and Defendants did not, cause the price artificiality complained of here.

D. Mem. pp. 2, 10 n. 5.

Each of these factual assertions is simply wrong and is disputed. See Arg. Pt. B infra.

For example, Plaintiffs contend that Defendants actively caused price artificiality through

multiple manipulative acts. They bought three times as much of the cheapest-to-deliver ("CTD")

Notes as they had ever bought during the month before delivery on a Ten Year Treasury. (The

CTD Note here was the February 2012 Note (the "2/12".)) They uneconomically added to their

long futures position. They made manipulative "market on close" purchases. They

uneconomically took the largest delivery in the history of the CBOT Treasury futures. They

engaged in other uneconomic or misleading acts. See Facts ¶¶ 3-17. Further, Defendants

effectively have admitted that they caused artificial prices. Id. ¶ 19(f); Declaration of Christopher

M. McGrath, dated December 5, 2007 ("M.D."), Ex. 8 (P-83) ("we had a major role in causing or reinforcing any market dislocation"); *see id.* Ex. 4 (P-187) ("most of richness due to squeeze of TYM5" [June Contract]; *see also id.* Ex. 7 (PIMCO P-55) (PIMCO on May 25th: TYM squeeze lifts overall market).

However, Plaintiffs have **not** admitted that so-called other factors caused the price artificiality that PIMCO did. Instead, these factors either reduced the artificiality caused by PIMCO or incentivized PIMCO to manipulate. *See* Arg. Pt. B *infra.* But such factors did not, themselves, cause any of the price artificiality attributed to PIMCO. *Id.* Also, the "government" did not make any findings regarding whether PIMCO caused price artificiality, but did amend the CBOT rules to prevent PIMCO from doing so again. *Id.*

**Exemption.** Finally, Defendants argue that "insufficient deliverable supply" is supposedly required for a market manipulation claim, but supposedly is absent here. D. Mem. pp. 2, 13-14. Both contentions are incorrect. Factually, Defendants manipulated and caused artificial prices by artificially increasing demand and artificially reducing supply. *See* Arg. Pt. B and C *infra.*

Moreover, though not required, Defendants also purchased 2/12 Notes and caused manipulative dislocations in the cash market. *Board of Trade v. Olsen*, 262 U.S. 1, 39 (1923) ("Manipulations of grain futures for speculative profit, though not carried to the extent of a corner or complete monopoly, exert a vicious influence and produce abnormal and disturbing temporary fluctuations of prices that are not responsive to actual supply and demand and discourage, not only this justifiable hedging, but disturb the normal flow of actual consignments."). But the "readily available supply," exclusive of Defendants' holding of 2/12 Notes and manipulative effects on the market, was always insufficient to satisfy Defendants'

4

putative demand for delivery. *See* Arg. Pt. C *infra*. Finally, futures trading is anticipatory and forward looking. Plaintiffs' Local Rule 56.1(b)(3)(A) Response to Defendants' Statement of Uncontested Facts ("Response") ¶ 23 (last paragraph). When Defendants were manipulating, there was always the threat (caused by Defendants) that even the hyperinflated supply of 2/12s created by Defendants' manipulation would not satisfy Defendants' delivery demands; this, alone, artificially inflated prices.

Legally, where Defendants intentionally inflate prices by injecting artificial demand into or withdrawing supply from the supply-demand equation for a futures contract price, a claim for manipulation is stated. *See id.; In re Soybean Futures*, 892 F.Supp. at 1031, 1044; *In re Indiana Farm Bureau*, 1982 WL 30249 at *3. Defendants did both here. Facts ¶¶ 10(b), 17(m)-(s).

In the latter regard, there is no "deliverable supply" exemption from manipulation because the standards of manipulative intent and causation must be applied in a practical way to the facts here.[5] *See Cargill*, 452 F.2d at 1163 ("The methods and techniques of manipulation are limited only by the ingenuity of man."); Markham, *Manipulation of Commodity Futures Prices - - The Unprosecutable Crime*, 8 YALE J. ON REG. 281, 360 n. 526 (1991) (efforts to catalogue manipulative practices rejected because "crafty" traders could evade the prohibitions).

Analyzing such standards practically demonstrates overwhelmingly that the manipulative intent and causation elements have been satisfied. At a minimum, they involve triable issues of

---

[5] *Cargill, Inc. v. Hardin*, 452 F.2d at 1163 ("test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished . . . The aim [is] to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand"); *accord Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991); (manipulation "is an intentional exaction of a price determined by forces other than supply and demand"; the "know it when you see it" test may be "most useful" test but in specific types of manipulation, traditional criteria may be employed, recognizing their "limitations") , quoted with approval by this Court at *Kohen, supra*, 244 F.R.D. at 481 n. 5.

fact. There is extensive evidence demonstrating that Defendants (a) intended to and did (b) cause (c) the prices of the June 2005 Contract to be artificially high during the Class Period. Indeed, whatever legal standards are applied, Defendants' nine manipulative acts here require that the joint summary judgment motions on intent and causation grounds must be denied.

---

[6] The Seventh Circuit noted further that, while control was not an element of manipulation, "In most, if not all of the cases in which a trader has been adjudged guilty of manipulation, it has effectively controlled the spot commodity to the extent necessary to enable it to convert its dominant long futures position into an illegal corner or squeeze." *Id.*

[7] *See also In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249 at *7 (CFTC Dec. 17, 1982) ("where there is evidence that the deliverable supply was intentionally and significantly reduced by a market participant, the seeking of 'unreasonably high prices,' which otherwise would be lawful conduct, becomes susceptible to an inference that the true purpose of the activities of the accused is to create prices not responsive to the forces of supply and demand").

9

**STATEMENT OF FACTS**

11

[8] Also, Defendants knew the 2/12 Note was going to become illiquid and lose value after June 30, 2005 when it ceased to be deliverable on ten year futures contracts. Facts ¶ 4(j); M.D. Ex. 51 (P-39).

