# ORIGINAL
# 07-8024

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

U.S.C.A.— 7th Circuit
FILED

AUG 1 4 2007 JAD

GINO J. AGNELLO
CLERK

| | |
|---|---|
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, AND PIMCO FUNDS, | ) ) ) ) |
| Defendants-Petitioners | ) ) |
| v. | ) ) |
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, AND RICHARD HERSHEY, | ) ) ) ) |
| Plaintiffs-Respondents | ) ) |

Petition for Permission to Appeal Pursuant to Rule 23(f) of the Federal Rules of Civil Procedures from Order Granting Class Certification

N.D. Ill. No. 05-CV-4681

The Honorable Ronald A. Guzman, Judge Presiding

FILED

AUG 1 4 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO RULE 23(f) OF THE FEDERAL RULES OF CIVIL PROCEDURE FROM ORDER GRANTING CLASS CERTIFICATION

U.S.C.A. — 7th Circuit
RECEIVED

AUG 1 4 2007 LEJ

GINO J. AGNELLO
CLERK

William J. Nissen
Eric H. Grush
Jennifer Tan
SIDLEY AUSTIN LLP
1 S. Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
Attorneys for Petitioner-Defendant Pacific Investment Management Company LLC

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
(609) 620-3200
Attorney for Petitioner-Defendant PIMCO Funds

Dated: August 14, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ....................................................................................................1

ISSUES PRESENTED FOR APPEAL.........................................................................3

STATEMENT OF FACTS AND PROCEDURAL HISTORY........................................4

STANDARD APPLICABLE TO PETITION FOR PERMISSION TO APPEAL.........7

ARGUMENT .............................................................................................................8

    I.      The District Court Erred in Refusing to Apply the Supreme
            Court's *Dura* Decision. ...........................................................................8

    II.     Application of *Dura* Requires That the Proposed Class Not Be
            Certified. ..............................................................................................10

          A.    The District Court's Certification of a Class Despite Extensive
                  Conflicts of Interest Was Erroneous .........................................10

          B.    Under *Dura*, Individual Issues Regarding Fact of Injury
                  Predominate...............................................................................15

          C.    The Certified Class Improperly Includes Uninjured
                  Members Who Lack Standing. ...................................................19

RELIEF SOUGHT .................................................................................................20

# ORIGINAL
# 07-8024

U.S.C.A. — 7th Circuit
FILED

AUG 1 4 2007 JAD

GINO J. AGNELLO
CLERK

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

|  |  |
|---|---|
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, AND PIMCO FUNDS, | ) ) ) ) |
| Defendants-Petitioners | ) ) ) |
| v. | ) ) ) |
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, AND RICHARD HERSHEY, | ) ) ) ) ) |
| Plaintiffs-Respondents | ) ) |

Petition for Permission to Appeal Pursuant to Rule 23(f) of the Federal Rules of Civil Procedures from Order Granting Class Certification

N.D. Ill. No. 05-CV-4681

The Honorable Ronald A. Guzman, Judge Presiding

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO RULE 23(f) OF THE FEDERAL RULES OF CIVIL PROCEDURE FROM ORDER GRANTING CLASS CERTIFICATION

U.S.C.A. — 7th Circuit
RECEIVED

AUG 1 4 2007 LEJ

GINO J. AGNELLO
CLERK

William J. Nissen
Eric H. Grush
Jennifer Tan
SIDLEY AUSTIN LLP
1 S. Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
Attorneys for Petitioner-Defendant Pacific Investment Management Company LLC

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
(609) 620-3200
Attorney for Petitioner-Defendant PIMCO Funds

Dated: August 14, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................................i

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ...................................................................................................................1

ISSUES PRESENTED FOR APPEAL...................................................................................3

STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................................4

STANDARD APPLICABLE TO PETITION FOR PERMISSION TO APPEAL .........7

ARGUMENT ...........................................................................................................................8

    I.      The District Court Erred in Refusing to Apply the Supreme
          Court's *Dura* Decision. ...........................................................................8

    II.    Application of *Dura* Requires That the Proposed Class Not Be
          Certified. ...............................................................................................10

          A.    The District Court's Certification of a Class Despite Extensive
                Conflicts of Interest Was Erroneous .........................................10

          B.    Under *Dura*, Individual Issues Regarding Fact of Injury
                Predominate...............................................................................15

          C.    The Certified Class Improperly Includes Uninjured
                Members Who Lack Standing. ....................................................19

RELIEF SOUGHT .................................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980) ........................................... 4

*Aiello v. Providian Financial Corp.*, 239 F.3d 876 (7th Cir. 2001).................. 10

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................ 6, 10

*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) ............................ 10

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ........................................... 7, 8

*Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999)................. 2

*Centurions v. Ferruzi Trading International*, 1994 WL. 114860 (N.D. Ill. Jan. 7, 1993) ..................................................................................................... 7

*DH2, Incorp. v. S.E.C.*, 422 F.3d 591 (7th Cir. 2004) ........................................ 4

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ............................ 4

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)........................... 2-5

*Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506 (S.D. Ill. 2004) ...... 10

*Federal Deposit Insurance Co. v. UMIC, Inc.*, 136 F.3d 1375 (10th Cir. 1998) ......................................................................................................................... 4

*Forman v. Data Transfer, Inc.*, 164 F.R.D. 400 (E.D. Pa. 1995) ...................... 4

*Fry v. UAL Corp.*, 136 F.R.D. 626 (N.D. Ill. 1991)............................................. 8

*Global Minerals & Metals Corp. v. Superior Court*, 7 Cal. Rptr. 3d 28 (Cal. Ct. App. 2003) ................................................................................................... 7

*In re Brand Name Prescription Drugs Antitrust Litigation*, 1994 WL. 663590 (N.D. Ill. 1994).............................................................................................. 10

*In re Copper Antitrust Litigation*, 196 F.R.D. 348 (W.D. Wis. 2000) .............. 4

*In re Household International Tax Reduction Plan*, 441 F.3d 500 (7th Cir. 2006)........................................................................................................................... 2

*In re Initial Public Offering Sec. Litigation,* 471 F.3d 24 (2d Cir. 2006) . 2, 8-10

*In re Natural Gas Commodities Litigation,* 231 F.R.D. at 183 ......................... 8

*In re Public Offering Fee Antitrust Litigation,* 2006 WL. 1026653
(S.D.N.Y. Apr. 18, 2006) ............................................................................ 10

*In re Soybean Futures Litigation,* 892 F. Supp. 1025 (N.D. Ill. 1995).............. 4

*In re Soybean Futures Litigation,* 1993 U.S. Dist. LEXIS 18738 (N.D.
Ill. Dec. 27, 1993) ........................................................................................ 7

*In re Sumitomo Copper Litigation,* 262 F.3d 134 (2d Cir. 2001) ...................... 3

*Isaacs v. Sprint Corp.,* 261 F.3d 679 (7th Cir. 2001) ........................................ 2

*J.P. Morgan & Co., Inc. v. Superior Court,* 6 Cal. Rptr. 3d 214 (Cal. Ct.
App. 2003) ..................................................................................................... 7

*Lamers Dairy Inc. v. U.S. Department of Agriculture,* 379 F.3d 466
(7th Cir. 2004) ......................................................................................... 1, 5

*Langbecker v. Electronic Data Systems Corp.,* 476 F.3d 299 (5th Cir.
2007) ..................................................................................................... 3, 6, 7

*Martino v. McDonald's System, Inc.,* 86 F.R.D. 145 (N.D. Ill. 1980) .............. 10

*McCollough v. Ferruzzi Trading International,* 1993 WL. 795256 (N.D.
Ill. June 8, 1993) ...................................................................................... 4, 7

*Merrill Lynch v. Curran,* 456 U.S. 353 (1982) ................................................... 4

*Mike v. Safeco Insurance Co.,* 223 F.R.D. 50 (D. Conn. 2004) .......................... 4

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154
(3d Cir. 2001) ......................................................................................... 1, 10

*Pickett v. Iowa Beef Processors,* 209 F.3d 1276 (11th Cir. 2000).................. 3, 6

*Pollock v. Citrus Associates,* Comm. Fut. L. Rep. ¶ 21 (S.D.N.Y. Nov.
19, 1981) ........................................................................................................ 1

*Saxe v. E.F. Hutton & Co.,* 789 F.2d 105 (2d Cir. 1986)................................... 4

*Smith v. Wisconsin Department of Agriculture*, 23 F.3d 1134 (7th Cir. 1994) ..................................................................................................................... 4

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) ....... 2, 3, 8, 9

*Waters v. International Precious Metals Corp.*, 172 F.R.D. 479 (S.D. Fla. 1996) ...................................................................................................... 5

*West v. Prudential Securities, Inc.*, 282 F.3d 935 (7th Cir. 2002) .................... 2

## FEDERAL STATUTES

28 U.S.C. § 1292(e) .............................................................................................. 1

28 U.S.C. § 1331 .................................................................................................. 1

Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a) .......... 1

## INTRODUCTION

Pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, Petitioners-Defendants Pacific Investment Management Company LLC ("PIMCO") and PIMCO Funds hereby petition this Court for leave to appeal from the district court's order granting class certification in *Kohen et al. v. Pacific Investment Management Company LLC et al.*, (N.D. Ill. No. 05 CV 4681) (the Order is attached as Exhibit A). The district court has jurisdiction over this action under 28 U.S.C. § 1331, the federal question statute. This Court has jurisdiction over this appeal pursuant to Rule 23(f) and 28 U.S.C. § 1292(e).

This case squarely presents at least two grounds previously recognized by this Court as a basis for granting Rule 23(f) review. First, class certification substantially expands the damages at stake in this case – to in excess of $600 million, by plaintiffs' calculations[1] – placing extraordinary pressure on Defendants to settle the case to avoid the potential for a catastrophic judgment, whether or not the case has merit. This Court has repeatedly found the need for interlocutory review under such circumstances "compelling."

Second, granting Rule 23(f) review here will allow this Court to advance the development of the law of class certification applicable to manipulation claims under Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a), which law this Court has not yet addressed. Review of the district court's decision will therefore provide much-needed guidance regarding standards applicable to class certification in such cases.

