

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 08-1075

JOSEF A. KOHEN, *et al.*, on their own behalf
   and that of all others similarly situated,

                                   *Plaintiffs-Appellees,*

               *v.*


PACIFIC INVESTMENT MANAGEMENT COMPANY LLC
   and PIMCO FUNDS,

                                   *Defendants-Appellants.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4681—**Ronald A. Guzmán**, *Judge.*

———————

ARGUED APRIL 1, 2009—DECIDED JULY 7, 2009

———————


Before POSNER, EVANS, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.*   The defendants in this class action suit have appealed from the district court's certification of a plaintiff class. Fed. R. Civ. P. 23(f). The suit, based on section 22(a) of the Commodity Exchange Act, 7 U.S.C. § 25(a), accuses the defendants, collectively "PIMCO," of having violated section 9(a) of the Act, 7 U.S.C. § 13(a), by cornering a futures market. A corner is

a form of monopolization. See *United States v. Patten*, 226 U.S. 525, 539-42 (1913); *Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476, 478-79 (7th Cir. 1953); *Peto v. Howell*, 101 F.2d 353, 358-59 (7th Cir. 1939); Robert W. Kolb & James A. Overdahl, *Understanding Futures Markets* 80 (6th ed. 2006) ("a successful effort by a trader or group of traders to influence the price of a futures contract by intentionally acquiring market power in the deliverable supply of the underlying good while simultaneously acquiring a large long futures position").

The class consists of persons who between May 9 and June 30, 2005, bought a futures contract on the Chicago Board of Trade in 10-year U.S. Treasury notes. Earlier they had sold such notes short, and the purchases they made between May 9 and June 30 were pursuant to contracts they had with other investors, including PIMCO, to deliver to a commodity clearinghouse, for those investors' accounts, on June 30, a specified quantity of the notes at the price specified in the futures contracts. With rare exceptions, however, futures speculations are completed not by delivery of the underlying commodity (such as milk, or pork bellies, or in this case Treasury notes) to the clearinghouse, though that is an option, but by the making of offsetting futures contracts, as described in Kolb & Overdahl, *supra*, at 17; Mark J. Powers & Mark G. Castelino, *Inside the Financial Futures Markets* 20 (3d ed. 1991); Jeffrey Williams, *The Economic Function of Futures Markets* 9-10 (1989); James M. Falvey & Andrew N. Kleit, "Commodity Exchanges and Antitrust," 4 *Berkeley Bus. L. J.* 123, 127-28 (2007); see also C.B. Reehl, *The Mathematics of Options Trading* 15 (2005). The following table illustrates the process.

**Futures Contracting**

| Day | Price | Trade | SS's position | B's position |
|-----|-------|-------|---------------|--------------|
| 1 | $1,000 | SS sells contract (to deliver pork bellies) to B. | SS deposits $100 (10% of the value of the contract) in his account with clearinghouse (required margin); acquires the obligation to deliver pork bellies to clearinghouse. | B deposits $100 in his account; acquires the right to require delivery of pork bellies from clearinghouse. |
| 2 | $1,500 | None | SS's account falls to –$400, so SS must deposit $500 in his account to maintain his 10% margin; SS is still obligated to deliver pork bellies to the clearinghouse. | B's account increases to $600; B still has the right to require delivery of pork bellies from the clearinghouse. |
| 3 | $1,500 | SS caps his losses and buys contract (to deliver pork bellies) from B. | SS's trade extinguishes his original contract: his obligation to deliver to the clearinghouse is offset by his right to require delivery from the clearinghouse. | B's trade extinguishes his original contract: his right to require delivery from the clearinghouse is offset by his obligation to deliver to the clearinghouse. |

