

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICHARD HERSHEY, ET AL       )
                                 )
         Plaintiffs,      )
                                 )    Case No. 05 C 4681
                                 )
       v.                     )    Judge Ronald A. Guzman
                                 )
                                 )    Magistrate Judge
                                 )    Arlander Keys
                                 )
PACIFIC INVESTMENT MANAGEMENT )
COMPANY LLC, ET AL          )
                                 )
         Defendants.      )

## MEMORANDUM OPINION AND ORDER

Plaintiffs represent a class of purchasers of a Ten-Year Treasury Note futures contract. The suit, brought pursuant to Section 22(a) of the Commodity Exchange Act (CEA), 7 U.S.C. § 25(a), alleges that Defendants manipulated the price of the contract in violation of Section 9(a) of the Act, 7 U.S.C. § 13(a). The Court's task is to decide Defendants' motions to exclude certain testimony of Plaintiffs' expert witnesses.[1] For the reasons set forth below, Defendant Pacific Investment Management Company LLC's (PIMCO) motions are granted in part and denied in part. Defendant PIMCO Funds' motion is granted.

---

[1] Defendants request that the Court "hold a *Daubert* hearing and exclude" expert testimony that they argue is inadmissible. The Court declines to hold such a hearing as it has before it more than enough information to determine reliability. Specifically, the parties have provided the Court with, *inter alia*, the depositions of the three experts at issue as well as their expert reports.

## Background

The factual and procedural history of this case may be traced through the following decision, *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 472 (N.D. Ill. 2007).  Consequently, neither will be outlined here.  Instead, the Court moves directly to address the legal issues presented by the pending motions.

## Standard of Review

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and by the principles announced in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).  Rule 702 provides that an expert witness may testify regarding scientific, technical, or other specialized knowledge that will assist the trier of fact in understanding evidence, if: 1) the testimony is based upon sufficient facts or data, 2) the testimony is based on reliable principles and methods, and 3) the expert properly applied those principles and methods to the facts of the case.

Under *Daubert* and *Kumho*, this Court is required to act as "gatekeeper," admitting only that expert testimony that passes a "flexible" test involving the consideration of a variety of factors intended to gauge the reliability and relevance of the evidence.  For expert testimony to be admitted, the movant must establish that the expert testimony is both reliable and helpful

in assisting the trier of fact in understanding the evidence or
determining a fact at issue in the case. *Bullock v. Sheahan*, 519
F. Supp. 2d 760, 761 (N.D. Ill. 2007). "The rejection of expert
testimony is the exception rather than the rule, and the trial
court's role as gatekeeper is not intended to serve as a
replacement for the adversary system." *Id.* (quoting *Spearman
Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148,
1150 (N.D. Ill. 2001)). The Court must also keep in mind that
the question of whether the expert is credible or whether the
theories being applied by the expert are correct, is a "factual
one that is left for the jury to determine after opposing counsel
has been provided the opportunity to cross-examine the expert
regarding his conclusions and the facts on which they are based."
*Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)(citing
*Walker v. Soo Line R.R.*, 208 F.3d 581, 589-90 (7th Cir. 2000)).

**Discussion**

Defendant PIMCO challenges the opinions of James G.
Rickards, Dr. John J. Merrick, Jr., and Dr. Craig Pirrong.
Defendant PIMCO Funds joins in PIMCO's motions but notes that it
was only named in the report of James Rickards. Consequently, it
filed its own motion and supporting memorandum to exclude Mr.
Rickards' testimony. The Court addresses each expert in turn.

**A.   Opinions of Attorney James G. Rickards**

PIMCO challenges certain opinions proferred by

3

James Rickards.  Specifically, it disputes the admissibility of
Mr. Rickards' testimony regarding 1) state of mind, 2) ultimate
issues/legal conclusions, and 3) market color.  PIMCO Funds
requests that the Court exclude Mr. Rickards' testimony in its
entirety, to the extent that it relates to it.

