**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | : : : | No. 05 C 4681 |
| Plaintiffs, | : : | |
| v. | : : | Honorable Ronald A. Guzman |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, and PIMCO FUNDS, | : : : | Magistrate Judge Arlander Keys |
| Defendants. | : : | |

**PIMCO'S AND PIMCO FUNDS' MOTION FOR LEAVE TO FILE
A RESPONSE TO PLAINTIFFS' "REPLY" MEMORANDUM**

Defendants Pacific Investment Management Company LLC ("PIMCO") and PIMCO Funds (together "Defendants") respectfully request leave to file the proposed Sur-Reply, attached hereto as Exhibit A, in response to Plaintiffs' reply brief submitted on April 27, 2010.

Although styled as a "reply," Plaintiffs' brief sets forth extensive attacks on the Magistrate Judge's ruling, makes fundamentally misleading statements and omissions on key issues, and advances new, flawed arguments that Plaintiffs did not raise in their Objections and that in critically important instances contradict positions they have endorsed for several years. Indeed, this "reply" cites sixteen additional cases not cited in Plaintiffs' Objections, including eight new cases that were never even cited before the Magistrate Judge. The issues addressed therein go to the very heart of matters now before the Court, and their importance to a fully

informed review of the Magistrate Judge's Order weighs in favor of granting Defendants' request for leave to file a supplemental brief addressing such issues.

Defendants request permission to file the attached proposed response, which demonstrates that Plaintiffs' experts did not even purport to separate the impact of PIMCO's allegedly unlawful conduct from its admittedly lawful conduct and that Plaintiffs' new argument that it is "unnecessary, if not impossible" to disaggregate the effects of lawful conduct from unlawful conduct is contrary to law and contradicts their experts' own admissions. This flaw is by itself dispositive of Plaintiffs' Objections, and the Court need not even consider Plaintiffs' remaining arguments. (Proposed Response Part I.)

Nevertheless, Plaintiffs' other arguments rely on a number of misstatements and mischaracterizations, which Defendants feel compelled to correct. For example:

(1) Plaintiffs falsely attribute to Defendants' expert Hartzmark a statement that is in fact *not from Hartzmark at all*, but instead a quotation from the deposition of *Plaintiffs'* expert Professor Gilbert. (Proposed Response Part II.B.)

 (2) Plaintiffs' assertion that PIMCO's position in the market was analogous to that of participants found to have manipulated the contract is misleading because PIMCO, unlike those market participants, made the underlying cash commodity available to the market through repurchase agreements. (Proposed Response Part II.A.)

(3) Plaintiffs' new argument that taking short positions decreases artificiality directly contradicts Plaintiffs' theory of the case – yet another self-contradiction inexcusably offered to avoid the impact of an earlier self-contradiction, all probative of the fundamental unreliability of Plaintiffs' experts' *methods*. (Proposed Response Part II.C.)

Courts routinely permit parties to file sur-reply briefs to complete the record where a reply brief raises new or misleading arguments, as is the case here.  *See, e.g.*, *National Production Workers Union Ins. Trust v. Life Ins. Co. North Am.*, No. 05-cv-5415, 2010 WL 1292429, at \*1 n.3 (N.D. Ill. Mar. 29, 2010) (*sua sponte* granting leave to file sur-reply because of new arguments in a reply brief); *Flory v. Mays*, No. 06 C 3523, 2007 WL 4232781, at \*3 (N.D. Ill. Nov. 26, 2007) (observing that leave was granted to file sur-reply where new arguments were raised in reply); *cf. Mercatus Group LLC v. Lake Forest Hosp.*, 528 F. Supp. 2d 797, 809 n.7 (N.D. Ill. 2007) (granting leave to file sur-reply *even where no new arguments were raised in reply*).  In granting leave to file a sur-reply, courts also consider the importance of the issues being addressed to the matter before the court.  *See, e.g.*, *Perry v. Novartis Pharm. Corp.*, 564 F. Supp. 2d 452, 455 n.1 (E.D. Pa. 2008) (court considered parties' reply and sur-reply in its analysis regarding motion to exclude Plaintiffs' experts' testimony on causation in part "because of the importance of the issue at hand").  Plaintiffs concede in their motion for leave to file the "reply" brief (at 1) that the issues addressed go to the matter before the court, and their importance weighs in favor of granting Defendants' request for leave to file the attached proposed response.

## Conclusion

For the foregoing reasons, Defendants respectfully request that the Court grant them leave to file the response brief attached hereto as Exhibit A.


Dated:  May 4, 2010                                    Respectfully submitted,


                                                       By:  /s/ David Boies
                                                       _____

LATHAM & WATKINS LLP                                   BOIES, SCHILLER & FLEXNER LLP
Sean M. Berkowitz                                      David Boies (pro hac vice)
Sears Tower, Suite 5800                                333 Main Street
233 South Wacker Drive                                Armonk, New York 10504
Chicago, IL 60606                                      Telephone: (914) 749-8200
(312) 876-7700

                                                       Robert Silver (pro hac vice)
Miles N. Ruthberg (pro hac vice)                       Philip M. Bowman (pro hac vice)
Robert W. Perrin (pro hac vice)                        Boies, Schiller & Flexner LLP
633 West Fifth Street, Suite 4000                      575 Lexington Avenue, 7th Floor
Los Angeles, CA 90071-2007                             New York, New York 10022
(213) 485-1234                                         Telephone: (212) 446-2300

                                                       *Counsel for Defendant Pacific Investment
                                                       Management Company LLC*



                                                       By:  /s/ Blake T. Hannafan
                                                       _____
DECHERT LLP
David A. Kotler (pro hac vice)                          HANNAFAN & HANNAFAN, LTD.
902 Carnegie Center, Suite 500                          Blake T. Hannafan
Princeton, NJ 08540                                     One East Wacker Dr., Suite 2800
(609) 955-3200                                          Chicago, IL 60601
                                                       312-527-0055

Matthew L. Larrabee (pro hac vice)
Dechert LLP
One Maritime Plaza
San Francisco, CA  94111-3513
Tel:  (415) 262-4500                                   *Counsel for Defendant PIMCO Funds*

# EXHIBIT A

**PIMCO'S AND PIMCO FUNDS' SUR-REPLY TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE KEYS' MEMORANDUM OPINION AND ORDER, DATED MARCH 10, 2010, EXCLUDING CERTAIN TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES**

**AND**

**APPENDIX OF EXHIBITS THERETO**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | : | No. 05 C 4681 |
| | : | |
| Plaintiffs, | : | |
| | : | Honorable Ronald A. Guzman |
| v. | : | |
| | : | |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, and PIMCO FUNDS, | : | Magistrate Judge Arlander Keys |
| | : | |
| Defendants. | : | |
| | : | |

**PIMCO'S AND PIMCO FUNDS' SUR-REPLY TO PLAINTIFFS' OBJECTIONS TO
MAGISTRATE JUDGE KEYS' MEMORANDUM OPINION AND ORDER, DATED
MARCH 10, 2010, EXCLUDING CERTAIN TESTIMONY OF PLAINTIFFS' EXPERT
WITNESSES**

# TABLE OF CONTENTS

I.     PLAINTIFFS CANNOT JUSTIFY THEIR FAILURE TO SEPARATE THE IMPACT OF LAWFUL CONDUCT FROM ALLEGEDLY UNLAWFUL CONDUCT. ................................................................................................. 1

II.    PLAINTIFFS' REMAINING "REPLY" ARGUMENTS ARE WRONG. ........................ 3

       A.     Plaintiffs Fundamentally Mischaracterize PIMCO's "Long-Long" Position and Thereby Again Fail to Justify Avoiding the Need for a Quantitative Rigorous Analysis. .................................................................. 3

       B.     Plaintiffs Concede That Pirrong's Predictive Regression Does Not Show Causation, and Their New "Two-Step" Argument Is Unavailing. ................................................................................................. 5

       C.     Plaintiffs' New Argument Concerning the Impact of Taking Short Positions Not Only Fails, but It Directly Contradicts Their Theory of the Case. ............................................................................................... 6

       D.     Plaintiffs' New Cases Confirm That Plaintiffs' Experts Are Required to Account for Major Factors. .................................................... 7

CONCLUSION .............................................................................................................. 8

Defendants Pacific Investment Management Company LLC ("PIMCO") and PIMCO Funds (together "Defendants") respectfully submit this memorandum in further response to Plaintiffs' Objections (hereafter "Ob.") to Magistrate Judge Keys' Memorandum Opinion and Order dated March 10, 2010 (hereafter "Order") excluding certain testimony of Plaintiffs' expert witnesses.

### <u>Argument</u>

I. **PLAINTIFFS CANNOT JUSTIFY THEIR FAILURE TO SEPARATE THE IMPACT OF LAWFUL CONDUCT FROM ALLEGEDLY UNLAWFUL CONDUCT.**

Plaintiffs' "reply" brief makes a number of misleading arguments and misstatements of law and fact, all in an apparent attempt to sow confusion and distract from the fundamental and clear flaws in their experts' analyses. Although the misstatements and omissions are so fundamentally at odds with basic facts – or with Plaintiffs' own theories – as to require Defendants to respond to some of these arguments in Part II below, the Court need not resolve any of them in order to determine that the Magistrate Judge's Order should be affirmed. That is because there is one simple yet fatal flaw in Plaintiffs' experts' analyses that Plaintiffs did not even attempt to justify or refute in their Objections. Specifically, as the Magistrate Judge held, Plaintiffs' experts do not even *purport* to isolate the impact (if any) of PIMCO's allegedly wrongful conduct from the impact of its lawful conduct. Under established law, as the Magistrate Judge correctly held, their experts' causation opinions are therefore inadmissible under *Daubert*. (*See* Order at 16-19, 24-25.) In their reply brief, Plaintiffs do not dispute that their experts failed to distinguish the impact of lawful conduct from that of allegedly unlawful conduct, but seek to justify this failure with two new arguments. One is based on a misstatement of the undisputed facts, and the other is based on a mischaracterization of established law.

*First*, Plaintiffs assert that "It is a Disputed Fact Whether Defendants Engaged in Any Lawful Conduct." (*See* Reply at 8-10.) That is simply not true. Plaintiffs' experts have already admitted – as they must – that a substantial part of PIMCO's position was *not* wrongful.[1] For example, Merrick testified that PIMCO could have legitimately moved out of the June contract at a "leisurely" pace. (Exhibit 1 hereto: First Merrick Dep. at 297-302.) Indeed, both Pirrong and Merrick testified that PIMCO could have taken substantial *deliveries* without being manipulative. (Exhibit 2 hereto: First Pirrong Dep. at 89:8-9 ("Well, in my opinion, something on the order of 60,000, 70,000, maybe somewhat less would have been definitely not excessive."); Exhibit 3 hereto: Second Merrick Dep. at 264:13-18 ("Even if you kept 48,000 of June available to take delivery . . . they'd be responsible and non-manipulative."), 278:11-21 (testifying that 70,000 deliveries was "probably the maximum amount" that would have been non-manipulative).)