## ARGUMENT

**A.**     **Defendants Have Failed To Negate Material Issues Of Fact Regarding Their Intent To Manipulate, A Question Generally Inappropriate For Summary Judgment**

Defendants argue that there is no evidence that they intended to manipulate. D. Mem. pp.

1, 6-9. Manipulation is "conduct [which] has been intentionally engaged in which has resulted in

a price which does not reflect basic forces of supply and demand." *Cargill,* 452 F2d at 1163,

cited with approval by this Court in *Kohen*, 244 F.R.D. at 485. Plaintiffs know of no case which

granted summary judgment on the issue of manipulative intent, and Defendants certainly cite to

none. D. Mem. *passim*. Manipulative intent is generally inappropriate for summary judgment in

any type of case. *See* n. 4 *supra*. Defendants' showing is particularly deficient here.

    **1.    Defendants' Manipulative Intent Is Properly Inferred From Their Conduct, Including Their Nine Manipulative Acts And Lies**

        **a.    Contrary To Defendants' Assertion, They Committed Nine Manipulative Acts, Not One**

Defendants are simply wrong in self-servingly characterizing this case as involving only

a failure to liquidate. *See* pp. 2-3 *supra*. For this reason alone, Defendants' first argument for

summary judgment should be denied.

        **b.    This Court Has Recognized That The Subjective Inquiry Of Intent Must Be Inferred From Conduct And The Totality Of The Circumstances**

As this Court has previously recognized, "[i]ntent is a subjective inquiry and 'must of

necessity be inferred from the objective facts and may, of course, be inferred by a person's

actions and the totality of the circumstances." *Kohen*, 244 F.R.D. at 482. *See also In re Soybean

Futures*, 892 F.Supp. at 1046 (denying summary judgment; "manipulation claims tend to be ad

hoc and fact-specific"); *In re Kosuga,* 19 A.D. 603, 624 (CEA 1960) (manipulative intent

inferred from conduct). While each of Defendants' nine manipulative acts would be sufficient

on its own to justify an inference of manipulative intent at the summary judgment stage (see

cases collected at n. 5), each manipulative step also strengthens the overall inference of

manipulative intent. *See In re Indiana Farm Bureau*, 1982 WL 30249 at *9 (noting cumulative effect of defendant's acts in *Cargill*).

### c. The Conduct Is Also Uneconomic

Although manipulative conduct need not be uneconomic,[9] much of Defendants' foregoing conduct is uneconomic. Facts ¶ 17. Extensive uneconomic conduct—all pointing towards intentionally inflating prices— would make sense only if Defendants intended to manipulate.

### d. Misleading Statements Also Justify The Inference Of Intent

Lies and misleading statements are indicative of manipulative intent. *See* Facts ¶¶ 12-16; *R. J. Koeppe & Co v. SEC*, 95 F.2d 550, 552 (7th Cir. 1938) (objective facts as to manipulative intent more persuasive than protestations of innocence), cited in *In re Henner*, 30 A.D. at 1222 (persons "must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary") (additional citations omitted).

### 2. Contrary To Defendants' Argument, Their Failure To Liquidate Is Manipulative Under The Circumstances Present Here

Defendants cite no authority supporting their "well established" proposition that the law condones their manipulative conduct after they acquired their long positions. D. Mem. p. 8. Indeed, the law is "well established" to the contrary, and holds the long interest to a duty not to exacerbate conditions in a congested market. *E.g.*, *In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249 at *32 (CFTC Dec. 17, 1982) ("The long interest, no matter how built up, that allows itself to be tempted into exploiting the situation (congestion) in a way to involve

---

[9] *Cargill*, 452 F2d at 1163 (uneconomic act is not necessary condition for a manipulation but is a sufficient one).

acute disturbance of the market becomes a cornering interest.") (Stone, Cmm'r, concurring)

(quoting REPORT ON THE GRAIN TRADE (FTC 1926). Thus,

> 'even if a dominant long played no role in the creation of a congested market, [the long] has a duty to avoid conduct that exacerbates the situation.' *In re Abrams*, [Current Transfer Binder] Comm. Fut. L.Rep. (CCH) p. 26, 479 at 43,136 (C.F.T.C. July 31, 1995) [*citing In the Matter of Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249 at *8 (C.F.T.C. December 17, 1982)].

*In the Matter of Fenchurch Capital Management, Ltd.,* 1996 WL 382313 at *6 (C.F.T.C. July 10,

1996), cited with approval in *Kohen*, 244 F.R.D. at 484; *see also In re Soybean Futures*, 892

F.Supp. at 1036 ("Whatever Defendants' original motivations, it is generally undisputed that by

May 1989 the Ferruzzi Parties had acquired substantial holdings in both the soybean cash and

futures markets.").[10]

Although Plaintiffs satisfy the "manipulative intent through exacerbation" prong of

manipulation law, factually, Plaintiffs' evidence of manipulative intent goes far beyond

exacerbation and, in the context of Defendants' other manipulative conduct, shows full-scale

manipulation, not mere profit-taking.

### 3. Defendants Cite To No Authority Condoning Their Failure To Liquidate Under The Circumstances Present Here

The alleged manipulators in the cases cited by Defendants did not buy up any of the

deliverable supply, let alone purchase substantial parts of the deliverable supply in an

uneconomic manner. They also did **not** (1) add to their futures market long positions during the

alleged manipulative period; (2) engage in market on close purchases: (3) engage in the

manipulative act of short-term lending; (4) lie to the regulators.  None of the cases on which

Defendants rely involved record high deliveries nor record high richness, let alone both at the

---

[10] Defendants' argument is also contrary to the law of the case. *See Kohen*, 244 F.R.D. at 485 (two examples of manipulative intent in *Indiana Farm* are not exclusive).

same time. The two principal, questionable cases relied upon by Defendants, *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52 (5th Cir. 1962) and *In Re Cox*, 1987 WL 106879 (CFTC July 15, 1987), involved only a failure to liquidate, on facts totally different from those here.