---

[1] Defendants contest plaintiffs' damages calculations (as well as liability).

Moreover, the district court's decision to certify a class should be reversed. As an initial matter, the district court erred in holding that, to determine whether a putative class member was injured, only the price at which he or she purchased a contract, and not the price at which the contract was sold, should be considered. The district court expressly refused to apply *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which held that assessment of injury must be based on the prices at which the market participant both *bought and sold*. The Court held that *Dura*, which arose in the context of a claim under the Securities Exchange Act, could not be applied to manipulation claims under the CEA. The CEA, however, has repeatedly been interpreted as consistent with the Securities Exchange Act. Moreover, the unanimous Court in *Dura* based its decision on "pure logic," which applies no less to the CEA than to the securities laws.

The district court's refusal to recognize that each class member's purchases *and* sales must be considered led it to certify a class that violates at least three fundamental class certification principles.

*First*, by certifying a class of market participants that includes persons who both *purchased* and *sold* futures contracts opposite each other, and whose damages are necessarily based on both purchase and sale, the district court created significant conflicts of interest. The interest of a class member who bought a contract on a given day will be directly antagonistic to the interest of a participant who sold on the same day. Two other Circuits have accepted interlocutory appeals and vacated or reversed decisions certifying classes under similar circumstances.

2

*Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 315-16 (5th Cir. 2007);

*Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000).

*Second*, the class definition adopted by the court below causes individual issues of fact regarding each class member's fact of injury to predominate over issues involving common proof, which precludes class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure. Specifically, individual inquiry must be made to determine the net effect of the alleged manipulation on each class member's purchases and sales, because some, and perhaps many, class members benefited from the alleged manipulation.

*Third*, because the class, as defined by the district court, includes uninjured members who therefore lack standing, this Court's precedent precludes certification.

For all these reasons, as explained more fully below, defendants respectfully request that this Court grant them permission to appeal, and reverse the district court's decision to certify a class.

## ISSUES PRESENTED FOR APPEAL

1.     Whether the district court erred in refusing to apply the Supreme Court's decision in *Dura Pharmaceuticals*, 544 U.S. 336 (2005)?

2.     Whether the district court erred in finding no conflicts of interest where the certified class includes both market participants who bought and market participants who sold the same futures contracts opposite each other?

3.      Whether the district court erred in including uninjured members in the certified class, which caused (a) individual issues to predominate common class issues, and (b) class members to lack standing?

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Treasury Futures Contracts. A "future," or futures contract, is an agreement in which the parties agree to the price, quantity, and date of delivery of a particular commodity in advance of the actual delivery. *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1032 (N.D. Ill. 1995). Thus, for example, in the futures contracts at issue here, plaintiffs and defendants entered into contracts to purchase or sell 10-year Treasury notes (which is the underlying commodity) at a particular price for delivery at the end of June 2005.

The party contracting to buy the underlying commodity is said to "buy" the futures contract, and is called the "long." (Ex.A at 2). The person contracting to "sell" the underlying commodity is said to "sell" the futures contract, and is called the "short." (*Id.*); *In re Soybean Futures*, 892 F. Supp. at 1032. PIMCO in this case is alleged to have bought, *i.e.*, established "long" positions in, a 10-year Treasury Note futures contract set to expire at the end of June 2005. (R.80 ¶ 3.)[2]

Instead of making or taking delivery under the futures contracts at the expiration of the contracts, longs and shorts have another option: They may satisfy their obligations by taking an equal, offsetting position in the same contract. (Ex.A at 2); *In re Soybean Futures*, 892 F. Supp. at 1032. Thus, a long, which (by

---

[2] Citations to the record in this brief are in the form "R.N, Ex.X at P," where "N" is the docket number in the district court, "X" is the exhibit number to any such document, and "P" is the page number.

4

definition) has previously *bought* the contract, may liquidate its position by *selling* the contract. Conversely, a short, which (by definition) has previously *sold* the contract, may liquidate its position by *buying* the contract.

The Alleged Manipulation. According to plaintiffs, PIMCO – which manages funds for institutions and individuals that invest in mutual funds and other investment programs[3] – established unusually large, multi-billion dollar long positions in the June 2005 Ten Year note futures contract and in the underlying Treasury note that was the cheapest note to deliver under the contract. (Ex.A at 3-4.) It then allegedly refused to liquidate its positions as quickly as other market participants. Plaintiffs allege that this caused the price of the June 2005 contract to become artificially inflated between May 9 and June 21, 2005. (*Id.* at 4.) They seek to represent a class of market participants who liquidated short positions by buying back the contract at allegedly artificial prices. (*Id.* at 7.)

The Commodity Futures Trading Commission ("CFTC"), which has authority under the CEA to investigate and take action against traders that manipulate futures contracts, has noted that several systemic market factors – and not the actions of any particular market participant – "caused" the "distorted" prices cited by plaintiffs.[4] In fact, the CFTC has found that such distorted pricing occurred

---

[3] Defendant PIMCO is investment advisor to Defendant PIMCO Funds, which is an investment company that does not make investment decisions or perform its own trades. (Ex.A at 2.)

[4] *See* November 30, 2005 Division of Market Oversight Memorandum at pages 8 & 11, http://www.cftc.gov/files/dea/dmocbtreasuryposlimitsmemo.pdf. This Court may take judicial notice of such reports of administrative bodies. *Lamers Dairy Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466, 471 n. 8 (7th Cir. 2004).

around the same time in several other Treasury futures contracts that plaintiffs do not allege PIMCO manipulated. *Id.*

Procedural History. Plaintiffs filed a motion to certify a class under Rule 23(b)(3) on February 9, 2006. As originally proposed, the class included persons who closed out a short position either by offset or delivery. Briefing was completed on August 30, 2006 with Plaintiffs' reply brief, in which they amended the proposed class to eliminate persons who closed out their short positions through delivery. The district court granted defendants leave to file an additional brief on March 28, 2007 regarding the amended class definition, and then granted plaintiffs' motion to certify the proposed class, as amended, in an opinion and order dated July 31, 2007.

The certified class includes "[a]ll persons who purchased, between May 9, 2005 and June 30, 2005 ('the Class Period'), inclusive, a June 10-year Treasury note futures contract in order to liquidate a short position." (Ex.A at 7.) In other words, the class includes all persons who first sold a futures contract (*i.e.*, established a "short" position), and then liquidated by buying back the contract anytime between May 9 and June 30, 2005. Thus, to identify just a few examples, all of the following are members of the class: (1) someone who sold the contract on May 9 and bought it back on May 10, (2) someone who sold on May 10 and bought on May 25, or (3) someone who sold on May 25 and bought on June 10. In these examples, participant #1 *bought* on the same day that participant #2 *sold*, and participant #2 *bought* on the same day that participant #3 *sold.* Moreover, these persons who

6

made opposite transactions on the same day would include persons who actually traded against each other in the same transaction.

## STANDARD APPLICABLE TO PETITION FOR PERMISSION TO APPEAL

Permission to appeal under Rule 23(f) should be granted, as noted above, (1) where the high stakes of the litigation after class certification could pressure the defendant to settle, whether or not the case has merit, or (2) the issues present an opportunity for this Court to advance the development of the law governing class actions. *In re Household Int'l Tax Reduction Plan*, 441 F.3d 500, 501 (7th Cir. 2006); *West v. Prudential Securities, Inc.*, 282 F.3d 935, 937 (7th Cir. 2002); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001); *Isaacs v. Sprint Corp.*, 261 F.3d 679, 681 (7th Cir. 2001); *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999).

Both of these criteria are met here. First, plaintiffs claim more than $600 million in damages for the certified class, which provides a "compelling" and "powerful" case for the exercise of discretion under Rule 23(f). *West v. Prudential Securities, Inc.*, 282 F.3d 935, 937 (7th Cir. 2002) ("The effect of a class certification in inducing settlement to curtail the risk of large awards provides a powerful reason to take an interlocutory appeal"); *Isaacs v. Sprint Corp.*, 261 F.3d 679, 681 (7th Cir. 2001). Where, as here, class certification turns a case into an action with hundreds of millions of dollars at stake, it "puts a bet-your-company decision" to the defendants' management "and may induce a substantial settlement even if customers' position is weak." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). This is a "prime occasion" for the use of Rule 23(f), due not only to

7

"the pressure that class certification places on the defendant but also because the ensuing settlement prevents resolution of the underlying issues." *Id.*

Second, this case presents an opportunity for this Court to provide necessary guidance to lower courts regarding important and unsettled issues involving class certification for manipulation claims under the CEA. We are aware of no Circuit that has analyzed the merits of the class certification issues presented here.[5] This is presumably because most (if not all) CEA manipulation class actions have been settled prior to trial, and thus before the defendant had the opportunity to appeal a class certification decision after final judgment.

Moreover, as set forth below, the district court's decision here is contrary to law and should be reversed.

## ·ARGUMENT

I.    The District Court Erred in Refusing to Apply the Supreme Court's *Dura* Decision.

The district court refused to consider both a class member's *purchases and sales* in determining whether he or she was injured. Instead, the court held that if plaintiffs prove manipulation, then all class members were injured simply based on a *purchase* at allegedly artificial prices. (Ex.A at 7-9; 18-19.) Under the court's ruling, a market participant who sold the futures contract, and then bought it back (*i.e.*, liquidated the short position) just a minute later at the same price and level of artificiality would somehow be deemed injured. This is not the law.

---

[5] The Second Circuit has considered whether to take a 23(f) appeal with respect to a commodities manipulation case; although it referred to some of the arguments Defendants make here, it did not provide an analysis on the merits. *See In Re Sumitomo Copper Litig.*, 262 F.3d 134 (2d Cir. 2001).

The Supreme Court, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), held – at least with respect to claims under the Securities Exchange Act – that a plaintiff's loss must be determined by comparing *purchase and sale*. In that case, the Supreme Court reversed the Ninth Circuit's holding that a plaintiff adequately alleged damages in a federal securities law action by merely alleging that it *bought* a security at an artificially high price caused by defendant's misrepresentation. The Supreme Court reasoned that both sides of a transaction – the purchase and the sell – must be considered to determine whether a loss was caused by the high price, and that buying at an artificially high price may or may not cause damages, depending on the sale price. *Id.* at 342-43. This is consistent with a decision in the Northern District of Illinois involving a manipulation claim under the CEA. *See McCollough v. Ferruzzi Trading Int'l*, 1993 WL 795256, at *4 (N.D. Ill. June 8, 1993) ("just as class members who bought . . . futures at artificially high prices would have been harmed, those same members who sold soybean futures at artificially high prices would have benefited").