In the example in the table, a short seller, *SS*, sells a specified quantity of pork bellies to *B* (buyer) at a price of $1,000 for delivery in June (hence a "June Contract"). *SS* hopes the price will fall by then. But before the delivery date arrives the price rises to $1,500, and *SS* decides to cap his losses. The simplest way to do this, as in the table, is for *SS* to buy from *B* the same quantity of pork bellies as *SS* had sold to *B*, paying $1,500. *SS* now has offsetting contracts to sell and to buy the same number of pork bellies, and *B* now has offsetting contracts to buy and sell the same number of pork bellies, so neither has a delivery obligation. Neither *wants* to have such an obligation, because both are speculators rather than farmers or meat packers. (Notice in the table that losses and gains are debited and credited to the traders' accounts with the clearinghouse every day, to minimize the risk of loss to the clearinghouse, which guarantees the fulfillment of the futures contract. But this detail plays no role in this case.)

Changes in the demand for or the supply of the underlying commodity will make the price of a futures contract change over the period in which the contract is in force. If the price rises, the "long" (the buyer) benefits, as in our example, and if it falls the "short" (the seller) benefits. But a buyer may be able to force up the price by "cornering" the market—in this case by buying so many June contracts for 10-year Treasury notes that sellers can fulfill their contractual obligations only by dealing with that buyer. *United States v. Patten, supra*, 226 U.S. at 539-41; *Zimmerman v. Chicago Board of Trade*, 360 F.3d 612, 616 (7th Cir. 2004); *Board of Trade v. SEC*, 187 F.3d 713, 724 (7th Cir. 1999) ("a person who owns a substantial portion

of the long interest near the contract's expiration date
also obtains control over the supply that the shorts need
to meet their obligations. Then the long demands
delivery, and the price of the commodity skyrockets. It
takes time and money to bring additional supplies to
the delivery point, and the long can exploit these costs to
force the shorts to pay through the nose"); Roberta
Romano, "A Thumbnail Sketch of Derivative Securities
and Their Regulation," 55 *Md. L. Rev.* 1, 29-30
(1996); "United States Commodity Futures Trading Com-
mission Glossary," www.cftc.gov/educationcenter/
glossary/glossary_co.html (visited June 10, 2009).

   *Board of Trade v. SEC, supra*, 187 F.3d at 725, remarks that
since the possibility of manipulation "comes from the
potential imbalance between the deliverable supply and
investors' contract rights near the expiration date[,] . . .
[f]inancial futures contracts, which are settled in cash,
have no 'deliverable supply'; there can never be a mis-
match between demand and supply near the expiration,
or at any other time." But while it is correct that most
financial futures contracts are settled in cash, *CFTC v.
Zelener*, 373 F.3d 861, 865 (7th Cir. 2004); Kolb, *supra*, at
16, and that if a cash option exists there is no market to
corner (no one can corner the U.S. money supply!), futures
contracts traded on the Chicago Board of Trade for ten-
year U.S. Treasury notes are an exception; they are not
"cash settled." Short sellers who make delivery must do
so with approved U.S. Treasury notes; otherwise they
must execute offsetting futures contracts. Chicago Board
of Trade Rulebook, "Chapter 19: Long-Term U.S. Treasury
Note Futures (6 ½ to 10-Year)," www.cmegroup.com/
rulebook/CBOT/V/19/19.pdf (visited June 22, 2009); CME

Group, "U.S. Treasury Futures Delivery Process," (4th ed. 2008),   www.cmegroup.com/trading/interest-rates/files/ CL-100_TFDPBrochureFINAL.pdf (visited June 22, 2009).

The note approved for delivery in this case was the "2/12 Treasury Note" (a Treasury note that expires in February 2012). The plaintiffs claim that PIMCO increased the percentage of these notes that it owned from 12 to 42 percent over a two-week span, with the result that they would have had to pay a monopoly price to get enough notes to close out their contracts. So instead they made offsetting futures contracts, and they claim that as a result they lost more than $600 million, the amount they would have saved had they been able to buy offsetting contracts at a competitive price. (These are just allegations; we do not vouch for their correctness.)