### 1.   *State of Mind*

PIMCO argues that Mr. Rickards seeks to impermissibly opine
on the mental states of both PIMCO and the Chicago Board of Trade
(CBOT).  It finds inappropriate Mr. Rickards' opinions that: 1)
PIMCO intended to manipulate the prices of the June contract and
2) the CBOT instituted position limits in response to its belief
that PIMCO had engaged in improper trading practices.
Consequently, it asks the Court to prohibit Mr. Rickards from
providing this testimony during trial.  Not surprisingly,
Plaintiffs challenge PIMCO's request.  In support of their
opposition, they offer Mr. Rickards' qualifications.

Rule 702 requires that a testifying expert possess
scientific, technical, or other specialized knowledge.  Fed. R.
Evid. 702.  While Mr. Rickards is accomplished in his field (a
matter not challenged by Defendant), there is nothing currently
before the Court that demonstrates that he is competent to opine
on the mental states of others.  In other words, the Court has no
reason to believe that Mr. Rickards' expertise affords him the
ability to read minds.  His opinions on PIMCO's intent and the

CBOT's beliefs, therefore, are based solely on his inferences drawn from evidence found in the record. In fact, Plaintiffs concede as much.  ("Mr. Rickards simply applied his expertise to the jargon and esoteric abbreviations in the documents and the quality and nature of the acts.")  Permitting him to testify regarding the state of mind of either PIMCO or the CBOT would effectively allow him to substitute his inferences for those that the trier of fact can and should draw on its own.  This is not permitted.  Indeed, it is well-established that "'testimony that does little more than tell the jury what result to reach' is unhelpful and thus inadmissible, and testimony regarding intent – essentially an inference from other facts – 'is even more likely to be unhelpful to the trier of fact.'"  *Dahlin v. Evangelical Child & Family Agency*, No. 01 C 1182, 2002 U.S. Dist. LEXIS 24558, at *10-11 (N.D. Ill. Dec. 18, 2002)(quoting *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997)).

Plaintiffs' argument that the opinions are admissible pursuant to Federal Rule of Evidence 704, also known as the "ultimate issue" rule, is similarly unavailing.  The Rule provides in relevant part that, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704.  This Rule, Plaintiffs maintain, dictates that the opinions be admitted.  But Rule 704 does not

exist in a vacuum.   Indeed, the Rule itself cautions that the
opinions must *otherwise* be admissible.   A fact reverberated by
the warning found in the Advisory Committee Notes to the Rule,
that the presence of "the ultimate issue rule does not lower the
bars so as to admit all opinions.   Under Rule[] . . . 702,
opinions must be helpful to the trier of fact."   Consequently,
the Court, finding that the opinions fail to assist the jury in
any meaningful way, need not reach Rule 704 to determine that
they are inadmissible.   *See* 3 Christopher B. Mueller & Laird C.
Kirkpatrick, Federal Evidence § 2:20 (3d ed. 2009)(noting that
such testimony remains excludable, "not because it directly
touches ultimate issues, but because it is not helpful and Fed.
R. Evid. 704 is not an open sesame to all opinion.")

     Undeterred, Plaintiffs contend that, because futures trading
litigation is "complex and esoteric," Mr. Rickards is more
qualified than the ordinary juror to draw the inferences at
issue.   The Court is not persuaded.   Though Plaintiffs cited an
endless number of cases, they failed to direct the Court's
attention to a single case that stands for the proposition that
the bar to admissibility is lowered because of the complex nature
of the issues being litigated.   Indeed, there are none.   The case
cited by Plaintiffs, *Louis Vuitton Malletier v. Dooney & Bourke,*
*Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007), upon which their
reliance is misplaced, involved alleged trademark infringement

claims, an area of the law also known to be "complex." *Coach*

*Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 165 (2d Cir.

1991). Yet, in that case, the court held that while the expert

was permitted to testify regarding *facts* that tended to prove

intent, he was not allowed to "testify that his findings *in fact*

indicated that Dooney & Bourke intentionally copied Louis

Vuitton's colors." *Id.* (quoting *Louis Vuitton Malletier v.*

*Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 646 (S.D.N.Y. 2007)).

Because the Court finds that the proposed testimony

regarding the state of mind of PIMCO and the CBOT are beyond the

scope of Mr. Rickards' expertise, and thus, will not assist the

trier of fact, and because the potential exists that the jury,

though fully capable of reaching a conclusion on its own, will

give undue deference to Mr. Rickards' conclusion, the testimony

is to be excluded. The Court's decision is especially

appropriate considering that Mr. Rickards' opinion regarding the

beliefs of the CBOT differ from those expressed by the entity

itself. Indeed, the CBOT stated that its decision to establish

position limits was the result of a "confluence of factors."