*Second*, Plaintiffs assert that it is "unnecessary, if not impossible" to present a causation analysis specific to the allegedly wrongful conduct, quoting *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 683 (E.D. Pa. 2007), *quoting LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003). (Reply at 10.) However, Plaintiffs mischaracterize both *Linerboard* and *LePage's*. *Linerboard* (an antitrust case) *did* require the plaintiffs to "isolate[] defendants' alleged collusive behavior as the cause of the alleged overcharge." 497 F. Supp. 2d at 680-82. *Linerboard* held only that the plaintiffs were not further required to isolate the particular impact of each of several allegedly illegal acts. *Id.* at 683. Similarly, in *LePage's*, the plaintiff *did* construct a but-for model that isolated the effect of the alleged wrongdoing. 324 F.3d at 165. Neither *Linerboard*

---

[1] The bulk of Section D of the Reply (at 8-10) is devoted to knocking down the strawman argument that a history of lawful conduct gives "license" to engage in unlawful conduct. Defendants' point, which Plaintiffs cannot contest, is that PIMCO is a major legitimate investor in Treasury notes and futures, quarter after quarter and year after year, and that Plaintiffs simply have no basis to suggest that PIMCO should have had *no* position in the June contract, as their analyses assume.

nor *LePage's* suggest that a plaintiff need not demonstrate that the alleged harm was caused by the unlawful as opposed to lawful conduct of the defendant. This is consistent with Seventh Circuit law. *See MCI Comms. Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant.") (emphasis in original).

## II.   PLAINTIFFS' REMAINING "REPLY" ARGUMENTS ARE WRONG.

### A.   Plaintiffs Fundamentally Mischaracterize PIMCO's "Long-Long" Position and Thereby Again Fail to Justify Avoiding the Need for a Quantitative Rigorous Analysis.

Plaintiffs seek to avoid the requirement that their experts offer some testable theory by asserting that PIMCO was both "long" the futures contract and "long" the deliverable and that parties that are "long-long" have "unfailingly" been found to have manipulated prices upward. (Reply at 7.) This is misleading because PIMCO, unlike the defendants in the cases Plaintiffs cite, *did not* control even the deliverable notes that it nominally held – because PIMCO substantially surrendered its position in the CTD notes to the market through repurchase agreements ("repos"), to the extent of having *negative* net holdings of the CTD for half of the delivery month. (Exhibit 9 hereto: Pirrong Rebuttal Report Ex. R8.) This enabled the *shorts* to have "physical" control and the ability to make deliveries.[2] *See In re Fenchurch Capital Mgmt., Ltd.*, CFTC No. 96-7, 1996 WL 382313, at *2 (CFTC July 10, 1996) ("Shorts who do not already own the security use the repo market rather than the cash market to acquire the particular

---

[2] *Cf. Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1165 (8th Cir. 1971) (noting that Cargill physically held "practically all" of the deliverable supply of wheat in Chicago warehouses); *G. H. Miller & Co. v. United States*, 260 F.2d 286, 289 (7th Cir. 1958) (noting that the defendants had physical control of the deliverable eggs, such that futures shorts wishing to make delivery were forced to buy the deliverable supply from the defendants); *In re Landon V. Butler*, 14 Agric. Dec. 429, 435 (CEA No. 65, June 20, 1955) (noting that the defendants caused the deliverable soybeans to be made "unavailable for delivery on futures"); *Great Western Food Distributors v. Brannan*, 201 F.2d 476, 478 (7th Cir. 1953) (noting that defendants "purchased and held" large quantities of the deliverable eggs and then "offered [them] for sale only at prices which made it unduly costly for shorts to purchase them for delivery"). Indeed all of these cases involved physical commodities in which repo markets were not at issue.

security needed for delivery on a futures contract. . . .  *The repo market is, therefore, the common source of supply of notes for delivery on government securities futures contracts*.") (emphasis added).

Indeed, Plaintiffs' own expert Merrick has recognized the "squeeze-ending" potential of repo lending.  (*See* Exhibit 5 hereto:  John J. Merrick Jr., et al., "Strategic Trading Behavior and Price Distortion in a Manipulated Market: Anatomy of a Squeeze," at 214-15 (describing the "squeeze-ending" offer by the Bank of England to make underlying securities available to shorts on overnight repo.).  *Compare Fenchurch*, 1996 WL 382313 at *1 ("Fenchurch exacerbated the tightness in the supply of the cheapest-to-deliver notes by increasing its position and intentionally *withholding the notes from the market*") (emphasis added).

Moreover, contrary to Plaintiffs' assertion that PIMCO somehow ignored the CBOT's warnings, PIMCO was in fact doing exactly what the regulators requested by making its CTD notes available in the repo market.  (*See* Exhibit 6 hereto:  June 8, 2005, letter from CBOT to PIMCO (stating that the CBOT "expects that PIMCO will make available in the repo market, through the contract's last delivery date, all of the cheapest to deliver security it has available").)[3]  Accordingly, the regulators, like Plaintiffs' experts, recognized the utility of making notes available on repo.[4]

---

[3] In making this argument, Plaintiffs are, once again, making statements about the regulators that contradict what they actually did, a form of misleading argument that the Magistrate Judge already had occasion to point out in his Order (at 7-8).

[4] Plaintiffs also argue that Defendants' distinction of *In re DiPlacido*, No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008), is somehow insufficient.  Defendants' point is that unlike in *DiPlacido*, the alleged manipulative conduct is not conduct that by definition had an obvious direct effect on price.  Hyperbolic references to "flagrant violations" (Reply at 5) by PIMCO are simply unsupported by the record and irrelevant here.  More broadly, Defendants do not here respond to all of Plaintiffs' inaccurate statements and misrepresentations of the record because to do so would require many pages of briefing, and these reiterations of Plaintiffs' version of the facts are simply irrelevant to the issue before the Court.

### B.   Plaintiffs Concede That Pirrong's Predictive Regression Does Not Show Causation, and Their New "Two-Step" Argument Is Unavailing.

Originally, Plaintiffs asserted that Pirrong's predictive regression, standing alone, proved PIMCO "*caused* statistically significant, truly abnormal deviations in June Contract prices." (Ob. at 2-3 (emphasis added).)  Plaintiffs have now conceded, as they must, that Pirrong's predictive regression did no such thing, but rather is simply an "estimate" of artificiality.  (Reply at 3-4.)  Plaintiffs now argue that it was just the first part of a "two-step" analysis, the second part of which is Pirrong's "contemporaneous correlation" analysis of daily price changes.  (Reply at 3-4.)

As an initial matter, Plaintiffs concede, as they must, that mere correlation does not prove causation.  (Reply at 14.)  Moreover, Plaintiffs' own theory is that "causation of the artificial price is not necessarily correlated with the time of trades."  (Ob. at 6; *see also id.* at 4 n.5 and 6 n.6.)  Accordingly, under Plaintiffs' own theory, a showing of "very high co-movement of changes in [Defendants'] positions and changes in price artificiality" (Reply at 14) would simply be irrelevant.

Finally, unable to defend their experts' analyses on the merits, Plaintiffs resort to outright misrepresentations.  Specifically, they quote Defendants' expert Hartzmark as supporting their experts' failure to link artificiality to PIMCO's allegedly wrongful conduct.  (Reply at 13.)  However, the quotation Plaintiffs attribute to Hartzmark is in fact from the deposition of their *own* expert, Professor Gilbert.  (Exhibit 4 hereto:  Second Gilbert Dep. at 35:13-16.)  What *Hartzmark* said is that Plaintiffs' experts failed to isolate the impact of PIMCO's allegedly wrongful conduct from other factors (including PIMCO's lawful conduct) because "none of the plaintiffs' experts provides a counterfactual or the but-for world, in which PIMCO makes no

allegedly manipulative trades." (Exhibit 7 hereto: Hartzmark Rebuttal Report ¶ 175.)[5]  The

very flaw Hartzmark describes is illustrated by the Plaintiffs' admitted failure to test for non-

challenged positions (*see* Section I above), but because Plaintiffs delete Hartzmark's own words

and present him as the author of what is actually Gilbert's statement, Plaintiffs' assertion

misleads in this additional critical respect as well.

   **C.    Plaintiffs' New Argument Concerning the Impact of Taking Short Positions
           Not Only Fails, but It Directly Contradicts Their Theory of the Case**

       Plaintiffs argue that the Other Large Trader decreased artificiality by opening additional

short positions in the futures contract in the face of concern about the availability of deliverable

supply.[6]  This new argument directly contradicts Plaintiffs' core theory of the case – that

artificiality was caused by a reduction in the available supply of deliverable notes relative to

large open interest in the face of a perceived threat that shorts would be required to deliver.

Plaintiffs have offered no support for the illogical proposition that taking additional short

positions could ever decrease artificiality in the world they describe, and they have consistently

argued that reducing the available supply of the CTD causes artificiality.  It is undisputed that the

Other Large Trader's net effect on the market, whether by boxing its CTD's, borrowing more, or

*adding* short positions to "justify" withholding the scarce supply of the CTD, was to reduce the

available supply of the CTD.  Thus under Plaintiffs' own theory, the Other Large Trader's

---

[5] Plaintiffs also argue that Defendants' experts endorsed the use of Granger analysis to demonstrate causation. (Reply at 15.)  In fact, however, Defendants' experts only ever performed any Granger analysis at all because Plaintiffs' expert Gilbert suggested it.  (*See* Exhibit 7 hereto: Hartzmark Rebuttal Report ¶ 43; Exhibit 8 hereto: Hanke Report at 14-15.)  Furthermore, Defendants' experts never suggested that Granger testing could ever be more than a "starting point."  (*See* Hanke Report at 15.)  Defendants have certainly never suggested that Granger testing was a reliable way to demonstrate causation.

[6] Plaintiffs assert that Defendants' argument that the withdrawal of CTD notes by the Other Large Trader caused price artificiality is "new."  (Reply at 4.)  In fact, that argument was expressly made to the Magistrate Judge, and the Plaintiffs simply failed until now to respond to it.  (PIMCO's Reply Memorandum in Support of Motion to Exclude Certain Expert Testimony of Craig Pirrong dated November 12, 2009, at 7.)

conduct could only have contributed to, not reduced, artificiality.  This is not a matter of

reasonable or "fact-centered" disagreement (Reply at 4); it is a simple self-contradiction,

inexcusably offered to avoid the impact of an earlier self-contradiction, all probative of the utter

unreliability of Plaintiffs' experts' *methods.  See, e.g.*, *Daubert v. Merrell Dow Pharms.*, 509

U.S. 579, 591 (1993) ("[S]cientific validity for one purpose is not necessarily scientific validity

for other, unrelated purposes."); *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)

("The second part of the *Daubert* analysis requires the district court to determine whether the

evidence or testimony assists the trier of fact in understanding the evidence or in determining a

fact in issue.  In other words, the suggested scientific testimony must 'fit' the issue to which the

expert is testifying.") (internal quotations and citations omitted).