*Volkart*, a case which conflicts with Seventh Circuit precedent and has been criticized for five decades,[11] is actually silent as to the circumstances of Volkart's acquisition of its admittedly dominant long position in the futures contract, but exonerated the holder of that dominant long position because the court believed that the shorts were at fault in failing to obtain supplies to make delivery. *In Re Cox* has no applicability herein because that case turned on the factual finding that deliverable supplies had not been purchased (or their availability otherwise restricted) by the long position holders. *Cox* also relied on the discredited *Volkart* reasoning which over-emphasized the shorts' responsibility to prepare to make delivery.[12]

Defendants' reliance on *Indiana Farm Bureau* is especially noteworthy in light of that decision's discussion of manipulative intent:

---

[11]       [T]he *Volkart* decision does not represent a clearly defined line of cases establishing a definitive standard of acceptable conduct under the statute prohibiting manipulation; it is in substantial conflict with both *Great Western Distributors, Inc. v. Brannan*, 201 F.2d 476 (7th Cir. 1953) and *G.H. Miller & Co. v. United States*, 260 F.2d 286 (7th Cir. 1958). And the *Volkart* decision has been criticized by commentators.
*Cargill*, 452 F.2d at 1172 (footnote omitted). *See also id.* at 1173 ("we conclude that if the *Volkart* decision is to be interpreted as prohibiting regulation of manipulative squeezes, it is not in line with the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, providing for competitive trading markets and proscribing excessive speculation, and should not be followed."); Note, *The Delivery Requirement: An Illusory Bar To Regulation Of Manipulation In Commodity Exchanges*, 73 YALE L.J. 171 (1963). The decision in *In re Henner* included a 28 page appendix excoriating the reasoning in *Volkart*. 30 Agric. Dec. at 1264-91.
[12] Courts, including this Court, have repeatedly refused to follow *Cox* and noted that its principles are not binding on them. *In re Soybeans*, 892 F.Supp. at 1046 (noting that *Cox* is not binding); *Minpeco v. ContiCommodity Serv.*, 673 F. Supp. 684, 693 n. 9 (S.D.N.Y. 1987) (declining to be bound by any holding in *Cox*). *Cox* also distinguished its facts from those in *Cargill* and *Great Western* in part because the longs had not been active in the cash market, and also because out-of-town wheat should have been considered part of the deliverable supply as "premium price differentials were available in certain circumstances." 1987 WL 106879 at *7.

> [W]here there is evidence that the deliverable supply was intentionally and significantly reduced by a market participant, the seeking of 'unreasonably high prices,' which otherwise would be lawful conduct, becomes susceptible to an inference that the true purpose of the activities of the accused is to create prices not responsive to the forces of supply and demand.

1982 WL 30249 at *7 (footnote omitted), citing *Cargill* and *G.H. Miller. Indiana Farm Bureau,* which (like *Volkart*) was silent as to the long's motivation for acquiring its dominant position, and which also relied on *Volkart*'s discredited focus on the shorts' failure to prepare to make delivery, did not involve acts to increase a position in the cash market or otherwise to restrict deliverable supply.

Defendants' failure to liquidate here is therefore quantitatively and qualitatively different from that in the cases on which they rely, and those cases strongly favor Plaintiffs on the facts here.

### 4. PIMCO's Manipulative Intent Is Imputed To PIMCO Funds, And The Facts Demonstrate PIMCO Funds' Knowledge Of The Manipulative Acts

PIMCO Funds, which reaped the overwhelming percentage of the profits from the wrongdoing in this case, reiterates its unsuccessful argument that it cannot be held to have had any intent to manipulate. *Kohen,* 224 F.R.D. at 482. The facts show otherwise: PIMCO and PIMCO Funds shared not only a name but numerous key personnel, including the head of operations for PIMCO Funds and several PIMCO Funds trustees responsible for creating investment guidelines for PIMCO to follow. Plaintiffs' Response In Opposition To Defendant PIMCO Funds' Local Rule 56.1 Statement Of Uncontested Material Facts ("Response to Funds") ¶¶ 3, 7, 8. PIMCO Funds also aided and abetted PIMCO's manipulation. *Id.* These facts confirm at this stage the reasonableness of the Court's inference that "PIMCO Funds was well aware of its ability to influence prices while it was accumulating these large contract

positions." *Kohen*, 224 F.R.D. at 482; Response ¶ 4.

Because its investment manager and agent --- PIMCO --- had manipulative intent (Response to Funds ¶¶ 3, 7, 8), PIMCO Funds did as well. *See Cange v. Stotler and Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987) (under Section 2(a)(1) of CEA, 7 U.S.C. § 4, principal was liable without regard to the fact that it "had no prior knowledge of the illegal acts and did not take commissions from the defrauded customer or otherwise benefit financially from the illegal acts" of its agent); *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 966 (7th Cir. 1986) (Posner, J.) (Section 2(a)(1) "impose[s] strict liability, under a theory of respondeat superior, for acts within" the scope of the agency "by agents who are not necessarily employees").

In related contexts involving funds[13] and trusts,[14] courts have imputed the agent's intent to its principal. PIMCO Fund's motion should be denied.

**B.**     **Defendants Have Failed To Negate Material Issues Of Fact Regarding Their Causation of Artificial Prices, A Question Generally Inappropriate For Summary Judgment**

Causation, as an element of a claim for manipulation, has been readily satisfied. *See In re Kosuga*, 19 A.D. 603, 624 (CEA 1960) ("[i]t is enough for purposes of a finding of manipulation in violation of sections 6(b) and 9 of the Act, that respondents' action contributed to the price [movement].").

---

[13] *SEC v. Haligiannis*, 470 F.Supp.2d 373 (S.D.N.Y. 2007) (summary judgment imputing investment manager's scienter to hedge fund); *SEC v. Credit First Fund, LP*, 2006 WL 4729240 at *10 n.19 (C.D.Cal. Feb.13, 2006) (imputing scienter to fund defendants for securities law violations).
[14] *SEC v. Blackwell*, 477 F.Supp.2d 891 (S.D.Ohio 2007) (imputing fiduciary's knowledge to trust); *SEC v. Moscowitz*, 1998 WL 524903 (S.D.N.Y. Aug. 20, 1998) (same).