The district court here, however, refused to apply *Dura*, reasoning that it involved the Securities Exchange Act, while this case is brought under the CEA. This was error. To begin with, the Supreme Court has noted that CEA manipulation claims are "analogous" to claims under the Securities Exchange Act. *Merrill Lynch v. Curran*, 456 U.S. 353, 395 (1982). And federal courts often look to the securities laws to interpret the CEA. *E.G., Federal Deposit Ins. Co. v. UMIC, Inc.*, 136 F.3d 1375, 1384 n. 4 (10th Cir. 1998); *Saxe v. E.F. Hutton & Co.*, 789 F.2d

9

105, 109 (2d Cir. 1986); *Waters v. International Precious Metals Corp.*, 172 F.R.D. 479, 485 (S.D. Fla. 1996).

Moreover, the unanimous Supreme Court in *Dura* noted that its holding was a matter of "pure logic." 544 U.S. at 343. There is no basis to ignore the Court's logic here. If a market participant buys and then sells a manipulated contract at the same level of artificiality, it makes no sense to suggest that it was injured by the manipulation. Moreover, if a market participant *buys* at a *less* inflated price than that at which it *sells*, it clearly benefited from the alleged artificiality. The district court gave no explanation for rejecting this elementary principle, which even one of the named plaintiffs and plaintiffs' experts acknowledged. (Ex.A at 18-19; R.101, Ex.F (Gilbert Deposition) at 183-188, 206-7; R.101, Ex. A (Rubio Deposition) at 157-159, 175). Any other rule would compensate market participants who suffered no economic loss, or actually benefited from the alleged artificiality.

As set forth below, the district court's failure to follow *Dura* led it to certify a class (1) with extensive conflicts of interest, (2) for which individual issues regarding fact of injury predominate over issues common to the class, *see* Fed. R. Civ. P. 23(b)(3), and (3) which improperly includes uninjured class members who lack standing.

II. Application of *Dura* Requires That the Proposed Class Not Be Certified.

  A. The District Court's Certification of a Class Despite Extensive Conflicts of Interest Was Erroneous.

Applying *Dura*, a class member who *bought* on a given day would obviously prefer to *maximize* the calculation of artificiality on that day in order to maximize

10

damages, while a class member who *sold* on the same day would prefer to *minimize* the calculation of artificiality, also to maximize damages. Because the certified class includes members who *bought and sold at the same time*, and even opposite each other in the same transaction, this creates extensive conflicts of interest. Rather than engaging in any sort of analysis of this conflict, however, the district court relied on inapposite case law, while rejecting out of hand applicable authority.

It is well established that a class should not be certified where there are conflicts of interest among plaintiffs and the putative class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). Applying this principle, the Fifth and Eleventh Circuit have accepted Rule 23(f) appeals under circumstances similar to those here (albeit under different statutes) and reversed or vacated decisions certifying classes that included members with differing interests in demonstrating the level of alleged price artificiality over time. *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 315-16 (5th Cir. 2007) (ERISA); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (Packers & Stockyards Act).

The district court here distinguished *Langbecker* by noting that it involved both damages and injunctive relief, while this case involves only damages. (Ex.A at 17.) It is clear on the face of the *Langbecker* decision, however, that its reasoning is not limited to cases involving injunctions. To the contrary, the Fifth Circuit rejected the plaintiffs' claim that the class was properly certified because the putative class members collectively shared the goal of attaining "maximum payment" to a 401(k) Plan, regardless of the designated date of purchase. 476 F.3d

at 315-16. The court ruled that the interests of those whose investments made money conflicted with the interests of those who lost money, and that among those who lost money, there were conflicts resulting from the different dates when it could be alleged that the stock became an imprudent investment. This was because, as here, different dates would have different consequences for the potential *recoveries* of different class members. *Id.* Thus, nothing in the Fifth Circuit's reasoning, or in the Eleventh Circuit's *Pickett* decision, suggests that those decisions apply only where the plaintiffs seek injunctive relief.

In fact, several courts have held that these very conflicts prevent certification of commodities manipulation cases where, as here, putative class members simultaneously bought and sold the same contracts. *Centurions v. Ferruzi Trading Int'l*, 1994 WL 114860, \*9-12 (N.D. Ill. Jan. 7, 1993); *McCollough v. Ferruzi Trading Int'l*, 1993 WL 795256, \*4 (N.D. Ill. 1993)[6]; *J.P. Morgan & Co., Inc. v. Superior Court*, 6 Cal. Rptr. 3d 214 (Cal. Ct. App. 2003); *Global Minerals & Metals Corp. v. Superior Court*, 7 Cal. Rptr. 3d 28 (Cal. Ct. App. 2003).

The authority on which the district court relied here (Ex.A at 16-17) is not to the contrary. As an initial matter, the only Court of Appeals decision cited by the district court – the thirty-two year old decision in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) – actually supports the existence of a conflict here. In particular, the

---

[6] Although the parties in *Centurions* and *McCollough* later stipulated to certification of a revised class, such stipulations are not precedent. Moreover, the later unpublished decision in these cases relied on by plaintiffs – *In re Soybean Futures Litig.*, 1993 U.S. Dist. LEXIS 18738 (N.D. Ill. Dec. 27, 1993) – did not consider the conflicts issues raised here.

12

court in *Blackie* held that a conflict between purchasers and sellers would exist only if an out-of-pocket measure of damages were applied, but would not exist if a rescissory measure of damages were applied. *Id.* at 908-09. Here plaintiffs rely only on an out-of-pocket measure of damages.

The district court decisions relied on by the court below are also readily distinguished. (*See* Order at 16, *citing Fry v. UAL Corp.,* 136 F.R.D. 626 (N.D. Ill. 1991), and *In re Natural Gas Commodities Litigation,* 231 F.R.D. at 183). The *Fry* decision did not involve class members simultaneously purchasing and selling the same instrument, but instead involved securities held by the class "in different forms" – which is not at issue here. *136 F.R.D.* at 633-34. And *In re Natural Gas Commodities Litigation,* 231 F.R.D. at 183, has subsequently been rejected by the Second Circuit as applying an inappropriate standard for class certification. *In re Initial Public Offering Sec. Litig.,* 471 F.3d 24, 35 & n.5 (2d Cir. 2006). In particular, the Second Circuit in *Initial Public Offering* adopted a much more rigorous class certification standard than had been applied by the district court; that Circuit's standard is now in line with the class certification standards previously enunciated by this Court in *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 675 (7th Cir. 2001).

In fact, this Court's decision in *Szabo* and the Second Circuit's decision in *Initial Public Offering* further demonstrate why class certification is improper here. Those decisions require district courts, in analyzing class certification, not simply to accept as true plaintiffs' allegations; instead, the courts must make whatever

13

factual determinations are necessary to determine whether plaintiffs meet their burden. *Szabo*, 249 F.3d at 676; *Initial Public Offering*, 471 F.3d at 41-42.

Here, the district court did nothing to analyze the evidence regarding the conflicts of interest, which is undisputed and shows extensive, concrete conflicts. For example, the evidence shows that at least one class member (and most likely many others) bought on May 24 (R.260, Jennifer Tan Declaration ("Decl.")., Ex. 6), which was the day with the highest level of artificiality according to plaintiffs' damages expert. (R.260, Tan Decl., Ex. 4.) But other class members were net *sellers* that day. (*Id.*, Ex. 2.) These various class members would accordingly have opposite and conflicting interests in quantifying the level of alleged artificiality on May 24, with the buyer wanting it to be high and the sellers wanting it to be low. Similar problems would exist for all days in the putative class period (during which trading volume was in the thousands of contracts), because plaintiffs have included in the putative class both those who sold and those who bought on each day.

Moreover, the evidence clearly demonstrates that class members have conflicting interests regarding the expert analyses they should offer. Plaintiffs offered opinions of two experts, Craig Pirrong and John Merrick, each of whom has developed different measures of artificiality during the class period (R.260, Tan Decl., Exs. 4 and 7.) According to Pirrong, for example, the artificiality was highest on May 24, but Merrick says that it was highest on May 25. (*Id.*) Thus, a class member who sold on May 24 and bought on May 25 would have benefited from the alleged artificiality according to one expert's calculation, but lost according to the

14

other's. (*Id.*) And, of course, other experts could have reached still other results. Different class members have conflicting interests, then, in which expert evidence they will present regarding the changes in the alleged artificial prices over time.

### B. Under *Dura*, Individual Issues Regarding Fact of Injury Predominate.

Because plaintiffs seek to certify a class under Rule 23(b)(3), they must also establish that common issues predominate over any individual issues. Fed. R. Civ. P. 23(b)(3); *see also Amchem*, 521 U.S. at 614. While some courts have held that variance in the *amount of damages* will not defeat predominance, because damages issues can be bifurcated from the liability determination at trial, it is clear that if *fact of injury* cannot be proven on a classwide basis, then individual issues predominate and class certification should be denied. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187-88 (3d Cir. 2001) (denying class certification where injury could not be proven on a classwide basis); *Aiello v. Providian Financial Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (affirming denial of class certification "because of the variance in injury among the members of class and the cost of individualized hearings that would in consequence be required for assessing damages"); *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (denying class certification and noting that some class members could have benefited from the alleged misconduct).[7]

---

[7] *See also In re Public Offering Fee Antitrust Litig.*, 2006 WL 1026653, at *9 (S.D.N.Y. Apr. 18, 2006); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 512-14 (S.D. Ill. 2004); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590, at *6 (N.D. Ill. 1994); *Martino v. McDonald's System, Inc.*, 86 F.R.D. 145, 147 (N.D. Ill. 1980).