The class certified by the district court consists, as we said, of all persons who between May 9 and June 30, 2005, bought a June Contract in order to close out a short posi- tion. PIMCO challenges the definition on the ground that it includes persons who lack "standing" to sue because they did not lose money in their speculation on the June Contract. For example, some of the class members might have taken both short and long positions (in order to hedge—that is, to limit their potential losses) and made more money in the long positions by virtue of PIMCO's alleged cornering of the market than they lost in their short positions. The plaintiffs acknowledge this possibility but argue that its significance is best determined at the damages stage of the litigation. If PIMCO is found to have cornered the market in the June Contract, then each member of the class will have to submit a claim for the damages it sustained as a result

of the corner. *Carnegie v. Household Int'l*, 376 F.3d 656, 661 (7th Cir. 2004); 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1784 (2009). Some of the class members, discovering that they were not injured at all, will not submit a claim, and others will submit a claim that will be rejected because the claimant cannot prove damages, having obtained off-setting profits from going long.

   PIMCO argues that before certifying a class the district judge was required to determine which class members had suffered damages. But putting the cart before the horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification. It is true that injury is a prerequisite to standing. But as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied. *United States Parole Commission v. Geraghty*, 445 U.S. 388, 404 (1980); *Wiesmueller v. Kosobucki*, 513 F.3d 784, 785-86 (7th Cir. 2008). This is true even if the named plaintiff (the class representative) lacks standing, provided that he can be replaced by a class member who has standing. "The named plaintiff who no longer has a stake may not be a suitable class representative, but that is not a matter of jurisdiction and would not disqualify him from continuing as class representative until a more suitable member of the class was found to replace him." *Id*. at 786.

   *Before* a class is certified, it is true, the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit. *Id*.;

*Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *Walters v. Edgar*, 163 F.3d 430, 432-33 (7th Cir. 1998); *Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir. 2001). And while ordinarily an unchallenged allegation of standing suffices, a colorable challenge requires the plaintiff to meet it rather than stand mute. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). PIMCO tried to show in the district court that two of the named plaintiffs could not have been injured by the alleged corner. We need not decide whether it succeeded in doing so, because even if it did, that left one named plaintiff with standing, and one is all that is necessary.

If the case goes to trial, this plaintiff may fail to prove injury. But when a plaintiff loses a case because he cannot prove injury the suit is not dismissed for lack of jurisdiction. Jurisdiction established at the pleading stage by a claim of injury that is not successfully challenged at that stage is not lost when at trial the plaintiff fails to substantiate the allegation of injury; instead the suit is dismissed on the merits. *American Civil Liberties Union v. St. Charles*, 794 F.2d 265, 269 (7th Cir. 1986). Pressed at argument, PIMCO's counsel retreated, conceded or at least seemed to concede that the issue was not jurisdictional, and clarified that his argument was only that the class members lacked "statutory standing." Then he took back his concession, arguing that if any class member were found not to have sustained damages, the court would have no jurisdiction over that class member, who would therefore not be bound by any judgment or settlement and so could bring his own suit for damages. That is to say that if a plaintiff loses his case, this shows that he had no standing to sue and therefore can start

over. That would be an absurd result, and PIMCO need not fear it. *Id.*; *Bruggeman v. Blagojevich*, 324 F.3d 906, 909 (7th Cir. 2003).

The term "statutory standing" is found in many cases, e.g., *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 830 (1999); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 96-97 and n. 2 (1998); *United States v. U.S. Currency, in Amount of $103,387.27*, 863 F.2d 555, 560-61 and n. 10 (7th Cir. 1988), but it is a confusing usage. It usually refers to a situation in which, although the plaintiff has been injured and would benefit from a favorable judgment and so has standing in the Article III sense, he is suing under a statute that was not intended to give him a right to sue; he is not within the class intended to be protected by it. *Steel Co. v. Citizens for a Better Environment*, *supra*, 523 U.S. at 97; *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Harzewski v. Guidant Corp.*, 489 F.3d 799, 803-04 (7th Cir. 2007). This is not such a case.