These factors include:

> First, the recent and present combination of low yields
> and a flat yield curve strongly favors delivery of
> Treasury issues with relatively short durations and short
> remaining times to maturity; in the case of 10-Year
> Treasury Note futures, these issues tend to be those that
> the Treasury sold three or more years ago.

Second, the issue sizes of Treasury securities that are
now attractive for delivery into Treasury futures happen
to be unusually small, partly as an artifact of the
Treasury's reduced borrowing needs during the years of
fiscal surplus (1999-2001), and partly due to changes in
the Treasury's funding practices.

Third, the notional value represented by open interest in
Treasury futures has grown rapidly and dramatically
relative to the underlying cash market.  It now
represents nearly double the proportion of that cash
Treasury market as it did two years ago.

Fourth, the increased incidence of fail epidemics since
9/11 in the cash Treasury market, and especially in the
Treasury repo market, has eroded trade certainty in the
cash Treasury market in ways that impair the ability of
market participants to perform cash-futures arbitrage.

Chicago Board of Trade Memo, Aug. 10, 2005, p. 2.

        To the extent that the evidence underlying Mr. Rickards'
inferences is admissible, it should be presented directly to the
jury.  The Court is confident that the jurors will be able to
draw the necessary inferences from the testimony presented,
thereby resolving the relevant issues.

### 2.    *Ultimate Issues/Legal Conclusions*

        PIMCO next maintains that Mr. Rickards should be precluded
from rendering legal conclusions and from testifying to ultimate
issues in the case.  It cites to Mr. Rickards' 1)
characterization of PIMCO's conduct as being "manipulative," and
2) statements regarding PIMCO's "duties and responsibilities."
In response, Plaintiffs assert that Mr. Rickards' opinions are

not legal conclusions,[2] nor do they relate to ultimate issues in the case.

As to Mr. Rickards' proffered opinions that certain of

---

[2]   The Court notes that, while Plaintiffs argue that Mr. Rickards is "not testifying about what the law is, or whether the Defendants' actions met a particular legal standard," Mr. Rickards, himself, conceded that his testimony regarding manipulation was legal in nature.

> Grush:        You have testified – your report states that you have a working definition of manipulation.  Are you testifying as to the legal standard for manipulation?
>
> Rickards:     My working definition, which I have evolved over many years of experience in the market, is what I consider to be the legal definition, sure.  It wouldn't do to have a working definition that bore no relationship to what the regulatory authorities actually consider to be manipulation.
>
> So yes, I consider it a legal standard, but it's not – the thing is the statutes don't – statutes and the regulations don't define manipulation.  They say manipulation is prohibited and manipulation may be fraudulent.  There are prohibitions on manipulation, but they don't define manipulation.  So one has to have a definition to avoid it.

. . .

> Grush:        So in your report when you say that certain conduct is manipulative, are you basing that on – are you basing that on – are you testifying as to what you understand the legal standard to be?
>
> Rickards:     Yes.

Rickards Dep. pp. 270-273.

PIMCO's conduct was "manipulative," the Court finds that these are inappropriate legal conclusions, and are thus, inadmissible. The Seventh Circuit has held that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)(citing *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)).  In order to prove a manipulation claim under the CEA, Plaintiffs must demonstrate, *inter alia*, that there was an artificial price and that PIMCO intended to cause it.  Consequently, a determination that Defendant's behavior was manipulative is material to establishing Defendant's legal liability.  *See Klaczak v. Consol. Med. Trans., Inc.*, No. 96 C 6502, 2002 U.S. Dist. LEXIS 13607, at *20 (N.D. Ill. May 26, 2005).  Implicit in Mr. Rickards' opinions that PIMCO engaged in manipulative conduct is the presumption that PIMCO did so as a means of effectuating an artificial price. This is one of the elements that Plaintiffs must prove.  The case law, including that relied on by Plaintiffs, is clear that such testimony is not allowed.