### D.     Plaintiffs' New Cases Confirm That Plaintiffs' Experts Are Required to Account for Major Factors.

Plaintiffs' citations of *Bazemore v. Friday*, 478 U.S. 385 (1986) – and other cases

following *Bazemore* (Reply at 3 n.2), none of which was cited in Plaintiffs' Objections and most

of which were not even cited to the Magistrate Judge – continue to undermine, not support

Plaintiffs' assertions.  Those cases make clear that any analysis must account for all major

factors.[7]

---

[7] *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 701 n.4 (7th Cir. 2003) (citing *Bazemore* for the proposition that an analysis that *does* account for other major factors is admissible); *Cement-Lock v. Gas Tech Inst.*, 618 F. Supp. 2d 856, 870-71 (N.D. Ill. 2009) (noting only that the expert was under no obligation to exclude "*every other possible explanation* for the devaluation" and not disturbing *Bazemore*'s requirement that experts eliminate "major, obvious factors") (emphasis added); *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, No. 1:05-CV-207, 2007 WL 1850860, at *11-*12 (N.D. Ind. June 25, 2007) (permitting expert analysis that "ruled out other possible causes of the run-out" at issue, even where the expert failed to account for a secondary feature of a particular structure (insulation around a furnace)); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 733 (N.D. Ill. 2007) ("[A]n expert's causation conclusion should not be excluded because he or she has failed to rule out *every possible alternative cause*.") (emphasis added) (quoting *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 693 (8th Cir. 2001); *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 923-24 (N.D. Ill. 2006) (allowing expert analysis where the alleged error would potentially affect only a small fraction of an analysis concerning an extended 15-year period of time and did not invalidate the utility of the data for

## Conclusion

For the foregoing reasons, PIMCO and PIMCO Funds respectfully request that the Court affirm the Order of the Magistrate Judge.

Dated:  May 4, 2010                              Respectfully submitted,

                                                 By:  /s/ David Boies
                                                 _____

LATHAM & WATKINS LLP                             BOIES, SCHILLER & FLEXNER LLP
Sean M. Berkowitz                                David Boies *(pro hac vice)*
Sears Tower, Suite 5800                          333 Main Street
233 South Wacker Drive                           Armonk, New York 10504
Chicago, IL 60606                                Telephone: (914) 749-8200
(312) 876-7700

Miles N. Ruthberg *(pro hac vice)*               Robert B. Silver *(pro hac vice)*
Robert W. Perrin *(pro hac vice)*                Philip M. Bowman *(pro hac vice)*
633 West Fifth Street, Suite 4000                Boies, Schiller & Flexner LLP
Los Angeles, CA 90071-2007                       575 Lexington Avenue, 7th Floor
(213) 485-1234                                   New York, New York 10022
                                                 Telephone: (212) 446-2300

                                                 *Counsel for Defendant Pacific Investment*
                                                 *Management Company LLC*

---

other periods); *Gerlib v. R.R. Donnelley & Sons Co.*, No. 95 C 7401, 2001 WL 1313794, at *13 (N.D. Ill. Oct. 26, 2001) (allowing expert analysis where opposing party did not allege that analysis failed to consider obvious or major alternative causes).

DECHERT LLP
David A. Kotler *(pro hac vice)*
902 Carnegie Center, Suite 500
Princeton, NJ 08540
(609) 955-3200


Matthew L. Larrabee *(pro hac vice)*
Dechert LLP
One Maritime Plaza
San Francisco, CA  94111-3513
Tel:  (415) 262-4500

By:  /s/ Blake T. Hannafan

HANNAFAN & HANNAFAN, LTD.
Blake T. Hannafan
One East Wacker Dr., Suite 2800
Chicago, IL 60601
312-527-0055



*Counsel for Defendant PIMCO Funds*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 4681 |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, and PIMCO FUNDS, | ) ) ) | Hon. Ronald A. Guzman |
| Defendants. | ) ) ) | |

## APPENDIX OF EXHIBITS TO PIMCO AND PIMCO FUNDS' SUR-REPLY TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE KEYS' MEMORANDUM OPINION AND ORDER, DATED MARCH 10, 2010, EXCLUDING CERTAIN TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES

**Exhibit 1**: Excerpt from the First Deposition of John J. Merrick, Jr. on March 29, 2007

**Exhibit 2**: Excerpt from the First Deposition of Craig Pirrong, Ph.D. on March 27, 2007

**Exhibit 3**: Excerpt from the Second Deposition of John J. Merrick, Jr. on July 16, 2007

**Exhibit 4**: Excerpt from the Second Deposition of Christopher L. Gilbert on July 19, 2007

**Exhibit 5**: John J. Merrick, Jr., Narayan Y. Naikb, Pradeep K. Yadavc, "Strategic Trading Behavior and Price Distortion in a Manipulated Market: Anatomy of a Squeeze"

**Exhibit 6**: Letter dated June 8, 2005, from the CBOT Business Conduct Committee to PIMCO

**Exhibit 7**: Excerpt from the Rebuttal Report of Michael L. Hartzmark, Ph.D. dated August 24, 2007

**Exhibit 8**: Excerpt from the Report of Steve H. Hanke dated April 20, 2007

**Exhibit 9**: Exhibit R8 from the Rebuttal Report of Craig Pirrong, Ph.D. dated May 21, 2007

# EXHIBIT  1

Merrick, John 03/29/07

page 1


```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4    JOSEF A. KOHEN, BREAKWATER          )

 5    TRADING, LLC, and RICHARD HERSHEY, )

 6                         Plaintiffs, )

 7          vs.                         ) No. 05 C 4681

 8    PACIFIC INVESTMENT MANAGEMENT      )

 9    COMPANY, LLC, and PIMCO FUNDS,     )

10                         Defendants. )

11

12       - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER -

13

14          The deposition of JOHN J. MERRICK, JR.,

15    called as a witness for examination, taken pursuant

16    to the Federal Rules of Civil Procedure of the

17    United States District Courts pertaining to the

18    taking of depositions, taken before PAULINE M.

19    VARGO, a Notary Public within and for the County

20    of DuPage, State of Illinois, and a Certified

21    Shorthand Reporter of said state, C.S.R. No.

22    84-1573, at Suite 3700, One South Dearborn Street,

23    Chicago, Illinois, on the 29th day of March, A.D.

24    2007, at 9:00 a.m.
```


page 1

Merrick, John 03/29/07

page 296


1    the repo market, those could generate market color?

2        MS. WEDGWORTH:  Objection.

3    BY THE WITNESS:

4        A.    In the same way that any -- I think if

5    you had a trade and any important trade could

6    generate market color, I agree.

7    BY MR. NISSEN:

8        Q.    And in your view, would the trades of

9    any trader that's turned his real money generate

10   market color?

11       A.    Again, what's going to generate market

12   color is the important trades of the day.  So if

13   you are doing an important trade that everybody

14   needs to know about the flow, it will generate

15   market color, so we are now to the subset of people

16   who have done important trades.

17       Q.    Do you have an opinion -- or strike

18   that.  What is your opinion as to at what point

19   in time PIMCO should have liquidated its entire

20   futures position?

21       A.    I am happy that you gave me an open-

22   ended question, and I will repeat the answer I had

23   earlier.

24             When they -- when their bottom analysis


page 296

Merrick, John 03/29/07

page 297


 1   was that someone was squeezing the September

 2   contract came up and they did their analysis and

 3   sat down and started discussing on May 9th, the

 4   result of that discussion should have been "We have

 5   to move out of futures and into other issues.

 6   Let's start because there is no payoff to waiting."

 7            So a reasonable portfolio manager at

 8   that point would have started doing basis trades

 9   out of June into other issues and continued in a

10   leisurely pace doing the trades they thought were

11   reasonable, and come time to the roll week, roll,

12   and continue doing those trades until they got out

13   of futures.  That's how I view the market.

14            Futures have been very, very good to

15   PIMCO over the years.  Here is one situation where

16   they are not so good.  It's time to move out, and

17   just do it in a professional way that's responsible

18   to the market.  They chose to engineer a squeeze,

19   and it's dishonorable contact -- conduct, and we

20   are here today because of that.

21       Q.   By what date is it your opinion PIMCO

22   should have been totally out of futures contracts?

23       A.   I wouldn't even have done -- I would not

24   set a date.  I think responsible behavior could


page 297

Merrick, John 03/29/07

page 298


1    have been to lighten the load dramatically from

2    May 9th into the roll week and then just roll into

3    September and then start moving out.  So, I mean,

4    that would have been a reasonable trading strategy.

5         Q.    When is the roll week?

6         A.    I would say it's probably, let's say,

7    the last ten days of the month and could go into

8    the -- you know, mid month things start.  It could

9    go into the beginning of June as well, there would

10   be some liquidity, but I would say probably in this

11   case, it probably started, you know, after the

12   15th.  Say the 15th.

13        Q.    The roll week started the 15th?

14        A.    I am going to give you two weeks.  But

15   let's say starting the 15th there would have been

16   some interest in doing rolls and then maybe from

17   the 20th on, probably more activity.

18        Q.    Well, you used the term "roll week,"

19   which sounded like it's a term that is used.

20        A.    The period in which there is some

21   liquidity in the roll, and I think I could pinpoint

22   it if we had data.  Certainly if we had data where

23   the open interest crossed from June to -- actually,

24   I have got here.


page 298

Merrick, John 03/29/07

page 299


1              I am just going to think in my head, so
2      don't type.
3              So total open interest in June started
4      to decline 32 days prior to the last day of
5      trading, so that would be 21 days of June and 11
6      days.  So let's say May 20 is when open interest in
7      June started to go down total, so I would say
8      that's when people started rolling, May 20.
9        Q.   So your testimony, even though you used
10     the term "roll week," it's more than a week?
11       A.   I would say it's a period.  Let's just
12     say a period.
13       Q.   But is "roll week" a term that's used in
14     the industry?
15       A.   I think the roll period.  I am going to
16     pass on that question.  I will just say when the
17     roll is done, and in this case from the 20th to
18     the end of the month is probably -- is probably the
19     time.  It probably is used, but it's late in the
20     day.  Sorry.
21       Q.   So your testimony is PIMCO should have
22     liquidated between May 9 and May 20, and then
23     during this roll period from May 20 to the end of
24     May, they should have liquidated entirely, is that


page 299

Merrick, John 03/29/07

page 300


 1    your testimony?

 2         MS. WEDGWORTH:  Objection.

 3    BY THE WITNESS:

 4         A.    That's not my testimony.  My testimony

 5    was there was a clear alternative that a

 6    responsible long who has a huge position could have

 7    enacted, and that would have been at the time they

 8    figured out that September was not a place that

 9    they wanted to be, begin the process of moving out

10    of June futures into a variety of other assets, and

11    that's what a responsible long would do.

12              I don't think I have to put any dates on

13    anything except that whatever the market gave you

14    in terms of good executions to move from June

15    futures to other interesting assets, do it, and

16    then when you come into the latter part of May, you

17    have the opportunity to move from June into

18    September and then continue doing basis trades out

19    of September into whatever assets that you were

20    interested in.

21              So there is no -- I guess in my view,

22    there is no time limit in terms of PIMCO's ability

23    to get out of futures and into attractive cash

24    assets.


page 300

Merrick, John 03/29/07

page 301


1  BY MR. NISSEN:

2      Q.    So you have no opinion as to whether --

3  well, first of all, is it your opinion PIMCO should

4  have liquidated all of its futures positions in the

5  June contract rather than take delivery on any of

6  them?