Implicitly recognizing that causation is generally inappropriate for determination on summary judgment, Defendants entitle their argument "Plaintiffs' Causation Theory Is Flawed As A Matter Of Law," D. Mem. p. 10. However, Defendants proceed to make intensely *factual* arguments and do not contest that Plaintiffs have submitted evidence that Defendants caused artificial prices. Instead, Defendants merely argue that as a matter of law Plaintiffs failed some supposed obligation to "sort out" multiple causes of artificial prices which Defendants assert are supposedly present and Plaintiffs supposedly have not done. Defendants cite to no case adopting this requirement, particularly at the summary judgment stage, D. Mem. *passim.* Prior manipulation cases have rejected it, and even the one case that apparently did, in dicta, erroneously potentially adopt the standard, expressly held that there is no 'sorting out" requirement at the summary judgment stage. *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 738 F.Supp. 1472 (S.D.N.Y. 1990) (denying summary judgment on defendants' argument that multiple causes of oil price movements were present).

Even if Defendants' arguments were legally correct, which they are not, their motions are rife with errors of fact. Defendants assert that Plaintiffs' causation evidence and theory are based on Defendants' failure to liquidate their positions. D. Mem. pp. 1, 10. But Plaintiffs have identified nine manipulative acts, most of which involve classic causes of artificial prices. Facts ¶¶ 4-16; *see* pp. 6-10 *supra.* In addition, Plaintiffs have submitted evidence that Defendants have engaged in seven types of behavior that artificially reduced supply and/or increased demand to cause artificial prices. *Id.* ¶ 17(m)-(s). Defendants have also made admissions that they inflated prices or caused artificiality in the market. M.D. Exs. 7 (P-55), 8 (P-83), 4 (P-187); *see also* Facts ¶ 4(n), 12(c), 19(e)-(f). Finally, Defendants' causation arguments are replete with other factual assertions which at best create material issues of fact.

Causation is an inherently factual issue which is inappropriate for summary judgment, *see* cases collected at n. 3 *supra*, and courts have repeatedly denied summary judgment on causation grounds against a complaint alleging commodity futures manipulation. *In re Soybean Futures; Transnor; Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989). *Apex Oil* is the only case known to Plaintiffs awarding even partial summary judgment on causation grounds. It denied summary judgment as to attempted manipulation but granted it as to "long squeeze" claims where the moving defendant [Belcher] held only 6.4% of the long open interest, did not acquire portions of the readily available supply, did not engage in all the other manipulative acts here, and deliverable supplies were found to exceed the shorts' requirements by 2.5 times. In these, polar opposite circumstances from those here, the court still partially denied summary judgment in favor of Belcher but also found that "[a]s a matter of law, the long defendants lacked the requisite market dominance to actually effect a long squeeze." *Id.* at 602.

Here, Plaintiffs allege far more manipulative conduct than merely a long squeeze, and, more important, PIMCO bought up substantial cash market supplies and engaged in seven kinds of uneconomic acts that artificially increased demand or decreased supply. Facts ¶¶ 17(m)-(s).

1.  **Defendants Rely Not On Law But Dicta, Which They Also Misread, As Their Sole Authority Against Causation**

Defendants argue that the "law" is supposedly "clear" under *In Re Cox* that: "If a claimant does not 'sort[] out' multiple causes, then 'the charge of manipulation cannot be sustained." D. Mem. p. 10. In truth, the "dicta," not "law," after a full trial in *Cox*, is that Defendants have the burden to establish that other causes exist before Plaintiffs must "sort out" (whatever that means)

anything. *Cox*'s causation language was added "without resolving the issue of causation in this case." *Id.* at *11. The Seventh Circuit expressly held that *Cox*'s causation statements are "dicta," not law. *Frey*, 931 F.2d at 1178.

Having debunked Defendants' assertion that *Cox* is "law," the next issue is whether the dicta by the non-binding *Cox* decision is persuasive. Courts, including this Court, have repeatedly refused to follow *Cox* and noted that its principles are not binding on them. *See* n. 12 *supra*. Moreover, Defendants ignore another part of the dicta in *Cox* which clearly places the burden on defendants, not plaintiffs, to demonstrate that price artificiality was caused by factors apart from defendant's unlawful behavior.

> If the respondents argue that other factors, apart from their own behavior, materially contributed to the artificial prices, **we will treat such claims as an affirmative defense**. In order to be absolved of liability under such a defense, the respondents must rebut the **evidence that they were a proximate cause of the artificial price**.

1987 WL 106879 at * 11 (emphasis supplied).[15] This part of the *Cox* dicta clearly implies that Plaintiffs need only establish that defendants were "a cause," and the burden then shifts to Defendants to prove their affirmative defense that other causes are responsible. Only if Defendants do so are multiple causes present. Contrary to the above-quoted, crystal-clear language of *Cox*, Defendants assert that *Cox* states:

> **If a claimant does not** 'sort[] out' **multiple causes, then** 'the charge of manipulation cannot be sustained.'

D. Mem. at 10 (emphasis added by defendants to the quote appearing in *In re Cox*, 1987 WL 106879 at *11). However, the full dicta from *Cox*, without elisions, is as follows:

> These decisions recognize that **there can be** multiple causes of an artificial price. Where these causes can be sorted out, and respondents are **a** 'proximate' cause of the artificial price, a charge of manipulation can be sustained. If the multiple causes cannot

---

[15] Here, Defendants have raised just such an affirmative defense. PIMCO Answer, "First Defense"; PIMCO Funds Answer, "First Defense".

be sorted out, **or** if the respondents are not **one of the proximate causes**, then the charge of manipulation cannot be sustained.

*Id.* (emphasis supplied). Thus, the *Cox* dicta also provides that the manipulation need not be the sole cause and *Cox* does not support --even at trial-- Defendants' contradictory interpretation that defendant's conduct must have "uniquely" caused the artificial price, much less that Plaintiffs must voluntarily create and disaggregate other causes.