The court's analysis in *Newton*, 259 F.3d at 177-81, and 187-89, illustrates the error in the district court's refusal to recognize this difference between amount of damages and fact of injury. In *Newton*, the Third Circuit affirmed the denial of class certification in a Section 10(b) securities case because individual issues regarding whether class members suffered economic losses predominated over issues common to the class. Contrary to the district court's holding here, the Third Circuit found that "[t]he ability to calculate the aggregate *amount of damages* does not absolve plaintiffs from the duty to prove each investor *was harmed* by the defendants' practice." *Id.* at 188 (emphasis added). In light of the fact that class members could have been harmed or benefited from their transactions, class certification was denied because "[d]etermining which class members were economically harmed would require an individual analysis into each trade and its alternatives. The individual questions, therefore, are overpowering." *Id.* at 189.

For precisely these reasons, courts have denied class certification in price manipulation cases where the class included market participants who simultaneously bought and sold. *Pollock v. Citrus Associates*, Comm. Fut. L. Rep. ¶ 21, 292 (S.D.N.Y. Nov. 19, 1981) ("[t]he necessity of such an individualized determination coupled with the fact that each class member will have to demonstrate damages individually, forcefully indicates that common questions do not predominate"); *J.P. Morgan & Co. v. Superior Court for San Diego County*, Commodity Fut. L. Rep. ¶ 29,625 (Cal. Ct. App. Nov. 12, 2003) (denying class certification because injury could not be proven on a classwide basis).

The district court cited to contrary opinions from the Southern District of New York (Order at 18-19), but, as noted above, the Second Circuit at the time used a more lenient standard for class certification. The Second Circuit has since adopted a standard that is in line with this Court's more rigorous class certification standard. *See Initial Public Offering*, 471 F.3d at 41-42; *Szabo*, 249 F.3d at 676. Moreover, the decisions on which the district court relied are contrary to the weight of authority cited above, holding that a class should not be certified where fact of injury is not subject to classwide proof.

Plaintiffs do not even assert – nor could they – that evidence common to the class could be used to prove the *fact* of injury (as opposed to *amount* of damages). Plaintiffs have offered expert testimony, but, *at best*, the expert testified only that a common statistical method could be developed to calculate the impact of the alleged manipulation *on the prices of the futures contract*. (R.101, Ex. F (Gilbert Dep.) at 193-194). Plaintiffs' expert also acknowledged that, to determine the impact *on any individual putative class member*, analysis would need to be made of all of his or her trades. (R.101, Ex. F (Gilbert Dep.) at 183-88, 193-194.) Named plaintiff Breakwater and PIMCO's expert agreed. (R.101, Ex.A (Rubio Dep.) at 157-59, 175, 257-258; R.100 (Hanke Aff.) ¶¶ 52-53.)

In fact, there is undisputed evidence of trades on which class members actually benefited from the alleged artificiality. For example, the trader that appears to be the largest class member *sold* many more contracts than it *bought* during the class period. (R.260, Tan Decl., Ex. 1.) Therefore, this class member

17

most likely benefited much more by selling contracts at allegedly artificially high prices than it suffered by buying, and it was thus in all likelihood a beneficiary of the alleged manipulation, not a victim.

Moreover, at least two of the three named plaintiffs made trades which benefited from the alleged manipulation. Plaintiff Hershey made three transactions during the class period: (1) Two buys on May 11, 2005, one of which closed out a pre-existing short position, and the other of which established a new long position, and (2) a sale of the long position on May 27, 2005. The alleged artificiality on these trades netted out to a benefit to Hershey. (*See* R.260, Tan Decl., Ex.4; R.101, Tan Decl. Ex.C (Hershey Dep.) at 80-85, Exs. E & H). Similarly, plaintiff Kohen made a trade on which he sold on May 24 and bought back on May 25; he also benefited from the claimed artificiality with respect to that transaction according to Plaintiffs' damages expert, who calculated that the artificiality was greater on the 24th than 25th. (*See* R.260, Tan Decl., Ex. 4; R.101, Ex.J & K (Kohen Dep. and exhibit).) In the court below, PIMCO provided additional concrete examples of class members who made transactions that benefited from the alleged manipulation. (R.260.)

Thus, there is uncontroverted evidence that an analysis of the many transactions of thousands of class members will be necessary to determine whether each and every class member was, in fact, injured. Under the well-established authority cited above, these individual issues regarding fact of injury predominate, and certification should be denied.

18

## C. The Certified Class Improperly Includes Uninjured Members Who Lack Standing.

Even if the overly broad class definition did not give rise to unavoidable conflicts or result in predominating individual issues regarding fact of injury, class certification should still be denied. As this Court has held, a certified class should not include class members who were not injured and who therefore lack standing. *Adashunas v. Negley*, 626 F.2d 600, 603-04 (7th Cir. 1980) (affirming denial of class certification because it was not "reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief"); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("no class may be certified that contains members lacking Article III standing").[8] The district court suggested that it was "premature" to analyze whether the class includes uninjured members, and that instead this issue could be "resolved at the damages stage." (Ex.A at 9.) But this is contrary to the authority cited above, and to the elementary principle that issues regarding standing should not wait for an analysis of damages at trial. *DH2, Incorp. v. S.E.C.*, 422 F.3d 591, 596-7 (7th Cir. 2004) (Addressing standing as a "threshold matter" and dismissing the action for failure to adequately allege injury in fact "without commenting on the merits" of the underlying action);

---

[8] Nor can plaintiffs cure this defect by simply adding the qualification "and were injured" to the class definition, because a class definition cannot depend on analysis of the merits of the case – such as whether a putative class member was, in fact, injured. *Mike v. Safeco Ins. Co.*, 223 F.R.D. 50, 52-53 (D. Conn. 2004); *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995). Instead, plaintiffs must define a class that, from an economic perspective, only includes injured members.

19

*see also, Smith v. Wisconsin Dep't of Agric.*, 23 F.3d 1134, 1142 (7th Cir. 1994) (Standing is a "jurisdictional prerequisite" and must be addressed before reaching the merits of the claim).

### RELIEF SOUGHT

For the foregoing reasons, petitioners respectfully request that this Court grant review of the district court's class certification order and, after such review, reverse that order.

RESPECTFULLY SUBMITTED,

Dated: August 14, 2007

William J. Nissen
Eric H. Grush
Jennifer Tan
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Attorneys for Petitioner-Defendant
Pacific Investment Management
Company LLC

Michael T. Hannafan
Blake T. Hannafan
HANNAFAN & HANNAFAN, LTD.
One East Wacker Dr., Suite 1208
Chicago, IL. 60601
(312) 527-0055

Attorneys for Petitioner-Defendant
PIMCO Funds

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
(609) 620-3200

## CERTIFICATE OF SERVICE

I, Eric H. Grush, an attorney, hereby certify that I have served a copy of the

foregoing Petition For Permission to Appeal Pursuant to Rule 23(f) of the Federal

Rules of Civil Procedure From Order Granting Class Certification upon the

following individuals by e-mail, and by Messenger or Federal Express, properly

addressed and postage prepaid, on this 14th day of August, 2007:

Marvin Alan Miller
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
mmiller@millerlawllc.com

Christopher Lovell
Christopher McGrath
Lovell Stewart Halebian, LLP
500 Fifth Ave.
New York, NY 10110
clovell@lshllp.com
cmcgrath@lshllp.com

David A. Kotler
Dechert LLP
Princeton Pike Corporate Center
PO Box 5218
Princeton, NJ 08543-5218
david.kotler@dechert.com

Eric H. Grush



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEF A. KOHEN, BREAKWATER )
TRADING LLC, and RICHARD HERSHEY, )
)
     Plaintiffs, )
)
v. )    **05 C 4681**
)
PACIFIC INVESTMENT MANAGEMENT )    **Judge Ronald A. Guzmán**
COMPANY LLC, PIMCO FUNDS, and )
John Does 1-100, )
)
     Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Breakwater Trading LLC ("Breakwater") and Richard Hershey have filed this

class action against Pacific Investment Management LLC ("PIMCO") and PIMCO Funds

alleging violations of §§ 9(a), 22(a) and 22(a)(1) of the Commodity Exchange Act ("CEA").

7 U.S.C. §§ 13(a), 25(a), 25(a)(1). Plaintiffs now move for class certification pursuant to Federal

Rule of Civil Procedure ("Rule") 23. Additionally, defendants have moved to dismiss the

complaint for failure to state a claim pursuant to Rule 12(b)(6). For the reasons set forth in this

opinion, the Court grants plaintiffs' motion for class certification, denies PIMCO Funds' motion

to dismiss, and grants in part and denies in part PIMCO's motion to dismiss.

### Facts

This is a class action brought by plaintiffs on behalf of purchasers of the June 2005

Ten-Year Treasury note futures contract ("June Contract"). (Pls.' Mem. Supp. First Am. Mot.

Class Cert. ("Pls.' Mem. Supp. Mot. Class Cert.") 1.) Plaintiffs allege defendants manipulated

and aided and abetted the manipulation of prices of the June Contract and the cheapest-to-deliver ("CTD") Treasury note underlying the June Contract in violation of §§ 9(a), 22(a) and 22(a)(1) of the CEA. (*Id.*)

Futures contracts are standardized according to terms specified by the commodities exchange that creates the contract, which makes such contracts fungible and allows them to be bought and sold over the exchange. (Compl. ¶ 29; PIMCO's Mem. Supp. Mot. Dismiss 3.) The party contracting to sell the underlying commodity pursuant to a futures contract is called the "short," and is said to have a "short position." (PIMCO's Mem. Supp. Mot. Dismiss 3-4.) The party contracting to buy the underlying commodity pursuant to a futures contract is called the "long," and is said to have a "long position." (*Id.*) The long position has the right to take delivery of the underlying commodity, while the short position is obligated to make delivery to the long position. (*Id.*) A party to a futures contract can "liquidate" its position by entering into an equal and opposite transaction (*i.e.*, "offset") in the futures market prior to the expiration of trading on the futures contract. (*Id.* at 4.)