What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification, *Carnegie v. Household Int'l*, *supra*, 376 F.3d at 661; 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 2:4, pp. 73-75 (4th ed. 2002), despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct. *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). Those cases focus on the class

definition; if the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad.

A related point is that a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant, see *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514-15 (7th Cir. 2006); *Romberio v. Unumprovident Corp.*, 2009 WL 87510, at *8 (6th Cir. Jan. 12, 2009); cf. *Brown v. American Honda*, 522 F.3d 6, 28-29 (1st Cir. 2008), if only because of the *in terrorem* character of a class action. *In re Bridgestone/ Firestone Tires Products Liability Litigation*, 288 F.3d 1012, 1015-16 (7th Cir. 2002); *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003); *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 881 (3d Cir. 2000). When the potential liability created by a lawsuit is very great, even though the probability that the plaintiff will succeed in establishing liability is slight, the defendant will be under pressure to settle rather than to bet the company, even if the betting odds are good. *Blair v. Equifax Check Services*, 181 F.3d 832, 834 (7th Cir. 1999); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1297-1300 (7th Cir. 1995). For by aggregating a large number of claims, a class action can impose a huge contingent liability on a defendant. PIMCO is a very large firm, however, with assets under management of more than $750 billion, www.pimco.com/ LeftNav/PressCenter/PIMCOFacts.htm (visited June 10, 2009). This suit does not jeopardize its existence. But it has good reason not to want to be hit with a multi-hundred-million-dollar claim that will embroil it in protracted and costly litigation—the class has more than a thousand members, and determining the value of

No. 08-1075                                                    11

their claims, were liability established, might thus
require more than a thousand separate hearings.

So if the class definition clearly were overbroad, this
would be a compelling reason to require that it be nar-
rowed. *Adashunas v. Negley, supra*, 626 F.2d at 603-04;
*Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993); *Eastland
v. Tennessee Valley Authority*, 704 F.2d 613, 617-18 (11th
Cir. 1983); 7AA Charles Alan Wright *et al., supra*, § 1760,
pp. 139-49; cf. *Crawford v. Equifax Payment Services*, 201
F.3d 877, 882 (7th Cir. 2000). But this has not yet been
shown. Although some of the class members probably
were net gainers from the alleged manipulation, there is
no reason at this stage to believe that many were. A
short seller hopes the price of the security that he's
selling will fall. He knows it may rise and his speculative
gamble therefore fail, but if the rise is caused or increased
by a violation of law the incremental loss caused by
the violation entitles him to an award of damages. And
while it is true that short sellers may want to hedge part
of the risk of a rise in the price of the security that they
are selling short, they will not hedge the *entire* risk, as
that would eliminate the prospect of speculative gains
that motivates short selling. Suppose a short seller sells
a security at $80, hoping the price will fall below that by
the delivery date; but fearing that it might rise far enough
to bankrupt him, he hedges by contracting to buy the
security at $100 should it rise that high. That will cap
his potential loss at $20, but he will sustain a loss if the
defendant drives the price of the security to any level
above $80.

A further possibility, however, is that some of the members of the class were actually speculating on a rise in the price of the June Contract, and made some short sales merely as a hedge, and because of PIMCO's alleged conduct obtained a net profit. We do not know how many of these "long" speculators the class may contain, but probably not many. Otherwise PIMCO would not have made huge purchases of the June Contract in order to drive up the price at which short sellers would have to close out their sales. Put differently, were there not a great many net short sellers of the June Contract, PIMCO could not have driven its price to an artificially high level because only short sellers would buy at such a price, for they alone would have to close out their short positions by buying the June Contract. (Not that the plaintiffs have *proved* that PIMCO tried to corner the market, or succeeded; but at this stage in the proceeding we must assume that they can prove it.)

So while PIMCO states correctly in its reply brief that "a proper class definition cannot be so untethered from the elements of the underlying cause of action that it wildly overstates the number of parties that could possibly demonstrate injury," it has failed to justify the use of the word "wildly" to describe the extent to which the class definition may be too broad.