In *In re Blech Sec. Litig.*, a case cited by Plaintiffs with approval, the court refused to allow an expert to testify regarding legal conclusions and held that, while an expert may opine on ultimate issues of fact, the expert "may not give testimony stating ultimate legal conclusions based on those

10

facts." No. 94 Civ. 7696 (RWS), 2003 U.S. Dist. LEXIS 4650, at
*62 (S.D.N.Y. Mar. 26, 2003)(quoting *Media Sport & Arts s.r.l v.
Kinney Shoe Corp.*, No. 95 Civ. 3901 (PKL), 1999 U.S. Dist. LEXIS
16035, at *4 (S.D.N.Y. Oct. 18, 1999). The court further noted
that, "in securities cases, the use of expert testimony must be
'carefully circumscribed,' and experts are not to improperly use
specific statutory and regulatory language, such as
'manipulation' . . . to describe the defendants' actions." *Id.*
at *63 (citations omitted). Though Plaintiffs rely on *Blech*, the
court clearly proscribed the precise types of opinions that
Plaintiffs now seek to introduce. The *Blech* court did not allow
them, neither will this Court. Therefore, while Mr. Rickards is
allowed to present and analyze *facts* indicating manipulation, he
may not embrace the ultimate issue of whether Defendant's acts
were, indeed, manipulative. Similarly, Mr. Rickards will not be
permitted to testify as to PIMCO's duties and responsibilities.
As this is also a legal conclusion that will resolve the ultimate
issue in this case, it, too, is an area left solely within the
province of the "knowledgeable gentleman in a robe whose
exclusive province it is to instruct the jury on the law." *Marx
& Co., Inc. v. Diner's Club, Inc.*, 550 F.2d 505, 512 (2d Cir.
1977).

Nor is the Court convinced, in light of its finding that the
testimony states ultimate issues, that Federal Rule of Evidence

704 compels admissibility.  "Although an expert's opinion may
'embrace an ultimate issue to be decided by the trier of fact,'
Fed. R. Evid. 704(a), the issue embraced must be a factual one."
*In re Commercial Money Ctr., Inc*, No. 1:02CV16000, 2007 U.S.
Dist. LEXIS 37260, at *20-21 (May 22, 2007).  As discussed *supra*,
the opinions at issue are legal, not factual.  Consequently, Rule
704 does not provide a basis for the admissibility of Mr.
Rickards' testimony.

Mr. Rickards' opinions characterizing PIMCO's conduct as
manipulative and those regarding PIMCO's duties and
responsibilities are, therefore, prohibited.

### 3.  *Market Color*

PIMCO challenges Mr. Rickards' proferred opinion regarding
"market color," an occurrence in which "market activities of
large traders are known in the market and exert large impact on
the expectations and subsequent behavior of others."
Specifically, PIMCO opposes Mr. Rickards' use of market color to
show that knowledge of PIMCO's trades permeated the marketplace
and "caused the market to panic and artificially drive up
prices."  Plaintiffs contend that the proposed testimony is
admissible custom and practices testimony.

Initially, the Court questions the reliability of Mr.
Rickards' testimony.  Though Plaintiffs argue that market color
does exist generally, they failed to provide proof of its

12

existence in the case at bar. Noticeably, the literature to
which Plaintiffs directed the Court's attention included
discussion of at least one interested party and its role in
market rumors. ("The Fed requires *primary dealers* to . . .
provide the Fed's trading desk with market information," "[t]here
was mention by the presenting *member* . . . that there have [sic]
been higher level of flows into the product . . . and how those
investors preferred being on the shorter end of the maturity
spectrum," "there are a number of *private and public pension
funds*, which are considering implementing the product into their
portfolios as natural inflation hedges to their liability
streams.")(emphasis added). Yet, Mr. Rickards' opinion is based
solely on "custom and practice"; it is not based on evidence
provided by a single market participant. Plaintiffs attempt to
overcome this deficiency by arguing that the opinions are
properly admissible as custom and practice testimony.