7      A.    I don't think it's a part of their

8  business to take delivery on a small part of a

9  futures contract, a small part of the futures

10  contract.  I mean, it is one of the options they

11  had.

12          If they took a responsible share of the

13  average amount of deliveries, that's fine.  It's

14  typically not their -- I would think that someone

15  who is a major player, that would not be the first

16  thing that they would -- well, I take it back.

17  Taking a responsible amount of delivery in an

18  average total delivery cycle is certainly something

19  they could have done.

20      Q.    But what is it in your opinion that

21  PIMCO should have done so as not to have engaged in

22  the manipulation that you say they engaged in with

23  respect to the short futures position?

24      A.    With respect to their long futures


page 301

Merrick, John 03/29/07

page 302

1   position.

2       Q.    Yes.  Let me rephrase.  I am just

3   looking for the date by which -- and haven't you

4   given the opinion that they had ample opportunity?

5       A.    Yeah, that's what I have been saying.

6   Starting on May 9th they had ample opportunity.

7   If you want me to be specific, I will say that one

8   scenario, one scenario is that starting on May 9th

9   they should have been selling their -- begin basis

10  trading out of June futures into a set of different

11  assets, perhaps some Treasury assets, perhaps some

12  mortgage assets, corporate assets, swaps, and then

13  in the middle of the roll week, which we now might

14  say is -- or then during each day of this roll

15  period beginning May 20th, move whatever remainder

16  into September contracts temporarily, and then by

17  the time that September is the front month,

18  continue to be in the liquid part of the futures

19  contract and then continue to do this move out of

20  futures and into cash.

21      Q.    So under that scenario would PIMCO have

22  liquidated all its futures before June 1st, 2005?

23      A.    It need not to.  Oh, their June futures?

24      Q.    Yes.

page 302

Merrick, John 03/29/07

page 303


1       A.    I would say by that time you would have

2   had the opportunity to do the roll, and so in my

3   world I would have been in the front month by the

4   time the front month was front.

5       Q.    Given the fact -- or let's assume the

6   fact that Citadel was going to make delivery on

7   75,000 contracts plus because it had the securities

8   in the box, it had the short futures contracts.

9   Then if you assume that Citadel was going to make

10  those deliveries, then someone would have had to

11  take 75,000 contracts from Citadel; isn't that

12  right?

13      A.    I'd start from scratch.  If on May 9th

14  PIMCO went through the scenario I suggested, the

15  futures would be perfectly priced off the

16  cheapest-to-deliver, Citadel would not be

17  interested in selling any more, adding to their

18  short futures positions and making delivery or

19  boxing the bonds.  None of that would have

20  happened.

21      Q.    That's not my question.  I am asking you

22  to assume that Citadel was going to deliver 75,000

23  contracts, which is what they did in the real

24  world, and I am asking you if you make that


page 303

# EXHIBIT  2

Pirrong, Craig 03/27/07

page 1


1               IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4

5    JOSEF A. KOHEN, BREAKWATER          )

6    TRADING LLC, and RICHARD HERSHEY,   )

7            Plaintiffs,                 )

8        vs.                             ) No. 05 C 4681

9    PACIFIC INVESTMENT MANAGEMENT       )

10   COMPANY LLC, and PIMCO FUNDS,       )

11           Defendants.                 )

12

13    THIS DEPOSITION CONTAINS CONFIDENTIAL INFORMATION

14

15           The deposition of CRAIG PIRRONG, Ph.D.,

16   called for examination, taken pursuant to the

17   Federal Rules of Civil Procedure of the United

18   States District Courts pertaining to the taking of

19   depositions, taken before KRISTIN C. BRAJKOVICH, a

20   Certified Shorthand Reporter, CSR. No. 84-3810, of

21   said state, at Suite 3700, One South Dearborn

22   Street, Chicago, Illinois, on the 27th day of

23   March, A.D. 2007, at 9:04 a.m.

24


page 1

Pirrong, Craig 03/27/07

page 88

1   BY THE WITNESS:

2       A.    Yes.  As arguably the most efficient

3   deliverer in the marketplace or one of the most

4   efficient deliverers, by holding on to this note,

5   it was more costly for other less efficient

6   deliverers to make delivery.

7   BY MR. NISSEN:

8       Q.    What are too few futures contracts to

9   liquidate, as referred in paragraph 32 of your

10  written report?

11      A.    Well, essentially, liquidations and

12  deliveries are the mirror image of one another.  If

13  one takes too many deliveries, given the size of

14  one's position, that means one has liquidated too

15· few contracts.  Differently from an economics

16  perspective, the price of the contract liquidated

17  is in excess of the marginal value of what is

18  delivered.  That would be a clear indicia of

19  excessive deliveries and, similarly, liquidation of

20  an insufficient number of contracts.

21      Q.    What was the number, in your opinion,

22  for the June 2005 contract that constituted

23  excessive deliveries?

24      A.    The deliveries that were made were

page 88

Pirrong, Craig 03/27/07

page 89


1    excessive, in my opinion, of 132,000 or more than

2    that.  I'll have to look in the report to get the

3    exact number, but more than 130,000-some contracts.

4    In my opinion, that was an excessive number of

5    deliveries.

6         Q.    And what was the largest number that

7    would not have been excessive?

8         A.    Well, in my opinion, something on the

9    order of 60,000, 70,000, maybe somewhat less would

10   have been definitely not excessive.

11        Q.    So in the March '05 contract, was taking

12   delivery of more than 70,000 excessive?

13        A.    Yes.  In my opinion, there was indicia

14   that the March price was high.  In particular, that

15   the marginal value, early March futures contract

16   was higher than the marginal value of what was

17   delivered against the March contract.

18        Q.    And so the party that took delivery in

19   the March contract, in your opinion, took excessive

20   deliveries; is that right?

21        MS. WEDGWORTH:  Objection.

22   BY THE WITNESS:

23        A.    Again, in my opinion, there were

24   excessive deliveries on that contract, that


page 89

Pirrong, Craig 03/27/07

page 90


 1    deliveries were taken that were uneconomic, and so

 2    yes.

 3    BY MR. NISSEN:

 4         Q.    And, to your knowledge, there has been

 5    no charge by any regulatory authority of

 6    manipulation of the March '05 contract, has there?

 7         A.    Not to my knowledge, no.

 8         Q.    And how does one, when one is deciding

 9    whether to liquidate, decide whether the marginal

10    cost for someone else is greater?

11         MS. WEDGWORTH:  Objection.

12    BY THE WITNESS:

13         A.    The marginal cost of what verse who else

14    is greater?  I'm just asking you to be -- I want to

15    make sure that my answers are very responsive and

16    very informative, so if I ask for clarification, it

17    is not to annoy you, sir.  It is to try to make

18    sure that I'm answering the question that you

19    really want to ask.

20    BY MR. NISSEN:

21         Q.    You testified that deliveries become

22    excessive when the marginal costs of getting the

23    deliverable goes up; is that right?

24         A.    That's not what I testified.


page 90

# EXHIBIT  3

Merrick, John 07/16/07

page 1


```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4     JOSEF A. KOHEN, BREAKWATER      )

 5     TRADING, LLC and RICHARD        )

 6     HERSHEY,                        )

 7                 Plaintiffs,         )

 8          vs.                        )  No. 05 C 4681

 9     PACIFIC INVESTMENT              )

10     MANAGEMENT COMPANY, LLC,        )

11     PIMCO FUNDS and JOHN DOES       )

12     1-100,                          )

13                 Defendants.         )

14              C O N F I D E N T I A L

15          The deposition of JOHN J. MERRICK, JR.,

16     called as a witness for examination, taken pursuant

17     to the Federal Rules of Civil Procedure of the

18     United States District Courts pertaining to the

19     taking of depositions, taken before VICTORIA C.

20     CHRISTIANSEN, a Notary Public within and for the

21     County of DuPage, State of Illinois, and a

22     Certified Shorthand Reporter of said state, CSR

23     No. 84-3192, at Suite 3800, One South Dearborn

24     Street, Chicago, Illinois, on the 16th day of July,
```

page 1

Merrick, John 07/16/07

page 263


1    to be manipulative.  That's what I want to know.

2              If it's 24,000, if it's zero, whatever

3    it is, please -- please give us --

4        A.    Okay.  Let me just think, just look

5    through this.

6                   (WHEREUPON, there was a short

7                    interruption.)

8    BY THE WITNESS:

9        A.    Just on the back of the envelope, I

10   would say if PIMCO took 48,000 contracts, that's a

11   two standard error deviation from the -- let's

12   assume the rest of the market takes 24,000, because

13   that's what they do on average without PIMCO, and

14   if we cede PIMCO the entire two standard error

15   itself, that's 48,000 contracts.

16             I mean, to me, that's a large strategic

17   trade, but it's certainly within the realm of the

18   numbers.  That would be again a very large total,

19   and now we're up to 72,000 as the total deliveries,

20   PIMCO taking two-thirds of it.

21             I don't -- you know, I would think that

22   that would be a reasonable large delivery, unusual,

23   not controlling.

24             I hope I answered.


page 263

Merrick, John 07/16/07

page 264


1   BY MR. NISSEN:

2       Q.    Okay.  So when in your opinion should

3   PIMCO have reduced its total position to no greater

4   than 48,000 contracts?

5       MS. WEDGWORTH:  Objection.

6   BY THE WITNESS:

7       A.    It's a very different -- I mean, it's --

8   again, I'm on the record to say that they should

9   have been reducing their positions as of May 9, and

10  by the time they got into the roll period, whatever

11  they hadn't reduced I would have rolled the rest to

12  September.

13           Even if you kept 48,000 of June

14  available to take delivery, roll the rest then into

15  September, and I think that would be very

16  reasonable.  It would be, you know, one way out of

17  an unattractive situation to them and life would go

18  on and they'd be responsible and non-manipulative.

19  BY MR. NISSEN:

20      Q.    So it's your testimony that PIMCO should

21  have been out of all but 48,000 contracts by May

22  31, is that correct?

23      MS. WEDGWORTH:  Objection.

24  BY THE WITNESS:


page 264

Merrick, John 07/16/07

page 265


```
 1      A.    We're talking about a general guideline
 2   which would be sensible to me as an ex-trader and
 3   someone who's evaluating manipulative vulnerability
 4   and so forth.
 5            I'm not proscribing anything.  I would
 6   think that's a very reasonable outcome that would
 7   make some sense, and certainly had they done that,
 8   they would have not had any of the -- the -- we
 9   wouldn't have seen any of these artificial crazy
10   prices of 88 cents rich.
11   BY MR. NISSEN:
12      Q.    But --
13      A.    And again, I would also say that all of
14   those unwinds would be in other Treasury bills, not
15   the Feb 2012s.  Having 4.8 billion of Feb 2012s
16   would be enough.  It would be double what they used
17   to have -- more than double what they were -- their
18   highest amount of CTD cash issue before from what's
19   been represented to me.
20      Q.    So it's your testimony that to be
21   non-manipulative, PIMCO would not need to reduce
22   its cash position on the February 2012 but should
23   not increase it and should also reduce its futures
24   contract by May 31 to 48,000 or less, is that
```

page 265

Merrick, John 07/16/07

page 277

1        Q.     Thank you.

2               Now, so the -- is it true, then, in your

3    view, that taking more than 70,000 contracts into

4    the delivery month was manipulative on the part of

5    PIMCO?

6        MS. WEDGWORTH:  Objection.

7    BY MR. NISSEN:

8        Q.     Is that the case?

9        A.     No.  My -- I think we've got 70,000, if

10   we want to retrace, as being the amount that they

11   would -- sort of a maximum amount that would be

12   consistent with taking delivery and maybe not be

13   suspicious after the fact.