### 2. Defendants' Causation Arguments Are Wrong As A Matter of Law And Run Counter To Established Authority

Defendants' misinterpretation of the *Cox* dicta also violates long-established authority in manipulation cases that a plaintiff need only prove that a defendant's acts were a substantial cause of price artificiality, regardless of the existence of other factors which may have contributed to or worsened the price artificiality. *CFTC v. Enron*, 2004 WL 594752 at *7 (S.D.Tex. Mar. 10, 2004); *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 173-74 (S.D.N.Y. 1989)(denying defendants' post-trial motions, on causation grounds, where defendant's acts were but one of several material proximate causes of price artificiality). As Judge Lasker instructed the jury in *Minpeco*:

> The second element of the claim of commodity manipulation which you must consider is whether an artificial market price in fact occurred as a proximate result of defendants' intentional conduct. . . .

> To establish what we call proximate cause, plaintiff must prove by a preponderance of the evidence that defendants' conduct played a substantial part in bringing about or actually causing the artificial price. **It is not necessary, however, that plaintiff prove to you that the defendants' conduct was the sole cause of an artificial price.**

*Minpeco, S.A. v. Hunt*, 81 Civ. 7619 (S.D.N.Y. Aug. 15, 1988) Trial transcript at 16717-19 (jury charge) (emphasis supplied). Judge Lasker's charge was based on a similar charge given by

24

Judge MacMahon as to antitrust and commodity manipulation claims in *Strobl v. New York*

*Mercantile Exchange*, 76 Civ. 4350 (S.D.N.Y. Nov. 17, 1983):

> [M]ere speculation that defendants' violation caused plaintiff's injury is not enough. Plaintiff must prove a logical relationship of cause and effect between the defendants' violation of the law and his injury. That is what we mean by proximate cause. . . .
> **At the same time, it is not necessary that plaintiff prove to you that the. . . violation was the sole or the only cause of his injury.** He must prove, however, that it was a material cause, that is, an important contributing cause, a cause that made a difference.

*Strobl*, Trial Transcript at 1218-19, 1220, 1221-22 (jury charge).

Defendants additionally misstate Plaintiffs' case by asserting that Plaintiffs have a

"theory for proving that PIMCO *uniquely* caused the alleged price artificiality." D. Mem. p. 10

(emphasis supplied). *But see* Response ¶ 23; Facts ¶¶ 17 and 19 (setting forth Plaintiffs'

causation evidence). Plaintiffs are not aware of any commodity manipulation case which has

required proof that defendant "uniquely" caused artificial prices. Defendants certainly cite to

none. D. Mem. *passim*. The law is clear that a defendant must be shown only to have been a

proximate cause of the artificiality.[16] On the contrary, where, as here, intentional harm or injury

is alleged, the common law is "astute to discover even very remote causation."[17]

Plaintiffs have readily met their burden of establishing through expert testimony that

Defendants' acts were a substantial proximate cause of the artificial prices and that plaintiffs

have sustained actual damages from Defendants' manipulation of the prices of the June 2005

Ten-Year Treasury note futures contract. Nothing more is required of plaintiffs particularly at

this stage of the litigation.

---

[16] *E.g., Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) ("a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden . . . .").

[17] *See* W. Page Keeton, PROSSER & KEETON ON THE LAW OF TORTS § 8 at 37 n. 27 (5th ed. 1984) quoting from *Derosier v. New England Tel. & Tel. Co.*, 130 A. 145, 152 (N.H. 1925).

### 3. Plaintiffs Have Submitted Extensive Evidence Disputing Defendants' Factual Assertion That There Were Multiple Causes Of Artificial Prices

Defendants assert that Plaintiffs admit that factors or traders other than Defendants caused some of the price artificiality that Plaintiffs' experts opine that Defendants caused. D. Mem. pp. 1-2, 10-12. However, implicitly recognizing that Plaintiffs do not concede the existence of other causes, Defendants themselves assert that other traders (including "A Large Market Participant" whose name is redacted by Order of this Court) or "systemic factors" caused some of the artificiality. But there is no authenticated or cognizable evidence of what this trader did. Response ¶¶ 49, 50. At most, the conduct of A Large Market Participant is that of a responsible short and actually **reduced** price artificiality rather than increased it.[18] *Id.* ¶ 19-54. Defendants' manipulation directly caused traders, in order to be in a position to deliver, to acquire 2/12 Notes and hold them. *Id*; Facts ¶ 4, 10. Thus, Plaintiffs do **not** concede that any factors or traders other than PIMCO caused the artificial prices that PIMCO caused. Response ¶¶ 40-44, 47-54. Plaintiffs have submitted evidence attesting that no other causes did exist. *Id.* Because Plaintiffs have disputed the existence of other causes, summary judgment must be denied.

Defendants also assert that the government found that systemic factors caused price distortion. D. Mem. p. 11. What the CBOT expressly stated was that it instituted position limits in order to "ensure that a single market participant (or multiple participants acting pursuant to an

---

[18] Plaintiffs' experts examined the positions of the two largest market participants in the June contract, PIMCO and A Large Market Participant, and concluded that PIMCO had manipulated the June 2005 Contract. *Id.* Cases have recognized that that it is a manipulative act for a large long position to buy up the deliverable supply, *Cargill,* 452 F2d at 1170, but that a responsible short must obtain deliverable supply in order to satisfy its short obligation. *Indiana Farm Bureau*, 1982 WL 30249 at *9. Consistent with the law, Plaintiffs' experts have found (a) no "Granger causation" between A Large Market Participant's Feb12 note positions and artificial June 2005 Contract prices, and (b) that PIMCO's Feb12 positions "Granger caused" changes in artificiality in the June 2005 Contract. Response ¶ 23.

express or implied understanding) cannot establish and hold a dominant and potentially

destabilizing position into the last ten trading days of an expiring contract." Facts 1(b); *see* M.D.