Plaintiffs Hershey and Breakwater purchased June Contracts during the class period to liquidate a short position and incurred a loss on the transaction. (Compl. ¶¶ 18-19.) PIMCO is an institutional money manager, and PIMCO Funds is a Massachusetts trust and registered open-end management investment company consisting of separate portfolios. (*Id.* ¶¶ 22-23.) PIMCO Funds does not make any investment decisions or execute trades; rather, PIMCO Funds contracts with its investment advisor, PIMCO. (PIMCO Funds' Mem. Supp. Mot. Dismiss 2.) Plaintiffs refer to PIMCO and PIMCO Funds collectively in their complaint. (Compl. ¶ 23.) Plaintiffs allege that between the years 2000 to 2004 the volume and open interest of the

2

Chicago Board of Trade ("CBT") Ten-Year Treasury note futures contract steadily increased while the available supply of Treasury notes deliverable in satisfaction of the futures contracts remained constant or declined, which made the futures contract susceptible to manipulation by a person in control of a large long position. (Pls.' Mem. Supp. Mot. Class Cert. 3.) In late 2004 and 2005, and with knowledge of the foregoing facts, defendants began to accumulate a large long position in the June Contract. (Compl. ¶¶ 2, 45.) By March 31, 2005, defendants held in excess of $16.3 billion in the June Contract, which plaintiffs claim is of unprecedented size and was many times larger than defendants' position prior to October 2004. (*Id.* ¶ 53; Pls.' Mem. Supp. Mot. Class Cert. 3.) This long position exceeded the available supply of the CTD Treasury note. (Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 6.)

Additionally, from March 20, 2005 until the end of June 2005, defendants increased their holdings of the February 2012 Treasury note (the "CTD Treasury note") to $13.3 billion, which was the CTD Treasury note for the June Contract and was in excess of 75% of the deliverable supply of such notes. (Compl. ¶¶ 5, 34, 37, 56, 58; Pls.' Mem. Supp. Mot. Class Cert. 4.) However, defendants argue that the $13.3 billion amounted to merely 3.16% of the notes deliverable under the terms of the June Contract. (PIMCO's Mem. Supp. Mot. Dismiss 6.)

The CBT rules specify a number of different Treasury note issues with maturity dates ranging from six-and-one-half to ten years that are acceptable for delivery against a Ten-Year Treasury note futures contract. (Compl. ¶ 33.) Although multiple Treasury note issues are typically deliverable against a particular futures contract, usually a single Treasury note is most economical for shorts to deliver, which is referred to as the CTD. (*Id.* ¶ 34.)

As the June Contract neared its expiration, and coinciding with a decline in the open

3

interest of the June Contract in May and June 2005, defendants held their long position in the June Contract, which plaintiffs claim is "highly unusual." (*Id.* ¶ 4; Pls.' Mem. Supp. Mot. Class Cert. 4; Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 6.) After trading in the June Contract closed, defendants represented that they took deliveries on the June Contract (which, according to plaintiffs, occurs less than 1% of the time because traders usually offset their future contract positions before their contracts mature) and acquired a large position in the CTD Treasury note for investment purposes. (Compl. ¶ 30; Pls.' Mem. Supp. Mot. Class Cert. 4.) However, by September 30, 2005, defendants had sold all of their CTD Treasury note holdings. (Pls.' Mem. Supp. Mot. Class Cert. 4.) On June 29, 2005, the CBT amended CBT Regulation 425.01 to limit the amount of contracts that could be held during the last ten trading days to 50,000 contracts, which was less than one-third of defendants alleged long position in the June Contract. (Compl. ¶¶ 81-82.)

Plaintiffs allege the motive and intent underlying defendants' conduct was to increase financial returns and profit from artificially high prices. (*Id.* ¶ 92; Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 7.) Throughout the class period, May 9, 2005 to June 30, 2005, the pricing relationships and trading behavior of the June Contract and/or the CTD Note exhibited anomalies, which plaintiffs alleged evinced an artificial market. (Compl. ¶¶ 62-73; Pls.' Mem. Supp. Mot. Class Cert. 4.)

### Discussion

Plaintiffs have moved for class certification pursuant to Rule 23. Additionally, defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a

4

claim upon which relief can be granted.

## I. Motion for Class Certification

Before discussing the merits of plaintiffs' motion for class certification, two preliminary arguments that have been raised by defendants will be considered. Defendants argue that plaintiffs lack standing to bring their individual actions, and that the class definition is fatally flawed because it includes persons that have not been injured by defendants alleged manipulation of the June Contract.

First, defendants argue that neither Hershey nor Breakwater can serve as a representative of the putative class because both plaintiffs lack standing. If the named plaintiffs cannot establish standing, then they may not seek relief on their own behalf or on the behalf of any other members of the class. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Defendants assert that § 22 of the CEA imposes the standing requirement that plaintiffs must have purchased or sold a futures contract and suffered actual damages as a result of the price manipulation of the futures contract. 7 U.S.C. § 25(a)(1)(D).

Defendants argue that plaintiffs were not the actual purchasers of the June Contract. According to defendants, plaintiffs entered into a partnership or joint account arrangement, which was the actual purchaser of the contracts. Defendants assert that Breakwater was not even the legal owner of the accounts in which its employees traded, and Hershey held only a minority interest in his joint account. According to defendants, that plaintiffs lack standing is consistent with general principles of jointly held claims. In support of their argument, defendants rely solely on *Shelley v. Noffsinger*, a case in which the court ordered joinder of a party with an

5

interest in the disputed joint account because it was necessary to avoid needless risk of multiple lawsuits. 91 F.R.D. 263, 266-67 (N.D. Ill. 1981).

The Court is not persuaded by defendants' argument. In *Hochschuler v. G.D. Searle & Co.*, the defendants argued that the absence of a joint owner rendered the class' named representative's claim atypical. 82 F.R.D. 339, 346 (N.D. Ill. 1978). In concluding the claim was not atypical, the court stated that both an individual purchaser and a purchaser that decided to purchase as a co-owner "would be influenced by the same material nondisclosures." *Id.* Similarly, in this case, the same alleged course of conduct by defendants that resulted in manipulation of the price of the June Contract would influence and harm both the individual purchaser and the co-owner of a joint account. Hershey's decision to purchase as a co-owner of a joint account should not affect his ability to seek remedies under the CEA because Hershey has alleged that he suffered actual damages from purchasing the June Contract at a manipulated price. (Compl. ¶ 103.) Therefore, the Court finds that Hershey has standing and may seek to represent other members of the putative class.

Additionally, the Court finds that Breakwater has standing to sue under the § 22 of the CEA. Breakwater has alleged that it purchased one or more June Contracts during the class period and was injured as a result of defendants' manipulative conduct. (*Id.*) Because Breakwater has alleged that it suffered injury, Breakwater has standing and may seek to represent other members of the putative class. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) ("Appellee has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others."); *see also Indemnified Capital Invs., SA v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1408-10 (7th Cir. 1993) (finding plaintiff did not have standing to sue based

6

on "customer accounts," as opposed to plaintiff's "house accounts," because customers alone suffered the loss; further noting that plaintiff did not allege that it was injured by losses sustained in customer accounts).

Second, defendants argue that despite plaintiffs' amendment, the amended class definition still includes class members who were not injured by the alleged manipulation of the June Contract. If class members cannot allege some threatened or actual injury resulting from defendants' illegal actions, then a federal court may not assume jurisdiction because there is no actual case or controversy. *O'Shea*, 414 U.S. at 493-94 (quotations omitted); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (stating it was not reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting relief in order to support the requirement of an actual case or controversy). Defendants contend that the amendment to the class definition still does not eliminate those members of class who both bought and sold, which in some cases resulted in a net benefit to those who sold at higher prices than they bought.

The amended class definition includes "[a]ll persons who purchased, between May 9, 2005 and June 30, 2005 ("Class Period"), inclusive, a June 10-year Treasury note futures contract in order to liquidate a short position (the "Class"). Excluded from the Class are defendants and any affiliated or associated party or defendants." (Pls.' Reply Mem. Supp. Class Cert. 4.) Defendants rely on *Dura Pharmaceuticals, Inc. v. Broudo* in support of the proposition that both sides of transactions by class members who bought and sold within the class period would need to be analyzed and netted to determine whether there was actual injury. 544 U.S. 336 (2005). In *Dura*, the Supreme Court reversed the Ninth Circuit's standard for pleading the element of loss

7

causation for a securities fraud claim. *Id.* at 346. The Court stated that merely alleging an inflated purchase price is inconsistent with the law's requirement that a plaintiff prove a defendant's fraudulent conduct caused the plaintiff's economic loss. *Id.* However, this is not a securities fraud case and, thus, the elements of proof are different. *Compare Id.* at 341-42 (listing the essential elements of a securities fraud claim: a material misrepresentation, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation), *with In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995) (listing the elements of a price manipulation claim: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price."). Therefore, the Court does not find *Dura* controlling on the issue of whether the class definition includes uninjured members.

Plaintiffs respond by arguing that all class members allegedly suffered the injury of paying an artificially inflated price for the June Contract. Even with regard to class members that purchased and sold before and during the class period, plaintiffs contend that market manipulation cases have repeatedly certified classes despite issues of net damages for in-and-out traders. *See, e.g., In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) (stating, in regard to in-and-out traders, that "factual differences in the amount of damages, date, . . . the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class.").

The Court finds that the amended class definition does not suffer from a fatal flaw. At this stage of the litigation, it would be premature to deny plaintiffs the opportunity to unify in

8

their task to prove that defendants engaged in a common course of conduct that negatively affected all members of the proposed class. Plaintiffs allege that defendants' conduct manipulated the price of the June Contract upward to an artificial level, and, thus, each purchaser of a June Contract within the class period would have paid a higher price than would otherwise be the case absent the alleged manipulation. Therefore, the Court is satisfied that all members of the class have suffered injury, and defendants' concerns over the final determination of net damages for some individual members of the class should be resolved in the damages stage of the litigation.[1] *See Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D. Ill. 1987) ("Traditionally . . . the courts have not allowed individual questions of damages to prevent class certification."); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 148 (N.D. Tex. 1980) ("[O]ne who has both bought and sold in the 'tainted market' may nonetheless have suffered an injury. Inquiry into matters of the measure of damage is not ordinarily made at the class certification stage."). Because defendants two preliminary arguments are not dispositive, the Court will move on to consider the merits of plaintiffs' motion for class certification.