PIMCO's repeated, indeed obsessive, citations to the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), a case that does not involve class certification, suggests desperation. The Court held in that case that an allegation that the plaintiffs had

bought securities at "artificially inflated prices" did not state a claim that the plaintiffs had been injured by the inflation because, for all that appeared, the prices had remained at that level, or even a higher one, or the plaintiffs had sold before the price bubble burst. The Court refused to "allow recovery where a misrepresentation leads to an inflated purchase price but nonetheless does not proximately cause any economic loss." *Id*. at 346. In this case, too, the plaintiffs claim that the defendants forced up the price, but there the resemblance between the two cases ends. The plaintiffs sold short, so, prima facie at least—being forced as they were to cover by June 30—they were injured if the price of cover was artificially inflated during the period between their sale and the delivery date.

   At argument PIMCO's lawyer told us that he could obtain names of class members. If so, he can, as in *Bell v. Farmers Ins. Exchange*, 9 Cal. Rptr. 3d 544, 550-51, 568, 571 (Cal. App. 2004), and *Long v. Trans World Airlines, Inc.*, 1988 WL 87051, at *1 (N.D. Ill. Aug. 18, 1988), depose a random sample of class members to determine how many were net gainers from the alleged manipulation and therefore were not injured, and if it turns out to be a high percentage he could urge the district court to revisit its decision to certify the class. Cf. *Hilao v. Estate of Marcos*, 103 F.3d 767, 782-84 (9th Cir. 1996); *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1325-30 (N.D. Ill. 1991); *Marisol A. v. Giuliani*, 1997 WL 630183, at *1 (S.D.N.Y. Oct. 10, 1997). PIMCO has not done this; should it take the hint and try to do so now, this will be an issue for consideration by the district judge.

PIMCO also argues that class certification should have been denied because of potential conflicts of interest among class members that will make it impossible for class counsel to represent all of them all impartially. Fed. R. Civ. P. 23(a)(4); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997); *Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986); *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280-81 (11th Cir. 2000). Class members covered by buying the June Contract, thus capping their losses, at different times during the seven-week period embraced by the complaint. One who covered very early would want to show that the effect of PIMCO's alleged misconduct peaked then. Moreover, the curve of rising prices for the June Contract dipped at one point during the complaint period and class members who covered during the dip might want to show that PIMCO's effect on the price level was completed by then and the post-dip rise in prices was due to market forces for which PIMCO was not responsible. Suppose the price had risen from $100 at the beginning of the complaint period to $130 at the bottom of the dip, and from $130 to $150 between then and the delivery date. Short sellers who covered during the dip would want to show that it was PIMCO who pushed the price up from $100 to $130, and that insofar as market forces were shown to be responsible for part of the price rise they operated after the dip rather than before. Short sellers who covered at the end of the period would want to show that the entire price increase, from $100 to $150, was due to PIMCO's illegal activity.

No. 08-1075                                                           15

At this stage in the litigation, the existence of such conflicts is hypothetical. If and when they become real, the district court can certify subclasses with separate representation of each, Fed. R. Civ. P. 23(c)(5); *Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975); 7AA Charles Alan Wright *et al.*, *supra*, § 1769.1, pp. 455-58, if that would be consistent with manageability. *In re Cendant Corp. Securities Litigation*, 404 F.3d 173, 201 (3d Cir. 2005); John C. Coffee Jr., "Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation," 100 *Colum. L. Rev.* 370, 398 (2000). To deny class certification now, because of a potential conflict of interest that may not become actual, would be premature. *Int'l Woodworkers of America, etc. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1269 (4th Cir. 1981); 1 Conte & Newberg, *supra*, § 3.25, p. 422; cf. *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003).

PIMCO's attempt to derail this suit at the outset is ill timed, ill conceived, and must fail. The district court's class certification is

AFFIRMED.