The Court acknowledges that courts generally allow testimony
regarding the custom and practices of an entity. *See, e.g., R.B.
Ventures, Ltd. v. Shane,* No. 91 CIV. 5678(CSH), 2000 WL 520615,
at *2 (S.D.N.Y. May 1, 2000). However, custom and practices
testimony that is "offered as probative of the conduct in which
the parties actually engaged" is excluded. *Id.* Plaintiffs argue
that, because PIMCO's trading and positions are uncontroverted,
the testimony is offered to "explain the effect or propriety of

13

the undisputed conduct," and consequently, admissible. The Court disagrees. Plaintiffs, in essence, attempt to use Mr. Rickards' testimony to show that, since market color is present in the market generally, it existed during the times at issue and that, as a result, PIMCO's conduct caused market participants to panic and artificially drive-up prices - as proof that PIMCO's behavior had a substantial impact on the market and proof that the participants reacted. Allegations that PIMCO steadfastly disputes. Because this is precisely the testimony that courts have counseled against, Mr. Rickards' market color testimony used to show causation, is prohibited.

### 4. PIMCO Funds

Defendant PIMCO Funds asks the Court to exclude the entirety of Mr. Rickards' testimony regarding it. In particular, it challenges the admissibility of Mr. Rickards' opinions that 1) PIMCO was PIMCO Funds' agent and 2) PIMCO Funds had a "strong reason to know" and a review of emails "would have revealed" the manipulative conduct. Plaintiffs maintain that the opinions are appropriate and, therefore, admissible.

The CEA provides three theories under which a plaintiff may pursue a claim of manipulation. They include a direct claim for market manipulation (as discussed above), a claim for aiding and

14

abetting,[3] and a claim of respondeat superior.[4]  Plaintiffs have

indicated that they could potentially proceed against PIMCO Funds

under a theory of respondeat superior.  A finding that PIMCO was

PIMCO Funds' agent, therefore, is a legal conclusion that is

crucial to the ultimate determination.  Consistent with the

Court's earlier discussion, because it is material to

establishing PIMCO Funds' legal liability, there can be no doubt

that Mr. Rickards' opinion on this matter is not allowed.

Also inadmissible are Mr. Rickards' opinions regarding what

PIMCO Funds had strong reason to know, as this necessarily

requires Mr. Rickards to opine on PIMCO Funds' state of mind.

Mr. Rickards is not precluded from offering the facts supporting

his inference.  However, he is not permitted, for the reasons

discussed above, to substitute his inferences for those that the

jury can and should draw for itself.  Because of the speculative

---

[3]  To state a claim for aiding and abetting liability under
§ 22 of the CEA, a plaintiff must allege that the defendant: "(1)
had knowledge of the principal's intent to commit a violation of
the CEA; (2) had the intent to further that violation; and (3)
committed some act in furtherance of the principal's objective."
*766347 Ontario, Ltd. v. Zurich Capital Mkts., Inc.*, 274 F. Supp.
2d 926, 935 (N.D. Ill. July 28, 2003)(citing *Damato v. Hermanson*,
153 F.3d 464, 473 (7th Cir. 1998)).

[4]  Section 2(a)(1), "provides respondeat superior and
general principal-agent standards for imposing liability on
employers and principals for the acts of their employees or
agents."  *Clayton Brokerage Co. of St. Louis, Inc. v. Commodity
Futures Trading Comm'n*, 794 F.2d 573, 581 (11th Cir.
1986)(quoting H.R. Rep. No. 565 Part I, 97th Cong., 2d Sess.
105); see 7 U.S.C. § 2(a)(1)(B).

15

nature of his testimony regarding what a review of emails would have revealed, it is similarly unreliable and thus excluded. Again, this ruling is in no way meant to alter Mr. Rickards' ability to present the facts underlying this presumption.

## B.   Opinions of Dr. John J. Merrick, Jr.

PIMCO seeks to exclude Dr. John J. Merrick Jr.'s testimony regarding 1) causation, 2) artificiality, 3) state of mind, and 4) ultimate issues/legal conclusions.

### 1.   Causation

PIMCO maintains that Dr. Merrick's opinions regarding causation should be excluded as they are inherently unreliable. Because the doctor failed to provide an analysis linking it to the alleged unlawful conduct and distinguishing it from other potential causal factors, and because he failed to quantify the effects of its alleged unlawful behavior, PIMCO maintains that the case law dictates that the opinions be prohibited. Plaintiffs counter that disaggregation is not a prerequisite for the admissibility of the opinions.  Dr. Merrick's testimony is reliable, thus admissible, they contend, because it is based on quantitative analyses as well as qualitative analyses supplemented by Dr. Merrick's analysis of the record.