14              We've talked about deliveries.  We did

15   not talk about what we took into June.  That's what

16   we talked about, deliveries.

17       Q.     But you testified, didn't you, that

18   PIMCO should have reduced by May 31 its position to

19   70,000 contracts?

20       MS. WEDGWORTH:  Objection.

21   BY THE WITNESS:

22       A.     That was one of many plans.

23              I'll devise another plan for you.  When

24   do we want to have the 70,000?  Give me a day and

page 277

Merrick, John 07/16/07

page 278


1    then I'll do the math again.

2    BY MR. NISSEN:

3        Q.    You're the one criticizing PIMCO.  I'd

4    like you to say --

5        A.    I told you exactly what I'd do.  You

6    have 15 days, blow out 20,000 contracts a day.

7        Q.    But I'm not asking for how you would do

8    things; I'm asking:  What do you view as

9    non-manipulative by PIMCO?

10       A.    And I --

11       Q.    Assume PIMCO wants to take the maximum

12   amount into delivery and maintain its options as

13   long as possible.

14             What's the maximum amount -- and I think

15   you've testified that 70,000 contracts is the

16   maximum amount.

17             Is that wrong?

18       MS. WEDGWORTH:  Objection.

19   BY THE WITNESS:

20       A.    That's -- that's the -- I would say

21   that's probably the maximum amount, yeah.

22   BY MR. NISSEN:

23       Q.    And it's your opinion they should have,

24   in order to be non-manipulative, been out of

Merrick, John 07/16/07

page 279


 1   everything but 70,000 by May 31, correct?

 2       MS. WEDGWORTH:  Objection.

 3   BY THE WITNESS:

 4       A.    I think even -- I think they should have

 5   not done anything to signal their intentions about

 6   standing for a manipulative outsized delivery, so

 7   that's the first thing.  They shouldn't have done

 8   anything that would have signaled intentions.

 9            I've given them a plan.  I've done some

10   very simple calculations not with the idea of

11   micromanaging but with the goal of getting down to

12   that type of figure, and I think we just decided

13   you could do that with 15,000 contracts a day to

14   get down to 70 or do 20,000 contracts a day and get

15   completely out of the position, and I think it's --

16   that's a very straightforward answer to your

17   question.

18            I'm giving you numbers and I'm giving

19   you days and I'm giving you a scenario.  I can't

20   give you anything more than that.

21   BY MR. NISSEN:

22       Q.    So you can't say what the maximum

23   contracts were that would be non-manipulative by

24   PIMCO, is that right?

# EXHIBIT 4

Gilbert, Christopher 07/19/07

page 1


```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                      EASTERN DIVISION

 4

 5   JOSEF A. KOHEN, BREAKWATER        )

 6   TRADING LLC, and RICHARD HERSHEY, )

 7            Plaintiffs,              )

 8       vs.                          ) No. 05 C 4681

 9   PACIFIC INVESTMENT MANAGEMENT     )

10   COMPANY LLC, and PIMCO FUNDS,     )

11            Defendants.              )

12

13    THIS DEPOSITION CONTAINS CONFIDENTIAL INFORMATION

14                 The deposition of CHRISTOPHER LESLIE

15   GILBERT, called for examination, taken pursuant to

16   the Federal Rules of Civil Procedure of the United

17   States District Courts pertaining to the taking of

18   depositions, taken before KRISTIN C. BRAJKOVICH, a

19   Certified Shorthand Reporter, CSR. No. 84-3810, of

20   said state, at Suite 3800, One South Dearborn

21   Street, Chicago, Illinois, on the 19th day of July,

22   A.D. 2007, at 8:04 a.m.

23

24
```

page 1

Gilbert, Christopher 07/19/07

page 34

1      Q.     We can look at it, but just as a general

2   matter, do you recall saying that you would do a

3   statistical analysis to show artificiality?

4      A.     Yes.

5      Q.     And have you done a statistical analysis

6   to show artificiality here?

7      A.     No.

8      Q.     And why not?

9      A.     Because I have not been asked by

10  plaintiffs to do so.

11     Q.     Are you offering an opinion that prices

12  were artificial?

13     A.     I'm offering a very specific opinion in

14  this rebuttal report, and the specific opinion I'm

15  offering is that plaintiffs -- sorry -- the

16  defendants' actions were causally determinate of

17  changes in the price of the June future, changes in

18  the price of the February 2012 note, and the

19  richness of the June future.  That is the specific

20  opinion I'm offering in this rebuttal report.

21     Q.     And I understand that.  We will get into

22  those points.

23            As I read your class certification

24  report, you said that you could conduct an analysis

page 34

1    to demonstrate artificiality.  Am I correct that

2    you have not studied artificiality to prove

3    artificiality here?

4        A.    I have not been asked to do that, and I

5    have not done that.

6        Q.    Now, in other manipulation cases, you

7    use something called the but-for test?

8        A.    Yes.

9        Q.    What is a but-for test?

10       A.    In those circumstances, I have built a

11   model of the relevant market, and one of the

12   components of that model has been the manipulators'

13   allegedly manipulative positions.  In the but-for

14   test, one simulates the estimated model, setting

15   the manipulative position's variable or variables

16   to zero.

17            This then generates a price path, which

18   one argues is the price which would have existed

19   but for the manipulative actions.

20       Q.    And is that -- have you used that

21   but-for analysis in every other manipulation case

22   that you have worked on?

23       A.    No.

24       Q.    In which ones haven't you?

Gilbert, Christopher 07/19/07

page 36


1       A.      There was a case in the British courts

2    which, in relation to Sumitomo, in the period

3    following June 1996 when the Sumitomo manipulation

4    terminated.  At that time Sumitomo asked Goldman

5    Sachs to take over their large position in copper

6    and to get rid of this in the least unprofitable

7    way, shall we say, that was possible.

8                And Goldman Sachs did that over the

9    subsequent nine months, and some market

10   participants alleged that Goldman Sachs manipulated

11   the London Metal Exchange, LME, copper market over

12   that period, so from June 1996 to March 1997.  And

13   I looked at that, and I did not perform a but-for

14   analysis in the way which I have outlined.  Okay.

15       MR. GRUSH:  Okay.  I would like to mark as the

16   next exhibit, 57, a copy of your deposition

17   transcript earlier in this case.

18                      (WHEREUPON, a certain document

19                       was marked Defendants' Deposition

20                       Exhibit No. 57, for

21                       identification.)

22   BY MR. GRUSH:

23       Q.      Do you recognize Defendant Exhibit 57 as

24   a copy of your deposition transcript from this


page 36

# EXHIBIT  5



Available online at www.sciencedirect.com

SCIENCE ⓓ DIRECT°



JOURNAL OF
Financial
ECONOMICS

Journal of Financial Economics 77 (2005) 171–218

www.elsevier.com/locate/econbase

# Strategic trading behavior and price distortion in a manipulated market: anatomy of a squeeze ☆

John J. Merrick Jr[a,*], Narayan Y. Naik[b], Pradeep K. Yadav[c]

[a]Zicklin School of Business, Baruch College, New York 10010, USA
[b]London Business School, Sussex Place, Regent's Park, London NW1 4SA, UK
[c]Lancaster University Management School, Bailrigg, Lancaster, LA1 4YX, UK

Available online 23 February 2005

## Abstract

This paper investigates an attempted delivery squeeze in a bond futures contract traded in London. Using cash and futures trades of dealers and customers, we analyze their strategic trading behavior, price distortion, and learning in a market manipulation setting. We argue that marked differences in settlement failure penalties in the cash and futures markets create conditions that favor squeezes. We recommend that regulators require special flagging of forward term repurchase agreements on the key deliverables that span futures contract maturity dates, and that exchanges mark-to-market

☆We are very grateful to the Financial Services Authority (FSA) for providing us data on government bond dealers' positions and trades. We thank the Bank of England and Alfredo Bequillard of Lehman Brothers for providing Gilt price data. We are grateful to Centre for Hedge Fund Research and Education at the London Business School for financial support. We thank Sharon Dittrich and Munir Dauhajre of Merrill Lynch and Daniel Grumbacher of the CBOT for helpful discussions, and George Oldfield, William Silber, and Wanda Wallace for useful comments. We are grateful to Steve Figlewski, Francis Longstaff, Pete Kyle, Kjell Nyborg, Stephen Craig Pirrong, Ilya Strebulaev, Avanidhar Subrahmanyam, S. Viswanathan, John Whitmore, participants at the EFA 2002 meetings in Berlin, and WFA 2003 meetings in Los Cabos for many useful comments. We are thankful to Purnendu Nath and Rajesh Sivaraman for excellent research assistance. This research was undertaken while Pradeep Yadav was visiting the Stern School of Business at New York University 2001 to 2002 and the Anderson School of Business at UCLA 2002 to 2003.
*Corresponding author.
    E-mail address: john_merrick@baruch.cuny.edu (J.J. Merrick Jr).

0304-405X/$ - see front matter ⓒ 2004 Published by Elsevier B.V.
doi:10.1016/j.jfineco.2004.10.004

*J.J. Merrick Jr et al. / Journal of Financial Economics 77 (2005) 171–218*     213

with access to uncollateralized sources of funds. In such circumstances, LIBOR should become the marginal financing rate in Equation (10). Since LIBOR is higher than the repo rate, the futures price should increase (rather than decrease) relative to that of the *cdi*1 during periods when squeeze concerns arise. Thus, evidence that LIBOR replaces repo as the relevant marginal financing rate during the squeeze episode provides a direct test of the valuation significance of the asymmetric penalties for failed settlements between cash and futures markets.

Fig. 9a plots three interest rate series: the general collateral repo rate, LIBOR, and the implied repo rate (i.e., the break-even financing rate implied by the relative prices



Fig. 9. (a) plots the LIBOR rate, the general collateral rate, and the implied repo rate (in %) during the sample period (from September 1, 1997 to March 4, 1998). (b) plots the mispricing of futures contract under two scenarios: first, when the financing rate is the general collateral rate, and second, when the financing rate is LIBOR.

of the *cdi*1 and March 98 futures). Up until January 20, 1998, the difference between the implied repo rate and LIBOR has a mean of $-0.34\%$ (*t*-statistic: 26.1). The difference between the implied repo rate and the general collateral rate has a mean of $-0.05\%$ (*t*-statistic: 4.06). After January 20, 1998, these mean differences equal $-0.006$ (*t*-statistic:$-0.47$) and 0.45 (*t*-statistic 30.4), respectively. Thus, up until January 20, 1998, the implied financing rate was slightly smaller than but significantly closer to the general collateral rate than LIBOR. Thereafter, instead of decreasing (as if the *cdi*1 had turned special due to futures-delivery related high demand), the implied financing rate increased and became statistically indistinguish-able from LIBOR. This result clearly reveals that during the latter part of the squeeze, the marginal arbitrageurs financed their cash market position using an uncollateralized source of funding rather than the repo market.