Ex. 115 (P-44, August 10, 2005 CBOT letter to FIA at pp. 3-4); Response ¶¶ 43-48. In other

words, the CBOT instituted position limits precisely in order to prevent a repeat of the PIMCO

scenario that had just played out in the June 2005 Contract: a single large market participant

standing for delivery on an excessively large number of contracts that caused a divergence

between futures and cash prices. *Id.*[19]

In this context, the "government" made no "finding," much less a finding as to which

Plaintiffs had an opportunity to be heard. Plaintiffs' evidence demonstrates that on May 9, 2005,

nothing changed in the so-called systemic factors but PIMCO's actions radically changed,

including its large manipulative purchases of 2/12 Notes. Response ¶¶ 22, 32, 44; Facts ¶¶ 4(d),

7(b), 7(e), 7(f). And on May 9 and 10, 2005, the price of the June 2005 Contract began to inflate

due to PIMCO's manipulative conduct. Facts ¶ 19(c). Plaintiffs assert that the systemic factors

did make the market more vulnerable or susceptible to a squeeze but did not, of themselves,

cause artificial prices. Response ¶¶ 41-44. Thus, the so-called "systemic factors" alluded to by

Defendants did not cause any injuries complained of by Plaintiffs. *Id.*

Defendants argue that Plaintiff Rubio admitted other participants had effects on prices

and that it was common knowledge that repurchases were withheld. D. Mem. pp. 11-12. But

_____

[19] Similarly, on November 30, 2005 the CFTC approved the CBOT's decision to establish
position limits noting that "[i]n view of the above cited market factors and events, it is
reasonable to conclude that the CBOT's adoption of spot month position limits represents an
appropriate self-regulatory action ***to address bona fide concerns about manipulation***."
Plaintiffs' Response ¶ 41; *see* Sexton Decl. Ex. 13 (D-43 (Commodity Futures Trading
Commission Information Memorandum, November 30, 2005, pp. 2, 3, and 19) (approving the
CBOT limits because they were necessary to "reduce the probability that a single party could
cause price distortion in the expiring subject futures contracts," "insulate Treasury futures from
potential manipulative conduct," "restrict a trader's ability to exercise market power" and
"address bona fide concerns about manipulation.").

Plaintiffs do not assert that the entire level of prices in the Note was determined by one trader.

Rather, Plaintiffs merely contend that PIMCO caused the **artificial portion** of the prices that

Plaintiffs attribute to PIMCO. Although many factors caused the overall level of prices,

Plaintiffs' experts opine that Defendants caused the price artificiality at issue here. Facts ¶ 19;

Response ¶¶ 43-51. Indeed, almost all factors---including the systemic factors---are present in

other prices in the market which Plaintiffs' experts used as a benchmark in determining

artificiality. Response ¶ 44; M.D. Exs. 16 (Pirrong Rebuttal Report ¶¶ 106-17), 26 (Pirrong Dep.

173:3-176:6, 178:24-179:11). Mr. Rubio was not testifying that Plaintiffs alleged that there were

other participants to the manipulation than the Defendants. Response ¶ 63-65.

     In this regard, Plaintiffs are not required to rule out every other market participant, *see*

*Enron*, 2004 WL 594752 at *7, but Plaintiffs have largely done so, M.D. Ex. 164 (Pirrong

Affidavit sworn to November 28, 2007 at ¶¶ 6-10); Response ¶64. In fact, Plaintiffs have

demonstrated that other traders did liquidate and rolled out of their June 2005 Contract positions

at a record rate. Facts ¶¶ 11(a), 12(g), 18( c). This is particularly true for longs in the Contract,

because PIMCO did not roll.[20]     *Id.* ¶¶ 11(a), 12(g).

     At most, Defendants' supposed "other causes" argument presents triable issues of

material fact.

     **4.**     **Plaintiffs Have Submitted Evidence Of Numerous Acts By Defendants, In Addition To Their Failure To Liquidate, Which Caused Artificial Prices**

---

[20] Finally, Defendants assert that their partial liquidation caused reductions in artificiality. D. Mem. 9-12. This is true, but all manipulators must follow a mixed strategy to profit from their manipulation. They first force prices up (as PIMCO did) and then liquidate as much as they can to "cash in" their profits from the manipulation. Facts ¶ 6(a), Response ¶ 31. As with Defendants, they must be careful not to liquidate too many contracts and destroy the richness and artificiality in the futures contract price that is caused by their manipulation. Response ¶ 10. As manipulators must, Defendants did also take large deliveries to subsidize the profits from the future sales. *Id.*

Defendants argue that Plaintiffs' supposed causation theory is that "if PIMCO had liquidated more of its positions the artificiality would have been zero." D. Mem. p. 10. This failure to liquidate premise is false because Defendants caused artificial prices by multiple manipulative acts. These include (*see* Facts ¶ 17(m)-(s)) by:

(1)  artificially reducing supplies deliverable on the June 2005 Contract through substantial purchase of the 2/12 Notes, including purchases made in an uneconomic manner (Facts ¶ 4(a)-(p));

(2)  artificially increasing demand for June 2005 Contracts through substantial purchases of such Contracts after May 9, 2005, including uneconomic purchases via "market on close" orders expressly designed to make the Contract close, in PIMCO's words, "as high as possible" (Facts ¶ 5(a)-(l));

(3)  artificially increasing demand for 2/12 Notes and artificially reducing supply of June 2005 Contracts by uneconomically standing for delivery of $13.249 billion of June 2005 Contracts when the prices of such Contracts were very rich compared to readily available, more liquid securities (Facts ¶ 6(a)-(h));

(4)  artificially increasing demand for June 2005 Contracts by uneconomically paying rich prices to add to Defendants' long positions after May 9th, 2005 (Facts ¶ 7(a)-(f));

(5)  artificially reducing the actual and perceived supplies of 2/12 Notes by uneconomically failing to lend such Notes early in the Class Period and after the Class Period, and intentionally lending such Notes exclusively for increasingly shorter periods during the middle and end of the Class Period (Facts ¶ 9(a)-(e));

(6)  artificially reducing supplies of the deliverable Notes by the profitless reverse repo transaction on which Defendants uneconomically failed to lend (Facts ¶ 8(a)-(f));

(7)  artificially reducing supplies of the June 2005 Contract by uneconomically refusing to liquidate or sell their June 2005 Contracts at the very rich prices which their manipulative conduct was causing (Facts ¶ 11(a)-(c)).