"[A] district court has broad discretion to determine whether certification of a class is appropriate." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993). The putative class representative has the burden of establishing four prerequisites to class certification: (1) the class is too numerous to join all members, (2) there are common questions of law or fact common to the case, (3) the claims or defenses of the representative parties are

---

[1] Defendants' concerns about the inclusion of class members that did not suffer actual damages will further be considered and analyzed infra in connection with the requirements of Rule 23.

9

typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Id.*; Fed. R. Civ. P. 23(a). Failure to satisfy any of the prerequisites will preclude certification of the class. *Retired Chi. Police Ass'n*, 7 F.3d at 596. "Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries . . . necessary under Rule 23." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

## A. Rule 23(a) Requirements

### 1. Numerosity

To satisfy the numerosity requirement, "the class must be so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs are not required to specify the number of members with exactness, *Marcial v. Coronet Insurance Co.*, 880 F.2d 954, 957 (7th Cir. 1989), and, to support a finding of numerosity, the court is entitled to make common-sense assumptions, *Peterson v. H & R Block Tax Servs.*, 174 F.R.D. 78, 81 (N.D. Ill. 1997).

Plaintiffs allege that there are over one thousand class members around the United States whose identities can be ascertained through CBT records. (Compl. ¶ 95; Pls.' First Am. Mot. Class Cert. ¶ 4.) Defendants fail to dispute the numerosity requirement, and the Court is satisfied that the number members in the proposed class is large enough to render joinder impracticable.

### 2. Commonality

To satisfy the commonality requirement, there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). "A common nucleus of operative fact is usually enough to

10

satisfy the commonality requirement," and "[t]he fact that there is some factual variation among the class . . . will not defeat a class action." *Rosario v. Livaditts*, 963 F.2d 1013, 1017-18 (7th Cir. 1992). The commonality requirement has been referred to as a low hurdle that is easily surmounted. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996); *In re Prudential Sec. Inc., Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 (S.D.N.Y. 1995); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). Commonality is satisfied as long as one question of law or fact is common to the class. *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 196 (N.D. Ill. 1998); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 663 (N.D. Ill. 1996).

Plaintiffs assert that questions of law are common to all members of the class. Under the CEA, they argue, the same elements for claims of manipulation and for claims of aiding and abetting manipulation are applicable to all class members. Defendants fail to dispute plaintiffs' assertion that common questions of law exist. Furthermore, plaintiffs argue that common questions of fact will arise as they seek to prove historical facts such as ordinary Treasury note futures prices, volumes, open interests, as well as industry practices. Plaintiffs argue that all class members will want to develop this historical information database, which will require extensive discovery and expert testimony, in order to establish whether and to what extent defendants' conduct caused the Treasury note futures prices to become artificial. Plaintiffs have established that there are questions of law and fact common to all members of the putative class.

11

### 3. Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983); *see Rosario*, 963 F.2d at 1018 ("[W]e look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)."). Even if there are factual distinctions between the representative parties and other class members, the typicality requirement can be satisfied. *De La Fuente*, 713 F.2d at 232. "Thus, similarity of legal theory may control even in the face of difference of fact." *Id.*

Defendants assert that plaintiffs are not typical of the putative class. Defendants note that "[i]f proof of [plaintiffs'] claims would not necessarily prove all of the proposed class members' claims," then the typicality prong is not satisfied. *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 586 (N.D. Ill. 2000) (quotation omitted). Because Hershey only purchased a June Contract on May 11, 2005, defendants contend that Hershey will only have to prove manipulation on that specific day, and he has no incentive to prove claims of the class members that purchased on other dates during the class period. Moreover, defendants contend Hershey's trading during the class period was profitable overall, and thus he is not typical of members that may have lost money overall.

Additionally, defendants assert that Breakwater is not typical of the class members. Defendants claim that Breakwater did not trade through the entire class period and Breakwater's claims focus only on certain days within the class period. Specifically, defendants state that

12

market volatility on the dates Breakwater traded resulted from an announcement on May 24, 2005 made by the Federal Reserve Board's Federal Open Market Committee. Thus, defendants contend Breakwater will have to litigate this issue individually, which renders Breakwater's claim atypical of other members of the class who do not have to address the Federal Reserve Board issue.

Plaintiffs argue that they are typical of members of the class because their claims are predicated on defendants' common course of conduct or scheme to create artificial prices for the June Contract. Plaintiffs contend that in order to prove a price manipulation claim, no class member could merely submit evidence of what occurred on the specific days they traded; rather, to have validity, the class members would need to present historical data.

The Court determines that plaintiffs' claims are typical of members of the class. Defendants are alleged to have engaged in a course of conduct that manipulated prices for the June Contract. All class members purchased the same futures contract within the class period, and, thus, all members were affected by defendants' same course of conduct and alleged price manipulation. Furthermore, all class members seek relief under the CEA based on the same legal theory. Therefore, plaintiffs' claims are typical because they arise from the same events or course of conduct that gives rise to the claims of other class members and are based on the same legal theory. *See De La Fuente*, 713 F.2d at 232.

The fact that plaintiffs did not trade through the entire class period does not preclude class certification. *See In re Sumitomo Copper Litig.*, 182 F.R.D. at 94 ("[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes, does not detract from the fact that every class member purchased or sold the same

13

fungible . . . contract in the same centralized . . . market."). Moreover, the Court agrees with plaintiffs that all class members would desire to compile historical evidence, as opposed to merely relying on evidence based on a single date, to support an allegation of price manipulation in order to lend reliability to their claims. Therefore, the fact that plaintiffs traded only on certain dates while members of the class traded on different dates is not dispositive of the typicality issue. *See In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) ("[T]he possibility that proof of injury might require separate evaluations of the artificiality of a commodities price at the moments affecting each of the class members need not defeat class certification.").

Even if defendants prove Hershey offset a loss during the class period, Hershey's claim would not be atypical of a class member who sustained a loss. *See Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 (S.D.N.Y. 2005) (recognizing the possibility that, although the nature of the manipulation was not yet ascertained by plaintiff, a class member who earned substantial profits through trading in natural gas futures could nonetheless have been damaged by the alleged scheme to manipulate prices higher than they otherwise would have been);[2] *In re Sumitomo Copper Litig.*, 182 F.R.D.

---

[2]The standard relied upon by the *In re Natural Gas Commodities* court to determine whether plaintiffs had adequately alleged Rule 23's requirements has since been overruled. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24,35 n.5 (2d Cir. 2006) (holding that the "some showing" standard is overruled, to be replaced with the standard that a judge should resolve any factual disputes relevant to establishing Rule 23 requirements prior to certifying a class). Other class actions certified in the Second Circuit prior to the ruling in *In re Initial Public Offering Securities Litigation* may have also relied on the more lenient standard. *See, e.g., In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998). However, district courts have broad discretion in determining whether to

at 93 (rejecting the argument that conflicts of interest in establishing the fact and extent of any manipulation will arise between spread and hedge traders and the proposed class). Finally, the Court determines that the market volatility purportedly caused by the Federal Reserve Board's announcement on May 24, 2005 is not a defense that renders Breakwater's claim atypical of the putative class. A named plaintiff is not a proper class representative only "where it is predictable that a major focus of the litigation will be on an arguable defense that is unique to the named plaintiff." *In re VMS Securities Litig.*, 136 F.R.D. 466, 475 (N.D. Ill. 1991). Even if defendants prove that the Federal Reserve Board's announcement affected market prices of the June Contract during the class period and that issue becomes a major focus of the litigation, many members of the class may have an interest in opposing this issue since it occurred in the middle of the class period. For these reasons, the Court determines that plaintiffs have satisfied the typicality requirement.

## 4. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation includes both adequacy of named plaintiff's counsel, as well as adequacy of representation in protecting the different, separate, and distinct interests of the class members. *Retired Chi. Police Ass'n*, 7 F.3d at 598. "A class representative must be part of the class and possess the same interest and suffer

---

certify a class, and each determination is fact specific. Because class certifications are fact specific, comparisons to other class certification cases is of limited value. In any event, the Court is satisfied that plaintiffs have carried their burden in their motion for class certification.

15

the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

Plaintiffs claim they have no interest antagonistic to the class. However, defendants argue that plaintiffs claims are in direct conflict with putative members of the class because, in order to prove their damages, plaintiffs must demonstrate that the price was artificial on the dates they purchased the June Contract, while other class members who sold on those same dates would have an interest in demonstrating the price was not artificially high in order to maximize their damages.[3]

The Court is satisfied that the representative parties will fairly and adequately protect the interests of the class. Despite defendants' arguments that there exists a potential conflict of interest in proving various levels of artificiality on different dates throughout the class period, courts have rejected similar arguments when certifying classes. *See Fry v. UAL, Corp.*, 136 F.R.D. 626, 633-34 (N.D. Ill. 1991) ("[A]ny alleged conflict in the fact [that plaintiffs] were primarily sellers of put contract [that must prove a decrease in price] as opposed to sellers of common stock [that must prove a increase in price] will arise at the damages stage of the litigation."); *Blackie*, 524 F.2d at 908 (agreeing that at some point in the litigation the class members will have differing interests, i.e., maximizing the inflation existing on one day while minimizing it on other days, but "altogether disagree[ing], for a spate of reasons, that such potential conflicts afford a valid reason at this time for refusing to certify the class."); *In re*

---

[3]Defendants also claim that the allegations of plaintiffs' complaint are partly attributable to one of the putative class members plaintiffs seek to represent. This argument will not preclude certification of the class, though it may be probative during the liability or damages stage of the trial.

*Natural Gas Commodities Litig.*, 231 F.R.D. at 183 (rejecting argument that class certification is precluded when class members, including purchasers, sellers, and speculators, have potentially conflicting interests in showing defendant's alleged misconduct caused the price to be lower or higher on particular dates). The Court determines that plaintiffs will be adequate representatives and protect the interests of the class. Defendants have failed to dispute adequacy of counsel, and the Court is satisfied that plaintiffs' counsel will vigorously prosecute this case. Accordingly, plaintiffs have fulfilled the adequacy of representation requirement.