As an initial matter, the Court notes that the district court drew a distinction between class certification in cases brought pursuant to the Commodity Exchange Act and those brought

16

pursuant to the Security Exchange Act of 1934. The Court, however, finds no principled reason to distinguish between commodities manipulation cases and securities cases in the instant matter, as both claims require proof of causation of a loss. Plaintiffs argue in favor of the distinction. But the Court finds that any perceived disparity lies in the fact that, while proof of loss is expressly required in the applicable securities statutory provision,[5] it is implicit in the analogous commodities provision's requirement that the defendant must have caused an artificial price.[6] Proceeding along this presumption, the Court analyzes Dr. Merrick's proffered opinions under well-established securities case law.

---

[5] In a securities fraud action, the plaintiff must show that the defendant:

> (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss.

In re Williams Secs. Litig., 558 F.3d 1130, 1136 (10th Cir. 2009)(citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 128 S. Ct. 761, 768, 169 L. Ed. 2d 627 (2008)).

[6] "The four elements of a price manipulation claim are: '(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price.'" Kohen, 244 F.R.D. at 481 (quoting In re Soybean Futures Litig., 892 F. Supp. 1025, 1045 (N.D. Ill. 1995)).

17

Securities cases routinely provide that in proving loss causation, the plaintiff must show that it suffered a loss as a result of the defendant's alleged unlawful behavior.  *In re Williams Secs. Litig.*, 558 F.3d at 1136 (citing *Stoneridge Inv. Partners, LLC*, 552 U.S. 148).  Because loss causation is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff," *Id.* at 1137 (citations omitted), the expert must then conduct some form of statistical analysis that isolates the defendant's conduct and apportions it to the overall loss.  *Id.; see, e.g., Fener v. Operating Engineers Constr. Indus. & Miscellaneous Pension Fund*, 579 F.3d 401, 409 (5th Cir. 2009)(holding that "the testimony of an expert – along with some kind of analytical research or event study – is required to show loss causation.")  Inherent in this is the requirement that the expert separate the alleged unlawful conduct from other possible significant causes.  This principle was recently illustrated in *In re Williams Secs. Litig.*, 558 F.3d at 1130.

In *Williams*, the plaintiffs appealed the decision of the trial court prohibiting them from offering the testimony of an expert to prove loss causation.  The court, however, affirmed the district court's decision rejecting the testimony as unreliable, because the expert failed to "distinguish between loss attributable to the alleged fraud and loss attributable to non-

fraud related news and events." *Id.* at 1132.   PIMCO argues that
this renders Dr. Merrick's opinions inadmissible.   The Court
agrees.

Plaintiffs do not dispute that Dr. Merrick failed to
apportion the loss between Defendant's conduct and that of other
possible causes.   However, as discussed *supra*, in determining
that Defendant caused an artificial price, Plaintiff must
distinguish between the effect on the price resulting from
Defendant's unlawful conduct and that caused by other factors.
While an event study appears to be the analysis of choice, the
Court declines to adopt a "one size fits all" approach.   However,
some form of quantitative statistical analysis is necessary.
Something more than observations and market rumors.   And because
Dr. Merrick failed to perform such analyses, his opinions
regarding causation are prohibited.[7]

---

[7] Though the Court's analysis proceeded pursuant to the
applicable securities law, it agrees with PIMCO that the outcome
would not differ if evaluated pursuant to the governing
commodities law.   To be sure, the Commodity Futures Trading
Commission held that,

> there can be multiple causes of an artificial price.
> Where these causes can be sorted out, and respondents are
> a 'proximate' cause of the artificial price, a charge of
> manipulation can be sustained.   If multiple causes cannot
> be sorted out, or if the respondents are not one of the
> proximate causes, then the charge of manipulation cannot
> be sustained.

*In re Cox*, CFTC Docket No. 75-16, 1987 CFTC LEXIS 325, at *35-6
(CFTC July 15, 1987).