Fig. 9b sheds more light on this issue by plotting two measures of futures mispricing based upon two alternative financing rates. The first measure assumes that the financing rate is the general collateral rate; the second measure uses LIBOR. After January 20, 1998, the March 98 futures contract appears overpriced relative to the repo-based funding calculations, while it seems to be fairly priced relative to the LIBOR-based funding calculation. The average daily overpricing with repo-based calculation equals 0.035% (*t*-statistic: 11.5) while that with LIBOR equals $-0.002\%$ (*t*-statistic: $-1.35$). These findings provide strong evidence of the importance of settlement nonperformance penalties in determining the behavior of arbitrageurs and market prices.

### 7.3. Squeeze-ending action by the Bank of England

Interestingly, the specific action taken by the Bank of England to end the squeeze also illustrates the importance of the differences in settlement nonperformance penalties between cash and futures markets in squeeze facilitation. Concerned about the distortions generated by the squeeze attempt, the Bank of England introduced an innovative noninvasive policy response via a temporary change in its repo policy. On February 16, 1998, the Bank of England released a press notice concerning "market developments in 9% Treasury Loan 2008 and the long gilt future contract on LIFFE". The following is an excerpt from that press notice:

*The Bank of England continues to monitor market developments in 9% Treasury Loan 2008 and the long gilt future contract on LIFFE. It recognizes that there is concern that some market participants may fail to be delivered stock due for repurchase under repo agreements and intended for delivery into the long gilt future. In order to forestall any market disruption resulting from significant failed trades or returns, the Bank of England is prepared to make supplies of the stock available from 23 February, on overnight repo only, to any gilt-edged market maker (GEMM) who has been subject to a failed return or delivery of stock, or has a customer who has been subject to a failed return or delivery of stock. HM Treasury will issue further amounts of this stock for this purpose.... The repo rate applying to any stock made available through this facility will be 0%.*

Note the ingenuity of the Bank of England's offer. The fact that the repo rate on the newly available quantities of gilts was set at 0% did not change the profit or loss or other incentives for any dealer or customer versus the alternative of failing in cash market settlement. The incremental supply of bonds would simply replace any quantity cornered by the squeezers through strategic repo fails. Thus, the Bank of England's action was targeted narrowly at addressing the asymmetries between settlement nonperformance penalties in the cash and futures markets. As Fig. 2 shows, the price distortion, the butterfly yield spread, and the implied squeeze probability all fell towards their "normal" values after the Bank's announcement. The squeezers were relying on the exceptionally high costs of failing in the futures market to force shorts to capitulate as the delivery date approached. The Bank's narrow action removed futures delivery fail risk, eliminated the fear of the additional LIFFE delivery fail penalties, and ended the squeeze.

One puzzle does remain. While the 9% 2008 cash issue re-priced back towards normal no-squeeze equilibrium levels after the Bank of England's policy change, March 98 futures remained slightly overpriced relative to cash on the basis of the cash-and-carry arbitrage relationship. In Fig. 9b, the deviation of the futures price from its repo-generated cash-and-carry arbitrage value remained about +0.02% of par value. We interpret this as a premium that the market was willing to pay for an option on "irrational" March 9th delivery behavior. Recall that the 9% 2008 was no longer eligible for delivery after the March 9th delivery date. Once the 9% 2008's eligibility ended, the price of the March 98 futures would jump 2% to reflect the new deliverable: the 8% 2009. Apparently, some market participants were willing to overpay for March 98 futures even after the squeeze threat vanished in the hope that some contract shorts would "forget" to deliver on March 9, 1998. Speculators on delivery irrationality were willing to pay +0.01% to +0.02% of par value on a lottery ticket that had a potential payoff of +2.00% of par value. However, in the end, rational delivery behavior reigned. Indeed, 92,401 contract deliveries were made using the *cdi*1 prior to the close of its eligibility window. These deliveries absorbed an amazing 82.4% of the outstanding par value of *cdi*1. No cash market gilt fails occurred and the Bank of England's special repo facility was never used.

## 8. Concluding remarks

This paper examines the strategic trading behavior of major market participants during an attempted delivery squeeze in a bond futures contract traded on the LIFFE. Our study investigates both the price distortions and trading positions of major market participants involved in the market-manipulation episode and identifies the particular institutional features that give an important endgame advantage to squeezers in futures markets. We present empirical evidence on the strategic trading behavior of major market participants (both dealers and customers), and demonstrate how learning takes place in a market-manipulation setting. We document how market prices and market depth were distorted and estimate the profits of strategic traders during different phases of the squeeze.

Finally, we present evidence in support of implications of certain models of trading volume and short squeezes.

From a regulatory perspective, this paper has several messages. First, regulators and exchanges need to be concerned about ensuring that manipulative squeezes do not take place. Squeezes entail severe price distortions and also some erosion of market depth, both of which randomly penalize hedgers. Second, regulatory reporting should require flagging of trades such as the forward term repo trades on the key deliverable issues underlying the futures contracts. Under current reporting systems, these trades can go undetected. Third, exchanges and regulators should be concerned about the fact that the marked differences in the penalties for settlement failures in the cash and futures markets create conditions that engender squeezes. Finally, futures exchanges should remove the sources of opportunities for engineering squeezes. Towards this end, the exchanges should mark-to-market the specifications of their bond contracts much more frequently than they do at present, so that the prevailing market conditions do not differ dramatically from those assumed in the calculation of conversion factors. Moreover, the futures exchanges should explore the possibility of redefining their bond futures contract to be cash-settled on a basket of traded bonds, rather than requiring physical delivery against a contract specified on a bond with a notional coupon and maturity.

## References

Agarwal, V., Naik, N., 2004. Risks and portfolio decisions involving hedge funds. Review of Financial Studies 17, 63–98.

Anderson, N., Sleath, J., 2001. New estimates of the U.K. real and nominal yield curves. Bank of England.

Barnhill, T., 1990. Quality option profits, switching option profits, and variation margin costs: an evaluation of their size and impact on Treasury bond futures prices. Journal of Financial and Quantitative Analysis 25, 65–86.

Boyle, P., 1989. The quality option and timing option in futures contracts. Journal of Finance 44, 101–113.

Brown, S., Goetzmann, W., Park, J., 1998. Hedge funds and the Asian currency crisis of 1997. Journal of Portfolio Management.

Chance, D., Hemler, M., 1993. The impact of delivery options on futures prices: a survey. Journal of Futures Markets 13, 127–155.

Chaumeton, L., Conner, G., Curds, R., 1996. A global stock and bond model. Financial Analysts Journal 65–74.

Chatterjee, A., Jarrow, R., 1998. Market manipulation, price bubbles, and a model of the U.S. Treasury securities auction market. Journal of Financial and Quantitative Analysis 33, 255–290.

Cooper, D., Donaldson, R., 1998. A strategic analysis of corners and squeezes. Journal of Financial and Quantitative Analysis 33, 117–137.

Copeland, T., 1976. A model of asset trading under the assumption of sequential information arrival. Journal of Finance 31, 1149–1168.

Cornell, B., Shapiro, A., 1989. The mispricing of U.S. Treasury securities auction market. Review of Financial Studies 2, 297–310.

Coval, J., Shumway, T., 2001. Is sound just noise? Journal of Finance 56, 1887–1910.

Duffie, D., 1996. Special repo rates. Journal of Finance 51, 493–526.

Dunn, K., Spatt, C., 1984. A strategic analysis of sinking fund bonds. Journal of Financial Economics 13, 399–423.

Epps, T., 1975. Security price changes and transaction volumes: theory and evidence. American Economic Review 65, 586–597.

# EXHIBIT  6

June 8, 2005

Jim Keller
Pacific Investment Management Co.
840 Newport Center Dr.
Newport Beach, CA 92660

Fax: 949-718-2612

Dear Mr. Keller,

As you know, the staff of the Office of Investigations and Audits, in consultation with the Business Conduct Committee, has been closely monitoring the position held by PIMCO in the June 2005 Ten Year Treasury Note contract which expires on June 21, 2005.

PIMCO currently holds a large long position in the contract, representing in excess of 50% of the contract's open interest. PIMCO also holds significant repo and cash positions in the cash security that is cheapest to deliver into this contract.

Given the size and concentration of PIMCO's position, the Business Conduct Committee believes that the firm's conduct can have an impact on whether or not the June 2005 Ten Year Note contract expires and delivers in an orderly and economic fashion. Consequently, the Business Conduct Committee hereby advises PIMCO of its responsibility to use its best efforts to assist in the maintenance of an orderly market. The Committee expects that PIMCO is prepared to participate, and will fully participate, in the market at economic levels and that PIMCO will be able to clearly justify its economics at all times through the contract's last delivery date.

Additionally, the Committee expects that PIMCO will take no action that could reasonably be expected to limit or constrain the freely available supply of the cheapest to deliver security. Consistent with the representations PIMCO has made to the CBOT's regulatory staff, the Committee expects that PIMCO will make available in the repo market, through the contract's last delivery date, all of the cheapest to deliver security it has available.

PIMCO is reminded that CBOT Rule 509.00 prohibits the manipulation of prices as well as any attempt to corner the market in any security, and that Rule 500.00 prohibits any conduct inconsistent with just and equitable principles of trade. Additionally, Regulation 425.07, Position Accountability, requires that PIMCO initiate and liquidate its position in an orderly manner.

The Business Conduct Committee will continue to closely monitor PIMCO's position and actions, and expects that PIMCO will fully and promptly comply with all requests for information by this Committee or staff of the Office of Investigations and Audits.

For the Business Conduct Committee,


Jay Homan
Chairman


cc:
       William Kokontis, CFTC

# EXHIBIT  7

REBUTTAL REPORT OF MICHAEL L. HARTZMARK, PH.D.

IN

JOSEF A. KOHEN, BREAKWATER TRADING LLC,

and RICHARD HERSHEY

(PLAINTIFFS)

v.

PACIFIC INVESTMENT MANAGEMENT COMPANY LLC,

and PIMCO FUNDS

(DEFENDANTS)


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CASE NUMBER: 05 C 4681


*Confidential Pursuant to Protective Order*

42.   The methodologies put forth by plaintiffs' experts in both their re-
buttal and initial reports assume that reactions to market news are at most a lin-
ear function of maturity and that relative prices remain in lockstep. The regres-
sion results presented here demonstrate that this assumption is false. Hence,
plaintiffs' methodology is not robust to the arrival of market news, and they have
not taken into account much important economic information regarding the rela-
tive pricing of the 4 7/8 2'12 and TYM5, and their conclusions concerning the al-
leged artificiality of prices are unreliable.