Thus, Defendants caused artificial June 2005 Contract prices because an artificial price is a price caused by a supply-demand equation that includes some artificial element of demand or supply. *E.g., In re Soybean Futures*, 892 F.Supp.at 1057.

Defendants, according to the CBOT, "negatively impacted" themselves. M.D. Ex. 94 (P-148); Facts ¶ 5(j). They did so by refusing to sell and, instead, buying at high prices. Facts ¶ 5(k). This artificially increased demand and artificially reduced supply in respect of the June 2005 Contract. *Id.* Thereby, Defendants artificially inflated June Contract prices. Defendants repeatedly lost monies and turned down profits in order to artificially reduce supplies, artificially increase demand or increase their market power in respect of the June 2005 Contract. *Id.* ¶ 17.

Plaintiffs' experts opine that Defendants engaged in this uneconomic conduct and substantial additional manipulative conduct to cause price artificiality. Facts ¶¶ 17, 19.

Moreover, Defendants themselves made admissions in their internal emails suggesting that they caused price artificiality. *E.g.*, M.D. Exs. 8 (P-83 ("am fairly certain that we, PIMCO, had a major role in causing or reinforcing any market dislocation that may have occurred")), 4 (P-187 ("[as late as August 2005,] most of richness [in intermediate term U.S. Notes was still] due to squeeze of TYM5 [TYM5 is the June 2005 Contract]")); *see also* id. Ex. 7 (P-55 (on May 25th, TYM squeeze lifts overall market)).

In sum, Plaintiffs and their experts have asserted and submitted evidence, including Defendants' admissions, that Defendants caused the price artificiality Plaintiffs attribute to them. But others in the market, including A Large Market Participant, acted to reduce artificiality. Thus, the total amount of artificiality caused by Defendants was more than the net amount of artificiality in the market. Plaintiffs have submitted evidence sufficient to demonstrate that Defendants were the sole proximate cause of the artificiality Plaintiffs attribute to them. With respect to the exact amount of price artificiality, Plaintiffs' expert has opined that Defendants could have reduced the total artificiality in the market to zero had they liquidated more of their

positions. Response ¶ 22-23. Defendants' manipulative failure to do so was only one of their numerous manipulative acts.

**C.  Defendants' Final, Throwaway Argument, Not Addressing Any Element Of A Manipulation Claim, Seeks An Exemption Whenever A Long Manipulator Takes Delivery Only Of CTD Notes**

Defendants argue that if the only deliveries on the June 2005 Contract were the cheapest to deliver notes---that is, the United States Treasury Notes maturing in February 2012 ("Feb 12 notes")—then there was no manipulation. D. Mem. pp. 1, 13-14. They do not address this argument to any element of a manipulation claim, *see* n. 1 *supra*, and offer no legal support for it; the logic of the argument is not apparent except as an effort to seek an exemption whenever the long interest takes delivery of only the CTD.

Implicitly recognizing that no such exemption has ever been found, Defendants again mischaracterize Plaintiffs' case as advancing a "panic theory." But as Defendants' nine manipulative acts show, Plaintiffs have offered extensive evidence of Defendants' systematic and continuous efforts to artificially reduce supply and increase demand in order to manipulate the market throughout the Class Period. *See supra.* Legally and factually, Defendants' "exemption" argument is a non-starter.[21] Defendants were without question hoping for a "panic" among the shorts which would result in deliveries to PIMCO of the non-CTD 8/12 Notes.[22]

---

[21]  First, futures markets are forward looking and anticipatory. Response ¶ 23(H). Defendants profited from their manipulation by selling $25,000,000,000 of June 2005 Contracts at artificially inflated prices, including all-time record levels of richness. *Id.* ¶ 27(B), 30-33; Facts ¶ 17(l), 19(e). Defendants stood for an all-time record delivery on the remainder of their position. Facts ¶ 6. Prior to Defendants' taking their manipulative profits by these liquidations, the amounts of deliveries that Defendants could demand far exceeded the amount of 2/12 Notes that could be delivered. Response ¶ 32. At these times, therefore, the Defendants forced the shorts and the market **correctly** to pay artificial prices to avoid having to deliver the 8/12 Notes. Thus, Defendants' threatened demand of 8/12s on delivery caused the artificially high and all-time record prices **correctly**, not mistakenly, to be paid by the shorts.

Undaunted by the lack of legal support for their claimed exemption, Defendants cite to

*Grossman v. Citrus Assoc. of the New York Cotton Exchange, Inc.*, 742 F.Supp. 843 (S.D.N.Y.

1990) for the proposition that intentionally causing a panic is not manipulation. But *Grossman*

does not remotely stand for any such thing.[23] Rather, the law is clear that any conduct that

intentionally causes artificial prices, including through influencing others, constitutes

---

Second, although an unprecedented actual delivery of the next-CTD 8/12s would be overwhelming evidence of manipulation, *G.H. Miller*, 260 F.2d at 289; *Fenchurch*, 1996 WL 382313 at *6; *United Egg Producers v. Bauer International Corp.*, 311 F. Supp. 1375, 1383 (S.D.N.Y. 1970), such unprecedented deliveries are not the threshold minimum prerequisites for manipulation. On the contrary, any actual deliveries above the "readily available supply" of 2/12s would be yet another dramatic evidence of manipulation. *Fenchurch*, 1996 WL 382313 at *6; Response ¶ 10; M.D. Ex. 9 (Pirrong Report ¶ 29). Because Defendants have failed even to propose undisputed facts relating to "readily available supplies" of 2/12 Notes, their motion for summary judgment must be denied. Defendants' Undisputed Facts, *passim*.