The supplemental authority submitted by defendants, *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007), does not persuade the Court otherwise. *Langbecker* is factually distinguishable from this case because in that case, appellants sought injunctive relief that would have dissolved the stock fund at issue. *Id.* at 315. That stock fund could not be partially dissolved and yet remain open as an investment option for absent class members, and the appellants were contesting conduct that involved "a multitude of considerations over a period of years." *Id.* In contrast, here, plaintiffs and all class members purchased the exact same standardized futures contract in the same market, seek the same type of relief, and there is a proposed fifty-two-day class period. Therefore, the nature and extent of potential conflicting interests in this case are much less.

**B. Rule 23(b) Requirement**

In addition to the requirements of Rule 23(a), one of the three subsections of Rule 23(b) must be satisfied before a class may be certified. Fed. R. Civ. P. 23(b). Here, plaintiffs seek certification under Rule 23(b)(3), which requires the court to find that common questions of law

17

or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.*

## 1. Predominance

The predominance requirement is far more demanding than the commonality requirement of Rule 23(a)(2). *Amchem Prods., Inc.*, 521 U.S. at 623-24. "At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." *Hyderi v. Wash. Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006). The court should consider whether the class seeks remedy to a common legal grievance. *Hochschuler*, 82 F.R.D. at 348-49.

Defendants assert that in order to be liable, both the fact of injury and causation must be proven on a class-wide basis. Thus, defendants argue, individual issues regarding whether individual class members suffered economic losses may predominate over issues common to the class. Additionally, defendants argue that there will be predominant individual issues related to plaintiffs' expert's statistical model and predominant issues raised by class members who satisfied their futures contract obligation with securities rather than cash.

The Court determines that common questions of law will predominate over individual questions. Plaintiffs argue, and the Court agrees, that the predominant issue in this case will be whether defendants unlawfully manipulated prices of the June Contract in violation of the CEA. Accordingly, if plaintiffs can prove price manipulation, then fact of injury will have been established for all members of the class that purchased the June Contract at higher prices than

18

otherwise would have existed absent manipulation. The determination of this legal question involves the same fungible futures contract purchased by all members of the class on the CBT, and the defendants' same alleged manipulative conduct that plaintiffs will attempt to prove through a common economic formula that has been developed through extensive discovery and expert testimony. In sum, the common legal grievance, violation of the CEA, depends upon proof and findings pertaining to defendants' course of conduct and favorable findings would prove the claims of all class members who purchased the June Contract.

Other courts considering class certification for price manipulation claims under the CEA have also found common questions to predominate. *See In re Sumitomo Copper Litig.*, 182 F.R.D. at 90-91 ("'The common factual questions of the who, what, when, where, and how of the conspiracy, and the common legal questions of the application of the law, particularly the Commodity Exchange Act, to the facts proven predominate over the individual questions of whether the conspiracy caused each class member some injury.'") (quoting *Gordon v. Hunt*, 98 F.R.D. 573, 578 (S.D.N.Y. 1983)); *see In re Natural Gas Commodities Litig.*, 231 F.R.D. at 183 (stating presence of class members with arguably conflicting interests did not undermine the predominance requirement because all class members have the same shared interest in proving price artificiality). Courts generally focus on the showing of predominance of common questions at the liability stage of litigation rather than at the damages stage. *In re Natural Gas Commodities Litig.*, 231 F.R.D. at 180-81; *Dura-Bilt Corp., v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981). Thus, the Court rejects defendants' argument that individual questions will predominate because, at some point, damage calculations may be required on an

19

individual basis.[4] For the same reasons, the Court rejects defendants' arguments related to the plaintiffs' expert's statistical model and class members that satisfied their futures obligations with securities rather than cash as these issues go to the individual determinations of damages after liability has been established. Therefore, the Court determines that plaintiffs have demonstrated that common questions will predominate.

## 2. Superiority

Rule 23(b)(3) requires "that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Defendants argue that many of the putative class members' claims are sufficiently large to provide them with incentive to prosecute their individual claims. Plaintiffs argue that the cost of bringing a commodity futures manipulation action is, even for Breakwater's multi-million dollar claim, a negative value claim—a claim that would cost more to prosecute than may be recovered in damages.

---

[4]Defendants cite the Third Circuit's analysis in *Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 259 F.3d 154 (3rd Cir. 2001), as instructive, which involved a § 10(b) claim under the Securities Exchange Act of 1934. The *Newton* court considered the plaintiff's duty to prove that each member of the class was injured by defendant's conduct, as distinguished from calculation of damages. *Id.* at 188. The court stated that class actions based on a fraud-on-the-market theory, excessive securities pricing policies, or antitrust violations were examples of conduct itself causing economic injury. However, the court noted: "[b]ut only those class members whose trades could have been executed at better prices sustained economic injury here," and thus individual questions in determining which class members were harmed was deemed overpowering. *Id.* at 189. In this case, the Court has concluded that injury in fact is satisfied by the fact that class members purchased the June Contract at an artificially manipulated high price. This, in essence, is "economic injury" and, thus, the Court does not find *Newton* to be inconsistent with the Court's determination. Moreover, this is not a securities fraud case and, thus, the elements of proof are different.

Considering that the size of the potential class is estimated at over one thousand, the class action is a superior method for adjudicating this case. Class actions permit pooled claims that otherwise would be uneconomical to litigate individually to have their day in court. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). This case involves a large number of investors who are geographically dispersed and seek to resolve a common legal grievance based on defendants' same course of conduct affecting the same fungible contract purchased on the CBT. The Court determines that judicial resources would be used most efficiently by certifying this class to resolve these common questions.

Additionally, defendants argue that difficulties will be encountered in the management of this class action. Specifically, defendants point to the number of traders within the class and the need for individual determinations of injury. However, previous commodities futures litigation classes have been certified, which were much larger than the class proposed here and included both purchasers and sellers of futures contracts, and were deemed to be manageable. *See, e.g., In re Natural Gas Commodities Litig.*, 231 F.R.D. at 179 (certifying a class numbering in the thousands, including both purchasers and sellers, with a three-year-class period). Therefore, the Court is satisfied that a class action will be a superior method for the fair and efficient adjudication of this controversy.

For the foregoing reasons, the Court finds that all of the requirements for class certification have been satisfied. Accordingly, the Court grants plaintiffs' Amended Motion for Class Certification.

21

## II. Motion to Dismiss

Defendants PIMCO and PIMCO Funds have moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Under Rule 12(b)(6), a court must "determine whether the complaint contains 'enough factual matter (taken as true)' to provide the minimum notice of the plaintiffs' claim that the Court believes a defendant [is] entitled to." *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, ___ F.3d ___, 2007 WL 1791004, *8 (7th Cir. June 22, 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1967-69 (2007)). All factual allegations and the inferences reasonably arising therefrom are accepted as true. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520-21 (7th Cir. 1990). However, the Court is not required to ignore facts in the complaint which undermine a plaintiff's claim. *R.J.R. Servs., Inc. v. Aetna Cas. Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1988).

Price manipulation of a commodity is prohibited by the CEA. 7 U.S.C. §§ 13(a)(2), 25(a). Although not defined in the statute, "broadly stated, [manipulation] is an intentional exaction of a price determined by forces other than supply and demand." *Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991).[5] The four elements of a price manipulation claim are: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045.

---

[5]The *Frey* court noted: "Sophisticated economic justification for the distinctions made in [the price manipulation area] may at times seems questionable. Sometimes the 'know it when you see it' test may appear most useful." *Id.*

22

## A. PIMCO Funds' Motion to Dismiss

The Court first considers PIMCO Funds' arguments in support of its motion to dismiss. First, PIMCO Funds argues it lacked the necessary intent to violate the CEA. PIMCO Funds contends that the complaint alleges PIMCO Funds was "controlled" and "managed" by PIMCO, and PIMCO "caused PIMCO Funds'" conduct in purchasing futures contract positions. (Compl. ¶ 23.) Therefore, PIMCO Funds concludes that the complaint itself concedes PIMCO Funds did not have the requisite ability or intent to manipulate the market. Second, PIMCO Funds argues plaintiffs fail to state a claim for aiding and abetting a violation of the CEA. Under § 22 of the CEA, to state a claim for aiding and abetting, plaintiffs must allege PIMCO Funds "(1) had knowledge of the principal's . . . intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *See Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998).

Plaintiffs assert that they have alleged that PIMCO Funds[6] knowingly aided and abetted the violations of the CEA, willfully intended to assist the manipulation, and had the motive and intent to profit from artificial prices. (Compl. ¶¶ 92, 104, 105.) Moreover, plaintiffs argue that it is premature to resolve PIMCO Funds' manipulative intent at this stage of the litigation.

Taking all factual allegations and the inferences reasonably arising therefrom as true, the Court concludes that plaintiffs have adequately pleaded that PIMCO Funds had the requisite intent to manipulate prices. Intent is a subjective inquiry and "must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the

---

[6]PIMCO and PIMCO Funds are referred to collectively in plaintiffs' complaint. (Compl. ¶ 23.)

23

circumstances." *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, No. 75-14, 1982 WL 30249, at *5 (C.F.T.C. Dec. 17, 1982). *Cf. Makor Issues Rights, Ltd., v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006) (stating, with regard to pleading a securities fraud claim, "[i]f a reasonable person could not draw . . . an inference [of scienter] from the alleged facts, the defendants are entitled to dismissal"). Here, considering the totality of the circumstances, it can be reasonably inferred from the facts alleged that PIMCO Funds intended to cause artificial prices or otherwise manipulate the futures market. PIMCO Funds is alleged to have accumulated a very large long position in the June Contract, which it did not liquidate, and PIMCO Funds is alleged to have accumulated a large position in the CTD Note. This coincided with an above average number of deliveries on the June Contract, which could not be satisfied with the CTD Treasury note. The reasonable inference that PIMCO Funds' had the requisite intent is not negated by plaintiffs' reference in the complaint to PIMCO causing PIMCO Funds' conduct because, taking the allegations as true and all reasonable inferences arising therefrom, PIMCO Funds was well aware of its ability to influence prices while it was accumulating these large contract positions. In addition, plaintiffs have sufficiently alleged that PIMCO Funds had the requisite intent with regard to aiding and abetting a violation of the CEA. For the reasons discussed above, it can be reasonably inferred form the alleged facts that PIMCO Funds knew that PIMCO intended to manipulate the futures market by accumulating large positions in the June Contract and the CTD Treasury note, and by acting as the purchaser of such notes, PIMCO Funds intended and actually furthered PIMCO's objective. Therefore, for the foregoing reasons, the Court denies PIMCO Funds' motion to dismiss.