## 2. *Artificiality*

PIMCO next argues that Dr. Merrick's opinions regarding the presence of an artificial price must be excluded as they, too, are unreliable. Conversely, Plaintiffs argue that the opinions are admissible as they are based on various studies and statistical analyses.

Generally, a price is "'artificial' . . . if it 'does not reflect the market or economic forces of supply and demand' operating upon it." *In re Soybean Futures Litig.*, 892 F. Supp. at 1053 n. 28 (citations omitted). In the case at bar, Plaintiffs make numerous allegations as to why the market was not reflective of the economic forces of supply and demand. These include, *inter alia*, PIMCO's increase of its position in the June 2005 contract and the cheapest-to-deliver note without economic rationale, its failure to liquidate those positions, its basis trading to increase its holding in the cheapest-to-deliver note, and the fact that PIMCO loaned some of its cheapest-to-deliver notes in the repurchase (repo) market but required return prior to the date on which the notes could be delivered on the June 2005 contract. Dr. Merrick, Plaintiffs argue, incorporated these into his resulting analyses. Defendant disputes their reliability and, thus, admissibility because 1) all of the price "richness" was attributed to Defendant and 2) in his analyses, Dr. Merrick incorporated dissimilar data. Defendant's arguments,

however, are misplaced.

In stating a claim for price manipulation pursuant to the CEA, Plaintiffs must show that there was an artificial price; it is not necessary that they apportion the cause of the price in order to satisfy this element. To hold otherwise would be to effectively collapse two of the elements (presence of an artificial price and causation of an artificial price) into one. Yet, the regulation was not drafted in such a manner. Consequently, this is not a ground by which the Court can exclude Dr. Merrick's opinion that an artificial price existed. Perceived flaws are best left for the jury to weigh in terms of the amount of weight to give the determination.

Nor is the Court persuaded by Defendant's argument that Dr. Merrick cherry-picked data. Specifically, Defendant maintains that, in generating his benchmark curve, Dr. Merrick chose a sample of Treasury notes that were dissimilar to the note at issue. In response, Plaintiffs maintain that Dr. Merrick chose data and a methodology prescribed by a respected text. This is adequate at this stage of the litigation, as it is not proper for the Court to make a determination of which notes are similar and dissimilar. Indeed, in *LeDonne v. AVA Equitable Life Ins. Co.*, the Court opined that "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent

21

to an issue in the case and whether the methodology underlying that testimony is sound." 2009 U.S. Dist. LEXIS 72445 at *5. Because the opinions are undoubtedly relevant and the methodology underlying the analyses sound, the Court finds that Dr. Merrick's testimony regarding the presence of an artificial price is admissible. Any attempts to discredit the opinion because of Dr. Merrick's failure to use data from comparable notes must be raised, if at all, during cross-examination.

### 3. *State of Mind*

PIMCO asserts that Dr. Merrick seeks to inappropriately opine on the mental states of both PIMCO and the Chicago Board of Trade (CBOT). In particular, PIMCO finds inappropriate, Dr. Merrick's opinions that: 1) PIMCO intended to manipulate the prices of the June contract, 2) PIMCO intended to force delivery of non-cheapest to deliver notes, 3) PIMCO employees intended to affect June futures prices and cause "market panic," and 4) the CBOT instituted position limits in response to its belief that PIMCO had engaged in improper trading practices. Consequently, it asks that these opinions be excluded. For reasons similar to those provided in its defense of Mr. Rickards' testimony, Plaintiffs argue that the statements are reliable and admissible. The Court can dispose of these arguments in short order, as the opinions that Dr. Merrick seeks to offer are similar – almost identical to those offered by Mr. Rickards. For the same reasons

22

provided *supra*, Dr. Merrick's opinions regarding PIMCO's and the
CBOT's state of mind are inadmissible.