IV.    PIMCO DID NOT GRANGER-CAUSE VARIATIONS IN
       JUNE 2005 10-YEAR TREASURY NOTE FUTURES PRICES,
       4 7/8 2'12 CASH PRICES OR ALLEGED ARTIFICIALITY

43.    Pursuant to an early suggestion by plaintiffs' expert Professor Gilbert, evidence has been presented by both sides investigating the question of whether PIMCO's trading activity "Granger-caused" a change in the price of the June 2005 future. The Hanke report (p. 14-18) was the first to implement Professor Gilbert's suggestion (over the objections raised by Drs. Merrick and Pirrong as to the statistical power and relevance of the Granger causality testing methodology), and found that

a)  "Plaintiffs have failed to demonstrate PIMCO's causation of the pricing observed in the Treasury market by any reasonable economic standard." (Hanke report, p. 67.)

b)  "A test of PIMCO's causation of the pricing observed in the Treasury market during the proposed class period according to standards proposed by plaintiffs' own expert rejects the hypothesis that PIMCO caused prices to depart from their equilibrium levels." (Hanke report, p. 67.)

44.    Now in their rebuttal reports Professor Gilbert and Dr. Pirrong present Granger causality analyses, which purport to overturn the conclusion reached by Dr. Hanke. I find that their results suffer from a number of errors related to their use of the data and the specification of their empirical models. Correct application of the Granger causality methodology shows that Dr. Hanke was correct that PIMCO did not Granger-cause an increase in futures prices. Similarly, PIMCO did not Granger-cause cash prices, richness or Dr. Pirrong's measure of alleged artificiality.

A.    Discussion of Granger Causality Applied to this Matter

45.    Granger causality is a statistical approach to forecasting that asks, generally speaking, whether the history of a variable (the independent variable) can improve the forecast of another variable (the dependent variable) versus a forecast of the same dependent variable that is based solely on its own history. Formally, an econometrician asks whether the statistical significance of an F-test statistic or Wald test allows the researcher to reject the null hypothesis that the coefficients on the lagged independent variables are equal to zero.  Generally, the statistical test examines whether the F-statistic is significant at a 5 percent level.[30]

46.    Granger causality is no more and no less than a test to determine statistically whether there is an improvement of forecast power when including the lagged independent variable(s). A statistically significant improvement in forecast power may be observed because the independent variable does indeed explain (or cause) variation in the dependent variable, but it may equally well be observed because the independent variable is an instrument or a proxy for an unobserved or otherwise unspecified factor that is the actual cause in the variation in the dependent variable. Granger causality, therefore, is not causation in the strict sense.[31]

47.    Furthermore, Granger causality analysis does not explain *how* a given independent variable Granger-causes changes in a dependent variable. Thus in advance of implementing the Granger tests it is important to be able to ask the question of how variation in the independent variable affects the dependent variable, both as a means of deciding whether the independent variable

---

[30] My definition is consistent with Professor Gilbert. (Gilbert rebuttal report, ¶3.)
[31] James H. Stock and Mark H. Watson, Introduction to Econometrics, Pearson Education, Inc. (2007), p. 547: "...Granger causality means that if X Granger-causes Y, then X is a useful predictor of Y, given the other variables in the regression.  While 'Granger predictability' is a more accurate term than 'Granger causality,' the latter has become part of the jargon of econometrics."

### 4.   *An Analysis of Barclays Transactions Show that Dr. Pirrong Overstates Damages*

170.    Barclays has produced transactions records. I examine the transactions records of all accounts with the name "Barclay." It is less likely that Barclays proprietary accounts would have traded through other brokers, so I can be more confident that I have a complete record of their trading activity. There are other accounts; however, it is more likely that these customers traded through other brokers as well. Thus, I would be less confident that I have records on their complete trading activity.[128]

171.    The results are presented in Exhibits 23.1 through 23.7. In every account, Dr. Pirrong's method far overstates the alleged damages. In four of the seven accounts, application of the alleged artificiality to both long and short transactions shows that overall the accounts actually benefited from the alleged artificiality. In the other three accounts the alleged damages were overstated by more than three times.

172.    I aggregate the total alleged damages and the overstatement and calculate that under Dr. Pirrong's method alleged damages would be $19,059,854. However, using both long and short transactions and applying Dr. Pirrong's measure of alleged artificiality, I calculate that class members would have benefited by $3,423,193. Thus, Dr. Pirrong's approach overestimates damages by over $22.0 million.

173.    Analysis of the records produced by the lead plaintiffs and third party Barclays shows that Dr. Pirrong's method dramatically overstates alleged damages. Application of the correct method clearly demonstrates that some

---

[128] Even if these accounts trade through multiple brokers, it is reasonable to believe the sample is representative of overall trading and we have not imposed a bias to our calculations.

class members – including lead plaintiff Mr. Hershey and many of the Barclays accounts -- are in fact beneficiaries of the alleged artificiality.

B.   The Absence of a But-For World in Plaintiffs' Damages Calculation

174.   To calculate damages the burden is on the Plaintiffs' to develop a meaningful "but-for" world to use as a benchmark for calculation.

175.   In an earlier stage of the current matter, Plaintiffs' expert Professor Gilbert underlined the importance of conducting a 'but-for' or counterfactual exercise in order to determine what share of measured price artificiality in the June 2005 future is properly attributed to the actions of PIMCO. At that time, Professor Gilbert noted that "ascribing the whole of such a discrepancy to Defendants' [allegedly] manipulative behavior would … not be correct."[129] Yet, in their rebuttal reports none of the plaintiffs' experts provides a counterfactual or the but-for world, in which PIMCO makes no allegedly manipulative trades.

176.   Overall, plaintiffs' experts totally fail to provide any method to benchmark or ascribe alleged damages, should they exist at all.

C.   Plaintiffs do not attempt to decompose pricing anomaly into it economic and artificial components

177.   Plaintiffs have not distinguished between what component of alleged richness is due to PIMCO's trading and what component is outside PIMCO's control.  I have demonstrated -- using the methodology proposed by the plaintiffs' own expert -- that external economic factors are critically important in explaining the alleged artificiality.  Plaintiffs have totally ignored and discounted the impact of external economic factors and therefore are unable to distinguish between the pricing anomaly that is based on economic richness (price

---

[129] "In the but-for test, one simulates the estimated model, setting the manipulative position's variable or variables to zero." (Deposition of Gilbert, July 2007, 33:10-13.)

inflation) and that portion based on artificial richness (price inflation). Since the burden is on them to distinguish and decomposes these two fairly obvious effects and because properly distinguishing them shows that anomalous prices were not caused by PIMCO, no damages should be awarded.

## VII.  CONCLUSION

178.    There is neither theoretical nor empirical evidence to suggest that PIMCO caused changes in prices, yields, richness or alleged artificiality.

179.    The unusual pricing of the June 2005 futures is explicable in terms of an unprecedented combination of external economic factors in the U.S. credit markets.

180.    Because the price anomaly is explained based on economic richness (not artificial richness) and economic price inflation (not artificial price inflation), and PIMCO's trading activity cannot be associated with any changes in the price anomaly it would be imprudent to suggest that damages are anything other than zero.

RESPECTFULLY SUBMITTED THIS TWENTY-FOURTH DAY OF AUGUST, 2007

Michael L. Hartzmark, PhD.
Vice President
CHICAGO PARTNERS, LLC

# EXHIBIT 8

CONFIDENTIAL

# Expert Report of Steve H. Hanke
# Kohen v. PIMCO

*April 20, 2007*

CONFIDENTIAL

The CFTC came to a similar conclusion in their investigation of market conditions during the proposed class period:

> In order to create equivalence among the various securities in the deliverable basket that have different maturities and coupon rates, the Exchange [the CBOT] applies a conversion factor to adjust the prices of the deliverable securities to a specified notional coupon rate and term-to-maturity. Currently, the specified notional coupon rate is 6%. The further away the market is from a 6% yield environment, the less well the adjustment factors equilibrate all securities within the basket; thus, some issues are cheaper to deliver than others.[26]

Why didn't the CBOT choose to change the notional coupon rate of its conversion factor? They probably left this remedy aside because they were not able to forecast the drastic decline in intermediate- and long-term interest rates brought on by the strong bull market in Treasuries at the beginning of 2005 prior to the opening of interest in the June 2005 contract.[27] Thomas Rubio observes, "when the Board of Trade changed from a [8] percent coupon to a [6] percent coupon, they changed it well in advance into a contract that had little or no open interest."[28] The flattening of the yield curve that ensued in early 2005 caught everyone by surprise, including the oracular Alan Greenspan, who could only call it a 'conundrum' that the yield curve could flatten so severely in the absence of other signs of recession. Nor could anyone have known then that the 10-year Treasury yield would remain around 4-5% to the present day.

Professor Merrick states, "in reality, the prices of the entire menu of deliverable cash Treasury prices, the future contract and financing rates are jointly determined. Thus, any analysis of normal or abnormal pricing of futures contracts must jointly analyze the determination of cash prices and repo

---

one issue that's economically deliverable." (Deposition, 232:12-18) Everybody who got involved in the contract would have known this. (See id. at 233) "So in fact it's built into the fluctuations of interest rates. We know interest rates go up or down. It's built into the contract that you might possibly have...a bad situation where effectively the economically deliverable list of securities is one, and that's the situation we have in June [2005]." (238:13-19)

[26] CFTC, "Amendments to Chicago Board of Trade rule 425.01," p. 9.

[27] Professor Merrick is also an advocate of this remedy. "So what they could do is change the coupon for every new contract and keep it close to the market." (Deposition, 239:4-6)

[28] Rubio deposition, 55:20-24.

13

CONFIDENTIAL

rates, especially for the CTD [cheapest-to-deliver] note."[29] We have done just that. To summarize, the

May-June 2005 period (as well as the period extending back to late 2004 and forward to September

2005) was characterized by a market environment in which sharply increasing open interest in the 10-

Year Treasury Note futures met with a dwindling supply of economically deliverable 10-Year Treasury

Notes. The accommodating stance of monetary policy diminished the ability of the repo market to call

forth additional supply. With the repo market unable to clear at a non-negative repo rate, an inversion

of the futures price over cash (a negative net basis) displaced the effects of shortages in the cheapest-

to-deliver note to the Treasury futures market which, like the repo market, was essentially behaving like

a forward on the cheapest-to-deliver. The CBOT's conversion factors, which would usually dissipate such

distress over several issues in the deliverable basket, instead further concentrated the dynamics of the

February 2012 Treasury Note into the pricing of the June 2005 10-Year Treasury Note future. This

combination of systemic and institutional phenomena, in addition to market participants' natural

economic responses to the usual menu of macroeconomic announcements, caused Treasury market

price relations to depart significantly from historical patterns without any need for a manipulative

trader.

## B.  Plaintiffs' test for causation proves that PIMCO did not cause artificial prices

1.      Plaintiffs' class certification expert offered Granger causality analysis as an economic test for causation

Despite numerous scattered acknowledgements of the unusual systemic factors affecting the

Treasury market in May-June 2005, plaintiffs do not attribute causation to them. Professors Merrick and

Pirrong instead rely on long, tedious, and poorly-reasoned narratives which juxtapose movements in

---

[29] Merrick report, p. 48, paragraph 131.