Third, readily available supply is a fact-intensive issue inappropriate for summary judgment. *See Frey*, 931 F.2d at 1177. Plaintiffs' expert has opined that the readily available supply of 2/12 Notes was approximately $15 billion, M.D. Ex. 9 (Pirrong ¶¶ 104, 209, 210); Facts ¶ 4(e); M.D. Ex. 57 (P-46), and that demanding, threatening or receiving actual additional deliveries through futures and 2/12 Note purchases over this amount would be manipulative and was. *Id.*

Fourth, even "readily available supply" is not an element of a claim for manipulation. *See* n. 1 *supra* (listing elements). If a manipulator acts intentionally to inflate prices by artificially inflating demand or artificially decreasing supply, then the manipulator is intentionally engaging in uneconomic acts that cause artificial prices. *Cargill*, 452 F.2d at 1170-71. Plaintiffs have submitted extensive evidence that Defendants did this. Facts ¶¶ 4, 5, 14, 17, 19.

Fifth, it is particularly manipulative for a long to buy significant portions of the deliverable supply. *See Cargill*, 452 F.2d at 1160-61. Plaintiffs have submitted extensive evidence that Defendants took this manipulative step and eight others. Facts ¶¶ 4 and 4-10. Through Manipulative Act #1 (Facts ¶ 4) and all these integrated manipulative steps Defendants had more than the ability to cause and did cause artificial prices. *Id.*; *see Indiana Farm*, 1982 WL 302409 at *9.

[22] Response ¶ 25. *See also* M.D. Ex. 191 (August 18, 2005 Zhu e-mail to IC re TYU5—"The likely end game is that they may sell/short TYU5 after market panic to profit, without actually going through delivery process….").

[23] The plaintiff in *Grossman* chose to short the concentrated frozen orange juice contract because his weather reporting service discounted the possibility of a freeze in Florida, although he was aware of other independent reports predicting a freeze. The court determined that plaintiff had no evidence that any of the conflicting weather reports were floated as false rumors intended to manipulate the contract, and imposed sanctions for a frivolous complaint

manipulation. Compare *In re Henner*, 30 A.D. at 1234 ("It has long been recognized that 'spreading of false intelligence' is one of the 'most common' methods of manipulating the market.").

Creating unsupportable exemptions runs counter to the law of manipulation and its practical application by courts to prevent "crafty" manipulators from evading its prohibitions. Markham, *supra*, 8 YALE J. ON REG. at 360 n. 526. Summary judgment must be denied on this exemption ground as well.

**D.     Defendants Have Failed To Negate Material Issues Of Fact Regarding Their Ability To Manipulate And The Existence Of Artificial Prices**

Although Defendants have done nothing to even attempt to point to genuine issues of material fact regarding their ability to manipulate and the existence of artificial prices, *Adickes*, 398 U.S. 144, 160 (1970), Plaintiffs have put forward extensive evidence of both elements. The law has a low standard for proof of the existence of an artificial price. *See In re Indiana Farm Bureau*, 1982 WL 30249 at * 4 n. 2 (an artificial price is one that "does not reflect the market or economic forces of supply and demand."). Plaintiffs easily satisfy this standard.

Expert testimony is a recognized form of evidence of demonstrating price artificiality. *In re Soybean Futures*, 892 F.Supp. at 1048; *In re Sumitomo Copper Litig.*, 182 F.Supp. 85, 91 (S.D.N.Y. 1998). Two economists who are leading experts on commodity futures manipulation have attested that June Contract prices were artificially high during the Class Period. Plaintiffs' Response ¶¶ 23, 25; Facts n. 1. They further opined that PIMCO had the ability to manipulate the market. Response ¶ 29.

## CONCLUSION

Defendants' overlapping motions for summary judgment should be denied in all respects.


Dated: December 6, 2007

Respectfully submitted,


**LOVELL STEWART HALEBIAN LLP**

/s/ Christopher Lovell
Christopher Lovell
Gary S. Jacobson
Peggy Wedgworth
Christopher M. McGrath
500 Fifth Avenue, New York, NY 10110
***Lead Counsel for Plaintiffs***

Geoffrey M. Horn
Vince Briganti
**LOWEY DANNENBERG BEMPORAD
SELINGER & COHEN, P.C.**
White Plains Plaza
One North Broadway, Suite 509
White Plains, New York 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
***Counsel for Plaintiffs***

**MILLER LAW LLC**

/s/ Marvin A. Miller
Marvin A. Miller
Matthew E. Van Tine
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
***Local Counsel for Plaintiff***

Louis F. Burke
**LOUIS F. BURKE, P.C.**
New York, New York 10022
Telephone: (212) 682-1700
Facsimile: (212) 808-4280
***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I, Christopher M. McGrath, an attorney, hereby certify that I have served **CORRECTED** copies of *Plaintiffs' Consolidated Memorandum In Opposition To Defendants' Motions for Summary Judgment* upon the following individuals by Electronic Means on December 6th, 2007:

William J. Nissen
wnissen@sidely.com
Eric J. Grush
egrush@sidley.com
Jennifer Tan
jtan@sidley.com
**SIDLEY AUSTIN LLP**
*Counsel for Defendant*
*Pacific Investment Management Company LLC*

Blake T. Hannafan
bth@hannafanlaw.com
**HANNAFAN & HANNAFAN, LTD.**

David Kotler
david.kotler@dechert.com
**DECHERT LLP**
*Counsel for Defendant PIMCO Funds*

Marvin A. Miller
MMiller@millerlawllc.com
**MILLER LAW LLC**
*Designated Local Counsel for Plaintiffs*

Geoffrey Horn
GHorn@lowey.com
Vince Briganti
VBriganti@lowey.com
**LOWEY DANNENBERG BEMPORAD SELINGER & COHEN, P.C.**

Louis F. Burke
lburke@lfblaw.com
**LOUIS F. BURKE, P.C.**
*Counsel for other Plaintiffs*

*/s/ Christopher M. McGrath*
Christopher M. McGrath

<u>CERTIFICATE OF SERVICE</u>

  I, Matthew E. Van Tine, one of the attorneys for Plaintiffs, hereby certify that on December 18, 2007, service of the foregoing ***Corrected*** copy of the ***Redacted Version of Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion for Summary Judgment*** was accomplished pursuant to ECF as to Filing Users and further that I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing user.

          <u>*/s/ Matthew E. Van Tine*</u>
          Matthew E. Van Tine