24

## B. PIMCO and PIMCO Funds' Joint Motion to Dismiss

The Court next considers PIMCO's arguments in support of its motion to dismiss. PIMCO Funds has joined the motion and adopts it in its entirety. (PIMCO Funds' Mem. Supp. Mot. Dismiss 1.)

The first element of a price manipulation claim requires that defendants possess the ability to influence prices. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Defendants argue they did not have the ability to manipulate prices because the June Contract allows for delivery of a number of other Treasury notes besides the CTD Treasury note. (Compl. ¶¶ 33-34.) In fact, defendants assert that they only held 3.16% of the notes deliverable under the terms of the June Contract. (PIMCO's Mem. Supp. Mot. Dismiss 6.) In support of this argument, defendants cite the Commodity Futures Trading Commission ("CFTC") in *In re Cox*: "the terms of the underlying futures contract should not be lightly ignored when calculating deliverable supply. If the terms of the contract permit delivery of premium grades of the commodity, then premium grades must be counted as part of the relevant supply, if otherwise available." No. 75-16, 1987 CFTC Lexis 325, at *20 (C.F.T.C. July 15, 1987). Therefore, defendants contend, June Contract prices could not have been artificial because the price was based on a mix of notes that are expressly deliverable under the terms of the June Contract.

Plaintiffs contend that defendants' argument has been refuted by the CFTC in *In re Fenchurch Capital Management, Ltd.* The CFTC found that Fenchurch controlled a dominant portion of the available supply of the CTD Treasury note but acknowledged that the terms of the futures contract allowed for delivery of securities other than the CTD Treasury note. No. 96-7, 1996 WL 382313, at *6 (C.F.T.C. July 10, 1996). However, the CFTC stated that the pricing and

delivery system at issue (*i.e.*, Treasury note futures) was different from that in *In re Cox* (*i.e.*, wheat futures), which led the CFTC to conclude Fenchurch's exacerbating conduct of increasing its position in the CTD Treasury note constituted manipulation in violation of the CEA, which resulted in certain shorts delivering a more valuable security. *Id.*

However, defendants contend *In re Fenchurch* is distinguishable from this case. The alleged manipulative conduct in *In re Fenchurch* commenced after trading on the futures contract had expired. *Id.* In contrast, here, the alleged misconduct occurred while the June Contract was still trading, and defendants argue the price of the June Contract reflected the current supply of the various contracts available for delivery, which absolves defendants from having the requisite ability to manipulate prices. Plaintiffs reply by arguing that the CFTC in *In re Fenchurch* intended its analysis to apply to futures contracts on treasury securities.[7]

Notwithstanding the intricacies of these arguments, plaintiffs have alleged defendants accumulated an unprecedented long position in the June Contract, which it did not liquidate, and a large position in the CTD Treasury note. Even if the Court were to accept the reasoning in *In re Cox* and defendants' argument that the price of the June Contract reflected the availability of all the notes available for delivery under the express terms of the June Contract, the price of the June Contract could still have been manipulated by defendants' alleged conduct because the

---

[7]The CFTC stated in *In re Fenchurch*:

> Further, the Commission does not intend that its determination that Fenchurch controlled the available deliverable supply of the Ten-Year Treasury note contracts by dominating a portion of that supply (i.e., control of the cheapest-to-deliver notes) necessarily should apply in determining available deliverable supply in markets other than those for futures on treasury securities.

1996 WL 382313, at *6.

June Contract, as defendants argue, incorporated the short supply of the CTD Treasury note available in the market. Therefore, defendants' large accumulation of the CTD Treasury note could have provided them with the ability to influence the price of the June Contract.

Moreover, regardless of the timing of purchases in *In re Fenchurch*, implicit in the CFTC's analysis was that Fenchurch's activity of increasing its position in the CTD Note gave Fenchurch the ability to influence prices of the futures contract. 1996 WL 382313, at *5 ("Fenchurch . . . controlled a dominant portion of the cheapest-to-deliver notes . . . and thus restricted the available supply of the cheapest-to-deliver issue. Fenchurch's conduct resulted in the value of the futures contract being artificially altered."). It is notable that the CBT announced on June 29, 2005 that it was amending CBT Regulation 425.01 to limit the permissible Ten-Year Treasury note contract position to 50,000 contracts during the last ten trading days. (Compl. ¶ 81.) Plaintiffs allege that 50,000 contracts is one-third of the amount defendants held, a fact the Court assumes is true for the purposes of this motion, and that the CBT's amended rule implies that a 50,000 contract position could create an ability to cause artificial prices. Therefore, the Court is satisfied that plaintiffs have adequately pleaded that defendants possessed the ability to influence prices of the June Contract.

The second and third elements of a price manipulation claim require plaintiffs to prove that an artificial price existed and that defendants caused the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Plaintiffs allegations are sufficient to satisfy their burden of pleading the existence of an artificial price caused by defendants' conduct for the same reasons the Court found plaintiffs adequately pleaded that defendants had the ability to manipulate prices. Also, for these same reasons, the Court rejects defendants' argument that the price was not

27

artificial because the price reflected the availability of all the contracts available for delivery under the express terms of the June Contract.

The fourth element of a price manipulation claim requires the allegation that defendants specifically intended to cause the artificial price. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Plaintiffs must allege that defendants both intentionally acquired the ability to manipulate prices and thereafter exercised that ability to cause artificial prices. *See In re Ind. Farm Bureau Coop. Ass'n, Inc.*, 1982 WL 30249, at *8 n.13 (citing *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58-59 (5th Cir. 1962); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971)). Defendants argue that plaintiffs' claim fails because the complaint does not allege defendants acquired its contract position with the intent to create artificial prices. Rather, plaintiffs merely allege an intentional breach of a duty by failing to liquidate its long positions.

Plaintiffs contend that the complaint alleges defendants intended to cause artificial prices. Specifically, plaintiffs allege that defendants: (1) "knowingly" changed their behavior as the futures contracts became susceptible to manipulation by persons controlling a large long position by their acts of acquiring an "extraordinary large long position" and refusing to liquidate (Compl. ¶¶ 1-4, 52-53, 60, 75); (2) were well aware of this form of manipulation (*id.* ¶¶ 41-45); (3) the motive and intent for the manipulative acts described in the complaint was to increase financial return (*id.* ¶ 92); and (4) intended to and did manipulate prices of the June Contract during the class period (*id.* ¶ 13.).

As discussed above, intent is a subjective inquiry and thus may be inferred from the facts alleged and the totality of the circumstances. *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, 1982 WL 30249, at *5. Accepting plaintiffs' factual allegations as true, and drawing all reasonable

28

inferences in their favor, the Court is persuaded that plaintiffs have adequately pleaded that defendants intended, at the time of acquisition, to cause an artificial price and subsequently exercised the ability to influence prices. Considering the totality of the circumstances, it may be reasonably inferred that defendants intended to acquire a very large long position in the June Contract and a large position in the CTD Treasury note because defendants would be benefited by refraining from liquidating these positions and instead taking delivery of more valuable notes other than the CTD Treasury note. Moreover, in a market that was susceptible to manipulation by a dominant long position, it is reasonable to infer that defendants were well aware of their potential ability to influence prices and that they intended to manipulate the futures market at the time of acquisition of the large contract positions.

Plaintiffs argue in the alternative that even if defendants did not intend to manipulate prices when they acquired their contract positions, they are liable once the requisite intent developed. Plaintiffs cite *Fenchurch*, in which the CFTC stated: "the Commission has held that even if a dominant long played no role in the creation of a congested market, the long has a duty to avoid conduct that exacerbates the situation." 1996 WL 382313, at *6. Plaintiffs have alleged defendants intentionally exacerbated the market, which was susceptible to price manipulation. (Compl. ¶ 11.)

Defendants assert that a mere refusal to liquidate is not the type of affirmative exacerbation that other courts have relied upon. Defendants argue that the type of manipulative intent that would suffice is conduct summarized in *In re Indiana Farm Bureau Cooperative Association, Inc.*: "Manipulative intent may be inferred . . . where, once the congested situation becomes known to him, the long exacerbates the situation by, for example, intentionally

29

decreasing the cash supply or increasing his long position in the futures market." 1982 WL 30249, at *8 n.12.

Although *In re Indiana Farm Bureau Cooperative Association, Inc.* set forth two situations in which manipulative intent may be inferred, the list is by no means exclusive. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971) ("The methods and techniques of manipulation are limited only by the ingenuity of man."). Considering the totality of the circumstances, intentional exacerbating conduct may be reasonably inferred from the alleged fact that defendants sold their entire position in the CTD Treasury note by September 30, 2005, mere months after purportedly accumulating these notes for investment purposes. Therefore, for the foregoing reasons, the Court is satisfied that plaintiffs have adequately alleged that defendants intended to cause an artificial price of the June Contract. Accordingly, the Court finds that plaintiffs have sufficiently pleaded their claims that defendants violated the CEA.

Finally, defendants argue that all claims against John Doe defendants should be dismissed for failure to state causes of action against such defendants. Plaintiffs do not oppose the dismissal, (Pls.' Mem. Opp'n PIMCO's Mot. Dismiss 25 n.17), and thus the Court grants defendants motion to dismiss as to the John Doe allegations.

30

## Conclusion

For the foregoing reasons, the Court grants Plaintiffs First Amended Motion for Class Certification, [doc. no. 87], denies PIMCO Funds' motion to dismiss, [doc. no. 82], grants PIMCO's Motion to Dismiss (which PIMCO Funds has joined) as to the John Doe allegations and denies the remainder of PIMCO's motion to dismiss [doc. no. 85].

**SO ORDERED**                    **ENTERED:** 7/31/07

HON. RONALD A. GUZMAN
United States Judge

31