### 4. Ultimate Issues/Legal Conclusions

PIMCO argues that the Court should prohibit Dr. Merrick from
providing legal conclusions and ultimate issues in the case.  It
finds inadmissible, Dr. Merrick's testimony that: 1) PIMCO
engaged in "manipulative" conduct, 2) PIMCO had certain duties
and responsibilities, 3) certain of PIMCO's conduct was
"manipulative," and 4) PIMCO "squeezed" the cheapest to deliver
note and played from the "squeezer's playbook."  As with his
opinions regarding state of mind, Dr. Merrick's testimony above
is akin to that of Mr. Rickards, the only seeming exception being
Dr. Merrick's opinions regarding squeezing.  The testimony,
consequently, is inadmissible for the same reasons presented in
the Court's analysis of Mr. Rickards' testimony.  The squeezing
testimony is no different, as squeezing is a means of
manipulating the market.[8]  As stated *supra*, the court must
determine whether PIMCO's conduct was manipulative.  Therefore,
it is for the court, and not Dr. Merrick to decide whether PIMCO
engaged in squeezing.

---

[8]  "Market power manipulation – commonly known as a 'corner'
or 'squeeze' – is one of the main regulatory and legal challenges
facing derivatives markets."  Craig Pirrong, *Squeeze Play: The
Dynamics of the Manipulation End Game*, Apr. 30, 2008, at 1.

## C.   Opinions of Dr. Craig Pirrong

PIMCO seeks to exclude Dr. Craig Pirrong's testimony regarding 1) causation, 2) artificiality, 3) state of mind, and 4) legal conclusions.[9]

### 1.  *Causation*

Dr. Pirrong opines that PIMCO caused price artificiality, an opinion that PIMCO vigorously opposes as being inadmissible. Because Dr. Pirrong's opinion is based on his evaluation of materials in the record and various statistical analyses, Plaintiffs argue that they are admissible.

The Court notes that Dr. Merrick did, indeed, perform multiple statistical analyses (predictive regression analysis, contemporaneous correlation analysis, Bayesian enhanced predictive regression analysis, Granger causality analysis). However, the Court finds that his opinions suffer from the same fatal flaw as those of Dr. Merrick (discussed *supra*) – he neither attributed loss between Defendant's alleged unlawful conduct and that which was not fraudulent, nor did he quantitatively consider the effect of other possible causes.  While Plaintiffs maintain that he did, in fact, do so, the Court finds no evidence, other than Dr. Pirrong's assertions, that this was done quantitatively.

---

[9]   Defendant also seeks to have prohibited, Dr. Pirrong's testimony regarding damages.  In light of the Court's ruling on the doctor's causation testimony, however, the Court need not reach this issue.

For this reason, Dr. Pirrong's opinions regarding causation must
be excluded.

### 2. *Artificiality*

PIMCO avers that Dr. Pirrong's opinion regarding the
presence of an artificial price is inadmissible as it is
unreliable. This is so, PIMCO maintains, because Dr. Pirrong
characterized all richness in the June contract as being
artificial and attributed it all to PIMCO. Plaintiffs argue that
the opinions are reliable and thus, admissible.

As discussed *supra*, a price is considered artificial if it
does not reflect legitimate market forces of supply and demand.
Here, Dr. Pirrong alleges as much. He also purports to include
these determinations in his subsequent analyses. This is all
that is required at this time. To be sure, there is no
requirement that he apportion the amount of artificiality in
order to show that an artificial price existed. Any deficiencies
noted by Defendant are properly brought out during its
examination of Dr. Pirrong. Consequently, Dr. Pirrong's
testimony regarding the presence of an artificial price is
admissible.

### 3. *State of Mind*

PIMCO opposes the testimony of Dr. Pirrong as to its state
of mind as well as that of the CBOT. Because the Court has
already addressed similar - some exact - opinions *supra*, it will

not discuss them again here.  For the reasons already expressed, Dr. Pirrong's opinions regarding PIMCO's and the CBOT's state of mind are excluded.

### 4.   Legal Conclusions

Similarly, PIMCO challenges Dr. Pirrong's opinions regarding its alleged "manipulative" conduct and its duties and responsibilities - allegations that are virtually identical to those of Mr. Rickards and Dr. Merrick.  For the reasons provided in the Court's analysis of those two experts, Dr. Pirrong's testimony regarding ultimate issues and legal conclusions is barred.

### Conclusion

For the reasons set forth above, Defendant PIMCO's motions are granted in part and denied in part.  Defendant PIMCO Funds' motion is granted.

Date: March 10, 2010                    E N T E R E D:


_____

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

26