CONFIDENTIAL

market prices with trades and utterances by PIMCO employees in the most haphazard way, surmising

that every movement in the market must be connected to PIMCO, no matter how small. Their passage

from the realm of economics to sensationalistic muckraking could have been avoided had they only

heeded the advice of plaintiffs' class certification expert, Professor Gilbert:

> I may need to establish whether and to what extent any artificiality in the price of the June [2005 future] or mispricing of the [February] 2012 (or any other) note is the result of defendants' alleged manipulative activities. It was for this purpose ... that I will need full information on defendants' daily Treasury note and Treasury note futures positions and trading history throughout the class period, as well as prior to and subsequent to the period. *Demonstration of effect is logically prior to quantification of that effect.* Economists routinely use Granger causality analysis for demonstrating probable causal effect. This is a regression-based technique named after its inventor, Nobel prize winner Clive Granger. ... If causality is established (in the sense implied by Granger causality), one can use standard regression techniques to quantify the extent that price artificiality result[ed] from defendants' alleged manipulative actions. This methodology is standard, routinely used by professional economists and taught in all good graduate econometrics courses. Given the positions data requested in my earlier affirmation, I will definitely be able to establish in an uncontroversial fact-based manner whether or not defendants' alleged manipulative behavior was the cause of any mispricing of the 2012 note or artificiality in the June future.[30]

I agree with Professor Gilbert that Granger causality is the starting point from which most

economists would begin a discussion of causation. I further agree with him that the demonstration of a

(probable) causal effect is prior to the quantification of the effect. Finally, I would add that Granger

causality, if anything, tends to find significant relations between time series more often than it should.

But if a Granger causality analysis showed the *absence* of a relationship between the price of the June

2005 future and PIMCO's allegedly manipulative trading patterns, this would be a devastating result for

the case brought by plaintiffs, because there can be no claim of causation that does not first

demonstrate correlation.

---

[30] Affirmation of Professor Christopher L. Gilbert, August 30, 2006, p. 8 (paragraph 16), emphasis added.

CONFIDENTIAL

2.      Granger causality analysis does not show that PIMCO caused Treasury futures prices

A Granger causality test that asks whether PIMCO's trading behavior caused changes in the prices of the June 2005 Treasury note future takes the form of a regression of the changes in some measure of PIMCO's holdings of Treasury securities on the change in the Treasury note future price. I use three different measures of PIMCO's holdings of Treasury futures and notes.[31] First, I consider their holdings of Treasury note futures alone. Secondly, I consider the aggregate notional value of their holdings of Treasury note futures, cash holdings of the underlying February 2012 note, and net borrowing of the February 2012 note from the repo market (positive if net borrowing, negative if net lending). Thirdly, I split their holdings into two separate components: holdings of Treasury note futures and net cash position (cash holdings of the February 2012 note plus net borrowing of the February 2012 note from the repo market. This third measure explicitly considers the futures market and the float of the February 2012 note as two distinct components.

It may be asked why it is worth considering futures trading alone when the other two measures consider PIMCO's total exposure to the February 2012 note. I have done so based on the economic principle that an effect produced in a market is usually most efficiently produced through direct transaction in the market, rather than indirect transactions. Thus, if direct transactions show no effect, then it will be unlikely that they will have an effect when combined with indirect transactions.

Before proceeding, it is also worth remarking that, while it is an elementary axiom of statistics that finding a correlation between changes in PIMCO's holdings and changes in price would not imply

---

[31] The data have been standardized to reflect PIMCO's inventories at any point in time. Holdings of futures and cash securities are given 'as of' each date, whereas repo transactions are considered active between the established settlement dates. With the data standardized in this way, a one-day lag in PIMCO's trading approximates measuring their trading as of the time orders were placed. Data are taken from Treasury Query 1 and 2. I have given a summary in **Exhibit J**.

16

# EXHIBIT  9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEF A. KOHEN, BREAKWATER TRADING LLC, and RICHARD HERSHEY, | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 05 C 4681 |
| v. | ) ) ) | Judge Ronald A. Guzman Magistrate Michael T. Mason |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, and PIMCO FUNDS, | ) ) ) | |
| Defendants. | ) ) | |

## REBUTTAL EXPERT REPORT OF DR. CRAIG PIRRONG

## I.     INTRODUCTION

1.  This rebuttal report is submitted in accordance with FRCP 26(a)(2)(C).

2.  In rebuttal to defendant's expert Dr. Steve Hanke's opinions designed to show that defendants did not cause artificial inflation in the June contract prices, I offer the following opinions and reasoning.

3.  The report submitted by Dr. Hanke is rife with conceptual, logical, economic, and data errors.  As a result, the opinions he offers are unreliable.

4.  Some of Dr. Hanke's errors relate to very fundamental concepts.  For example, he is very confused—and wrong—on simple concepts such as the net basis, and swap spreads.  These concepts should be of second nature to anyone familiar with the operation of the Treasury markets.  He also makes numerous data errors, such as omitting the bulk of CBOT Treasury Note futures trading from his volume calculations,

1

**Exhibit R8**

Corrected from Robinson

| Date | Face Value | Repo Lending | Net of Repo |
|---|---|---|---|
| 4/1/2005 | 1,213,487,000 | 562,834,000 | 650,653,000 |
| 4/4/2005 | 1,400,267,000 | 563,534,000 | 836,733,000 |
| 4/5/2005 | 1,185,867,000 | 569,434,000 | 616,433,000 |
| 4/6/2005 | 1,192,237,000 | 586,834,000 | 605,403,000 |
| 4/7/2005 | 1,181,137,000 | 586,834,000 | 594,303,000 |
| 4/8/2005 | 1,186,037,000 | 565,434,000 | 620,603,000 |
| 4/11/2005 | 1,248,637,000 | 564,934,000 | 683,703,000 |
| 4/12/2005 | 1,247,737,000 | 539,734,000 | 708,003,000 |
| 4/13/2005 | 1,385,437,000 | 540,734,000 | 844,703,000 |
| 4/14/2005 | 1,332,537,000 | 540,734,000 | 791,803,000 |
| 4/15/2005 | 1,268,237,000 | -81,100,000 | 1,349,337,000 |
| 4/18/2005 | 1,370,637,000 | -79,400,000 | 1,450,037,000 |
| 4/19/2005 | 1,421,837,000 | -77,600,000 | 1,499,437,000 |
| 4/20/2005 | 1,446,587,000 | -58,100,000 | 1,504,687,000 |
| 4/21/2005 | 1,439,187,000 | -88,900,000 | 1,528,087,000 |
| 4/22/2005 | 1,415,087,000 | -106,250,000 | 1,521,337,000 |
| 4/25/2005 | 1,451,587,000 | -104,850,000 | 1,556,437,000 |
| 4/26/2005 | 1,582,087,000 | -107,150,000 | 1,689,237,000 |
| 4/27/2005 | 1,814,414,000 | -107,150,000 | 1,921,564,000 |
| 4/28/2005 | 1,815,914,000 | -107,150,000 | 1,923,064,000 |
| 4/29/2005 | 1,869,414,000 | -87,250,000 | 1,956,664,000 |
| 4/30/2005 | 1,869,414,000 | -87,250,000 | 1,956,664,000 |
| 5/2/2005 | 1,874,914,000 | -87,250,000 | 1,962,164,000 |
| 5/3/2005 | 1,906,014,000 | -76,750,000 | 1,982,764,000 |
| 5/4/2005 | 1,791,814,000 | -76,750,000 | 1,868,564,000 |
| 5/5/2005 | 1,675,814,000 | -78,050,000 | 1,753,864,000 |
| 5/6/2005 | 1,671,214,000 | -76,350,000 | 1,747,564,000 |
| 5/9/2005 | 2,567,714,000 | -76,350,000 | 2,644,064,000 |
| 5/10/2005 | 2,843,614,000 | -78,150,000 | 2,921,764,000 |
| 5/11/2005 | 2,805,614,000 | -78,150,000 | 2,883,764,000 |
| 5/12/2005 | 2,806,914,000 | -55,350,000 | 2,862,264,000 |
| 5/13/2005 | 2,968,914,000 | 2,008,434,000 | 960,480,000 |
| 5/16/2005 | 2,962,214,000 | 2,297,622,000 | 664,592,000 |
| 5/17/2005 | 2,972,464,000 | 2,582,022,000 | 390,442,000 |
| 5/18/2005 | 2,971,664,000 | 2,559,222,000 | 412,442,000 |
| 5/19/2005 | 2,967,464,000 | 2,530,122,000 | 437,342,000 |
| 5/20/2005 | 3,404,064,000 | 2,521,634,000 | 882,430,000 |
| 5/23/2005 | 4,703,964,000 | 2,930,134,000 | 1,773,830,000 |
| 5/24/2005 | 6,062,272,000 | 3,987,972,000 | 2,074,300,000 |
| 5/25/2005 | 6,182,872,000 | 5,791,572,000 | 391,300,000 |
| 5/26/2005 | 6,072,072,000 | 5,821,272,000 | 250,800,000 |
| 5/27/2005 | 6,135,772,000 | 5,988,172,000 | 147,600,000 |
| 5/30/2005 | 6,135,772,000 | 5,988,172,000 | 147,600,000 |
| 5/31/2005 | 6,368,872,000 | 6,058,472,000 | 310,400,000 |
| 6/1/2005 | 6,359,672,000 | 6,122,672,000 | 237,000,000 |
| 6/2/2005 | 6,306,572,000 | 6,092,672,000 | 213,900,000 |
| 6/3/2005 | 6,303,822,000 | 6,316,172,000 | -12,350,000 |

| | | | |
|---|---|---|---|
| 6/6/2005 | 6,303,822,000 | 6,342,722,000 | -38,900,000 |
| 6/7/2005 | 6,289,922,000 | 6,342,722,000 | -52,800,000 |
| 6/8/2005 | 6,379,272,000 | 6,324,922,000 | 54,350,000 |
| 6/9/2005 | 5,789,472,000 | 6,273,422,000 | -483,950,000 |
| 6/10/2005 | 5,754,172,000 | 5,769,372,000 | -15,200,000 |
| 6/13/2005 | 5,369,272,000 | 5,771,572,000 | -402,300,000 |
| 6/14/2005 | 5,071,372,000 | 5,538,172,000 | -466,800,000 |
| 6/15/2005 | 5,071,372,000 | 5,238,172,000 | -166,800,000 |
| 6/16/2005 | 4,954,872,000 | 5,238,472,000 | -283,600,000 |
| 6/17/2005 | 4,954,872,000 | 4,937,672,000 | 17,200,000 |
| 6/20/2005 | 4,950,372,000 | 4,934,372,000 | 16,000,000 |
| 6/21/2005 | 4,885,872,000 | 4,934,372,000 | -48,500,000 |
| 6/22/2005 | 4,885,872,000 | 4,865,172,000 | 20,700,000 |
| 6/23/2005 | 4,885,872,000 | 4,867,472,000 | 18,400,000 |
| 6/24/2005 | 4,885,872,000 | 4,868,172,000 | 17,700,000 |
| 6/27/2005 | 4,885,872,000 | 4,868,172,000 | 17,700,000 |
| 6/28/2005 | 4,770,872,000 | 4,868,172,000 | -97,300,000 |
| 6/29/2005 | 20,041,072,000 | 4,863,272,000 | 15,177,800,000 |